## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>BC HOSPITALITY GROUP INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-13103 (___)<br><br>(Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF

BC Hospitality Group Inc. and its affiliated debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through their undersigned proposed counsel, hereby submit this motion (this " Motion") for entry of interim and final orders granting the relief described below.  In support hereof, the Debtors rely upon the *Declaration of David Selinger in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration")[2] and the declaration of Patrick J. Bartels, Jr. in support of this Motion (the "Bartels Declaration"), filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: BC Hospitality Group Inc. (8766); BC Hospitality Group LLC (9360); BC International LLC (1356); BC Commissary NJ LLC (0230); E2 185 Bleecker LLC (6862); E2 60 West 22nd Street LLC (9567); E2 Lafayette LLC (7419); BC Williamsburg LLC (8277); BCRC LLC (7297); CW SSS LLC (9958); BC Union Square LLC (5172); BC 1385 Broadway LLC (2138); BC 630 Lexington LLC (3202); CCSW Fenway LLC (5517); E2 Seaport LLC (9720); BC Back Bay LLC (0550); BC Providence LLC (0737); BC Silver Lake LLC (2825); BC Century City LLC (0901); and BC West Hollywood LLC (3878). The Debtors' mailing address is 205 Hudson Street, Suite 1001, New York, New York 10013.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the DIP Term Sheet (as defined below), or the Interim Order (as defined below), as applicable.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference* from the United States District Court for the District

of Delaware dated February 29, 2012.   Pursuant to Rule 9013-1(f) of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by

the Court in connection with this Motion to the extent that it is later determined that the Court,

absent consent of the parties, cannot enter final orders or judgments in connection herewith

consistent with Article III of the United States Constitution.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   Venue of these chapter

11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363,

364, 503, and 507 of title 11 of the United States Code, as amended (the "Bankruptcy Code"),

Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Local Rules 2002-1(b), 4001-2, and 9013-1(m).

## RELIEF REQUESTED

4.      The Debtors seek entry of an interim order, substantially in the form attached hereto

as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order"[3] and, together with the

Interim Order, the "DIP Orders"):

> (a)      authorizing BC Hospitality Group Inc. (the "DIP Borrower") to obtain
> postpetition financing pursuant to the DIP Facility (as defined below), and
> for each  of the DIP Borrower's Debtor affiliates as guarantors (the "DIP
> Guarantors," and, together with the DIP Borrower, the "DIP Obligors") to
> guarantee unconditionally on a joint and several basis, and subject to the
> terms and  limitations set forth herein and in the term sheet attached to the

---

[3]    The Debtors will file a proposed Final Order prior to the Final Hearing (as defined below).

27434211.5

Interim Order as Exhibit A (the "DIP Term Sheet") in all respects, the DIP Borrower's obligations under the DIP Facility, consisting of a senior secured super-priority multi-draw term loan credit financing facility (the "DIP Facility"), on the terms and conditions set forth in the DIP Term Sheet (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, and, together with any other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and the Final Order, collectively, the "DIP Loan Documents"), by and among the DIP Obligors and Bain Capital Double Impact Fund, LP, BCIP Double Impact Associates, L.P., Kitchen Fund, LP, KF-Chloe, LLC, Qoot International UK Limited, Lion/BC LLC, and Collab+Consumer I, L.P. (collectively, the "DIP Secured Parties"), in an aggregate principal amount of $3.25 million in term loan commitments which shall be available as term loans (the "DIP Loans") to the DIP Borrower upon entry of the Interim Order and satisfaction of the other conditions set forth therein in an initial amount not to exceed $1.4 million (the "Initial DIP Loan"), and the remainder of the DIP Facility available upon entry of the Final Order to the extent set forth therein, the Approved Budget (as defined below) and the DIP Loan Documents;

(b)     authorizing the Debtors to execute, deliver, and enter into the DIP Loan Documents and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

(c)     authorizing the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including, without limitation, any principal, interest (including interest accruing after the maturity of the DIP Loans and interest accruing after the commencement of these chapter 11 cases), fees, commitment fees, exit fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the respective DIP Secured Parties (including the reasonable and documented fees and expenses of each of the DIP Secured Parties' attorneys, advisors, accountants, and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, in each case, to the extent constituting all Debtors and/or DIP Guarantors obligations of any kind under the DIP Loan Documents (such obligations collectively, the "DIP Obligations");

(d)     authorizing the Debtors, immediately upon entry of the Interim Order, to use proceeds of the DIP Facility as expressly provided in the DIP Loan Documents and solely in accordance with the Interim Order and the applicable Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) to: (A) pay costs, premiums, fees, and expenses related to the above-captioned chapter 11

cases and in connection with the DIP Facility; and (B) provide financing for working capital and for other general corporate purposes of the Debtors in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents); and granting and approving of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1), and 507(b) of the Bankruptcy Code, to the DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve Out (as defined below);

(e)    granting to the DIP Secured Parties of valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens in all DIP Collateral, including, without limitation, any "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), to secure the DIP Obligations, which DIP Liens shall be subject to the relative rankings and priorities set forth herein and in the other DIP Loan Documents;

(f)    modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(g)    subject to entry of a Final Order, waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and certain rights of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(h)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order; and

(i)    scheduling of a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing.

## **PRELIMINARY STATEMENT**

1.    Immediate access to incremental liquidity in the form of postpetition financing (as well as access to Cash Collateral) is vital to preserving the value of the Debtors' estates and to maximizing the likelihood of a successful sale process.  The Debtors will suffer immediate and irreparable harm absent access to additional liquidity.

2.    As described in the First Day Declaration, due to the onset of the COVID-19 pandemic, three of the Debtors' restaurants have been entirely closed since late March and the

27434211.5

remaining eleven restaurants are operating at a reduced capacity. The cessation of normal business operations has deprived the Debtors of vital cash flow, without which the Debtors are incapable of meeting their obligations in the ordinary course, including obligations to employees, landlords, vendors, suppliers, and other creditors and claimants. As a result, the Debtors were forced to reassess the viability of their previously successful business and their near-term survival.

3.      Given the deteriorating financial and cash position of the Debtors, it became apparent that a bankruptcy or other insolvency process was likely needed. In light of his extensive bankruptcy expertise, on November 16, 2020, the Board of BCHG Inc. appointed Mr. Patrick J. Bartels, Jr. to serve as an independent director of the Company. Shortly thereafter, the Company retained Young Conaway Stargatt & Taylor, LLP as its bankruptcy counsel and Ankura Consulting Group, LLC as its financial and restructuring advisor.

4.      On December 7, 2020, the Board of Directors of BCHG Inc. formed a committee independent of the Board (the "Restructuring Committee") to independently evaluate the Debtors' capital structure, negotiate financing and other strategic alternatives to address the Debtors' ongoing liquidity issues, and make decisions with respect to certain designated restructuring matters and appointed Mr. Bartels as the sole member of the Restructuring Committee. The Restructuring Committee authorized the Debtors' advisors to initiate the process of securing debtor-in-possession financing to fund a potential chapter 11 filing and facilitate the Debtors' sale process.

5.      As discussed in the Bartels Declaration, the Debtors' professionals promptly reached out to certain of the Debtors' equity investors to determine their interest in providing financing in connection with the filing of the chapter 11 cases and the pursuit of a sale or restructuring process by the Debtors. The investors (such investors, in their capacity as investors,

27434211.5

the "Investor Group" and in their capacity as DIP lenders, the "DIP Secured Parties," as listed below) offered to provide the Debtors with the DIP Facility (as defined below) to support the Debtors' sale process within the context of a chapter 11 proceeding.

6.     Notably, although members of the Investor Group, in their capacities as DIP Secured Parties, are insiders of the Debtors, and previously an Investor Group representative was a member of the Debtors' board of directors, the Debtors, through the Restructuring Committee and the Debtors' professional advisors,  engaged in good faith, arms' length negotiations with the DIP Secured Parties to ensure that the terms of the DIP Facility are market and are fair and reasonable to the Debtors and their estates.  To that end, the Debtors, on the one hand, and the DIP Secured Parties, on the other hand, each had separate professional advisors negotiate the DIP Facility.

7.     The Debtors solicited proposals for alternative debtor-in-possession financing from a variety of third-party potential lenders, including at least forty-eight lenders and financial institutions (including specialty lenders and those that routinely provide debtor-in-possession financing) to gauge their interest in providing postpetition financing on an unsecured basis, on a junior priority basis, or on more favorable economic terms than the proposed DIP Facility (as defined below).  No other actionable proposal or indication of interest in a debtor-in-possession financing facility was provided to the Debtors other than the proposed DIP Facility.

8.     With respect to DIP financing, the DIP Secured Parties have committed to enter into a $3.25 million senior secured, super-priority, debtor-in-possession term credit facility (the "DIP Facility") that will be used to provide the Debtors with sufficient funding to sustain their operations during the chapter 11 cases.  $1.4 million of this commitment will be available immediately upon entry of an order of the Court approving the DIP Facility on an interim basis.

27434211.5

The term sheet for the DIP Facility also includes certain milestones pertaining to the Debtors' sale and plan process.

9.      As discussed in the Bartels Declaration, the provisions of the DIP Term Sheet and the Interim Order were negotiated at arm's-length and in good faith, and the proposed DIP Facility provides the best terms presently available to the Debtors.   The Debtors firmly believe that incurrence of the DIP Facility will allow the Debtors to continue operations while in chapter 11, including paying their existing employees, vendors, landlords, and satisfying other working capital and operational requirements, and is in the exercise of the Debtors' sound business judgment. Satisfaction of these key obligations is necessary to preserve and maintain the value of the Debtors' estates while the Debtors pursue their sale or restructuring process.   Accordingly, the Debtors have an immediate need to obtain postpetition or "DIP" financing and to use their Cash Collateral and, therefore, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

## BACKGROUND

### I.      THE CHAPTER 11 CASES

10.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code and elected to proceed under Subchapter V of the Bankruptcy Code.   The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).   No trustee, examiner, or official committee of unsecured creditors has been appointed in these chapter 11 cases.

11.     Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

## II.     THE DEBTORS' PRE-PETITION CAPITAL STRUCTURE

12.     As of the Petition Date, the Debtors' capital structure, on a consolidated basis, consists of secured debt of approximately $24,000 in connection with Debtor BC Commissary's vehicle lease, unsecured trade debt of approximately $2.5 million, and other potential non-contingent unsecured debt of approximately $250,000 in connection with accrued payroll, gift card liability, and other things.

## III.    ALTERNATIVE SOURCES OF FINANCING ARE NOT READILY AVAILABLE

13.     Given the financial condition of the Debtors, they do not have alternative sources of financing readily available.  Bartels Declaration ¶ 11.  While simultaneously determining the interest of the DIP Secured Parties in providing the DIP Facility, the Debtors, with the assistance of their advisors and at the direction of the Restructuring Committee, began soliciting indications of interest from at least forty-eight alternative third-party sources of debtor-in-possession financing (including specialty lenders, distressed-oriented investors with experience in retail, and those that routinely provide debtor-in-possession financing), to gauge their interest in providing postpetition financing to the Debtors.  *Id.* ¶ 11.  No other party provided an actionable proposal for alternative financing.  *See id.*

## IV.    MATERIAL TERMS OF THE DIP FACILITY

14.     Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2 (a)(ii) require that a motion for authority to obtain credit list or summarize, and set out the location within the relevant documents, all material provisions of the proposed credit agreement and form of order, including

27434211.5

interest rate, maturity, events of default, liens, borrowing limits and borrowing conditions. The

principal terms of the DIP Facility are as follows:[4]

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Interim Order, ¶1<br><br>DIP Term Sheet, p. 1 | BC Hospitality Group Inc. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Interim Order, ¶1<br><br>DIP Term Sheet, p. 1 | All other Debtors. |
| **DIP Secured Parties (referred to in the DIP Term Sheet as "DIP Lenders")**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Interim Order, ¶1<br><br>DIP Term Sheet, p. 5 | Bain Capital Double Impact Fund, LP, BCIP Double Impact Associates, L.P., Kitchen Fund, LP, KF-Chloe, LLC, Qoot International UK Limited, Lion/BC LLC, and Collab+Consumer I, L.P. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The earliest of (a) 120 days after entry of the Interim Order (or such later date as the DIP Lenders in their sole discretion may agree in writing with the Borrower); (b) the consummation of a sale of all or substantially all of the assets of the DIP Loan Parties; (c) acceleration of the DIP Loans pursuant to this Term Sheet or the other Loan Documents; (d) 30 days after entry of the Interim Order (or such later date as the DIP Lenders in their sole discretion may agree in writing |

---

[4]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Term Sheet, the Interim Order and the other DIP Loan Documents. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Term Sheet, the Interim Order or other DIP Loan Documents, as applicable.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(ii)<br><br>DIP Term Sheet, p. 6 | with the Borrower) if the Final Order has not been entered on or prior to the expiration of such 30-day period; and (e) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court. |
| **Amount of DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>Interim Order, ¶1.2(a)<br><br>DIP Term Sheet, p. 5 | The aggregate amount of the DIP Facility is $3.25 million.<br><br>The interim borrowing limit is $1.4 million. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>DIP Term Sheet, p. 18 | The closing of the DIP Facility and extensions of credit thereunder are subject to the satisfaction of usual and customary conditions precedent set forth in the DIP Term Sheet, including entry of the Interim Order. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>DIP Term Sheet, p. 6 | Interest shall accrue on the DIP Loans at the rate of one-month Libor + 4% per annum (or, if less, at the highest rate then permitted by applicable law) (subject to a 0.00% Libor floor), and shall be payable monthly, on the first (1st) business day of each month, in arrears, in accordance with the Budget. All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid.<br><br>During any Event of Default, the applicable rate plus 1.0%. |
| **Use of DIP Financing Facility and Cash Collateral** | The proceeds of the DIP Loans and Cash Collateral shall be available to finance, in each case consistent with the Budget (subject to Permitted Variances): (1) working capital and general corporate purposes, including capital expenditures, of the Debtors; and (2) bankruptcy- |

27434211.5

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Bankruptcy Rule** 4001(b)(l)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>DIP Term Sheet, p. 9 | related costs and expenses (including the pursuit and consummation of a sale and Plan, all consistent with this Term Sheet, including the Budget), subject to the Carve-Out. |
| **Liens & Priority**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>Local Rule 4001-2(a)(ii)<br><br>Interim Order, Section 2<br><br>DIP Term Sheet, p. 16 | All of the claims of the DIP Lenders under the DIP Facility with respect to the DIP Loans and the DIP Obligations shall at all times: (1) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status in the chapter 11 cases (which claims shall be payable from and have recourse to all DIP Collateral) (subject only to the Carve-Out); (2) pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all DIP Collateral other than all property of the Debtors that is subject to valid and perfected liens in existence at the time of the commencement of the chapter 11 cases or subject to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (the "<u>Prior Senior Liens</u>"); and (3) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all DIP Collateral of the Debtors that is subject to a Prior Senior Lien. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>DIP Term Sheet, p. 6 | **Commitment Fee:** 3% fee on all commitments under the DIP Facility to be fully earned and accrued upon entry of the Interim Order, and payable upon the earlier of (a) any prepayment, repayment or refinancing of the DIP Facility, and (b) the Maturity Date.<br><br>**Exit Fee:** 3% exit fee on all funded amounts and outstanding commitments under the DIP Facility, payable upon the earlier of (a) any prepayment, repayment or refinancing of the DIP Facility, and (b) the Maturity Date. |
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>Interim Order, ¶4.4<br><br>DIP Term Sheet, p. 7 | All advances, and the use of funds provided, under the DIP Facility shall be subject to and consistent with the budget agreed to by the DIP Lenders and the Debtors, attached as Exhibit 1 to the Interim Order. |

27434211.5

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) Interim Order, ¶3.1 DIP Term Sheet, p. 30 | The DIP Term Sheet includes usual and customary events of default including, among others, failure to pay any interest or principal when due. |
| **Costs and Indemnification:** Bankruptcy Rule 4001(c)(1)(B)(ix) Interim Order, ¶4.13 DIP Term Sheet, p. 35 | All reasonable and documented professional fees and out-of-pocket expenses incurred by the DIP Lenders (including, but not limited to, the fees and expenses of the DIP Lenders' counsel) shall be promptly paid by the DIP Loan Parties on no less than a monthly basis.  The DIP Lenders (and their affiliates and respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person. |
| **Milestones:** Bankruptcy Rule 4001(c)(1)(B)(vi) DIP Term Sheet, p. 29 | Achieve each of the following Case Milestones: <br><br> 1. Within one (1) business day of the Petition Date, the Debtors shall file a motion establishing bidding procedures (the "Bidding Procedures"); <br><br> 2. No later than three (3) business days after the Petition Date, entry by the Bankruptcy Court of the Interim Order; <br><br> 3. No later than twenty-one (21) calendar days after the Petition Date, the Debtors shall file a plan of reorganization that is reasonably acceptable to the DIP Lenders (the "Plan"); <br><br> 4. No later than thirty (30) calendar days after the Petition Date, entry by the Bankruptcy Court of the Final Order; <br><br> 5. No later than thirty five (35) calendar days after the Petition Date, entry by the Bankruptcy Court of an order approving the |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | Bidding Procedures, which order shall be reasonably acceptable to the DIP Lenders; |
| | 6. No later than thirty five (35) calendar days after the Petition Date, entry by the Bankruptcy Court authorizing, or the filing by the Debtors of a notice setting forth, procedures with respect to the solicitation of votes on the Plan, which order or notice shall be reasonably acceptable to the DIP Lenders; |
| | 7. No later than seventy-five (75) days after the Petition Date, entry of an order by the Bankruptcy Court confirming the Plan, which order shall be reasonably acceptable to the DIP Lenders; and |
| | 8. No later than eighty-five (85) days after the Petition Date, the effective date of the Plan shall occur. |
| **Automatic Stay:**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Interim Order, ¶ 3.5 | The Interim Order provides that the automatic stay shall be modified as to the DIP Secured Parties to permit such parties to perform such actions described in or permitted in the Interim Order. |
| **Release:**<br>Bankruptcy Rule 4001(c)(l)(B)(viii)<br><br>Interim Order, ¶4.15<br><br>DIP Term Sheet, p. 36 | The Final Order shall provide for a release and exculpation by the DIP Loan Parties of the DIP Lenders and each of their respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals with respect to any and all claims or causes of action the Debtors may have against such parties solely in their capacity as DIP Lenders. |
| **Liens on Avoidance Actions:**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br><br>Local Rule 4001-2(a)(i)(D)<br><br>Interim Order, ¶2.2(a) | The DIP Facility will be secured by a superpriority first priority lien on all of the DIP Loan Parties' assets, including (effective upon the entry of the Final Order) all avoidance actions and the proceeds thereof, that are not subject to valid, perfected liens as of the Petition Date, and a second priority lien on all of the DIP Loan Parties' other assets. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| DIP Term Sheet, p. 5 | |

## V.    HIGHLIGHTED PROVISIONS PURSUANT TO LOCAL RULE 4001-2

15.    The DIP Facility includes certain provisions the Debtors are required to highlight pursuant to Local Rule 4001-2(a)(i) as set forth below.  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

16.    **Cross Collateralization:**  Pursuant to Local Rule 4001-2(a)(i)(A) a movant must identify any provisions that grants cross-collateralization protections.  The DIP Facility does not contain any cross-collateralization provisions.

17.    **Validity, Perfection and Amount of Prepetition Obligations:** Pursuant to Local Rule 4001-2(a)(i)(B), a movant must identify any provisions that contain findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor.  The DIP Facility does not contain any such provisions.

18.    **Challenge Period:** Local Rule 4001-2(a)(i)(B) also requires disclosure of the challenge period with respect to the Debtors' stipulations as to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor.  The DIP Secured Parties do not have any prepetition liens.  As for the potential wavier of claims, the Interim Order, subject to entry of the Final Order, provides for a release and exculpation by the DIP Loan Parties of the DIP Secured Parties and each of their respective current and former

affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives and other professionals with respect to any and all claims or causes of action the Debtors may have against such parties solely in their capacities as DIP Secured Parties.

19.    **Waiver of Section 506(c) of the Bankruptcy Code**: Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  The Interim Order provides that the waiver of any rights under section 506(c) of the Bankruptcy Code is subject to entry of the Final Order.  Because this waiver only will be effective upon entry of the Final Order and to the extent such order so provides, the Debtors respectfully submit that parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice," but the Debtors discloses the provision out of an abundance of caution.

20.    **Liens on Avoidance Actions**: Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that provide for immediate liens on actions under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code.  Here, solely upon entry of the Final Order will DIP Liens be granted on such actions.

21.    **Roll-Up Provisions**: Pursuant to Local Rule 4001-2(a)(i)(E), a movant must identify any roll-up provisions.  The DIP Facility does not contain any such provisions.

22.    **Carve-Out**: Local Rule 4001-2(a)(i)(F) requires disclosure of disparate treatment between the professionals retained by the Debtor and the professionals retained by the unsecured creditors' committee, if any, with respect to a professional fee carve out.  The Debtors commenced

27434211.5

these cases under Subchapter V of the Bankruptcy Code and accordingly do not believe that an unsecured creditors' committee will be appointed.  Accordingly, the DIP Facility does not contain any provisions pertaining to an unsecured creditors' committee.

23.     **Nonconsensual Priming:** Pursuant to Local Rule 4001-2(a)(i)(G), a movant must identify any provisions that seek to prime any secured lien without the consent of that lienor.  The DIP Facility does not contain any such provisions.

24.     **Waiver of Section 552(b)(1):** Pursuant to Local Rule 4001-2(a)(i)(H), a movant must identify any provisions that seek to affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code.  Solely upon entry of the Final Order, the DIP Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties and the DIP Obligations.  The Debtors believe that such relief is often provided, and appropriate, upon entry of the Final Order.

25.     The DIP Secured Parties would not have agreed to provide the DIP Facility and consented to the use of Cash Collateral, each of which was heavily negotiated among the various parties, absent the terms set forth in the DIP Term Sheet and the Interim Order.  Moreover, as discussed below, these provisions are justified under the circumstances.  Finally, the Debtors determined in their sound business judgment, that agreeing to such provisions was appropriate under the circumstances of these chapter 11 cases to afford the Debtors immediate and much needed liquidity to fund, on the most competitive terms available, their ongoing operations and the sale process in these chapter 11 cases.

27434211.5

**BASIS FOR RELIEF**

I.    **THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN POSTPETITION FINANCING THROUGH THE DIP FACILITY**

A.    **ENTRY INTO THE DIP FACILITY AND DIP LOAN DOCUMENTS IS AN EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGMENT**

26.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

27.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should

not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

28.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).    The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

29.     The Debtors' determination, as authorized by the Restructuring Committee, to move forward with the DIP Facility is an exercise of their sound business judgment following a search for other viable and actionable alternatives and an arm's-length process and careful evaluation.  Specifically, the Debtors and their advisors determined that postpetition financing will

create certainty with respect to cash flows necessary for the administration of these chapter 11 cases through a sale or restructuring process. The Debtors negotiated the DIP Facility with the DIP Secured Parties in good faith, at arm's length, and with the assistance of their respective advisors and under the direction of the Restructuring Committee. The Debtors conducted intensive negotiations with the DIP Secured Parties that resulted in the proposed DIP Facility, which provides reasonable milestones for the Debtors to conduct an appropriate sale and restructuring process. Given the Debtors' capital structure and current circumstances, the Debtors believe that they have obtained the best financing available. Accordingly, the Court should approve the DIP Facility and authorize the Debtors' entry into the DIP Loan Documents, as it is a reasonable exercise of the Debtors' business judgment.

### B. THE DEBTORS SHOULD BE AUTHORIZED TO GRANT LIENS AND SUPERPRIORITY CLAIMS

30. The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Secured Parties postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order) that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order, as follows:

> The DIP Liens on the DIP Collateral securing the DIP Obligations shall have and are hereby granted (i) junior, perfected security interests and liens upon any assets of the DIP Obligors that are subject to valid, enforceable and unavoidable security interests that were perfected as of the Petition Date or in existence as of the Petition Date and perfected subsequently as permitted by section 546(b) of the Bankruptcy Code and (ii) superpriority perfected security interests and liens upon all property and assets of the DIP Obligors as of now or hereafter arising or acquired that are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests.

*See* Interim Order at p. 16.

31.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    (a)    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    (b)    the credit transaction is necessary to preserve the assets of the estate; and

    (c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

32.     As described above and as set forth in the Bartels Declaration, third-party lenders were unwilling to provide postpetition financing on an unsecured basis or other basis.  *See* Bartels Declaration ¶¶ 11.

33.     Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases and to continue operating their business, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP

27434211.5

20

Facility, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

34.      In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving superpriority claims in favor of the DIP Secured Parties is reasonable and appropriate.

### C.      NO COMPARABLE ALTERNATIVE TO THE DIP FACILITY IS REASONABLY AVAILABLE

35.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); see also *In re Plabell Rubber Prods., Inc.,* 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section

364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

36.     As noted above, the Debtors do not believe that viable, alternative sources of financing are reasonably available given the realities imposed by the Debtors' business and the Debtors' unsuccessful solicitation of alternative financing proposals.  Indeed, the Debtors have searched for actionable alternative proposals—in this regard, the market has spoken.  There are no other options.   Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  *See* Bartels Declaration ¶¶ 11-12.  Therefore, in addition to evidence to be introduced at the hearing on the Interim Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.    THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

37.     Section 363 of the Bankruptcy Code generally governs the use of estate property.  Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the DIP Secured Parties consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

38.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (*en banc*).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech.*

*Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, No. 91-803 (HSB), 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

39.    As set forth in the Interim Order, the Debtors propose to provide the DIP Secured Parties with adequate protection for the Debtors' use of Cash Collateral in the form of the DIP Liens and Superpriority Claims.  The Debtors submit that the proposed adequate protection is sufficient and necessary to protect the DIP Secured Parties from any diminution in value to the Cash Collateral but is also fair and appropriate under the circumstances of these chapter 11 cases. This proposed adequate protection will ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

## III.    THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES REQUIRED BY THE DIP SECURED PARTIES UNDER THE DIP LOAN DOCUMENTS

40.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Secured Parties consisting of the following:

(a)    **Commitment Fee**: 3% fee on all commitments under the DIP Facility to be fully earned and accrued upon entry of the Interim Order, and payable upon the earlier of (a) any prepayment, repayment or refinancing of the DIP Facility, and (b) the Maturity Date.

(b)    **Exit Fee**:  3% exit fee on all funded amounts and outstanding commitments under the DIP Facility, payable upon the earlier of (a) any prepayment, repayment or refinancing of the DIP Facility, and (b) the Maturity Date.

27434211.5

41.     Under the circumstances of these cases, these fees and costs are reasonable, customary, and appropriate.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.  *See* Bartels Declaration ¶ 12.

## IV.     THE DIP SECURED PARTIES SHOULD BE DEEMED GOOD-FAITH LENDERS UNDER SECTION 364(e)

42.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

43.     As explained herein and in the Bartels Declaration, the DIP Loan Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Secured Parties offered the most favorable terms on which to obtain vital postpetition financing; and (b) arms' length, good-faith negotiations between the Debtors and the DIP Secured Parties.  The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP Secured Parties are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

27434211.5

## V.    THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS

44.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit the DIP Secured Parties (a) to implement the postpetition financing arrangements authorized by the Interim Order, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Loan Documents, and (d) upon expiration of the Remedies Notice Period, to take any action and exercise all rights and remedies provided to it by this Interim Order, the other DIP Loan Documents, or applicable law.

45.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.

## VI.    FAILURE TO OBTAIN IMMEDIATE INTERIM ACCESS TO THE DIP FACILITY AND CASH COLLATERAL WOULD CAUSE IMMEDIATE AND IRREPARABLE HARM

46.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

47.    For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral and access additional liquidity under the DIP Facility.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to

27434211.5

this liquidity.  The Debtors will use cash to, among other things, fund the administration of these chapter 11 cases and the operation of their business.  The Debtors will be unable to operate their business or otherwise fund these chapter 11 cases without access to the DIP Facility and Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral and access to additional financing is vital to preserve and maximize the value of the Debtors' estates.

48.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive immediate authorization to use Cash Collateral and initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

49.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event more than 30 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

50.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

27434211.5

## **NOTICE**

51.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the twenty (20) largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to the Debtors' post-petition lenders; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the Office of the United States Attorney General for the District of Delaware; (g) the Banks; (h) all parties known to have asserted a lien or security interest in the Debtors' property; (i) the Environmental Protection Agency and all similar state environmental agencies for states in which the Debtors conduct business; (j) the attorneys general in the states where the Debtors conduct their business operations; and (k) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of page intentionally left blank]*

27434211.5

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: December 14, 2020  
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Elizabeth S. Justison*
M. Blake Cleary (No. 3614)
Elizabeth S. Justison (No. 5911)
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
E-mail:  mbcleary@ycst.com
ejustison@ycst.com

*Proposed Counsel to the Debtors and Debtors in Possession*

27434211.5

**EXHIBIT A**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>BC HOSPITALITY GROUP INC., *et al*.,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 20-13103 (___)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. ___** |

**INTERIM ORDER PURSUANT TO**
**11 U.S.C. §§ 105, 361, 362, 363, 364, 503, AND 507**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN**
**SENIOR SECURED SUPERPRIORITY POSTPETITION**
**FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING USE**
**OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY;**
**(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors (the "Debtors")

pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, and

507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules

4001-2 and 9013-1, seeking, *inter alia*:

(1)        authorization for BC Hospitality Group Inc. (the "DIP Borrower") to obtain

postpetition financing pursuant to the DIP Facility (as defined below), and for each of the DIP

Borrower's direct and indirect subsidiaries as guarantors (the "DIP Guarantors," and, together with

the DIP Borrower, the "DIP Obligors") to guarantee unconditionally on a joint and several basis,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: BC Hospitality Group Inc. (8766); BC Hospitality Group LLC (9360); BC International LLC (1356); BC Commissary NJ LLC (0230); E2 185 Bleecker LLC (6862); E2 60 West 22nd Street LLC (9567); E2 Lafayette LLC (7419); BC Williamsburg LLC (8277); BCRC LLC (7297); CW SSS LLC (9958); BC Union Square LLC (5172); BC 1385 Broadway LLC (2138); BC 630 Lexington LLC (3202); CCSW Fenway LLC (5517); E2 Seaport LLC (9720); BC Back Bay LLC (0550); BC Providence LLC (0737); BC Silver Lake LLC (2825); BC Century City LLC (0901); and BC West Hollywood LLC (3878). The Debtors' mailing address is 205 Hudson Street, Suite 1001, New York, New York 10013.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

and subject to the terms and limitations set forth herein and in the term sheet attached hereto as **Exhibit A** (the "DIP Term Sheet") in all respects, the DIP Borrower's obligations under the DIP Facility, consisting of a senior secured super-priority multi-draw term loan credit facility (the "DIP Facility"), on the terms and conditions set forth in the DIP Term Sheet (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, and, together with any ancillary and other related agreements, documents, security agreements, or pledge agreements intended to effectuate the terms of the DIP Term Sheet, including the Interim Order (as defined below) and the Final Order (as defined below), collectively, the "DIP Loan Documents"), by and among the DIP Obligors and Bain Capital Double Impact Fund, LP, BCIP Double Impact Associates, L.P., Kitchen Fund, LP, KF-Chloe, LLC, Qoot International UK Limited, Lion/BC LLC, and Collab+Consumer I, L.P. (collectively, the "DIP Secured Parties"), in an aggregate principal amount of $3,250,000 million in term loan commitments which shall be available as term loans (the "DIP Loans") to the DIP Borrower upon entry of this interim order (the "Interim Order") and satisfaction of the other conditions set forth therein in an initial amount not to exceed $1,400,000 (the "Initial DIP Loan"), and the remainder of the DIP Facility available upon entry of the Final Order to the extent set forth therein, the Approved Budget (as defined below) and the DIP Loan Documents;

(2)        authorization for the Debtors to execute, deliver, and enter into the DIP Loan Documents and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

(3)        authorization for the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including, without limitation, any principal, interest (including interest accruing after the maturity of the DIP

Loans and interest accruing after the commencement of the Case (as defined below)), fees, commitment fees, exit fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the respective DIP Secured Parties (including the reasonable and documented fees and expenses of each of the DIP Secured Parties' attorneys, advisors, accountants, and other consultants), any obligations in respect of indemnity claims, whether primary, secondary, direct, indirect, contingent or absolute, in each case, to the extent constituting any Debtor's obligations of any kind under the DIP Loan Documents (such obligations collectively, the "DIP Obligations");

(4)     authorization for the Debtors, immediately upon entry of this Interim Order, to use proceeds of the DIP Facility as expressly provided in the DIP Loan Documents and solely in accordance with this Interim Order and the applicable Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) to: (A) pay costs, premiums, fees, and expenses related to the above-captioned jointly administered cases (collectively, the "Case") and in connection with the DIP Facility; and (B) provide financing for working capital and for other general corporate purposes of the Debtors in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents);

(5)     the granting and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1), and 507(b) of the Bankruptcy Code, to the DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve Out (as defined below);

(6)     the granting to the DIP Secured Parties of valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including, without limitation, any "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), to secure the DIP Obligations, which DIP

- 3 -

Liens shall be subject to the relative rankings and priorities set forth herein and in the other DIP Loan Documents;

(7)    the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(8)    a waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and certain rights of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(9)    a waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

(10)    the scheduling of a final hearing on the Motion (the "Final Hearing") to consider entry of the order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing (the "Final Order"); and

(11)    the Court to grant such other and further relief as is just and proper.

The initial hearing on the Motion having been held by this Court on December __, 2020 (the "Interim Hearing"), and upon the record made by the Debtors at the Interim Hearing, including the Motion and the *Declaration of David Selinger in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 3] (the "First Day Declaration") and the declaration of Patrick J. Bartels, Jr. in support of the Motion [Docket No. [__]] (the "DIP Declaration"), any exhibits in connection with the foregoing, and the filings and pleadings in the Case, this Court having found that the interim relief requested in the Motion is fair and reasonable and is in the best interests of the Debtors, the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates"), their stakeholders and other parties in interest, and represents a sound

exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses; it appearing to this Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; and appropriate and adequate notice of the Motion, the interim relief requested therein, and the Interim Hearing (the "Notice") having been given under the circumstances; and the Notice having been served by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules on: (a) the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the entities listed as holding the 20 largest unsecured claims against the Debtors (on a consolidated basis) (the "20 Largest Unsecured Creditors"); (c) the DIP Secured Parties; (d) the counsel to each of the parties referenced in clause (c); (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the Environmental Protection Agency and all similar state environmental agencies for states in which the Debtors conduct business; (i) the attorneys general in the states where the Debtors conduct their business operations; (j) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien on the Debtors' assets; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"); and the opportunity for an interim hearing on the Motion was appropriate under the circumstances; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To

A.      Petition Date. On December 14, 2020 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Subchapter V of chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No chapter 11 trustee or examiner has been appointed in the Case.

B.      Jurisdiction and Venue.   This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Local Rules 4001-2 and 9013-1.

C.      Notice. The Notice was given in the manner described in the Motion. Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing, and the relief granted under this Interim Order, constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001 and the Local Rules.

D.      Parties' Acknowledgments, Agreements, and Stipulations. In requesting the DIP Facility and use of Cash Collateral, and in exchange for and as a material inducement to the DIP Secured Parties to agree to provide the DIP Facility, access to the Cash Collateral, and subordination of the DIP Liens (as defined herein) to the Carve Out and as a condition to providing financing under the DIP Facility and consenting to the use of Cash Collateral, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree, as follows:

---

the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

(i)    <u>Indemnity</u>. The DIP Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, the DIP Secured Parties shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, *provided* that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this Section E(i) or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the DIP Secured Parties, as the case may be.

(ii)    <u>Sale and Credit Bidding</u>. The Debtors admit, stipulate, acknowledge, and agree that any of the DIP Secured Parties or DIP Secured Parties shall have the right to credit bid the entirety of (or any portion of) the DIP Obligations, as applicable, including the DIP Obligations under the DIP Loan Documents.

E.    Findings Regarding the Postpetition Financing.

(i)    <u>Postpetition Financing</u>. The Debtors have requested from each of the DIP Secured Parties, and the DIP Secured Parties are willing, subject to the terms of this Interim Order and satisfaction of the conditions set forth in the DIP Loan Documents, to extend the DIP Loans

on the terms and conditions set forth in this Interim Order and the DIP Loan Documents, respectively.

(ii)    <u>Need for Postpetition Financing</u>. The Debtors do not have sufficient liquidity, including Cash Collateral, to operate their businesses in the ordinary course of business without the financing requested in the Motion. The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, pay employees, taxes, and certain fees and expenses as set forth herein, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties as set forth in this Interim Order and other DIP Loan Documents, as applicable, is vital to the preservation and maintenance of the going concern value of each Debtor. Accordingly, the Debtors have an immediate need to obtain the postpetition financing to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Estates.

(iii)    <u>No Credit Available on More Favorable Terms</u>. The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, or liens on property of the Estates not subject to a lien pursuant to sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtors assert in the Motion, the First Day Declaration, and in the DIP Declaration, and demonstrated at the Interim Hearing, that they have been unable to procure the necessary financing on terms more

favorable, taken as a whole, than the financing offered by the DIP Secured Parties pursuant to the DIP Loan Documents. In light of the foregoing, and considering all alternatives, the Debtors have reasonably and properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to the Debtors at this time, and is in the best interests of the Debtors, their Estates, and all of their stakeholders.

(iv)    Budget. The Debtors have prepared and delivered to the DIP Secured Parties an initial budget (the "Initial Budget"), a copy of which is attached hereto as **Exhibit B**. The Initial Budget reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Budget and each subsequent budget approved by the DIP Secured Parties then in effect, an "Approved Budget"). The Debtors believe that the Initial Budget is reasonable under the facts and circumstances. The DIP Secured Parties are relying upon the Debtors' agreement to comply with the terms set forth in the Approved Budget, the other DIP Loan Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for herein.

(v)    Certain Conditions to DIP Facilities. The DIP Secured Parties' willingness to make the DIP Loans is conditioned upon, among other things: (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of the respective obligations thereunder, and to confer upon the DIP Secured Parties all applicable rights, powers, and remedies thereunder in each case as modified by this Interim Order; (b) the DIP Secured Parties being granted, as security for the prompt payment of the DIP Facilities and all other obligations of the Debtors under the DIP Loan Documents, (x) superpriority perfected security interests in and liens upon all property and assets of the DIP Obligors as of now or hereafter arising or acquired that are

not otherwise subject to valid, perfected, enforceable, and unavoidable security interests and (y) junior, perfected security interests in and liens upon any assets of the DIP Obligors that are subject to valid, enforceable and unavoidable security interests perfected as of the Petition Date or in existence as of the Petition Date and perfected subsequently as permitted by section 546(b) of the Bankruptcy Code (collectively hereinafter referred to as the "DIP Collateral," and, for the avoidance of doubt, the DIP Collateral shall include, subject to entry of the Final Order, any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code), including any proceeds thereof (collectively, the "Avoidance Actions")). For the avoidance of doubt, DIP Collateral shall not include the DIP Obligors' leasehold interests, but instead shall include solely the proceeds of any such leasehold interests.

(vi)    Business Judgment and Good Faith Pursuant to Section 364(e). Any credit extended, loans made, and other financial accommodations extended to the Debtors by the DIP Secured Parties, including, without limitation, pursuant to this Interim Order, have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Facilities, the DIP Liens, and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(vii)    Credit Bid Rights.    The Debtors and DIP Secured Parties hereby acknowledge and agree that they shall not object, or support any objection, to the DIP Secured Parties' rights to credit bid up to the full amount of their DIP Obligations, in each case including, without limitation, any accrued and unpaid interest and expenses, in any sale of the DIP Collateral,

including any sale effectuated through section 363 of the Bankruptcy Code or pursuant to a plan of reorganization, whether in a chapter 11 or chapter 7 proceeding, section 1123 of the Bankruptcy Code or other applicable law.  For the avoidance of doubt, any such credit bid may provide for the assignment of the right to purchase the acquired assets to a sub-agent or a newly-formed acquisition vehicle.

(viii)   Sections 506(c) and 552(b). The Debtors have agreed as a condition to obtaining financing under the DIP Facilities and the use of Cash Collateral that as a material inducement to the DIP Secured Parties to agree to provide the DIP Facility, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Facility to the extent set forth herein, (b) the DIP Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve Out, and (c) the use of Cash Collateral consistent with the Approved Budget, the terms of the DIP Loan Documents, and the terms of this Interim Order, each of the DIP Secured Parties are entitled to receive (x) subject to entry of the Final Order, a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (y) subject to entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

(ix)   Good Cause. Good cause has been shown for the entry of this Interim Order. The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (a) minimize disruption to the Debtors' businesses and on-going operations, (b) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (c) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets. The terms of the

DIP Facility are fair and reasonable, reflect the Debtors' exercise of their business judgment, and are supported by reasonably equivalent value and fair consideration. The DIP Facility is the product of reasonable, arm's length, good faith negotiations between the Debtors and the DIP Secured Parties.

(x)    Immediate Entry. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). Any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

Section 1.    Authorization and Conditions to Financing.

1.1    Motion Granted. The Motion is granted on an interim basis to the extent provided in this Interim Order. Any objections to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

1.2    Authorization of DIP Financing.

(a)    The Debtors are hereby authorized and empowered to immediately borrow, incur, and guarantee (as applicable), DIP Loans, pursuant to the terms and conditions of the DIP Loan Documents, in an aggregate principal amount not to exceed $3,250,000, with the Initial DIP Loan to be made upon entry of this Interim Order and satisfaction of other conditions set forth in the DIP Loan Documents, with the remaining DIP Loans to be advanced in accordance with the DIP Loan Documents and consistent with the applicable Approved Budget and the DIP Loan Documents.

(b)      The Debtors are hereby authorized to (i) borrow under the DIP Facility during the Interim Financing Period (as defined below) in accordance with, and for the purposes permitted by, the DIP Loan Documents (including the Interim Order), and (ii) pay all interest, costs, fees, and other amounts and obligations accrued or accruing under the DIP Loan Documents, all pursuant to the terms and conditions of this Interim Order and the other DIP Loan Documents, in each case during the period commencing on the date of this Interim Order through and including the entry of the Final Order (the "<u>Interim Financing Period</u>"). The Initial Budget is hereby approved in all respects. The Debtors shall use the proceeds of the DIP Facility solely in a manner consistent with the Approved Budget and the terms and conditions of the DIP Loan Documents (including this Interim Order).

       1.3      <u>Financing Documents</u>.

(a)      <u>Authorization</u>. The Debtors are hereby authorized and directed to enter into, execute, deliver, and perform all obligations under the DIP Loan Documents. No obligation, payment, transfer, or grant of security hereunder or under the other DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or foreign law (including, without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule, or regulation by any person or entity.

(b)      <u>Approval; Evidence  of Borrowing Arrangements</u>.    All      terms, conditions, and covenants set forth in the DIP Loan Documents are approved. All such terms,

conditions, and covenants shall be sufficient and conclusive evidence of (i) the borrowing arrangements by and among the Debtors, the DIP Obligors, and the DIP Secured Parties, and (ii) the Debtors' assumption and adoption of, and agreement to comply with, all the terms, conditions, and covenants of this Interim Order and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees, and other expenses, including, without limitation, all of each DIP Secured Parties' closing, arranger, and administrative fees, consultant fees, professional fees, attorney's fees and legal expenses, as more fully set forth in the DIP Loan Documents. Upon effectiveness thereof, the DIP Loan Documents shall evidence the DIP Obligations, which DIP Loan Documents and DIP Obligations shall be valid, binding, and enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee appointed in the Case or any case under chapter 7 of the Bankruptcy Code upon the conversion of this Case (collectively, the "Successor Cases"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the other DIP Loan Documents.

(c)     Payment of DIP Fees and Other Expenses. Any and all fees and expenses payable pursuant to the DIP Loan Documents (collectively, any and all such fees and expenses, the "DIP Fees") are hereby approved and the Debtors are hereby authorized and directed to pay, in cash and on a current basis, all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Secured Parties incurred at any time, as provided by the DIP Loan Documents (including this Interim Order) in accordance with Section 4.13 hereof. The DIP Fees shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

(d)     <u>Amendments to DIP Loan Documents</u>. Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the applicable DIP Secured Parties may make amendments, modifications, or supplements to any DIP Loan Document, and the DIP Secured Parties may waive any provisions in the DIP Loan Documents, without further approval of the Court; *provided* that any amendments, modifications, or supplements to any DIP Loan Documents that operate to increase the aggregate commitments, the rate of interest payable thereunder, or existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee) other than as currently provided in the DIP Loan Documents (the "<u>Material DIP Amendment</u>"), shall be filed with the Court, and the Debtors shall provide prior written notice of the Material DIP Amendment to (i) counsel to the DIP Secured Parties and their counsel, (ii) the 20 Largest Unsecured Creditors, and (iii) the U.S. Trustee; *provided* that the consent of the foregoing parties will not be necessary to effectuate any such amendment, modification, or supplement, except that any Material DIP Amendment that is subject to a timely and unresolved objection must be approved by the Court. For the avoidance of doubt, the Debtors must receive written consent as to any Material DIP Amendment prior to filing notice thereof with the Court from the applicable DIP Secured Parties.

1.4     <u>Indemnification</u>. The Debtors are authorized to indemnify and hold harmless each DIP Secured Party, and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved.

Section 2.       <u>Postpetition Lien; Superpriority Administrative Claim Status</u>.

      2.1    <u>Postpetition Lien</u>.

      (a)    <u>Postpetition DIP Lien Granting</u>.       To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Secured Parties of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Secured Parties, for the benefit of themselves and the DIP Secured Parties, shall have and are hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (such security interests and liens, the "<u>DIP Liens</u>") in and upon all DIP Collateral.

      (b)    <u>DIP Lien Priority in DIP Collateral</u>. The DIP Liens on the DIP Collateral securing the DIP Obligations shall have and are hereby granted (i) junior, perfected security interests in and liens upon any assets of the DIP Obligors that are subject to valid, enforceable and unavoidable security interests that were perfected as of the Petition Date or in existence as of the Petition Date and perfected subsequently as permitted by section 546(b) of the Bankruptcy Code and (ii) superpriority perfected security interests in and liens upon all property and assets of the DIP Obligors as of now or hereafter arising or acquired that are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests.

      (c)    <u>Postpetition Lien Perfection</u>. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, and the other security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such

security interest or lien, including, without limitation, control agreements with any financial institution(s) party to a control agreement or other depository account consisting of DIP Collateral, or requirement to register liens on any certificates of title (a "Perfection Act"). Notwithstanding the foregoing, if the DIP Secured Parties, as applicable, shall, in their sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then such DIP Secured Parties are authorized to perform such act, and the Debtors and DIP Guarantors are authorized and directed to perform such act to the extent necessary or appropriate to give effect to the terms of the DIP Loan Documents, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law. The DIP Secured Parties, as applicable, may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law. Should any DIP Secured Parties, as applicable, so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(d)    To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Interim Order or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby

preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of this Court; *provided*, *however*, that nothing herein shall excuse the Debtors from payment of any local fees, if any, required in connection with such liens. By virtue of the terms of this Interim Order, to the extent that any DIP Secured Party has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including any DIP Guarantor), such filings shall be deemed to properly perfect its liens and security interests granted and confirmed by this Interim Order without further action.

(e)     Except as provided in Section 2.3 herein, the DIP Liens and the DIP Superpriority Claims (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in this Case or any Successor Cases and shall be valid and enforceable against the Debtors, their Estates, any trustee, or any other estate representative appointed or elected in this Case or any Successor Cases and/or upon the dismissal of this Case or any Successor Cases; (B) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise; and (C) any intercompany or affiliate lien or claim and (ii) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.

2.2     <u>Superpriority Administrative Expenses</u>.

(a)     <u>DIP Loans</u>. Subject to the Carve Out, all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the other DIP Loan Documents, or otherwise, the DIP Secured Parties, for the benefit of themselves and the DIP Secured Parties, are granted an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities,

and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 507(a), 507(b), 546(c), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions) (such superpriority administrative expense claim, the "DIP Superpriority Claims").

       2.3   Carve Out Provisions.

       (a)    For purposes of this Interim Order, "Carve Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses incurred by a trustee under section 1183 of the Bankruptcy Code (the "Standing Trustee"); (iii) solely upon conversion of this Case to cases under chapter 7, all reasonable fees and expenses up to $50,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"), which amount may be modified in connection with the Final Hearing; (iv) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees, costs, disbursements and expenses (the "Allowed Professional Fees") incurred or earned by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Professional Persons") at any time before or on the first business day following delivery by the DIP Secured Parties of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to, on or after delivery of a Carve Out Trigger Notice

(the amounts in (i)–(iv), collectively, the "Pre-Trigger Carve Out Cap"); and (v) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000.00 incurred after the first business day following delivery by the DIP Secured Parties of the Carve Out Trigger Notice to the Carve Out Trigger Notice Parties (as defined below) (such date, the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (v) being the "Post-Carve Out Trigger Notice Cap" and such amounts set forth in clauses (i) through (v), the "Carve Out Cap"); *provided* that nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of any Professional Person.  On a weekly basis, budgeted fees, costs and expenses of professionals retained by the Debtors and the Standing Trustee shall be funded into an escrow account with Young Conaway Stargatt & Taylor, LLP (the "Professional Fee Reserve").  Amounts funded into the Professional Fee Reserve shall be considered used by the Debtors at such time as they are deposited into the Professional Fee Reserve account for distribution to professionals in accordance with orders of the Bankruptcy Court.  Any amounts remaining in the Professional Fee Reserve account on the effective date of a chapter 11 plan of the Debtors' shall be applied and funded to any professional fee reserves established as a part of such chapter 11 plan.

       (b)    For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email by the DIP Secured Parties to the Debtors, their lead restructuring counsel, the Standing Trustee, and the U.S. Trustee (collectively, the "Carve Out Trigger Notice Parties"), which notice shall be delivered upon the expiration of the Remedies Notice Period (as defined below), and shall describe in reasonable detail such Event of Default (as defined in the DIP Term Sheet) that is alleged to have occurred and to be continuing at the end of

such Remedies Notice Period and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)    On the Trigger Date, the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter generated by the Debtors to fund the Carve Out Account (as defined below) up to the Carve Out Cap.

(d)    Upon delivery of a Carve Out Trigger Notice, and prior to the payment to any DIP Secured Party on account of any adequate protection or otherwise, the Debtors shall be required to deposit, in a segregated account not subject to the control of the DIP Secured Parties (the "Carve Out Account"), in an amount equal to the Carve Out Cap, (i) cash available on the Termination Declaration Date (as defined below) and (ii) available cash from time to time after the Termination Declaration Date after giving effect to the cash contributions under clause (i) above. The funds on deposit in the Carve Out Account shall only be available to satisfy the obligations set forth in the definition of Carve Out. The DIP Secured Parties shall have a security interest upon any residual amount in the Carve Out Account available following satisfaction in cash in full of all obligations benefiting from the Carve Out as further described in clause (e) below. Notwithstanding the foregoing, so long as a Carve Out Trigger Notice has not been issued, the Debtors shall be permitted to pay fees to the Professional Persons and reimburse expenses incurred by Professional Persons and that are allowed or authorized by the Court and payable under sections 328, 330, 331, and 1103 of the Bankruptcy Code and compensation procedures approved by the Court, as the same may be due and payable, it being understood that the Pre-Trigger Carve Out Cap shall be reduced by actual payments of Allowed Professional Fees included in the Pre-Trigger Carve Out Cap made after the Termination Declaration Date. Any payment or

reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar- for-dollar basis. Any funding of the Carve Out by the DIP Secured Parties shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the other DIP Loan Documents, the Bankruptcy Code, and applicable law.

(e)     All funds in the Carve Out Account shall be used first to pay all obligations set forth in clauses (i) through (iv) of the definition of Carve Out, until paid in full, and then the obligations set forth in clause (v) thereof.

(f)     No portion of the Carve Out, any Cash Collateral, or proceeds of the DIP Facility or DIP Collateral may be used for or in connection with (i) preventing, hindering, or delaying any of the DIP Secured Parties' enforcement or realization upon the DIP Collateral following the expiration of the Remedies Notice Period, (ii) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral in a manner not permitted by the DIP Loan Documents, or (iii) incurring any indebtedness other than under the DIP Facility or on account of the Standing Trustee performing its duties under section 1183 of the Bankruptcy Code, as otherwise permitted by the DIP Loan Documents or as authorized by the Court.

Section 3.     Default; Waivers; Rights and Remedies; Relief from Stay.

3.1     Events of Default. The occurrence of (a) any "Event of Default" as that term is defined in the DIP Loan Documents, (b) any failure to meet or satisfy any Milestone as defined in, and in accordance with, the DIP Loan Documents, (c) the Maturity Date under the DIP Loan Documents, or (d) any material violation, breach, or default by the Debtors with respect to any of their obligations under this Interim Order or any other DIP Loan Document, shall constitute a "DIP

Termination Event" hereunder unless waived in writing by the DIP Secured Parties in accordance with the DIP Loan Documents.

      3.2    <u>Debtors' Waivers</u>.

      (a)    Prior to the indefeasible payment in full or otherwise acceptable satisfaction of all DIP Obligations, any request by the Debtors with respect to the following shall also constitute a DIP Termination Event: (i) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full of the DIP Obligations, other than as provided in this Interim Order or as may be otherwise permitted pursuant to the DIP Loan Documents; (ii) to challenge the application of any payments authorized by this Interim Order pursuant to section 506(b) of the Bankruptcy Code; (iii) to file a motion seeking approval of any sale or restructuring transaction other than as permitted under the DIP Loan Documents; (iv) to propose or support any challenge by any party in interest to seek to limit or prevent the DIP Secured Parties from exercising their right to credit bid the DIP Obligations in full in connection with the sale of any assets of the Debtors; or (v) to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would restrict or impair (A) the rights and remedies of the DIP Secured Parties against the Debtors as provided in this Interim Order or any of the DIP Loan Documents or (B) the exercise of such rights or remedies by any of the DIP Secured Parties against the Debtors in accordance with the DIP Loan Documents (including this Interim Order); *provided*, *however*, that the DIP Secured Parties may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party.

(b)      It shall also be a DIP Termination Event under the DIP Facility if, prior to the indefeasible payment in full of such DIP Facility, the Debtors propose or support any chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations (other than indemnities then due and payable) in full in cash and the payment of the Debtors' obligations with respect to the adequate protection hereunder, in full in cash, within a commercially reasonable period of time, and in any event no later than the effective date of such chapter 11 plan or sale, without the written consent of the DIP Secured Parties.

3.3      [Reserved].

3.4      <u>Rights and Remedies upon a DIP Termination Event</u>. During the period covered by this Interim Order, after five (5) business days following the delivery of a written notice of the occurrence of and during the continuance of a DIP Termination Event (the "<u>Remedies Notice Period</u>") and subject to any cure provision provided in the DIP Loan Documents, the DIP Secured Parties shall be entitled to independently take any act or exercise any right or remedy as provided in this Interim Order or any other DIP Loan Document, as applicable, including, without limitation, (a) declare all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (b) terminate, reduce, or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains, (c) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations, (d) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the other DIP Loan Documents to use any Cash Collateral and all authority to use Cash Collateral shall cease, and/or (e) invoke the right to charge interest at the default rate under the DIP Loan Documents *nunc pro*

*tunc* to the date of such Event of Default. For the avoidance of doubt, notwithstanding the foregoing, (x) during the Remedies Notice Period, the Debtors may use Cash Collateral in amounts that the Debtors have determined in good faith are necessary to the preservation of the Debtors and their Estates solely in accordance with the Approved Budget, or that have otherwise been approved in advance in writing by the applicable DIP Secured Parties, and (y) notwithstanding anything herein, the obligations of the DIP Secured Parties to advance DIP Loans is subject to the satisfaction or waiver by the DIP Secured Parties in their sole and absolute discretion of the conditions set forth in the DIP Loan Documents (including, for the avoidance of doubt, that no default or Event of Default has occurred and is continuing). Notwithstanding anything to the contrary contained herein, the DIP Secured Parties can only enter upon a leased premises during the continuation of a DIP Termination Event in accordance with (i) a separate written agreement by and between the DIP Secured Parties and any applicable landlord, (ii) pre-existing rights of the DIP Secured Parties and any applicable landlord under applicable non-bankruptcy law, or (iii) entry of an order of this Court obtained by motion of the applicable DIP Secured Parties on such notice to the applicable landlord as shall be required by this Court.

3.5    <u>Modification of Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to permit the DIP Secured Parties to perform any act authorized or permitted under or by virtue of this Interim Order, the DIP Term Sheet, or the other DIP Loan Documents, as applicable, including, without limitation, (a) to implement the postpetition financing arrangements authorized by this Interim Order, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (c) to assess, charge,

collect, advance, deduct and receive payments with respect to the DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Loan Documents, and (d) upon expiration of the Remedies Notice Period, to take any action and exercise all rights and remedies provided to it by this Interim Order, the other DIP Loan Documents, or applicable law.

Section 4.    <u>Other Rights and DIP Obligations</u>.

4.1    <u>No Modification or Stay of this Interim Order</u>. The DIP Secured Parties have acted in good faith in connection with the DIP Facility and with this Interim Order, and their reliance on this Interim Order is in good faith, and the DIP Secured Parties are entitled to the protections of section 364(e) of the Bankruptcy Code.

4.2    <u>Rights of Access and Information</u>. The Debtors shall provide the DIP Secured Parties reasonable access and information as requested by the DIP Secured Parties.

4.3    <u>Power to Waive Rights; Duties to Third Parties</u>.

(a)    Subject to the terms of the DIP Loan Documents, the DIP Secured Parties shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Secured Parties (the "<u>DIP Lender Rights</u>"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights. Any waiver by the DIP Secured Parties of any DIP Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein. Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Secured Parties to any liability to any other party, nor cause or enable any party other than the Debtors to

rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to any DIP Secured Party.

4.4     No Unauthorized Disposition of Collateral; Use of Cash Collateral. The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory and Cash Collateral), other than pursuant to the terms of this Interim Order or as permitted by the DIP Loan Documents, and the Debtors are authorized to use Cash Collateral in a manner consistent with this Interim Order, the Approved Budget and the other DIP Loan Documents (including the permitted variances and exclusions to the Approved Budget permitted thereunder).

4.5     No Waiver. The failure of the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facility, or the Interim Order, as applicable, shall not constitute a waiver of any of the DIP Secured Parties' rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Secured Parties to: (a) request conversion of the Case to a case under chapter 7, dismissal of the Case, or the appointment of a trustee in the Case; (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties.

4.6     Maintenance of Collateral. Unless the DIP Secured Parties otherwise consent in writing, until (a) the indefeasible payment in full or otherwise acceptable satisfaction of all DIP Obligations and (b) the termination of the DIP Secured Parties' obligations to extend

credit under the DIP Facility, the Debtors shall comply with the covenants contained in the DIP Loan Documents regarding the maintenance and insurance of the DIP Collateral. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Secured Parties (on behalf of the DIP Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

4.7    Reservation of Rights. The terms, conditions, and provisions of this Interim Order are in addition to and without prejudice to the rights of each DIP Secured Party to pursue any and all rights and remedies under the Bankruptcy Code, the other DIP Loan Documents, or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral or granting of any interest in the DIP Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates.

4.8    Binding Effect.

(a)    All of the provisions of this Interim Order and the other DIP Loan Documents, the DIP Obligations, all liens, and claims granted hereunder in favor of each of the DIP Secured Parties, and any and all rights, remedies, privileges, immunities and benefits in favor of the DIP Secured Parties set forth herein, including, without limitation, the parties' acknowledgements, stipulations, and agreements in Section D of this Interim Order (without each of which the DIP Secured Parties would not have entered into or provided funds under the DIP Loan Documents provided or acknowledged in this Interim Order, and any actions taken pursuant

thereto, shall be effective and enforceable as of the Petition Date immediately upon entry of this Interim Order and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, shall continue in full force and effect, and shall survive entry of any other order or action, including, without limitation, any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment, or replacement of the DIP Obligations, converting the Case to any other chapter under the Bankruptcy Code, dismissing the Case, approving any sale of any or all of the DIP Collateral, or vacating, terminating, reconsidering, revoking, or otherwise modifying this Interim Order or any provision hereof; *provided* that in the event the Final Order is entered, the terms and conditions of such Final Order shall control over this Interim Order; *provided*, *further*, that such Final Order must affirm each of the provisions, protections, grants, statements, stipulations, and agreements in this Interim Order in order for such provisions, protections, grants, statements, stipulations, and agreements to remain in effect after entry of the Final Order.

(b)    No order dismissing the Case under section 1112 or otherwise may impair the DIP Superpriority Claim, and the DIP Secured Parties' liens on and security interests in the DIP Collateral, respectively, and all other claims, liens, adequate protections, and other rights granted pursuant to the terms of this Interim Order, which shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full or each of the DIP Secured Parties has otherwise agreed to alternate treatment in writing and such alternate treatment has been consummated. Notwithstanding any such dismissal, this Court shall retain jurisdiction for the purposes of enforcing all such claims, liens, protections, and rights referenced in this paragraph and otherwise in this Interim Order.

(c)      Except as set forth in this Interim Order, in the event the Court modifies, reverses, vacates, or stays any of the provisions of this Interim Order or any of the other DIP Loan Documents following a Final Hearing, such modifications, reversals, vacatur, or stays shall not affect the (i) validity, priority, or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Secured Parties, of the effective date of such modification, reversal, vacatur, or stay, (ii) validity, priority, or enforceability of the DIP Liens or the DIP Superpriority Claims, or (iii) rights or priorities of any DIP Secured Parties pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations.

(d)      This Interim Order shall be binding upon the Debtors, all parties in interest in the Case, and their respective successors and assigns, including, without limitation, (i) any Standing Trustee or any other trustee or other fiduciary appointed in the Case or any Successor Case and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law. This Interim Order shall also inure to the benefit of the Debtors, the DIP Secured Parties, and each of their respective successors and assigns.

4.9      <u>Discharge</u>. The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in the Case, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Secured Parties has otherwise agreed in writing.

4.10      <u>Section 506(c) Waiver</u>. Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in this Case at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection,

or enhancement of value by the DIP Secured Parties upon the DIP Collateral) shall be charged against any of the DIP Secured Parties, the DIP Obligations, or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Secured Parties, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out or the approval of any budget hereunder).

4.11    Section 552(b) Waiver. Subject to entry of the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facility and using Cash Collateral that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties and the DIP Obligations.

4.12    No Marshaling/Application of Proceeds. Subject to entry of the Final Order, in no event shall the DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, and all proceeds shall be received and applied in accordance with the DIP Loan Documents.

4.13    Payment of DIP Secured Parties' Fees and Expenses.

(a)    The Debtors shall pay (i) the reasonable and documented fees and expenses reimbursable under the DIP Facility, the DIP Term Sheet, or the other DIP Loan Documents, as applicable, whether incurred before or after the Petition Date and (ii) all reasonable and documented out-of-pocket costs and expenses of the DIP Secured Parties including, without limitation, reasonable and documented fees and disbursements of counsel in connection with the enforcement or preservation of any rights under the DIP Facility, the DIP Term Sheet, or the other DIP Loan Documents (collectively, the "DIP Fees and Expenses"). Upon entry of this Interim

Order, the Debtors shall immediately pay, and the DIP Secured Parties are hereby authorized to immediately make an advance under the DIP Loan Documents to immediately pay, all accrued and unpaid DIP Fees and Expenses incurred prepetition.

(b)    With respect to DIP Fees and Expenses incurred postpetition, professionals for the DIP Secured Parties shall deliver an invoice in summary form (which shall not be required to include time entry detail and may be redacted for privileged information) to the Debtors and the U.S. Trustee, and the Standing Trustee, with a copy of such invoices delivered simultaneously to the DIP Secured Parties. If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) business days after delivery of such invoice to the Debtors, the U.S. Trustee, and the Standing Trustee, the Debtors shall promptly pay, and the DIP Secured Parties are hereby authorized to make an advance under the DIP Loan Documents to timely pay, such DIP Fees and Expenses. If an objection to a professional's invoice is timely received, the Debtors shall promptly pay, and the DIP Secured Parties are authorized to make an advance under the DIP Loan Documents to timely pay, the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Under no circumstances shall professionals for any of the DIP Secured Parties be required to comply with the U.S. Trustee fee guidelines or otherwise be required to file a fee or retention application with the Court. Payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination, or disgorgement.

4.14    Limits on Lender Liability.

(a)    In determining to make any loan under the DIP Loan Documents, authorizing the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the other DIP Loan Documents, the DIP Secured Parties

shall not be deemed to (i) be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of the Debtors, so long as such party's actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a facility owned or operated by the Debtors, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act (subject to Final Order only), the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors or their Estates. Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

(b)    Nothing in this Interim Order or the other DIP Loan Documents shall permit the Debtors to violate 28 U.S.C. § 959(b).

(c)    As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the other DIP Loan Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

4.15   <u>Release</u>. Subject to entry of the Final Order, each of the Debtors, their Estates, the Borrower, and the DIP Guarantors, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries, and assigns, to the fullest extent permitted by law, hereby forever, unconditionally, permanently, and irrevocably release,

- 33 -

discharge, and acquit each of the DIP Secured Parties, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns solely in their capacities as DIP Lenders (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the DIP Obligations, the DIP Loan Documents, or the DIP Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the DIP Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or related to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of the Final Order.

4.16    <u>Survival</u>. The provisions of this Interim Order, the validity, priority, and enforceability of the DIP Liens, the DIP Superpriority Claims, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in this Case, (b) converting this Case to a case under chapter 7 of the Bankruptcy Code, (c) dismissing this Case, (d) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents), or (e) pursuant to which the Court abstains from hearing this Case. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Secured Parties pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in this Case, following dismissal of this Case or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facility, all of the DIP Obligations, pursuant to the DIP Loan Documents (including this Interim Order), have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility are terminated or each of the DIP Secured Parties has otherwise agreed in writing and such alternate treatment has been consummated.

4.17    <u>No Third Party Rights</u>. Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

4.18    <u>No Avoidance</u>. No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facility shall be avoidable or recoverable

from the DIP Secured Parties under any section of the Bankruptcy Code or any other federal, state, or other applicable law.

4.19    Reliance on Order. All postpetition advances under the DIP Loan Documents are made in reliance on this Interim Order.

4.20    Payments Free and Clear. Any and all payments or proceeds remitted to the DIP Secured Parties shall, subject to the terms of this Section 4.20, be irrevocable, received free and clear of any claims, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve Out in all respects.

4.21    Limited Effect. In the event of a conflict between the terms and provisions of any of the DIP Loan Documents (including this Interim Order), the terms and provisions of this Interim Order shall govern.

4.22    Headings. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

4.23    Bankruptcy Rules. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

4.24    General Authorization. The Debtors and the DIP Secured Parties are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

4.25    <u>Retention of Exclusive Jurisdiction</u>. This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the DIP Term Sheet, and the other DIP Loan Documents.

4.26    <u>No Implied Modification of Approved Budget</u>. For the avoidance of doubt, any order of this Court authorizing the Debtors to make certain payments shall not be construed as authorization for the Debtors to make any payments inconsistent with the Approved Budget and the Approved Budget shall control in all respects.

4.27    <u>Final Hearing and Response Dates</u>. The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is set for _____ __, 2021 at __:__ a.m./p.m. (prevailing Eastern Time). The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court. The Debtors may serve the Motion and the Interim Order without the exhibits attached thereto as such exhibits are voluminous and available, free of charge, at https://dm.epiq11.com/bychloe, and such notice is deemed good and sufficient and no further notice need be given.  Any objections or responses to entry of the Final Order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____ ___, 202_, and shall be served on: (a) the Debtors, 205 Hudson Street, Suite 1001, New York, NY 10013, Attn: Patrick J. Bartels, Jr. (patrick@redanadvisors.com); (b) proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: M. Blake Cleary, Esq. (mbcleary@ycst.com) and Elizabeth S. Justison, Esq. (ejustison@ycst.com); (c) counsel to the DIP Secured Parties, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Andrew S. Mordkoff, Esq. (amordkoff@willkie.com); (d) the U.S. Trustee, 844 King Street, Suite 2207, Lock Box 35,

Wilmington, Delaware 19801, Attn: Rosa Sierra (rosa.sierra@usdoj.gov); and (e) the Standing

Trustee, **[●]**, **[●]** (**[●]**).

# EXHIBIT A

**DIP Term Sheet**

# BC HOSPITALITY GROUP INC.

## DIP FACILITY TERM SHEET

### December 14, 2020

This term sheet (this "***Term Sheet***") sets forth a summary of the terms and conditions with respect to the DIP Loans (as defined below) and the DIP Facility (as defined below). This Term Sheet shall be a binding agreement with respect to the DIP Loans and, together with the Financing Orders (as defined below) and any other related agreements, documents, security agreements or pledge agreements entered into in connection herewith and therewith (collectively, the "***Loan Documents***"), sets forth all of the terms, conditions, representations and other provisions with respect to the DIP Facility. The obligations of the DIP Lenders (as defined below) to provide financing pursuant to the Loan Documents is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein and in the Financing Orders. In the event of any conflict between this Term Sheet and the terms of the Financing Orders, the terms of the Financing Orders shall govern.

| | |
|---|---|
| **Borrower:** | BC Hospitality Group Inc., a Delaware corporation and a contemplated debtor in possession in the cases (the "***Chapter 11 Cases***") to be filed with respect to itself and each of its subsidiaries (each, a "***Debtor***" and, collectively, the "***Debtors***") under Chapter 11 of Title 11 of the United States Code (as amended, the "***Bankruptcy Code***") and filed with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"). (As used herein, the term "***Petition Date***" shall mean the date upon which the Chapter 11 Cases are commenced in the Bankruptcy Court.) |
| **Guarantors:** | All other Debtors (the Borrower and the Guarantors, together, the "***DIP Loan Parties***").[1] <br><br> Each Guarantor hereby jointly and severally unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all obligations of the Borrower now or hereafter existing hereunder and under any related document, whether for principal, interest, fees, expenses or otherwise (such |

---

[1] The DIP Loan Parties shall be the following:  BC Hospitality Group Inc. (8766); BC Hospitality Group LLC (9360); BC International LLC (1356); BC Commissary NJ LLC (0230); E2 185 Bleecker LLC (6862);  E2 60 West 22nd Street LLC (9567); E2 Lafayette LLC (7419); BC Williamsburg LLC (8277); BCRC LLC (7297); CW SSS LLC (9958); BC Union Square LLC (5172); BC 1385 Broadway LLC (2138); BC 630 Lexington LLC (3202); CCSW Fenway LLC (5517); E2 Seaport LLC (9720); BC Back Bay LLC (0550); BC Providence LLC (0737); BC Silver Lake LLC (2825); BC Century City LLC (0901); and BC West Hollywood LLC (3878).

obligations, to the extent not paid by the Borrower, being the "**_Guaranteed Obligations_**"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the DIP Lenders (or any of them) in enforcing any rights under the guaranty set forth herein. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrower to the DIP Lenders but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving the Borrower or any Guarantor.

Each Guarantor agrees that this guaranty constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any DIP Lender to any collateral. The obligations of each Guarantor under this guaranty are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against the Borrower or any other Guarantor or whether the Borrower or any other Guarantor is joined in any such action or actions. The liability of each Guarantor under this guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

1.      any lack of validity or enforceability of this Term Sheet or any other Loan Documents;

2.      any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from this Term Sheet or any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to the Borrower or any Guarantor or otherwise;

3.      any taking, exchange, release or non-perfection of any collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

4.      the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any

person or entity, including, without limitation, any DIP Lender;

5.      any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of the Borrower or any Guarantor; or

6.      any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by any DIP Lender that might otherwise constitute a defense available to, or a discharge of, the Borrower, any Guarantor or any other guarantor or surety.

This guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the DIP Lenders or any other person or entity upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

Each Guarantor hereby waives (a) promptness and diligence, (b) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this guaranty and any requirement that the DIP Lenders exhaust any right or take any action against the Borrower or any Guarantor or any other person or entity or any collateral, (c) any right to compel or direct any DIP Lender to seek payment or recovery of any amounts owed under this guaranty from any one particular fund or source, (d) any requirement that any DIP Lender protect, secure, perfect or insure any security interest or lien on any property subject thereto and (e) any other defense available to any Guarantor (other than indefeasible payment in full of the Guaranteed Obligations). Each Guarantor agrees that the DIP Lenders shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Guaranteed Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waivers set forth herein are knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this guaranty, and acknowledges that this guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Each Guarantor will not exercise any rights that it may now or hereafter acquire against the Borrower or any Guarantor or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this guaranty, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the DIP Lenders against the Borrower or any Guarantor or any other guarantor or any collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from the Borrower or any Guarantor or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of the DIP Lenders, shall forthwith be paid to the DIP Lenders to be credited and applied to the Guaranteed Obligations and all other amounts payable under this guaranty, whether matured or unmatured, in accordance with the terms of this Term Sheet and related documentation, or to be held as collateral for any Guaranteed Obligations or other amounts payable under this guaranty thereafter arising. If (a) any Guarantor shall make payment to the DIP Lenders of all or any part of the Guaranteed Obligations, (b) all of the Guaranteed Obligations and all other amounts payable under this guaranty shall be indefeasibly paid in full in cash and (c) all commitments under the DIP Facility have been terminated, the DIP Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

Subject to the reinstatement provision set forth herein and any surviving obligations, at such time as the Guaranteed Obligations have been indefeasibly paid in full, the Guarantors shall be released from this guaranty. At the request and sole expense of any Guarantor following any such release, the DIP Lenders shall execute and deliver to the Guarantors such documents as the Guarantors shall reasonably request to evidence such release.

| DIP Lenders: | Bain Capital Double Impact Fund, LP, BCIP Double Impact Associates, L.P., Kitchen Fund, LP, KF-Chloe, LLC, Qoot International UK Limited, Lion/BC LLC, and Collab+Consumer I, L.P. |
|---|---|
| | Each DIP Lender shall be severally and not jointly obligated to make loans. |
| | The commitments in respect of the DIP Loans shall be allocated as follows: |
| | -   Bain Capital Double Impact Fund, LP:  32.31% |
| | -   BCIP Double Impact Associates, L.P.;  3.43% |
| | -   Kitchen Fund, LP: 12.65% |
| | -   KF-Chloe, LLC: 6.65% |
| | -   Qoot International UK Limited: 36.72% |
| | -   Lion/BC LLC: 6.95% |
| | -   Collab+Consumer I, L.P.: 1.29% |
| DIP Facility: | Up to $3,250,000 under a multi-draw term loan debtor-in-possession financing facility (the "***DIP Facility***" and the loans made thereunder, the "***DIP Loans***"). As provided herein, the DIP Facility will be secured by a superpriority first priority lien on all of the DIP Loan Parties' assets, including (effective upon the entry of the Final Order) all avoidance actions and the proceeds thereof, that are not subject to valid, perfected liens as of the Petition Date, and a second priority lien on all of the DIP Loan Parties' other assets. Subject, in each case, to the conditions precedent set forth herein and in the Financing Orders, $1,400,000 of the DIP Facility (the "***Interim DIP Loan***") will be funded upon entry of an order approving on an interim basis the DIP Facility in form and substance acceptable to the DIP Lenders (the "***Interim Order***"), with the remainder (the "***Remaining DIP Loans***") to be funded, consistent with the Budget (as defined below) following entry of an order approving on a final basis the DIP Facility in form and substance acceptable to the DIP Lenders (the "***Final Order***, and together with the Interim Order, the "***Financing Orders***"). |

| | |
|---|---|
| | Without limiting the foregoing, the DIP Facility shall be subject to the entry in the Bankruptcy Court of the Interim Order, in form and substance acceptable to the DIP Lenders. |
| **Interest Rate / Default Rate:** | Interest shall accrue on the DIP Loans at the rate of one-month Libor + 4% per annum (or, if less, at the highest rate then permitted by applicable law) (subject to a 0.00% Libor floor), and shall be payable monthly, on the first (1st) business day of each month, in arrears, in accordance with the Budget. All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid.<br><br>At all times while an Event of Default (as defined below) exists, at the election of the DIP Lenders, principal, interest and other amounts under the DIP Facility shall bear interest at a rate per annum equal to 1.00% in excess of the interest rate set forth in the immediately preceding paragraph.<br><br>It is the intention of the parties hereto to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Term Sheet and related Loan Documents shall be subject to reduction to the amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction over such matters. |
| **Fees:** | • **Commitment Fee:** 3% fee on all commitments under the DIP Facility to be fully earned and accrued upon entry of the Interim Order, and payable upon the earlier of (a) any prepayment, repayment or refinancing of the DIP Facility, and (b) the Maturity Date (as defined below).<br><br>• **Exit Fee:** 3% exit fee on all funded amounts and outstanding commitments under the DIP Facility, payable upon the earlier of (a) any prepayment, repayment or refinancing of the DIP Facility, and (b) the Maturity Date. |
| **Maturity Date:** | The earliest of (a) 120 days after entry of the Interim Order (or such later date as the DIP Lenders in their sole discretion may agree in writing with the Borrower); (b) the consummation of a sale of all or substantially all of the assets of the DIP Loan Parties; (c) acceleration of the DIP Loans pursuant to this Term Sheet or the other Loan Documents; (d) 30 days after entry of the Interim Order (or such later date as the DIP Lenders in their sole discretion may agree in |

| | |
|---|---|
| | writing with the Borrower) if the Final Order has not been entered on or prior to the expiration of such 30-day period; and (e) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court. |
| **Budget:** | All advances, and the use of funds provided under the DIP Facility and any Cash Collateral (as defined below) shall be subject to and consistent with a customary budget to be agreed by the DIP Lenders and the Borrower (the "***Budget***"), which Budget may be modified from time to time by the DIP Loan Parties with the written consent of the DIP Lenders in their sole and absolute discretion and without further order of the Bankruptcy Court. The funding of all DIP Loans following the Interim DIP Loan shall be subject to prior use of cash in accordance with the Budget and cash need under the Budget. <br><br> On the fourth (4th) Friday following the Petition Date (and on each Friday every four (4) weeks thereafter), the DIP Loan Parties shall furnish a supplement to the initial Budget (or the previously supplemented Budget), updating and/or extending the period covered by the initial Budget (or the previously supplemented Budget) so that it covers at least the period ending 13 weeks from the week in which the supplement is delivered. Such supplemental Budgets shall be subject to the DIP Lenders' approval in their sole and absolute discretion and without further order of the Bankruptcy Court. The initial Budget (or the previously supplemented and approved Budget) shall remain the Budget in effect with respect to the period covered by such Budget until such time as the DIP Lenders approve such supplemental Budget. <br><br> The DIP Loan Parties shall deliver to the DIP Lenders a variance report (each, a "***Variance Report***") for the applicable Testing Period (as defined below) setting forth (a) in reasonable detail, any differences between (i) the actual, cumulative cash receipts for such Testing Period compared to the projected, cumulative cash receipts on an aggregate basis set forth in the Budget for such Testing Period, (ii) the actual, cumulative cash operating disbursements for such Testing Period compared to the projected cash, cumulative cash operating disbursements for |

| | |
|---|---|
| | such Testing Period, and (b) an explanation (in form and detail reasonably acceptable to the DIP Lenders) of any per line item variance greater than 5.00%. |
| | The term "***Testing Period***" means with respect to the Variance Report required to be delivered on the Testing Date, the two week period beginning on the Saturday immediately following the Friday that is three weeks prior to the Testing Date and ending the Friday one week prior to the Testing Date. The first Testing Date shall be the third (3rd) Friday following the Petition Date, and Testing Dates shall occur each second (2nd) Friday thereafter. For the avoidance of doubt, the initial Testing Date shall begin with the Petition Date through the Friday that is one week prior to the initial Testing Date even if that period is not a two week period. |
| | As of any applicable Testing Date: |
| | 1.    the cumulative cash receipts of the DIP Loan Parties for the applicable Testing Period may vary from the Budget by no more than the following: (a) 20.00% for the first two (2) Testing Periods; and (b) 15.00% for each Testing Period thereafter (the "***Cash Receipt Variance***"), in each case, for the avoidance of doubt, with negative variance meaning that actual receipts are less than projected receipts; and |
| | 2.    the cumulative cash operating disbursements of the DIP Loan Parties for the applicable Testing Period may vary from the Budget by no more than the following: (a) 20.00% for the first two (2) Testing Periods; and (b) 15.00% for each Testing Date thereafter (the "***Cash Operating Variance***" and together with the Cash Receipt Variance, the "***Permitted Variances***"), in each case, for the avoidance of doubt, with negative variance meaning that actual disbursements are greater than the projected disbursements. |
| **DIP Obligations:** | As used herein, the term "***DIP Obligations***" means (a) the due and punctual payment by the DIP Loan Parties of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the DIP Loans and interest accruing after the commencement of the Chapter 11 Cases) the DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses and indemnities, whether |

<table>
<tr><td></td><td>primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of the DIP Loan Parties to the DIP Lenders under this Term Sheet, the Financing Orders and related documentation, and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of the DIP Loan Parties to the DIP Lenders under or pursuant to this Term Sheet, the Financing Orders and related documentation.<br><br>No later than the effective date of the Plan (as defined below), the DIP Obligations shall be indefeasibly paid in full in cash; *provided* that, subject to the DIP Lenders' right to credit bid as set forth below, the DIP Lenders shall have, with the Debtors' consent, the option to equitize their DIP Obligations at their sole discretion.</td></tr>
<tr><td>**Cash Collateral:**</td><td>Subject to the entry in the Bankruptcy Court of the Interim Order, the DIP Lenders hereby consent to the use of their "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "***Cash Collateral***"), all in accordance with the terms and conditions set forth in this Term Sheet, the Financing Orders, any related documentation and the Budget; *provided* that the DIP Loan Parties shall operate their cash management system in a manner that is the same or substantially similar to their prepetition cash management system.<br><br>In the event that the Final Order is not entered in the Bankruptcy Court on or prior to the date that is 30 days after entry of the Interim Order (or such later date as the DIP Lenders in their sole discretion may agree in writing with the Borrower), upon the expiration of the Waiting Period (as defined below) (and subject to the Waiting Period Procedures (as defined below) and any other applicable provisions of the Financing Orders, as the case may be), the consent of the DIP Lenders to the use of Cash Collateral shall automatically terminate.</td></tr>
<tr><td>**Use of DIP Loan Proceeds and Cash Collateral:**</td><td>The proceeds of the DIP Loans and Cash Collateral shall be available to finance, in each case consistent with the Budget (subject to Permitted Variances):<br><br>1.    working capital and general corporate purposes, including capital expenditures, of the Debtors;</td></tr>
</table>

| | |
|---|---|
| | 2.      bankruptcy-related costs and expenses (including the pursuit and consummation of a sale and Plan, all consistent with this Term Sheet, including the Budget), subject to the Carve-Out. |
| **Initial Funding:** | Subject to the terms and conditions set forth in this Term Sheet (including the Conditions Precedent (as defined below)) and the Financing Orders:<br><br>1.      Upon entry by the Bankruptcy Court of the Interim Order, in form and substance acceptable to the DIP Lenders, approving the DIP Loans and this Term Sheet and any other applicable documentation, the Interim DIP Loan will be available for the liquidity needs of the Debtors consistent with the Budget (subject to Permitted Variances).<br><br>2.      Upon the entry by the Bankruptcy Court of the Final Order, in form and substance acceptable to the DIP Lenders, approving (among other things) the DIP Facility and the DIP Loans, the Remaining DIP Loans will be available for the liquidity needs of the Debtors consistent with the Budget (subject to Permitted Variances). |
| **Security:** | As security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the DIP Obligations (for purposes of this section, references to the DIP Obligations shall be deemed to be a reference to the Guaranteed Obligations, as the context requires), each DIP Loan Party hereby grants to the DIP Lenders a security interest in and continuing lien on all of such DIP Loan Party's right, title and interest in, to and under all the DIP Loan Parties' assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "***DIP Collateral***"): (a) all assets and property of each DIP Loan Party and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations |

and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all equity interests (to be limited to the extent of any adverse tax consequences, as reasonably determined by the DIP Lenders and the Borrower, and limitations imposed by applicable law), all books and records relating to the foregoing, all other personal and real property of the DIP Loan Parties (but excluding any property subject to a purchase money lien, capital lease or similar arrangement not entered into in contemplation of the DIP Facility to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto other than a DIP Loan Party or otherwise requires third party consent thereunder other than the consent of a DIP Loan Party), and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, as defined in Article 9 thereof)); and (b) subject to entry of the Final Order, proceeds of any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code.

Each DIP Loan Party hereby authorizes the DIP Lenders to, at any time and from time to time, file financing statements, continuation statements and amendments thereto that describe the DIP Collateral (including describing the DIP Collateral as "all assets" or "all personal property" of each DIP Loan Party, or words of similar effect), and which contain any other information required pursuant to the UCC for the sufficiency of filing office acceptance of any financing statement, continuation statement or amendment, and each DIP Loan Party agrees to furnish any such information to the DIP Lenders upon request.

For the purpose of enabling the DIP Lenders to exercise rights and remedies under this Term Sheet and related documentation, each DIP Loan Party hereby grants to each

DIP Lender an irrevocable, non-exclusive license (only exercisable after the occurrence and during the continuance of an Event of Default and without payment of royalty or other compensation to such DIP Loan Party) to use, license or sublicense any intellectual property now owned or hereafter acquired by such DIP Loan Party, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.

If an Event of Default shall occur and be continuing, the DIP Lenders may exercise, in addition to all other rights and remedies granted to them in this Term Sheet, the Financing Orders and in any other instrument or agreement securing, evidencing or relating to the DIP Obligations, all rights and remedies of a secured party under the UCC or any other applicable law. Without limiting the generality of the foregoing, if an Event of Default shall occur and be continuing, the DIP Lenders, to the extent permitted by applicable law without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any DIP Loan Party or any other person or entity (all and each of which demands, presentments, protests, advertisements and notices and related defenses are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the DIP Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give options to purchase, or otherwise dispose of and deliver the DIP Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the DIP Lenders or elsewhere upon such terms and conditions as they may deem advisable and at such prices as they may deem best, for cash or on credit or for future delivery with assumption of any credit risk. To the extent permitted by applicable law, the DIP Lenders may disclaim any warranties that might arise in connection with any such lease, assignment, grant of option or other disposition of DIP Collateral and have no obligation to provide any warranties at such time. To the extent permitted by applicable law, the DIP Lenders shall have the right upon any such public sale or sales, and upon any such private sale or sales, to purchase the whole or any part of the DIP Collateral so sold, free of any right or equity of redemption in any DIP Loan Party, which right or equity is hereby waived and released. Such

sales may be adjourned and continued from time to time with or without notice. To the extent permitted by applicable law, the DIP Lenders shall have the right to conduct such sales on any DIP Loan Party's premises or elsewhere and shall have the right to use any DIP Loan Party's premises without charge for such time or times as the DIP Lenders deem necessary or advisable. Each DIP Loan Party further agrees, at the DIP Lenders' request, if an Event of Default shall occur and be continuing, to assemble the DIP Collateral and make it available to the DIP Lenders at places which the DIP Lenders shall reasonably select, whether at such DIP Loan Party's premises or elsewhere. The DIP Lenders shall apply the net proceeds of any action taken by them pursuant to this provision, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the DIP Collateral or in any way relating to the DIP Collateral or the rights of the DIP Lenders hereunder, including attorneys' fees and disbursements, to the payment of the DIP Obligations in accordance with this Term Sheet, the Financing Orders and related documentation. To the extent permitted by applicable law, each DIP Loan Party waives all claims, damages and demands it may acquire against the DIP Lenders arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of DIP Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

Each DIP Loan Party recognizes that the DIP Lenders may be unable to effect a public sale of any or all equity interests pledged hereunder, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "***Securities Act***") and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each DIP Loan Party acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. The DIP Lenders shall be under no obligation to delay a sale of any equity interests pledged hereunder for the period of time necessary to permit the issuer thereof to

register such securities or other interests for public sale under the Securities Act, or under applicable state securities laws, even if such issuer would agree to do so.

Each DIP Loan Party agrees to use its commercially reasonable efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of the equity interests pledged hereunder pursuant to this provision valid and binding and in compliance with applicable law. Each DIP Loan Party further agrees that a breach of any of the covenants contained in this provision will cause irreparable injury to the DIP Lenders, that the DIP Lenders have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this provision shall be specifically enforceable against such DIP Loan Party, and to the extent permitted by applicable law such DIP Loan Party hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred.

Each DIP Loan Party waives and agrees not to assert any rights or privileges which it may acquire under Section 9-626 of the UCC. Each DIP Loan Party shall remain liable for any deficiency if the proceeds of any sale or other disposition of the DIP Collateral are insufficient for the DIP Obligations to be indefeasibly paid in full and the fees and disbursements of any attorneys employed by the DIP Lenders to collect such deficiency.

Each DIP Loan Party hereby irrevocably constitutes and appoints each DIP Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such DIP Loan Party and in the name of such DIP Loan Party or in its own name, for the purpose of carrying out the terms of this Term Sheet and related documentation, to take any and all appropriate and reasonable action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Term Sheet and related documentation. If any DIP Loan Party fails to perform or comply with any of its agreements contained herein, the DIP Lenders, at their option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement and such DIP Loan Party shall reimburse the DIP Lenders for any amounts paid by the

DIP Lenders pursuant to the "Expenses and Indemnification" section of this Term Sheet. Such DIP Loan Party's obligation to reimburse the DIP Lenders pursuant to the preceding sentence shall be a DIP Obligation payable in accordance with this Term Sheet and related documentation. Each DIP Loan Party hereby ratifies all that such attorneys shall lawfully do or cause to be done by virtue hereof. All powers, authorizations and agencies contained in this provision are coupled with an interest and are irrevocable until this Term Sheet is terminated and the security interests created hereby are released. The DIP Lenders' sole duty with respect to the custody, safekeeping and physical preservation of the DIP Collateral in its possession shall be (a) to deal with it in the same manner as the DIP Lenders deal with similar property for their own account, and (b) to account for monies actually received.

Subject to the reinstatement provision set forth herein and any surviving obligations, at such time as the DIP Obligations have been indefeasibly paid in full, the DIP Collateral shall be released from the liens created hereby. At the request and sole expense of any DIP Loan Party following any such termination, the DIP Lenders shall deliver to the DIP Loan Parties any DIP Collateral held by the DIP Lenders hereunder, and execute and deliver to the DIP Loan Parties such documents as the DIP Loan Parties shall reasonably request to evidence such termination.

Each DIP Loan Party understands and agrees that the obligations of each DIP Loan Party under this provision shall be construed as continuing, absolute and unconditional without regard to (a) the validity or enforceability of this Term Sheet and any related documentation, any of the DIP Obligations or any other collateral security therefor or guaranty or right of offset with respect thereto at any time or from time to time held by DIP Lender, (b) any defense, set-off or counterclaim (other than a defense of indefeasible payment of the DIP Obligations in full) which may at any time be available to or be asserted by any DIP Loan Party or any other person or entity against the DIP Lenders or (c) any other circumstance whatsoever (with or without notice to or knowledge of any DIP Loan Party) which constitutes, or might be construed to constitute, an equitable or legal discharge of any DIP Loan Party for the DIP Obligations, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and

| | |
|---|---|
| | remedies hereunder against any DIP Loan Party, each DIP Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against any other DIP Loan Party or any other person or entity or against any other collateral security or guaranty for the DIP Obligations or any right of offset with respect thereto, and any failure by any DIP Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from any other DIP Loan Party or any other person or entity or to realize upon any such collateral security or guaranty or to exercise any such right of offset, or any release of any other DIP Loan Party or any other person or entity or any such collateral security, guaranty or right of offset, shall not relieve any DIP Loan Party of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the DIP Lenders against any DIP Loan Party. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings. |
| **Priority and Liens:** | All of the claims of the DIP Lenders under the DIP Facility with respect to the DIP Loans and the DIP Obligations shall at all times: |
| | 1.      pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral) (subject only to the Carve-Out); |
| | 2.      pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all DIP Collateral other than all property of the Debtors that is subject to valid and perfected liens in existence at the time of the commencement of the Chapter 11 Cases or subject to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (the "***Prior Senior Liens***"); and |
| | 3.      pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all DIP Collateral of the Debtors that is subject to a Prior Senior Lien. |
| **Carve-Out:** | The Financing Orders shall provide for a customary, agreed funded budget for the Debtors' professionals that will be |

| | |
|---|---|
| | subject to a carve-out of the superpriority claims and liens of the DIP Lenders (the "***Carve-Out***"). |
| **Credit Bidding:** | The Financing Orders shall authorize the DIP Lenders to credit bid any outstanding DIP Obligations in any sale of the DIP Collateral, including under sections 363 and 1123 of the Bankruptcy Code. Any such credit bid may provide for the assignment of the right to purchase the acquired assets to a sub-agent or a newly-formed acquisition vehicle. |
| **Marshaling and Waiver of Section 506(c) Claims and Section 552(b) Rights:** | Each of the Financing Orders shall provide, effective upon the entry of the Final Order, that in no event shall the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, and waivers of all claims and similar rights under sections 506(c) and 552(b) of the Bankruptcy Code. |
| **Automatic Stay:** | Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Financing Orders, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), the DIP Lenders shall be entitled to immediate indefeasible payment of all obligations under the DIP Facility and to enforce the remedies provided for under this Term Sheet, the Financing Orders and under applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court, but subject to the following conditions (the "***Waiting Period Procedures***"): |
| | 1.      The DIP Lenders shall notify the DIP Loan Parties in writing that the Maturity Date has occurred (such notice, a "***Maturity Date Notice***" and the date of any such notice, the "***Maturity Date Notice Date***"). A copy of any Maturity Date Notice shall be provided by email to the Debtors' counsel.<br><br>2.      A waiting period shall commence upon delivery of the Maturity Date Notice and shall expire five (5) business days after the Maturity Date Notice Date (the "***Waiting Period***"). During the Waiting Period, the Debtors shall be entitled to seek an emergency hearing before the Bankruptcy Court for the sole purpose of contesting the occurrence of the Maturity Date (including, for the avoidance of doubt, contesting the occurrence of any breach, default, or Event of Default alleged to underlie the occurrence of the Maturity Date). |

|  | 3.      During the Waiting Period, the Debtors may continue to use the DIP Collateral, including the Cash Collateral, so long as such DIP Collateral (including the Cash Collateral) is used solely to pay any expenses which are (a) necessary to preserve the Debtors' going concern value or (b) necessary to contest in good faith the occurrence of the Maturity Date or underlying Event of Default.

None of the DIP Lenders shall (a) object to any motion filed by the Debtors during the Waiting Period to the extent such motion seeks such expedited hearing or (b) seek to reduce such Waiting Period. |
| **Conditions Precedent:** | The several obligations of the DIP Lenders to make any DIP Loans shall be conditioned on the satisfaction or waiver of the following:

1.      with respect to the availability of the Interim DIP Loan, the entry by the Bankruptcy Court of the Interim Order in form and substance acceptable to the DIP Lenders and such order has not been stayed, reversed, modified or appealed.

2.      with respect to the availability of the Remaining DIP Loans, the entry of the Final Order in form and substance acceptable to the DIP Lenders and such order has not been stayed, reversed, modified or appealed;

3.      no trustee (other than a standing trustee under section 1183 of the Bankruptcy Code) or examiner having expanded powers shall have been appointed with respect to the DIP Loan Parties or their estates;

4.      there shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the DIP Loan Parties) threatened in writing in any court or before any arbitrator or governmental instrumentality (other than (i) the current and prior litigation with former co-owner Chloe Coscarelli as described in the *Declaration of David Selinger in Support of Chapter 11 Petitions and First Day Motions* (the "**Arbitration**"), (ii) the Chapter 11 Cases or (iii) the consequences that would normally result from the commencement and continuation of the Chapter 11 Cases) restraining, prohibiting or imposing material and adverse conditions on any DIP Loan Party, the DIP Facility, the Loan Documents or the DIP Collateral; |

| | |
|---|---|
| | 5.      no default or Event of Default shall have occurred or be continuing under this Term Sheet; |
| | 6.      the representations and warranties of the DIP Loan Parties under this Term Sheet shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); |
| | 7.      except for the Interim DIP Loan, the Borrower shall have delivered to the DIP Lenders a customary borrowing notice at least three business days prior to funding, and the aggregate amount of such borrowing shall not exceed the cash need for the subsequent four weeks as set forth in the Budget; |
| | 8.      to the extent applicable, all necessary governmental, Bankruptcy Court and third party orders, approvals and consents in connection with the Interim DIP Loan or the Remaining DIP Loans, as applicable, shall have been obtained and remain in effect and all applicable waiting periods shall have expired without any action being taken by any competent authority, which in the judgement of the DIP Lenders restrains, prevents or imposes material and adverse conditions upon the Interim DIP Loan or the Remaining DIP Loans, as applicable; |
| | 9.      this Term Sheet and any related documentation required hereunder shall have been executed and delivered in form, scope and substance satisfactory to the DIP Lenders, and the DIP Lenders shall have a perfected security interest (subject to liens permitted hereby and with the priority required hereby) in the DIP Collateral; and |
| | 10.      the DIP Lenders shall have received copies of (a) the resolutions of each DIP Loan Party authorizing the transactions contemplated hereby and under the Financing Orders and (b) a good standing certificate of each DIP Loan Party, in each case, showing that such DIP Loan Party is in good standing; provided, however, that a good standing certificate for each DIP Loan Party set forth on Schedule I shall not be required for the Interim DIP Loan but shall be required for any DIP Loan thereafter. |
| **Prepayments / Commitment Reductions:** | Voluntary prepayments of the DIP Loans and termination or reduction of the commitments in respect of the DIP Loans in whole or in part shall be permitted at any time, in minimum |

| | |
|---|---|
| | principal amounts not less than $100,000 and increments of $50,000 in excess thereof upon not less than two (2) business days' prior written notice to the DIP Lenders, without premium or penalty. All payments and prepayments of principal hereunder and all principal reductions effected in accordance with the terms of this Term Sheet and the Financing Orders shall be applied <u>first</u> to the accrued and unpaid interest due hereunder and <u>second</u> to the unpaid principal balance of the DIP Loans then outstanding. |
| **Representations and Warranties** | The DIP Loan Parties hereby represent and warrant to the DIP Lenders as follows, subject to the entry of the Financing Orders: |
| | 1. Except as set forth on Schedule I attached hereto, each of the DIP Loan Parties is duly organized, validly existing, in good standing and qualified to do business in the jurisdiction of its organization. |
| | 2. The stipulations of the Debtors in each of the Financing Orders are true, accurate and correct in all material respects. |
| | 3. Each of the DIP Loan Parties has full power and authority to operate and conduct its business, to execute, deliver and perform this Term Sheet and associated documents and to incur obligations under this Term Sheet and the Financing Orders. |
| | 4. None of the DIP Obligations shall be subject to setoff or recoupment or any such rights under section 553 of the Bankruptcy Code or otherwise with respect to any claim the Debtors may have against the DIP Lenders arising on or before the Petition Date. |
| | 5. Each of this Term Sheet and any related documentation required to be executed and delivered in connection herewith and the Financing Orders has been duly and validly executed and delivered by the applicable DIP Loan Parties and constitutes legal, valid and binding obligations of the applicable DIP Loan Parties enforceable in accordance with the terms thereof, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity. |

6.     This Term Sheet and the other documents executed in connection herewith do not, nor does the performance and observance by the DIP Loan Parties of any of the matters herein or therein provided for, (a) contravene or constitute a default under any provision of law or judgment, injunction, order or decree binding upon the DIP Loan Parties or any provision of the organizational documents of the DIP Loan Parties, (b) contravene or constitute a material default under any material covenant, indenture or agreement of or affecting the DIP Loan Parties or any of their property or (c) result in the creation or imposition of any lien on any property of any DIP Loan Party not permitted hereby or thereby.

7.     The DIP Loan Parties own or have a valid leasehold interest in each item of the DIP Collateral. There are no liens of any nature whatsoever on any property of the DIP Loan Parties other than liens permitted hereunder or under the Financing Orders. The DIP Loan Parties are not party to any contract, agreement, lease or instrument the performance of which, either unconditionally or upon the happening of an event, will result in or require the creation of a lien on any property of the DIP Loan Parties (other than liens permitted hereunder or under the Financing Orders) or otherwise result in a violation of this Term Sheet or the Financing Orders.

8.     There are no conditions precedent to the effectiveness of this Term Sheet that have not been satisfied or waived.

9.     No DIP Loan Party is an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

10.     No DIP Loan Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock and no proceeds of the DIP Loans will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock. No DIP Loan Party will take any action which might cause this Term Sheet, the Financing Orders or any document or instrument delivered pursuant hereto or thereto to violate any regulation of the Board of Governors of the Federal Reserve System of the United States.

11.     As of the date hereof, no DIP Loan Party has any material liabilities with respect to any (a) Title IV plans, or

(b) multiemployer plans. On the date hereof, no ERISA Event has occurred in connection with which material obligations or liabilities of the DIP Loan Parties are outstanding.

12.    None of the representations or warranties made by any DIP Loan Party in this Term Sheet or any documentation delivered in connection herewith as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any DIP Loan Party or any of its subsidiaries in connection with this Term Sheet or any such documentation (other than any statement which constitutes projections, forward looking statements, budgets, estimates or general market data), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered (it being recognized by the DIP Lenders that any projections and forecasts provided by the DIP Loan Parties are based on good faith estimates and assumptions believed by the DIP Loan Parties to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projections and forecasts may differ from projected or forecasted results).

13.    No Event of Default exists or would result from the incurring of any DIP Obligations by the DIP Loan Parties or the grant or perfection of the DIP Lenders' liens on the DIP Collateral or the consummation of the transactions contemplated by this Term Sheet or the Financing Orders. Neither the DIP Loan Parties nor any subsidiary of the DIP Loan Parties is in default under or with respect to any contractual obligation in any respect which, individually or together with all such defaults, could reasonably be expected to have a material adverse effect.

14. Set forth on the signature pages hereto are (a) the jurisdiction of organization, (b) the chief executive office location and (c) the exact legal name of each DIP Loan Party.

"***ERISA Event***" means any of the following: (a) a reportable event described in Section 4043(c) of ERISA with respect to a Title IV plan and with respect to which notice has not been waived under applicable regulations; (b) the withdrawal of

| | |
|---|---|
| | any ERISA affiliate from a Title IV plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA affiliate from any multiemployer plan; (d) with respect to any multiemployer plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV plan or multiemployer plan by the PBGC; (g) the failure by an ERISA affiliate to make any required contribution to any Title IV plan or multiemployer plan when due; (h) the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA affiliate; (i) the failure of a benefit plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code to qualify thereunder; (j) a Title IV plan is in "at risk" status within the meaning of Code Section 430(i); and (k) a multiemployer plan is in "endangered status" or "critical status" within the meaning of Section 432(b) of the Code. |
| **Affirmative Covenants:** | So long as any amount remains due and outstanding under this Term Sheet or the Financing Orders, the DIP Loan Parties will, and cause each of their subsidiaries to, do all of the following:<br><br>1.    use the advances made under the DIP Facility and the Cash Collateral consistent with the Budget (subject to Permitted Variances), and not use such funds to commence any action against the DIP Lenders or their respective affiliates, employees, directors, officers or principals;<br><br>2.    permit the DIP Lenders and their representatives and designees to visit and inspect the properties, books and records of the DIP Loan Parties upon reasonable notice; provided that no disclosure of information by the DIP Loan Parties to the DIP Lenders in connection with any such inspection shall be required to the extent that such disclosure would result in the breach of any confidentiality obligations to which the DIP Loan Parties are subject or if such |

disclosure would compromise attorney-client privilege or require the disclosure of attorney work product;

3. subject to the Budget, pay all material taxes, assessments, contributions, other governmental charges and other material obligations imposed upon any DIP Loan Party or any of its properties or assets as they become due and payable, to the extent payment and/or enforcement thereof is not stayed as a result of the Chapter 11 Cases;

4. maintain in good working order all material properties used in the business of the DIP Loan Parties (other than ordinary wear and tear, casualty and condemnation and to the extent not causing a material adverse effect), as and to the extent in good working order as of the Petition Date;

5. maintain insurance with respect to the business and property of the DIP Loan Parties adequate to cover risks of such types and in such amounts as are customary for companies of similar size engaged in similar lines of business;

6. comply with the requirements of all applicable laws unless failure to comply could not reasonably be expected to result in a material adverse effect;

7. comply with the schedule of Case Milestones (as defined below);

8. promptly upon request execute and deliver such documents and do such other acts as the DIP Lenders may reasonably request in connection with the DIP Facility, and in accordance with this Term Sheet and the Financing Orders (including but not limited to execution of any additional security documents that may be reasonably requested);

9. maintain, preserve and renew its corporate existence and all material licenses, authorizations and permits necessary to conduct its business;

10. maintain proper books of record and account which present fairly in all material respects its financial condition and results of operations;

11. deliver, or cause to be delivered, such agreements, documents and instruments in furtherance of this Term Sheet and the Financing Orders as the DIP Lenders may from time to time reasonably request to (a) carry out more effectively

|  | the purposes of this Term Sheet and the Financing Orders, (b) subject to the liens created hereby any of the DIP Collateral, (c) perfect and maintain the validity, effectiveness and priority of the liens created hereby and (d) better assure, convey, grant, assign, transfer, preserve, protect and confirm to the DIP Lenders the rights granted or now or hereafter intended to be granted to the DIP Lenders under this Term Sheet and the Financing Orders; and

12.    maintain the security interest created by this Term Sheet as a perfected security interest having at least the priority required hereby, and defend such security interest against all other claims and demands. |
|---|---|
| **Reporting Covenants:** | In addition to the cash flow forecasts to be provided as described under the "Budget" section of this Term Sheet:

1.    within 45 days after the end of each quarterly accounting period of the DIP Loan Parties, unaudited consolidated profit and loss statements of the DIP Loan Parties and their consolidated subsidiaries for such quarterly period (as well as unaudited consolidated profit and loss statements of the DIP Loan Parties and their consolidated subsidiaries for the period from the beginning of the fiscal year to the end of such quarter);

2.    within 30 days after the end of each month, unaudited consolidated profit and loss statements of the DIP Loan Parties and their consolidated subsidiaries for such monthly period (as well as unaudited consolidated profit and loss statements of the DIP Loan Parties and their subsidiaries for the period from the beginning of the fiscal year to the end of such month);

3.    promptly upon receipt, provide the DIP Lenders with copies of any detailed audit reports, management letters or recommendations submitted to the DIP Loan Parties or any subsidiary thereof by auditors in connection with the accounts or books of the DIP Loan Parties or any subsidiary thereof or any audit of the DIP Loan Parties or any subsidiary thereof; and

4.    promptly notify the DIP Lenders of each of the following (and in no event later than five (5) business days after an officer of the DIP Loan Parties becoming aware thereof): |

(a)     the commencement of, or any material development in, any litigation or proceeding affecting the DIP Loan Parties or any of their subsidiaries or any DIP Collateral;

(b)     the occurrence of an ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the DIP Loan Parties and their subsidiaries in an aggregate amount exceeding $10,000;

(c)     receipt of any written notice of any governmental investigation or any litigation or proceeding commenced or threatened in writing against the DIP Loan Parties or any of their subsidiaries that (i) seeks damages in excess of $15,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any benefit plan, its fiduciaries or its assets, (iv) alleges criminal conduct by the DIP Loan Parties or any of their subsidiaries, (v) alleges the violation, in any material respect, of any law regarding, or seeks remedies in connection with, any environmental laws or (vi) contests any tax, fee, assessment or other governmental charge in excess of $30,000; or

(d)     the occurrence of any Event of Default or event which with the giving of notice or lapse of time or both would be an Event of Default.

5. The DIP Loan Parties' senior management and their legal and financial advisors shall be available to conduct a telephonic conference call no more than once a week, if reasonably requested by the DIP Lenders, to discuss the Budget, any variance or related reports delivered in connection with the Budget, the Chapter 11 Cases, and the financial condition, performance, and business affairs of the Company.

| | |
|---|---|
| **Negative Covenants:** | So long as any amount remains due and outstanding under this Term Sheet or the Financing Orders, the DIP Loan Parties will not, and cause each of their subsidiaries to not, do any of the following:<br><br>1.     incur any indebtedness (other than  (i) the borrowings under the DIP Facility and obligations permitted to be incurred consistent with the  Budget, (ii) any other indebtedness permitted (with prior written consent) to be incurred by the DIP Lenders and the Bankruptcy Court,  (iii) any unsecured obligations incurred in the ordinary course of |

business by the DIP Loan Parties and (iv) indebtedness which in the aggregate does not exceed $50,000 at any time);

2.      incur any liens (other than   (i) liens securing indebtedness required or permitted by this Term Sheet and the Financing Orders to be secured (ii) liens permitted (with prior written consent) by the DIP Lender, (iii) customary nonconsensual liens, and (iv)  liens which in the aggregate do not secure obligations in excess of $50,000 at any time);

3.      make any investments in any other person or make any loan to any other person (other than (i) investments contemplated by and consistent with the Budget, , (ii) investments permitted (with prior written consent) by the DIP Lenders and (iii) investments which in the aggregate do not exceed $50,000 at any time);

4.      engage in any business other than the business engaged in by the DIP Loan Parties on the Petition Date and other business activities which are reasonably related or ancillary to the foregoing or otherwise permitted (with prior written consent) by the DIP Lenders;

5.      sell or transfer any assets outside the ordinary course of business, unless such sale or transfer results in the indefeasible payment in full in cash of the DIP Obligations (other than (i) dispositions contemplated by and consistent with the Budget, (ii)  dispositions permitted (with prior written consent) by the DIP Lenders and (iii) a general dispositions basket so long as any asset sold does not generate proceeds in excess of $50,000);

6.      directly or indirectly, by operation of law or otherwise, acquire any material assets or equity interests of another person, merge, consolidate or dissolve (other than acquisitions of assets contemplated by and consistent with the Budget or as permitted (with prior written consent) by the DIP Lenders);

7.      terminate or make any modification to the capital structure or any organizational documents of any DIP Loan Party that would be adverse to the DIP Lenders in any respect without the prior consent of the DIP Lenders;

8.      engage in any transactions with affiliates, except as set forth in the Budget, transactions in the ordinary course of business upon fair and reasonable terms no less favorable to

the DIP Loan Parties and their subsidiaries than would be obtained in a comparable arm's length transaction with a non-affiliate or otherwise as permitted (with prior written consent) by the DIP Lenders;

9.      use proceeds of the Carve-Out and the DIP Collateral (including the Cash Collateral) except as set forth in this Term Sheet and the Financing Orders;

10.     seek or agree to amend any of the Financing Orders, any Bankruptcy Court order relating to cash management or the Budget or any of the terms of any of the foregoing without the prior written consent of the DIP Lenders in their sole and absolute discretion;

11.     seek or agree to entry of any order precluding or modifying the DIP Lenders' rights to credit bid up to the full amount of the outstanding DIP Obligations for the Debtors' assets;

12.     other than the Carve-Out and as contemplated by the Financing Orders, consent to the granting of adequate protection payments or liens, superpriority administrative expense claims or liens having priority senior to or *pari passu* with those granted to the DIP Lenders, except as otherwise expressly permitted by this Term Sheet or the Financing Orders;

13.     make any dividends or other distributions on account of the capital stock of the DIP Loan Parties or their subsidiaries (other than ordinary course tax distributions and corporate overhead expenses in accordance with the Budget and other dividends or distributions permitted (with prior written consent) by the DIP Lenders); and

14.     except upon 10 days' prior written notice to the DIP Lenders and delivery to the DIP Lenders of all additional financing statements and other documents reasonably requested by the DIP Lenders as to the validity, perfection and priority of the security interests provided for herein, with respect to any DIP Loan Party: (a) change the location of its chief executive office from that specified on the signature pages hereto or in any subsequent notice delivered pursuant to this provision; or (b) change its name, jurisdiction of incorporation or organization, identity, federal employer

| | |
|---|---|
| | identification number, organizational identification number or corporate structure. |
| **Case Milestones:** | Unless waived by the DIP Lenders in their sole discretion, the failure of the DIP Loan Parties to meet the following milestones shall constitute an Event of Default:<br><br>1. Within one (1) business day of the Petition Date, the Debtors shall file a motion establishing bidding procedures (the "***Bidding Procedures***");<br><br>2. No later than three (3) business days after the Petition Date, entry by the Bankruptcy Court of the Interim Order;<br><br>3. No later than twenty-one (21) calendar days after the Petition Date, the Debtors shall file a plan of reorganization that is reasonably acceptable to the DIP Lenders (the "***Plan***");<br><br>4. No later than thirty (30) calendar days after the Petition Date, entry by the Bankruptcy Court of the Final Order;<br><br>5. No later than thirty five (35) calendar days after the Petition Date, entry by the Bankruptcy Court of an order approving the Bidding Procedures, which order shall be reasonably acceptable to the DIP Lenders;<br><br>6. No later than thirty five (35) calendar days after the Petition Date, entry by the Bankruptcy Court authorizing, or the filing by the Debtors of a notice setting forth, procedures with respect to the solicitation of votes on the Plan, which order or notice shall be reasonably acceptable to the DIP Lenders;<br><br>7. No later than seventy-five (75) days after the Petition Date, entry of an order by the Bankruptcy Court confirming the Plan, which order shall be reasonably acceptable to the DIP Lenders; and<br><br>8. No later than eighty-five (85) days after the Petition Date, the effective date of the Plan shall occur. |

| | |
|---|---|
| **Events of Default:** | The term "Event of Default" as used herein means the occurrence or happening, at any time and from time to time, of any of the following:<br><br>1.    The failure by the DIP Loan Parties to timely perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in this Term Sheet or any of the Financing Orders; <u>provided</u> that in the case of Affirmative Covenants (other than the requirements set forth herein or in the Financing Orders regarding the use of proceeds of DIP Loans, delivery of the Budget or Variance Reports, delivery of notice of any default or Events of Default, cash management or Case Milestones), such failure continues for five (5) days from the earlier of written notice to the Borrower or knowledge of an officer of the DIP Loan Parties thereof.<br><br>2.    The cessation of the DIP Facility being in full force and effect or the DIP Facility being declared by the Bankruptcy Court to be null and void or the validity or enforceability of any provision of the DIP Facility being contested by any DIP Loan Party or any DIP Loan Party denying in writing that it has any further liability or obligation under any provision of the DIP Facility or the DIP Lenders ceasing to have the benefit of the liens granted by the Loan Documents.<br><br>3.    Except as permitted by this Term Sheet or the Financing Orders and other than with respect to the Carve-Out, the entry of any order of the Bankruptcy Court granting to any third party a claim or lien *pari passu* with or senior to that granted to the DIP Lenders hereunder.<br><br>4.    Until the DIP Obligations are indefeasibly repaid in full (other than contingent obligations for which no claim has been made) and all commitments under the DIP Facility are terminated, the DIP Loan Parties shall make any payment of prepetition principal or interest or otherwise on account of any prepetition indebtedness for borrowed money or payables other than the DIP Obligations under the DIP Facility or other than as is consistent with the Budget or the Financing Orders.<br><br>5.    The failure of the Borrower to make any interest payments due under this Term Sheet or the Financing Orders within three (3) business days of when due. |

6.      Failure of the DIP Loan Parties to meet any of the applicable Case Milestones (other than as the result of any action or omission of the DIP Lenders).

7.      The entry of an order converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, or the Debtors filing a motion or not opposing a motion seeking such relief.

8.      The entry of an order dismissing the Chapter 11 Cases, or the Debtors filing a motion or not opposing a motion seeking such relief without the prior written consent of the DIP Lenders.

9.      The entry of an order in the Chapter 11 Cases appointing any examiner having expanded powers or a trustee to operate all or any material part of the Debtors' business.

10.     The entry of an order in the Chapter 11 Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property with a value in excess of $75,000, including the DIP Collateral, of the Debtors or to commence or continue any prepetition litigation against the DIP Loan Parties involving potential liability not covered by insurance in excess of $75,000 in the aggregate.

11.     The entry of an order in the Chapter 11 Cases charging any of the DIP Collateral under section 506(c) of the Bankruptcy Code against the DIP Lenders or the commencement of other actions by any DIP Loan Party or affiliate thereof that challenges the rights and remedies of any of the DIP Lenders under the DIP Facility in any of the Chapter 11 Cases or in a manner inconsistent with this Term Sheet or the Financing Orders.

12.     Without the prior written consent of the DIP Lenders and other than in respect of the DIP Facility and the Carve-Out or as expressly permitted in this Term Sheet or the Financing Orders, the bringing of any motion or taking of any action, seeking entry of an order, or the entry of an order by the Bankruptcy Court, in any of the Chapter 11 Cases (a) granting superpriority administrative expense status to any claim *pari passu* with or senior to the claims of the DIP Lenders, (b) permitting the Debtors to obtain financing under section 364 of the Bankruptcy Code that does not provide for

the repayment in full of the DIP Obligations, (c) permitting the Debtors to grant security interests or liens under section 364 of the Bankruptcy Code, (d) permitting the Debtors to use cash collateral under section 364 of the Bankruptcy Code or (e) authorizing the Debtors to take other actions adverse to any DIP Lender (in its role as a DIP Lender) or its rights and remedies under this Term Sheet or the Financing Orders or its interest in the DIP Collateral under section 364 of the Bankruptcy Code.

13.    The entry of any order terminating any Debtor's exclusive right to file a plan of reorganization or the expiration of any Debtor's exclusive right to file a plan of reorganization.

14.    There shall arise any superpriority claim in the Chapter 11 Cases which is *pari passu* with or senior to the priority of the claims of the DIP Lenders, except with respect to the Carve-Out and as set forth in this Term Sheet or the Financing Orders.

15.    The entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by any Debtor of similar relief in favor of any one or more of any Debtor's prepetition creditors, contrary to the terms and conditions of any of this Term Sheet or the Financing Orders.

16.    The DIP Loan Parties or any of their subsidiaries or affiliates, or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist, fail to object to after the DIP Lenders so request, or otherwise participate as an adverse party in any suit or other proceeding against any DIP Lender (in its role as a DIP Lender) regarding the DIP Facility.

17.    A plan of reorganization shall be filed by the Debtors, or be confirmed in any of the Chapter 11 Cases, or any order shall be entered which dismisses any of the Chapter 11 Cases and which plan or order

(a)    does not indefeasibly satisfy the DIP Obligations in full in cash, or

(b)    is not otherwise satisfactory to the DIP Lenders.

18.    Other than the Arbitration and the disputes related to the Arbitration, any final judgment or order as to liability not

covered by insurance or third party indemnity, or debt for the payment of money, in excess of $75,000 shall be rendered against the DIP Loan Parties (individually or in the aggregate), and, in each case, there shall be a period of five (5) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

19.     The Bankruptcy Court shall enter an order authorizing the sale of all or substantially all of the assets of the Debtors unless such order contemplates indefeasible repayment in full in cash of the DIP Facility upon consummation of the sale process unless the DIP Lenders consent in advance in writing in their sole and absolute discretion.

20.     The entry of an order in the Chapter 11 Cases avoiding or permitting avoidance of any portion of the payments made on account of the obligations under the DIP Facility, this Term Sheet, the Financing Orders or any related documents or any other indebtedness provided to the Debtors and their subsidiaries by any DIP Lender, or the taking of any action by any DIP Loan Party to challenge or support a challenge of any such payments.

21.     This Term Sheet or the Financing Orders and the terms thereof shall cease to create a valid and perfected security interest and lien on the DIP Collateral (other than an immaterial portion thereof) to the extent required hereby.

22.     The Final Order does not include a waiver, in form and substance satisfactory to the DIP Lenders in their sole and absolute discretion, of (a) the right to surcharge the DIP Collateral under section 506(c) of the Bankruptcy Code; and (b) the doctrine of marshaling.

23.     The filing or support of any pleading by any DIP Loan Party (or any subsidiary thereof) seeking, or otherwise consenting to, any relief the granting or prosecution of which could reasonably be expected to result in the occurrence of an Event of Default, including the support or acceptance of any bid in a 363 sale that does not provide for the indefeasible repayment in full in cash of the DIP Facility upon consummation of the sale unless the DIP Lenders consent in advance in writing in their sole and absolute discretion.

|  | 24.    Any of the Financing Orders being amended or modified without the prior written consent of the DIP Lenders. |
|  | 25.    Except with respect to the tax matters disclosed on Schedule I, the issuance by any tax authority of one or more deficiency notices with respect to any subsidiary of any Debtor exceeding, in the aggregate, $30,000 at any time. |
|  | 26.    Any representation or warranty made or deemed made by or on behalf of any DIP Loan Party under or in connection with this Term Sheet or the Financing Orders or any report, certificate or other document delivered in connection therewith shall have been incorrect in any material respect (or in the case of representations and warranties with a "materiality" qualifier, incorrect in any respect) when made or deemed made. |
|  | 27.    (a) An ERISA Event occurs which has resulted or could reasonably be expected to result in liability of the DIP Loan Parties, any subsidiary or any ERISA affiliate in an aggregate amount which could reasonably be expected to result in material liability, (b) there is or arises an unfunded pension liability (taking into account only pension plans with positive unfunded pension liability) that could reasonably be expected to result in material liability, or (c) any of the DIP Loan Parties, any subsidiary or any ERISA affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a multiemployer plan in an aggregate amount which could reasonably be expected to result in a material liability. |
| **Remedies:** | Notwithstanding the provisions of section 362 of the Bankruptcy Code, but subject to the Waiting Period Procedures and any other applicable provisions of the Financing Orders, as the case may be, if any Event of Default occurs and is continuing, the DIP Secured Parties may, at the direction of the DIP Lenders, take any or all of the following actions: |
|  | 1.    declare, by a Maturity Date Notice, the commitment of the DIP Lenders to make DIP Loans and consent to use of Cash Collateral to be terminated, whereupon such commitment and consent shall be terminated; |

| | |
|---|---|
| | 2.      declare, by a Maturity Date Notice, the unpaid amount of the DIP Obligations, all interest accrued and unpaid thereon, and all other amounts owing or payable under this Term Sheet and the Financing Orders to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the DIP Loan Parties; or<br><br>3.      take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lenders and including as set forth above under the "Credit Bidding" section) permitted under this Term Sheet or the Financing Orders, or by applicable law (including, without limitation, the rights of a secured creditor under the Uniform Commercial Code). |
| **Expenses and Indemnification:** | All reasonable and documented professional fees and out-of-pocket expenses incurred by the DIP Lenders in connection with the establishment of the DIP Facility, including, without limitation, the negotiation, preparation, execution, delivery, performance and administration of this Term Sheet and the related documentation (including, but not limited to, the fees and expenses of the DIP Lenders' primary and local counsel), and including expenses incurred in connection with defending the validity and enforceability of the DIP Obligations or any of the liens or adequate protection securing the same, shall be promptly paid by the DIP Loan Parties on no less than a monthly basis.<br><br>The DIP Lenders (and their affiliates and respective officers, directors, employees, advisors and agents) (each such person, an "*Indemnitee*") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person.<br><br>This provision shall survive repayment of the DIP Obligations (and the termination of all commitments hereunder), any foreclosure under, or any modification, release or discharge of, or termination of, the Loan Documents. |

| | |
|---|---|
| **Release:** | The Final Order shall provide for a release, to the fullest extent permitted by law, by the DIP Loan Parties of the DIP Lenders and each of their respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives and other professionals with respect to any and all claims or causes of action the Debtors may have against such parties solely in their capacities as DIP Lenders. |
| **Amendments and Waivers; Assignments:** | Except as otherwise provided herein or therein, the provisions of the Loan Documents may not be amended or waived without the written consent of the DIP Lenders. This Term Sheet shall be binding upon each party hereto and its respective successors and permitted assigns, and shall inure to the benefit of the DIP Lenders and the successors and permitted assigns of the DIP Lenders. No other person or entity shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Term Sheet or any related documentation. The rights and obligations of the DIP Loan Parties hereunder may not be assigned by the DIP Loan Parties without the prior written consent of the DIP Lenders, which consent may be grated or withheld in the DIP Lenders' sole discretion.<br><br>The rights and remedies of the DIP Lenders expressly set forth herein and in the related documentation are cumulative and in addition to, and not exclusive of, all other rights and remedies available at law, in equity or otherwise. No failure or delay on the part of the DIP Lenders in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege or be construed to be a waiver of any default or Event of Default. |
| **Governing Law:** | Delaware and, on and after the Petition Date to the extent applicable, the Bankruptcy Code. |

| Miscellaneous: | All payments to be made to the DIP Lenders hereunder shall be made in the lawful money of the United States of America in immediately available funds. If any payment by the DIP Loan Parties is due on a day which is not a business day, the payment shall be due and payable on, and the time period shall automatically be extended to, the immediately following business day, and interest shall continue to accrue at the required rate hereunder until any such payment is made. |
|---|---|
| | Each party hereto hereby consents and agrees that the courts in the state of Delaware or of the United States for the District of Delaware shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining to the Loan Documents or to any matter arising out of or relating to the Loan Documents; *provided* that during the Chapter 11 Cases the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining to this Term Sheet or any Loan Document or to any matter arising out of or relating to the Loan Documents; *provided, further* that nothing in this Term Sheet shall be deemed to operate to preclude the DIP Lenders from bringing suit or taking other legal action in any other jurisdiction to realize on any security for the DIP Obligations, or to enforce a judgment or other court order in favor of the DIP Lenders. The DIP Loan Parties hereby expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, and the DIP Loan Parties hereby waive any objection that the DIP Loan Parties may have based upon lack of personal jurisdiction, improper venue or *forum non conveniens* and hereby consent to the granting of such legal or equitable relief as is deemed appropriate by such court. |
| | Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right to jury trial with respect to any claim, demand, action or cause of action arising under this Term Sheet and the related documentation or in any way connected with or related to the dealings in respect hereof or thereof, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise. |
| | In case any provision in or obligation hereunder or in any related document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of |

- 37 -

the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Each DIP Loan Party hereby waives presentment for payment, protest, demand, notice of protest, notice of nonpayment and diligence with respect to this Term Sheet and related documentation, and waives and renounces all rights to the benefits of any statute of limitations or any moratorium, appraisement, exemption, or homestead now provided or that hereafter may be provided by any federal or applicable state statute, including but not limited to exemptions provided by or allowed under the Bankruptcy Code, both as to itself and as to all of its property, whether real or personal, against the enforcement and collection of the DIP Obligations and any and all extensions, renewals, and modifications hereof.

All notices and other communications hereunder shall be in writing and shall be delivered personally by hand, by electronic mail, or sent by an overnight courier service to the parties at the following addresses (or at such other address for a party as shall be specified by such party by like notice):

If to the DIP Loan Parties:

BC Hospitality Group Inc.
205 Hudson Street, Suite 1001
New York, NY 10013
Email: patrick@redanadvisors.com
Attn: Patrick J. Bartels, Jr., Director

With a copy (that will not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Email: mbcleary@ycst.com
Attention: M. Blake Cleary, Esq.

If to the DIP Lenders:

Bain Capital Double Impact Fund, LP and BCIP Double Impact Associates, L.P.

200 Clarendon Street
Boston, MA 02116
Attention:  Bryan Curran
Email:  BCurran@BainCapital.com

Kitchen Fund, LP and KF-Chloe, LLC

500 Park Avenue, 4th Floor
New York, New York 10022
Attention:  Gregory Golkin
Email:  greg@kitchenfund.com

Qoot International UK Limited

c/o TGP International
276 Vauxhall Bridge Road, 3rd Floor
London, SW1V 1BB
Attention:  Simon Wright
Email:  simon.wright@qootco.com


Lion/BC LLC

21 Grosvenor Place
London SW1X 7HF
Attention:  Simon Brown,
        Attorney for Cottesmore Partners LLP,
        Managing Member of Lion/BC LLC


Collab+Consumer I, L.P.

347 Bowery, 2nd Floor
New York, New York 10003
Attention:  Craig Shapiro


With a copy (that will not constitute notice) to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6009
Attention: Andrew S. Mordkoff, Esq.
E-mail:  amordkoff@wilkie.com

All notices given pursuant to the DIP Term Sheet shall be deemed to have been given (i) if delivered personally, on the date of delivery or on the date delivery was refused by the addressee, (ii) if delivered by electronic mail, when transmitted to the recipient, or (iii) if delivered by overnight courier, on the date of delivery as established by the return receipt or courier service confirmation (or the date on which the courier service confirms that acceptance of delivery was refused by the addressee).The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," whether or not so expressly stated in each such instance and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), and any reference to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation, (b) any reference herein to any person or entity shall be construed to include such person's or such entity's successors and permitted assigns, and (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Term Sheet in its entirety and not to any particular provision hereof.

This Term Sheet and related documentation are the result of negotiations among and have been reviewed by counsel to each party hereto and thereto, and are the products of all parties. Accordingly, such documentation shall not be construed against the DIP Lenders merely because of the DIP Lenders' involvement in their preparation.

This Term Sheet may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same agreement. Receipt by telecopy or electronic transmission of any executed signature page to this Term Sheet or any related documentation shall constitute effective delivery of such signature page. This Term Sheet,

together with the Financing Orders and related documentation, embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such parties, verbal or written, relating to the subject matter hereof and thereof.

This Term Sheet shall remain in full force and effect and continue to be effective should any petition be filed by or against any DIP Loan Party for liquidation or reorganization, should any DIP Loan Party become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of any DIP Loan Party's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the DIP Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the DIP Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the DIP Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

**DIP LOAN PARTIES:**

**BC HOSPITALITY GROUP INC.,**
a Delaware corporation as the Borrower

By:_____
     Name:
     Title:

**BC HOSPITALITY GROUP LLC**, a New York limited liability company
**BC INTERNATIONAL LLC**, a Delaware limited liability company
**BC COMMISSARY NJ LLC**, a New York limited liability company
**E2 185 BLEECKER LLC**, a New York limited liability company
**E2 60 WEST 22ND STREET LLC**, a New York limited liability company
**E2 LAFAYETTE LLC**, a New York limited liability company
**BC WILLIAMSBURG LLC**, a New York limited liability company
**BCRC LLC**, a New York limited liability company
**CW SSS LLC**, a New York limited liability company
**BC UNION SQUARE LLC**, a New York limited liability company
**BC 1385 BROADWAY LLC**, a New York limited liability company
**BC 630 LEXINGTON LLC**, a New York limited liability company
**CCSW FENWAY LLC**, a Massachusetts limited liability company
**E2 SEAPORT LLC**, a New York limited liability company
**BC BACK BAY LLC**, a Massachusetts limited liability company
**BC PROVIDENCE LLC**, a Rhode Island limited liability company
**BC SILVER LAKE LLC**, a Delaware limited liability company
**BC CENTURY CITY LLC**, a California limited liability company
**BC WEST HOLLYWOOD LLC**, a California limited liability company

By:_____
     Name:
     Title:

Chief Executive Office of the DIP Loan Parties:
205 Hudson Street, Suite 1001, New York, New York 10013

**DIP LENDERS:**

**BAIN CAPITAL DOUBLE IMPACT FUND, LP**, as a DIP Lender


By:_____
    Name: Bryan Curran


**BCIP DOUBLE IMPACT ASSOCIATES, L.P.**, as a DIP Lender


By:_____
    Name: Bryan Curran


**KITCHEN FUND, LP**., as a DIP Lender


By:_____
    Name: Gregory Golkin


**KF-CHLOE, LLC**, as a DIP Lender


By:_____
    Name: Gregory Golkin

**QOOT INTERNATIONAL UK LIMITED**


By: _____
     Name:  Simon Wright



**LION/BC LLC**

By: _____
     Name:  Simon Brown,
     Attorney for Cottesmore Partners LLP,
     Managing Member of Lion/BC LLC


**COLLAB+CONSUMER I, L.P.**


By: _____
     Name:  Craig Shapiro

## SCHEDULE I

The following entities are not in good standing as of the Petition Date:

BC International LLC (DE)

CCSW Fenway LLC (MA)

BC Providence LLC (RI)


Those certain taxes outstanding as of the Petition Date as set forth in *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Petition Taxes and Fees and (II) Granting Related Relief* as filed on the Petition Date.

## EXHIBIT B

**Initial Budget**

**BC Hospitality Group Inc.**
**Ch.11 DIP Budget**

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Week Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week-Ended | 18-Dec | 25-Dec | 1-Jan | 8-Jan | 15-Jan | 22-Jan | 29-Jan | 5-Feb | 12-Feb | 19-Feb | 26-Feb | 5-Mar | 12-Mar | |
| Description ($ 000's) | Proj. | Proj. | Proj. | Proj. | Proj. | Proj. | Proj. | Proj. | Proj. | Proj. | Proj. | Proj. | Proj. | Proj. |
| **SALES** | | | | | | | | | | | | | | |
| **Sales** | | | | | | | | | | | | | | |
| Food | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 185 | 2,401 |
| Beverage | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 55 |
| Merchandise | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 16 |
| **Total Sales** | **190** | **190** | **190** | **190** | **190** | **190** | **190** | **190** | **190** | **190** | **190** | **190** | **190** | **2,471** |
| **RECEIPTS** | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| Gross Sales | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 2,471 |
| Less: Commissions | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (250) |
| Less: Credit Card Charges | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (15) |
| Sales Tax | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 210 |
| DIP Financing | 1,400 | - | - | 1,100 | - | - | - | 750 | - | - | - | - | - | 3,250 |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | **1,586** | **186** | **186** | **1,286** | **186** | **186** | **186** | **936** | **186** | **186** | **186** | **186** | **186** | **5,666** |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| **Cost of Sales** | | | | | | | | | | | | | | |
| Food | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 741 |
| Beverage | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 32 |
| Paper Goods | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 94 |
| **Total Cost of Sales** | **67** | **67** | **67** | **67** | **67** | **67** | **67** | **67** | **67** | **67** | **67** | **67** | **67** | **867** |
| **Payroll** | | | | | | | | | | | | | | |
| Payroll | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 1,433 |
| Fringes | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 215 |
| Independent Director | 25 | - | - | 25 | - | - | - | 20 | - | - | - | 20 | - | 90 |
| Accrued PTO | 21 | - | - | - | - | - | - | - | - | - | - | - | - | 21 |
| Accrued Flex Accounts | 3 | - | - | - | - | - | - | - | - | - | - | - | - | 3 |
| **Total Payroll** | **176** | **127** | **127** | **152** | **127** | **127** | **127** | **147** | **127** | **127** | **127** | **147** | **127** | **1,762** |
| **Occupancy** | | | | | | | | | | | | | | |
| Stub-Rent | - | - | - | - | - | - | - | - | - | - | - | - | 129 | 129 |
| Rent | - | - | - | 211 | - | - | - | 211 | - | - | - | 211 | - | 632 |
| RE & Personal Property Tax | 39 | - | - | - | - | 6 | 5 | - | - | - | - | - | 11 | 60 |
| **Total Occupancy** | **39** | **-** | **-** | **211** | **-** | **6** | **215** | **-** | **-** | **-** | **-** | **211** | **139** | **821** |
| **Operating** | | | | | | | | | | | | | | |
| Supplies | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 90 |
| Repairs & Maintenance | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 158 |
| Utilities | - | - | - | 47 | - | - | - | 47 | - | - | - | - | 47 | 142 |
| Telephone & Cable | - | - | - | - | 6 | - | - | - | 6 | - | - | - | 6 | 19 |
| Human Resources | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 20 |
| Marketing | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 15 |
| Insurance | 84 | - | - | - | 18 | - | - | 40 | - | - | - | - | 100 | 242 |
| Corp Freight & Messengers | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 13 |
| Travel | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 22 |
| Computer Services | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 69 |
| Franchise Tax | 20 | - | - | - | - | - | - | - | - | - | - | - | 12 | 32 |
| Truck Lease | - | - | 1 | - | - | - | - | - | - | - | - | 1 | - | 3 |
| Sales Tax | 95 | - | - | 19 | - | 45 | - | 19 | - | 45 | - | 19 | - | 243 |
| All Other | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 14 |
| **Total Operating Expenses** | **230** | **31** | **32** | **50** | **102** | **76** | **32** | **50** | **124** | **76** | **32** | **50** | **196** | **1,080** |
| **Non-Operating** | | | | | | | | | | | | | | |
| Professional Fees | 118 | 105 | 85 | 78 | 55 | 55 | 40 | 30 | 30 | 20 | 15 | 15 | 15 | 660 |
| DIP Loan Fees | - | - | - | - | - | - | - | - | - | - | - | - | 195 | 195 |
| Interest Expense | - | - | - | 5 | - | - | - | 9 | - | - | - | 11 | - | 25 |
| 503(b)(9) | 140 | - | - | - | - | - | - | - | - | - | - | - | - | 140 |
| Utility Escrow | - | - | 47 | - | - | - | - | - | - | - | - | - | - | 47 |
| Transition Services | - | - | - | - | - | - | - | - | 25 | - | - | - | 25 | 50 |
| **Total Non-Operating** | **258** | **105** | **132** | **82** | **55** | **55** | **40** | **39** | **55** | **20** | **15** | **26** | **235** | **1,117** |
| **Disbursements** | | | | | | | | | | | | | | |
| Cost of Sales | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 867 |
| Payroll | 176 | 127 | 127 | 152 | 127 | 127 | 127 | 147 | 127 | 127 | 127 | 147 | 127 | 1,762 |
| Occupancy | 39 | - | - | 211 | - | 6 | 215 | - | - | - | - | 211 | 139 | 821 |
| Operating | 230 | 31 | 32 | 50 | 102 | 76 | 32 | 50 | 124 | 76 | 32 | 50 | 196 | 1,080 |
| Non-Operating | 258 | 105 | 132 | 82 | 55 | 55 | 40 | 39 | 55 | 20 | 15 | 26 | 235 | 1,117 |
| **Total Disbursements** | **768** | **329** | **358** | **562** | **351** | **324** | **271** | **518** | **373** | **289** | **240** | **500** | **764** | **5,648** |
| **Net Cash Flow (Weekly)** | 818 | (143) | (172) | 724 | (165) | (138) | (85) | 418 | (187) | (103) | (55) | (315) | (579) | |
| **Cumulative Cash Flow** | 818 | 674 | 502 | 1,227 | 1,062 | 923 | 838 | 1,256 | 1,069 | 966 | 911 | 597 | 18 | 18 |
| **Beginning Cash** | - | 818 | 674 | 502 | 1,227 | 1,062 | 923 | 838 | 1,256 | 1,069 | 966 | 911 | 597 | |
| **Ending Cash** | 818 | 674 | 502 | 1,227 | 1,062 | 923 | 838 | 1,256 | 1,069 | 966 | 911 | 597 | 18 | 18 |