**<u>EXHIBIT 1</u>**



800 LASALLE AVENUE          612 349 8500 TEL
SUITE 2800                  612 339 4181 FAX
MINNEAPOLIS MN  55402       ROBINSKAPLAN.COM

PATRICK M. ARENZ
612 349 8591 TEL
PARENZ@ROBINSKAPLAN.COM

February 4, 2021

Honorable Brendan L. Shannon
U.S. Bankruptcy Judge
824 Market Street
Wilmington, DE 19801

      Re: *In re* BC Hospitality Group, et al. (No. 20-13103 (BLS))

Dear Judge Shannon:

      I submit this letter on Chloe's behalf to outline the parties' dispute over the By Chloe trademark and the best path forward for resolution.

**I.     Chloe disputes BCHG's purported unconditional ownership in the By Chloe trademark.**

      Following Chloe's growing fame as a celebrity chef, Chloe and ESquared Hospitality formed CCSW LLC (now incorrectly called BCHG) to run Chloe's concept for fast-casual vegan restaurants. Over nine months of extensive negotiations, the parties finalized two foundational documents relevant to this dispute: (1) a 50-page Operating Agreement setting forth membership terms for Chef Chloe LLC and ESquared Hospitality LLC; and (2) a Name, Face, Likeness License Agreement (the NFL Agreement) between CCSW and Chloe. Exs. A-B. Chloe objects to BCHG's purported ownership of the By Chloe trademark under these agreements for two core reasons.

     **1.  The plain language in the Operating Agreement makes any ownership of the By Chloe trademark conditional.**

      The unambiguous terms of the Operating Agreement provide that BCHG never had unconditional ownership of the By Chloe trademark. Paragraph 4.4 details six subparts that address the By Chloe trademark. The preamble starts with the guiding principle that the Operating Agreement does not bestow any rights to Chloe's NFL Rights, except as provided in the agreement and the NFL Agreement.

      Paragraph 4.4(a) provides in full: "The Company shall own all right, title and interest in and to the By Chloe Mark, including the right to register the By Chloe Mark with the U.S. Patent & Trademark Office, ***subject to*** *the terms and conditions of this Operating Agreement and the NFL License Agreement*." The first dispute for the Court focuses on this italicized language. Chloe will explain that the unambiguous

interpretation of "subject to"—or at least a reasonable interpretation—is "conditional or dependent on." Put differently, the parties intended the Company to own the By Chloe Mark—a standard corporate practice for administrative reasons—conditioned on the Company complying with the terms and conditions the parties agreed to. BCHG, in contrast, contends that it owns the By Chloe Mark outright—without conditions—which would render the italicized clause and other terms and conditions in the agreements meaningless.

        The rest of Paragraph 4.4 about the mark confirms Chloe's interpretation. One term and condition that the Company's ownership depended on, for instance, was its obligation in Paragraph 4.4(e) not to use the By Chloe Mark to block Chloe from obtaining trademark rights of her own. Another term and condition of any ownership in the By Chloe Mark was that the Company would only use the mark for fast-casual vegan restaurants—and not, for example, for retail products—unless Chloe approved otherwise in writing. The parties negotiated and bargained for these terms and conditions, and Chloe did not and would not have agreed for the company to have rights to use her name in the brand without them.

        Nor is this an academic exercise for this Court. BCHG breached these terms and conditions. BCHG used the By Chloe Mark to oppose Chloe's trademark applications for "Chef Chloe" and "Chloe's Delicious." And it sold retail products with the By Chloe Mark at Whole Foods without Chloe's consent. Through its breach of these unambiguous terms and conditions, it lost ownership rights in the By Chloe Mark. Thus, Chloe objects to BCHG's plans to sell the trademark in this proceeding.

   **2. The Company also does not own the By Chloe Mark because it incorporates a NFL Right that is subject to the now-terminated NFL Agreement.**

        BCHG's plan to sell the By Chloe Mark fails for a second independent reason. The question for the Court is whether the use of Chloe's *name* in the mark is subject to the "*name*, face, likeness" agreement. Of course it is. First, the plain language of 4.4(a) states that ownership is "subject to" the "NFL License Agreement." If the mark did not implicate the NFL rights, then it makes no sense to condition ownership on that agreement. Second, the NFL agreement itself licenses Chloe's name, including all variations of her name, which By Chloe uses in the mark. Third, the interplay between the Operating Agreement and NFL Agreement is key. Chef Chloe LLC, as a corporate entity, is a party to the Operating Agreement, while Chloe as an individual is a party to the NFL Agreement. The only vehicle for Chloe to provide her individual rights in her name was through the NFL Agreement. The Operating Agreement confirms this conclusion in Paragraph 4.3(d). Unlike ESquared Hospitality which "hereby licenses" (a present assignment) in 4.3(c), Chef Chloe and Chloe "shall enter into the NFL License Agreement" (a future assignment) in 4.4(d) to grant use of, among other things, Chloe's "name." Put differently, the By Chloe Mark is subject to the NFL Agreement precisely because that mark is a NFL right.

VIA EMAIL

Yet Chloe retained the ability to terminate the NFL right. And she exercised that termination right in March 2018. Even more, the NFL Agreement provides for survival of some terms following termination. The portion of the NFL Agreement in Section 1 relating to the By Chloe Mark is *not* one of those surviving provisions. At minimum, a reasonable interpretation—if not the *only* reasonable interpretation—is that BCHG lost ownership in the mark when Chloe terminated the NFL Agreement. Parol evidence only enhances this conclusion too. Chloe was promised before—and after—entering into these agreements that she would "immediately" receive a 1% royalty under Paragraph 10 if the company repurchased her membership interest, recognizing use of the By Chloe mark was a NFL right. The parties never intended that BCHG could use her name while she had no membership or royalty interest.

BCHG's reliance on Judge Furman's preliminary injunction decision is not to the contrary. That decision addressed a different issue under different circumstances. Chloe's preliminary injunction motion did *not* ask Judge Furman to decide ownership of the By Chloe mark. Rather, Chloe asked the Court to enjoin BCHG from selling retail products. Judge Furman addressed both the Operating Agreement and the NFL Agreement. Under the Operating Agreement, the Court proceeded under the status quo, accepting BCHG's mistaken contention that the company repurchased Chef Chloe's membership interest. Judge Furman explained it was unclear whether the fast-casual vegan restaurant limitation was a "surviving right." Since that decision, however, Judge Hochberg declared BCHG's purported repurchase of Chef Chloe's membership interests "null and void" along with any attempts to amend the Operating Agreement without her consent. And Judge Furman, of course, has confirmed Judge Hochberg's liability finding. Thus, the entire foundation for the preliminary injunction has changed.

The Court also considered the NFL Agreement separately. There, Judge Furman did conclude at the preliminary stage that the By Chloe Mark was not a NFL right and that BCHG owned the mark "outright." Yet he made this preliminary decision on an incomplete record and without the context of the arguments above. Again, Chloe briefed a different issue, and the Court held no oral argument. Indeed, if BCHG believed Judge Furman resolved this issue, then it should have consented to Chloe's stay relief motion for Judge Furman to reaffirm it. The basic fact remains that Chloe deserves to be heard and she deserves to have a court—any court—decide the merits of her challenge to BCHG's ownership of a trademark with her name.

## II. This Court should resolve this dispute on a full record at the February 25 hearing.

The most efficient process forward is for the Court to hear from each side in full in briefing and at the February 25 hearing. To start, BCHG chose this expedited proceeding with full knowledge that Chloe contested its ownership of the By Chloe Mark. A consequence of picking this forum and schedule is that the parties need to address issues on an expedited basis. Chloe is prepared to do so. Indeed, Chloe withdrew her motion for stay relief based on BCHG's complaints that Judge Furman

February 4, 2021                                    VIA EMAIL
Page 4

may not decide the issue quickly enough, and with the understanding that this Court
would do so.

The Court is well suited to address this issue efficiently too. To start, courts—as
opposed to juries—often consider all evidence while limiting their decisions to what is
relevant. Put another way, if the Court decides the contracts are unambiguous, then
your Honor will say so and not rely on any parol evidence. Yet the burden to hear the
parties in full is minimal, and perhaps even unnecessary following briefing. The Court
should allow each side up to 1.5 hours to present any evidence (through direct or cross
examination). That, along with oral argument from counsel, means the Court can
complete the hearing in 4-5 hours. Along with the inherent value in a decision on a
full record, this will also avoid any delay in the current sale date.

BCHG's bankruptcy counsel's desire for discovery is unwarranted. The parties
have litigated these issues to death. From 2016 through present, the parties have
litigated two arbitrations, an appeal in New York state courts, and a 19-count
complaint with 7 BCHG counterclaims in the Southern District of New York. Every
signatory to the Operating Agreement and the NFL Agreement has been deposed,
including through BCHG's deposition of Chloe for two full days. The parties have
collectively produced over 289,000 documents that cover all relevant parol evidence.
The most recent arbitration involved disputes about interpreting the Operating
Agreement, and Judge Hochberg found portions ambiguous. The parties are beyond
prepared to address this dispute now.

Nor is BCHG correct that the ownership issue was not part of the SDNY
litigation. BCHG submitted a 50-page declaration with exhibits from the attorney who
drafted the Operating Agreement and NFL Agreement with a Rule 12 motion relating
to the By Chloe trademark and NFL Agreement. Chloe submitted a declaration and
attached exhibits in the litigation as well. And Chloe's complaint bases her claims for
breach of contract and rights of publicity on BCHG's misuse of the "By Chloe Mark."
BCHG's defense was that it owned the mark. Likewise, Chloe pled that BCHG lacked
ownership as an affirmative defense to BCHG's counterclaims: "BCHG has breached
the terms and conditions of the Operating Agreement and NFL License Agreement,
and therefore lacks ownership and standing to assert the By Chloe Mark."

I look forward to addressing these issues with the Court tomorrow.

Respectfully submitted,

*/s/ Patrick M. Arenz*

Patrick M. Arenz

## EXHIBIT A

**OPERATING AGREEMENT**

**OF**

**CCSW LLC**

**(A NEW YORK LIMITED LIABILITY COMPANY)**

Table of Contents

| | | |
|---|---|---|
| **ARTICLE I** | **DEFINITIONS** | 1 |
| | SECTION 1.1   DEFINITIONS | 1 |
| | | |
| **ARTICLE II** | **FORMATION** | 10 |
| | SECTION 2.1   FORMATION | 10 |
| | SECTION 2.2   NAME | 11 |
| | SECTION 2.3   TRADE NAME AFFIDAVITS | 11 |
| | SECTION 2.4   FOREIGN QUALIFICATION | 11 |
| | SECTION 2.5   TERM | 11 |
| | SECTION 2.6   NO STATE LAW PARTNERSHIP | 11 |
| | | |
| **ARTICLE III** | **OFFICES** | 11 |
| | SECTION 3 1   REGISTERED OFFICE; PLACE OF BUSINESS; REGISTERED AGENT | 11 |
| | SECTION 3.2   OTHER OFFICES | 12 |
| | | |
| **ARTICLE IV** | **BUSINESS AND POWERS** | 11 |
| | SECTION 4.1   BUSINESS | 11 |
| | SECTION 4.2   POWERS | 11 |
| | SECTION 4.3   OWNERSHIP OF CONCEPT AND INTELLECTUAL PROPERTY RIGHTS; NFL LICENSE | 11 |
| | | |
| **ARTICLE V** | **INTERESTS IN THE COMPANY** | 12 |
| | SECTION 5.1   GENERAL RIGHTS | 12 |
| | SECTION 5.2   MEMBERSHIP INTERESTS | 12 |
| | | |
| **ARTICLE VI** | **CAPITAL CONTRIBUTIONS; MEMBERS** | 13 |
| | SECTION 6.1   CAPITAL CONTRIBUTIONS; ADVANCES | 13 |
| | SECTION 6.2   ADDITIONAL CONTRIBUTIONS/LOANS | 13 |
| | SECTION 6.3   WITHDRAWAL OF CAPITAL | 13 |
| | SECTION 6.4   NO INTEREST ON CAPITAL | 13 |
| | SECTION 6.5   ADMISSION OF MEMBERS | 13 |
| | SECTION 6.6   CAPITAL RETURN | 14 |
| | SECTION 6.7   OUTSIDE ACTIVITIES | 14 |
| | | |
| **ARTICLE VII** | **MANAGEMENT** | 14 |
| | SECTION 7.1   GENERALPOWERS | 14 |
| | SECTION 7.2   BINDING AUTHORITY | 16 |
| | SECTION 7.3   MANAGERS | 16 |
| | SECTION 7.4   ACTIONS REQUIRING APPROVAL OF THE CC ENTITY | 17 |
| | SECTION 7.5   RESIGNATION, REMOVAL AND VACANCIES | 17 |
| | SECTION 7.6   COMPENSATION; EXPENSES | 18 |
| | SECTION 7.7   FIDUCIARY DUTY | 18 |
| | SECTION 7.8   TRANSACTIONS WITH AFFILIATES | 18 |
| | SECTION 7.9   DELEGATED AUTHORITY | 19 |
| | SECTION 7.10  OTHER BUSINESS ACTIVITIES OF MANAGERS | 19 |
| | SECTION 7.11  INVESTMENT OPPORTUNITIES | 19 |
| | SECTION 7.12  POWEROF ATTORNEY | 19 |
| | SECTION 7.13  OFFICERS | 19 |
| | | |
| **ARTICLE VIII** | **CONFIDENTIALITY** | 20 |

SECTION 8.1    CONFIDENTIALITY/PROPRIETARY RIGHTS/RETURN OF COMPANY
               PROPERTY                                                        20


ARTICLE IX CONTRACTS, CHECKS, DRAFTS, BANK ACCOUNTS, PROXIES, ETC.             21
       SECTION 9.1    EXECUTION OF DOCUMENTS                                    21
       SECTION 9.2    DEPOSITS                                                  21
       SECTION 9.3    PROXIES IN RESPECT OF STOCK OR OTHER SECURITIES OF OTHER
                      COMPANIES                                                 21

ARTICLE X BOOKS AND RECORDS; RIGHT OF INSPECTION; TAX MATTERS                  21
       SECTION 10.1    BOOKS AND RECORDS                                        21
       SECTION 10.2    INFORMATION                                              21
       SECTION 10.3    TAX RETURNS                                             22
       SECTION 10.4    TAX ELECTIONS                                           22
       SECTION 10.5    TAX MATTERS PARTNER                                     22
       SECTION 10.6    NO PARTNERSHIP                                          23
       SECTION 10.7    TITLE TO COMPANY ASSETS                                 23

ARTICLE XI CAPITAL ACCOUNTS                                                    23
       SECTION 11·1    MAINTENANCE                                             23
       SECTION 11·2    ADJUSTMENTS                                             23
       SECTION 11.3    MARKET VALUE ADJUSTMENTS                                24
       SECTION 11.4    TRANSFER                                                24

ARTICLE XII ALLOCATION OF INCOME, GAIN, LOSS AND DEDUCTION                     24
       SECTION 12.1    ALLOCATION OF NET PROFITS AND NET LOSSES                24
       SECTION 12·2    ALLOCATION IN THE EVENT OF PROPERTY DISTRIBUTION        25
       SECTION 12.3    SPECIAL RULES                                           25
       SECTION 12.4    TAX ALLOCATIONS                                         27

ARTICLE XIII DISTRIBUTIONS                                                     28
       SECTION 13.1    DISTRIBUTIONS                                           28
       SECTION 13·2    WITHHOLDING                                            29
       SECTION 13.3    OFFSET                                                  29
       SECTION 13.4    TAX DISTRIBUTION                                        29
       SECTION 13.5    LIMITATION UPON DISTRIBUTIONS                           29

ARTICLE XIV INDEMNIFICATION                                                    29
       SECTION 14.1 INDEMNIFICATION                                            29
       SECTION 14.2 INDEMNIFICATION NOT EXCLUSIVE                              30
       SECTION 14.3 INSURANCE ON BEHALF OF INDEMNIFIED PARTY                   30
       SECTION 14.4 INDEMNIFICATION LIMITED BY LAW                            31

ARTICLE XV ACCOUNTING PROVISIONS                                              31
       SECTION 15.1 FISCAL YEAR                                               31
       SECTION 15.2 ACCOUNTING MATTERS                                        31

ARTICLE XVI DISSOLUTION                                                        31
       SECTION 16.1 DISSOLUTION                                                33

ARTICLE XVII LIQUIDATION                                                       31
       SECTION 17.1  LIQUIDATION                                               31
       SECTION 17.2  PRIORITY OF PAYMENT                                       32
       SECTION 17.3  NEGATIVE CAPITAL ACCOUNTS                                 32
       SECTION 17.4  TIMING                                                    32

SECTION 17.5  LIQUIDATING REPORTS ·                                    32
SECTION 17.6  ARTICLES OF DISSOLUTION                                  32

ARTICLE XVIII TRANSFER RESTRICTIONS                                    33
SECTION 18.1   TRANSFER RESTRICTIONS                                   33
SECTION 18.2   PERMITTED TRANSFERS                                     33
SECTION 18.3   RIGHT OF FIRST REFUSAL                                  33
SECTION 18.4   DRAG-ALONG RIGHTS                                       34
SECTION 18.5   TAG ALONG RIGHTS                                        35
SECTION 18.6   APPRAISAL IN CONNECTION WITH SALE OF ESQUARED
               HOSPITALITY                                             35
SECTION 18.6   TIME OF THE ESSENCE                                     36

ARTICLE IX SERVICE MEMBER                                              36
SECTION 19.1   SERVICE MEMBER                                          36
SECTION 19.2   SERVICE MEMBER'S POSITION AND DUTIES                    36
SECTION 19.3   SEPARATION FROM SERVICE                                 36
SECTION 19.4   ACKNOWLEDGEMENT AND WAIVERS                             38
SECTION 19.5   OPTION TO PURCHASE INTEREST OF A TERMINATED
               SERVICE MEMBER                                          38
SECTION 19.6   PROCEDURES FOR MEMBERSHIP INTEREST RECAPTURE            39
SECTION 19.7   RESTRICTIVE COVENANT/NON-SOLICITATION                   40
SETION 19.8    DUTIES OF ESQUARED HOSPITALITY; BACK OFFICE FEE         42

ARTICLE XX GENERAL PROVISIONS                                          42
SECTION 20.1   AMENDMENT                                               42
SECTION 20.2   WAIVER OF DISSOLUTION RIGHTS·                           43
SECTION 20.3   WAIVER OF PARTITION RIGHT                               43
SECTION 20.4   WAIVERS GENERALLY                                       43
SECTION 20.5   EQUITABLE RELIEF                                        44
SECTION 20.6   REMEDIES FOR BREACH                                     44
SECTION 20.7   COSTS                                                   44
SECTION 20.8   COUNTERPARTS                                            44
SECTION 20.9   NOTICE                                                  44
SECTION 20.10  DATE OF PERFORMANCE                                     44
SECTION 20.11  LIMITED LIABILITY                                       44
SECTION 20·12  PARTIAL INVALIDITY                                      45
SECTION 20.13  ENTIRE AGREEMENT                                        45
SECTION 20.14  BINDING EFFECT                                          45
SECTION 20.15  FURTHER ASSURANCES                                      45
SECTION 20.16  HEADINGS                                                45
SECTION 20.17  TERMS                                                   46
SECTION 20.18  GOVERNING LAW; CONSENT TO JURISDICTION                  46
SECTION 20.19  ARBITRATION                                             46
SECTION 20.20  REPRESENTATIONS AND WARRANTIES                          47
SECTION 20.21  SEPARATE COUNSEL                                        48

EXHIBIT A      CAPITAL CONTRIBUTIONS AND PERCENTAGE INTERESTS
EXHIBIT B-1    ESQUARED LICENSED PRE-EXISTING IP
EXHIBIT B-2    CHEF CHLOE LICENSED PRE-EXISTING IP
EXHIBIT C      NFL LICENSE AGREEMENT
EXHIBIT D      PERSONAL SERVICES AGREEMENT
EXHIBIT E      UNMODIFIED CC EXISTING RECIPES

# CCSW LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "**Agreement**"), effective as of November 7, 2014 (the "**Effective Date**"), of CCSW LLC, a New York limited liability company (the "**Company**"), is entered into by and among **ESquared Hospitality LLC**, a Delaware limited liability company having an address at 950 Third Avenue, Suite 2300, New York, NY  10022 ("**ESquared Hospitality**"), and **Chef Chloe, LLC**, a California limited liability company with an address at 4712 Admiralty Way, Marina Del Rey, CA 90292 ("**CC Entity**").

## W I T N E S S E T H

WHEREAS, the Company was formed on November 6, 2014 pursuant to the provisions of the Act by the filing of the Articles of Organization of the Company (said Articles, as the same may be amended, restated, supplemented or modified from time to time, the "**Articles of Organization**") with the Secretary of State of the State of New York;

WHEREAS, the Members desire to set forth the Members' agreement for the conduct of the business and operation of the Company.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein and other good and valuable consideration, the parties hereto set forth their agreement as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1      Definitions.  For purposes of this Agreement, capitalized terms used but not otherwise defined herein shall have the following meanings:

"**Act**" means the New York Limited Liability Company Law, as amended from time to time.

"**Adjusted Capital Account**" means, with respect to any Member, the balance in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)      such Capital Account shall be deemed to be increased by any amounts that such Member is obligated to restore to the Company (pursuant to this Agreement or otherwise) or is deemed to be obligated to restore pursuant to (A) the penultimate sentence of § 1.704-2(g)(1) of the Regulations, or (B) the penultimate sentence of §1.704-2(i)(5) of the Regulations; and

(b)      such Capital Account shall be deemed to be decreased by the items described in paragraphs (4), (5) and (6) of §1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted and applied consistently therewith.

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of §1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted and applied consistently therewith.

"**Affiliate**" means, with respect to any Person, (a) any Person who is a member of the Immediate Family of any individual, (b) any entity which owns or controls (i.e., which owns directly or indirectly 50% or more of the beneficial interest in or otherwise has the right or power by any means to control), is owned or controlled by or which is under common ownership or control with a Person, and (c) any individual who is an officer, director, trustee, member, manager, or employee of, or partner in, a Person referred to in the preceding clause (b).

"**Agreement**" shall have the meaning ascribed to such term in the preamble.

"**Approved Financing Arrangements**" means (a) debt or equity financing arrangements under terms that are approved by CC Entity (or its Permitted Transferee) and (b) debt or equity financing arrangements under terms that are no less favorable to the CC Entity (or its Permitted Transferee), on the whole, than previously approved financing arrangements. Without limiting the foregoing, CC Entity hereby approves financing arrangements for Restaurants whereby the available cash of the restaurants is split 50/50 between the Company and the investors (after the investors have been paid back their capital contributions and a preferred return of no more than 10% calculated on a simple, straight line, non-compounding basis); provided, that if ESquared Hospitality or any of its Affiliates are providing twenty five percent (25%) or more of the financing, CC Entity does not hereby approve any preferred return for such arrangement.

"**Approved Projects**" shall have the meaning ascribed to such term in Section 4.1.

"**Articles of Organization**" means the Articles of Organization of the Company, as amended, modified and/or restated from time to time.

"**Available Cash**" means, for any fiscal quarter, all cash receipts of the Company during such quarter from any source (excluding funds received as Capital Contributions or proceeds of loans), plus all undistributed Available Cash from previous fiscal quarters, less the sum of the following to the extent made from such cash receipts:

(a)     all cash expenditures of the Company made during such quarter (except Distributions), including debt service, salaries, repayment of advances, and other expenses and costs incurred in the acquisition, ownership, or management of the Company's business and property; and

(b)     funds set aside as reserves allocated for contingencies, working capital, debt service, taxes, insurance, approved investments or acquisitions (if any), mandatory distributions (including Tax Distributions) or other anticipated costs or expenses incident to the conduct of the Company's business.

"**Available Interest**" shall have the meaning ascribed to such term in Section 19.6.

"**Back Office Fee**" shall have the meaning ascribed to such term in Section 19.8.

2

"**Book Value**" means, with respect to any asset of the Company, the adjusted basis of such asset as of the relevant date for federal income tax purposes, except as follows:

(a)     the initial Book Value of any asset contributed by a Member to the Company shall be the Fair Market Value of such asset;

(b)     the Book Values of all Company assets (including intangible assets such as goodwill) may be adjusted to equal their respective Fair Market Values as of the following times as determined by the Managers in their sole discretion:

(1)     the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution or contribution of more than a de minimis amount of property;

(2)     the distribution by the Company to a Member of more than a de minimis amount of money or Company property as consideration for its interest in the Company; and

(3)     the liquidation of the Company within the meaning of §1.704-1(b)(2)(iv)(f)(5)(ii) of the Regulations and taking into account §1.704-1 (b)(2)(iv)(l) of the Regulations.

(c)     if the Book Value of an asset has been determined or adjusted pursuant to subsection (a) or (b) above, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purpose of computing Net Profits and Net Losses and other items allocated pursuant to Article XII hereof.

The foregoing definition of Book Value is intended to comply with the provisions of §1.704-1(b)(2)(iv) of the Regulations and shall be interpreted and applied consistently therewith.

"**Breach Notice**" means, with respect to a breach of the Service Member's obligations pursuant to Section 19.2 of this Agreement, a notice provided by the Company to the Service Member in writing within 90 days after the Company first learns of the alleged breach that sets out with specificity the basis for such breach and reasonable requirements that, when satisfied, would be deemed to cure such breach, if curable.

"**Business**" shall have the meaning ascribed to such term in Section 4.1.

"**Business Day**" means any day other than Saturday, Sunday and any other day on which banks in New York City are not open for business.

"**By Chloe Design Mark**" means any logo or other design mark incorporating the By Chloe Word Mark in stylized font and/or color and/or design that is pre-approved by the CC Entity, and used in connection with the goods and services of the Business.

"**By Chloe Mark**" means, collectively, the By Chloe Design Mark and the By Chloe Word Mark.

"**By Chloe Word Mark**" means the standard character mark "BY CHLOE" in connection

with the goods and services of the Business.

"**Capital Account**" means the capital account established and maintained for each Member pursuant to Article XI hereof.

"**Capital Contributions**" means the cash contributions by a Member to the capital of the Company pursuant to Sections 6.1 and 6.2 hereof.

"**Cause**" means the Service Member's (a) willful and intentional refusal to perform its responsibilities relating to the Business assigned by the Company pursuant to Section 19.2 of this Agreement, which continues more than thirty (30) days after the notification of such breach pursuant to a Breach Notice (it being understood and agreed that if the reasonable requirements set forth in the Breach Notice are reasonably satisfied, then such Breach Notice shall be of no force or effect); (b) engaging in gross negligence or fraud in connection with the Business; (c) a material breach of the confidentiality obligations set forth in Section 8.1 hereof; (d) theft, embezzlement, or attempted theft, embezzlement, perpetration of fraud, or misappropriation of any tangible or intangible assets or property of the Company or any of its Affiliates; and/or (e) a conviction of, or a plea of nolo contendre or guilty to a felony or crime involving moral turpitude.

"**CC**" means Chloe Coscarelli.

"**CC Entity**" shall have the meaning ascribed to such term in the preamble.

"**CC Entity Pre-Existing IP**" shall have the meaning ascribed to such term in Section 4.3(b).

"**CC Existing Recipes**" means those recipes that are included in the CC Entity Pre-Existing IP and that are the basis for any Company Modified Recipes.  The initial Members acknowledge that, in connection with the development of the Concept and commercializing of recipes, the CC Existing Recipes have been modified into Company Modified Recipes.  If there are any CC Existing Recipes that do not get modified into Company Modified Recipes, the Members shall create and attach a schedule of such recipes and attach the same hereto as Exhibit E (which exhibit may be modified by the Members from time to time as appropriate).

"**CC Permitted Activities**" shall have the meaning ascribed to such term in Section 19.2(a).

"**CC Promotional Activities**" shall have the meaning ascribed to such term in Section 19.2(a).

"**Code**" means the Internal Revenue Code of 1986, as amended, or any corresponding provisions of superseding federal revenue statute.

"**Companies**" shall have the meaning ascribed to such term in Section 8.1(a).

"**Company**" shall have the meaning ascribed to such term in the preamble.

"**Company Assets**" means all right, title and interest of the Company in and to all or any

4

portion of its assets.

"**Company IP**" means (i) the Concept (which includes menus and Company Recipes); and(ii) all other intellectual property rights associated with the Concept and Business including without limitation all discoveries or inventions (whether or not patentable and whether or not reduced to practice), created or developed by or on behalf of the Business, and improvements of whatever kind thereon; any and all trademarks, service marks, trade dress, product names, Internet domain names, logos and trade names used by or in connection with the Business, including the By Chloe Mark, and all goodwill associated therewith; works of authorship, drawings, designs, recipes, websites, interfaces, applications, software, and copyrightable works developed by or on behalf of the Business; trade secrets and confidential information, know-how and product processes used in connection with the Business; all applications and registrations for all the foregoing and renewals or extensions thereof; all embodiments of each of the foregoing (in whatever form and media); and all claims or causes of action arising out of or related to infringement or misappropriation of the foregoing. .

"**Company Minimum Gain**" means the aggregate amount of gain (of whatever character), determined for each Nonrecourse Liability of the Company, that would be realized by the Company if it disposed of the Company property subject to such liability in a taxable transaction in full satisfaction thereof (and for no other consideration) and by aggregating the amounts so computed, determined in accordance with §1.704-2(d) and (k) of the Regulations.

"**Company Minimum Gain Chargeback**" shall have the meaning ascribed to such term in Section 12.3(a)(iii).

"**Company Modified Recipes**" means recipes resulting from any modification of any kind of any CC Existing Recipes that have been so modified (once or more than once for any particular recipe) and used in connection with the Business; provided, however, that for the avoidance of doubt the Company Modified Recipes shall not include the unmodified CC Existing Recipes.

"**Company Recipes**" means the aggregate of (a) the Company Modified Recipes, and (b) all of the food and beverage recipes developed by or on behalf of the Company for use in connection with the Business.

"**Concept**" means a "fast casual" vegan restaurant.

"**Confidential Information**" shall have the meaning ascribed to such term in Section 8.1(a).

"**Default Rate**" means an interest rate equal to the greater of (a) ten (10%) percent per annum and (b) the WSJ Rate.

"**Depreciation**" means, for each Fiscal Year or part thereof, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year or part thereof, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, the depreciation, amortization or other cost recovery deduction for such Fiscal Year or

5

part thereof shall be an amount which bears the same ratio to such Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or part thereof bears to such adjusted tax basis and provided further that if the federal income tax basis of such asset is zero (0) or less, then the depreciation, amortization or other cost recovery deduction shall be whatever the Managers determine is reasonable under the circumstances.

"**Disability**" means any medically determinable physical or mental impairment that makes such Person unable to perform his/her/its duties that has been continuing for a period of 180 or more days, whether or not consecutive, within any period of 12 consecutive months.

"**Dissolution**" means the happening of any of the events set forth in Section 16.1.

"**Distribution**" means any cash and the Fair Market Value of any property (net of liabilities secured by such property that the Member is deemed to assume or take subject to under Section 752 of the Code) distributed by the Company to the Members in accordance with Article XIII or XVII of this Agreement.

"**Drag-Along Notice**" shall have the meaning ascribed to such term in Section 18.4(a).

"**Drag-Along Right**" shall have the meaning ascribed to such term in Section 18.4(a).

"**Dragging Member**" shall have the meaning ascribed to such term in Section 18.4(a).

"**Economic Interest**" means a Person's share of the Company's income, gain, loss, deductions, credits and similar items and distributions of the Company pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management, or except to the extent mandatory and not subject to waiver under the Act, any right to information concerning the business and affairs of the Company.

"**Effective Tax Rate**" means the highest cumulative net federal, state and city income tax that would be paid on incremental income earned by and allocated to a hypothetical New York City resident as a an owner of the Company.

"**ESquared Hospitality Liquidity Event**" means a sale, financing, public offering or other change of control transaction involving ESquared Hospitality (or its parent entity) and/or no less than a majority of the restaurants that ESquared Hospitality and its Affiliates have an ownership and/or management interest in.

"**ESquared Pre-Existing IP**" shall have the meaning ascribed to such term in Section 4.3(b).

"**Fair Market Value**" means, with respect to any property (including the Membership Interests), the value that would be obtained in an arm's length transaction for ownership of such property for cash between an informed and willing seller and an informed and willing purchaser, each with an adequate understanding of the facts and under no compulsion to buy or sell. When determining the Fair Market Value of the Company, it shall be valued based on the entire value of the enterprise and no discounts or premiums shall be taken into consideration for lack of control or control.

6

"**Family Trust**" means, with respect to any individual, a trust for the benefit of such individual or for the benefit of any member of such individual's Immediate Family (for the purpose of determining whether or not a trust is a Family Trust, the fact that one or more of the beneficiaries (but not the sole beneficiary) of the trust includes a Person or Persons, other than a member of such individual's Immediate Family, entitled to a distribution after the death of the settlor if he, she, it, or they shall have survived the settlor of such trust, which distribution is to be made of something other than a Membership Interest and/or includes an organization or organizations exempt from federal income tax pursuant to the provision of Section 501(a) of the Code and described in Section 501(c)(3) of the Code shall be disregarded); provided, however, that in respect of transfers by way of a testamentary or inter vivos trust, the trustee or trustees shall be solely such individual, a member or members of such individual's Immediate Family, a responsible financial institution, an attorney that is a member of the Bar of any State in the United States, or an individual or individuals approved by the Members, other than the interested Member.

"**Fiscal Year**" means the fiscal and taxable year of the Company, which shall be the year ending December 31st.

"**Good Reason**" means (i) any material breach by ESquared Hospitality of its obligations set forth in Section 19.8 hereof; (ii) any action by the Company or ESquared Hospitality which results in a material diminution in Service Member's title or position from those set forth in this Agreement other than for Cause; or (iii) a requirement by the Company that Service Member engage in any act, or that Service Member not act, where such act or omission, as applicable, would be illegal or would be reasonably likely to be materially damaging or detrimental to Service Member's reputation; provided, however, that in the case of subsections (i) – (iii) it shall be a prerequisite of any such termination for Good Reason that Service Member shall have given ESquared Hospitality written notice, specifying the circumstances of such Good Reason, and thirty (30) calendar days to cure prior to any such termination (or such longer period as is reasonably required to cure such breach with diligent and good faith effort). For the sake of clarity, the parties agree that neither (a) a termination of the Personal Services Agreement nor (b) a removal under Section 19.3 shall, in and of itself, be grounds for termination for Good Reason under clause (ii) above.

"**Immediate Family**" means, with respect to an individual, (a) such individual's spouse (former or current), (b) such individual's parents and grandparents, (c) such individual's children and grandchildren (in each case, natural or adoptive, of the whole or half blood), (d) such individual's sons-in-law and daughters-in-law (in each case, former or current), (e) any other ascendants and descendants (natural or adoptive, of the whole or half blood) of such individual's parent or of the parents of such individual's spouse (former or current), and (f) any lineal descendants (natural or adoptive) of such individual's spouse.

"**Indemnification Obligation**" shall have the meaning ascribed to such term in Section 14.1.

"**Indemnified Party**" shall have the meaning ascribed to such term in Section 14.1.

"**Liquidation**" means the process of winding up and terminating the Company after its

7

Dissolution.

"**Major Decisions**" shall have the meaning ascribed to such term in Section 7.4.

"**Managers**" means each Person appointed to the position of Manager pursuant to Section 7.3.

"**Member**" means any Person who or which is bound by and all of whom are identified on Exhibit A annexed hereto this Agreement and who or which is admitted to the Company as a Member in accordance with the terms of this Agreement.

"**Member Minimum Gain**" means the aggregate amount of gain (of whatever character), determined for each Member Nonrecourse Debt, that would be realized by the Company if it disposed of the Company property subject to such Member Nonrecourse Debt in a taxable transaction in full satisfaction thereof (and for no other consideration), determined in accordance with the provisions of §1.704-2(i)(3) and (k) of the Regulations for determining a Member's share of minimum gain attributable to a Member Nonrecourse Debt.

"**Member Minimum Gain Chargeback**" shall have the meaning set forth in Section 12.3(a)(iv).

"**Member Nonrecourse Debt**" has the meaning ascribed to the term "partner non-recourse debt" specified in § 1.704-2(b)(4) of the Regulations.

"**Membership Interest**" means, with respect to each Member, the entirety of the interest of the Member in the Company, including all of the Economic Interest in the Company held by such Member and such Member's rights to vote and participate in the management of the Company, and to receive allocations of Net Profits, Net Losses and Distributions.

"**Net Profit**" and "**Net Losses**" means an amount equal to the Company's taxable income or loss for such fiscal year or other period, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments, without duplication:

(a)      any income of the Company exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

(b)      any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Regulation Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss, including deductions for any losses incurred in connection with the sale or exchange of Company Assets disallowed pursuant to Sections 267(a)(1) of the Code or 707(b) which shall be treated as expenditures described in §705(a)(2)(B) of the Code;

(c)      in the event the Book Value of any Company Asset is adjusted, the amount of such

8

adjustments shall be taken into account as gain or loss from the disposition of property for purposes of computing Net Profits or Net Losses;

(d)     gain or loss resulting from any disposition of any Company Asset with respect to which gain or loss is recognized for federal income tax purposes (or is deemed recognized pursuant to subsection (c) above) shall be computed by reference to the Book Value of the Company Asset disposed of, notwithstanding that the adjusted basis of such Company Assets differs from its Book Value;

(e)     in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period; and

(f)     items specifically allocated to the Members pursuant to Section 12.3 hereof shall not be taken into account in computing Net Profits or Net Losses.

"**NFL License Agreement**" means the Name, Face and Likeness License Agreement by and between CC, CC Entity and the Company, dated as of the date hereof, as such agreement may be amended from time to time.

"**NFL Rights**" means the rights granted to the Company under the NFL License Agreement.

"**Nonrecourse Liability**" means any Company liability (or portion thereof) for which no Member bears the economic risk of loss for such liability under §1.752-2 of the Regulations.

"**Offer Notice**" shall have the meaning ascribed to such term in Section 18.3(a).

"**Offer Period**" shall have the meaning ascribed to such term in Section 18.3(a).

"**Participating Holder**" shall have the meaning ascribed to such term in Section 18.5(a).

"**Percentage Interest**" shall have the meaning set forth in Section 6.5(a) hereof subject to adjustment pursuant to this Agreement.  The Percentage Interest of any transferee shall be such portion of the Percentage Interest of the transferor as is indicated in the instrument of transfer and the Percentage Interest of the transferor shall be thereafter appropriately adjusted.

"**Permitted Transfer**" shall have the meaning ascribed to such term in Section 18.2.

"**Permitted Transferee**" shall have the meaning ascribed to such term in Section 18.2.

"**Person**" means an individual, corporation, limited liability company, partnership, trust or unincorporated organization, or other entity.

"**Personal Services Agreement**" means the Personal Services Agreement by and between the Company and CC, dated as of the date hereof, as such agreement may be amended from time to time.

9

"**Position**" shall have the meaning ascribed to such term in Section 19.1.

"**Regulations**" means the Treasury Regulations (including temporary or proposed regulations) promulgated and in effect under the Code, as amended from time to time (including corresponding provisions of succeeding regulations).

"**Regulatory Allocations**" shall have the meaning ascribed to such term in Section 12.3(a)(vi).

"**Repurchase Right**" has the meaning set forth in Section 19.5

"**Response Notice**" shall have the meaning ascribed to such term in Section 18.3(a).

"**Restaurants**" shall have the meaning ascribed to such term in Section 4.1.

"**Restricted Period**" shall have the meaning ascribed to such term in Section 19.7(a).

"**Restricted Person**" shall have the meaning ascribed to such term in Sections 8.1.

"**§704(b) Regulations**" shall have the meaning ascribed to such term in Section 11.1.

"**Selling Member**" shall have the meaning ascribed to such term in Section 18.5(a).

"**Selling Member Notice**" shall have the meaning ascribed to such term in Section 18.5(a).

"**Service Member**" shall have the meaning ascribed to such term in Section 19.1.

"**Super Majority of the Members**" shall mean Members owning at least seventy five percent (75%) of the outstanding Membership Interests in the Company.

"**Surviving Rights**" shall have the meaning ascribed to such term in Section 19.3(c).

"**Tag Along Period**" shall have the meaning ascribed to such term in Section 18.5(a).

"**Tax Distribution**" shall have the meaning ascribed to such term in Section 13.4.

"**Tax Matters Partner**" shall have the meaning ascribed to such term in Section 10.5(a).

"**Termination Event**" means, with respect to the Service Member, the occurrence of such Member's death, insanity, adjudication of incompetency, Disability, or any event that, absent provisions to the contrary in this Agreement or otherwise, would terminate the continued membership of such Person in the Company or Service Member by operation of law. For purposes of this paragraph, the occurrence of CC's death, insanity, adjudication of incompetency or Disability shall be considered a Termination Event of CC Entity (or a successor).

"**Testers**" shall have the meaning ascribed to such term in Section 8.1(b).

"**Transfer**" shall have the meaning ascribed to such term in Section 18.1.

"**Unreturned Capital Contribution**" means, with respect to a Member, as of any date, the excess, if any, of:

(a)     the sum of such Member's Capital Contributions actually made to the Company as of such date; less

(b)     the cumulative distributions to such Member pursuant to, or by reference to Sections 13.1 and 13.4.

"**Withholding Advance**" shall have the meaning ascribed to such term in Section 13.2(b).

"**WSJ Rate**" means, on any particular date, a rate per annum equal to the rate of interest published in The Wall Street Journal as the "prime rate," as in effect on such day; provided, however, that if more than one prime rate is published in The Wall Street Journal for a day, the average of the prime rates shall be used; provided, further, however, that the prime rate (or the average of the prime rates) will be rounded up to the nearest 1/16 of 1% or, if there is no nearest 1/16 of 1%, to the next higher 1/16 of 1%. In the event that The Wall Street Journal ceases or temporarily interrupts publication (or publication of a "prime rate"), then the WSJ Rate shall mean the daily average prime rate published in another business newspaper, or business section of a newspaper, of national standing chosen by the unanimous consent of the Managers. If The Wall Street Journal resumes publication, the substitute index will immediately be replaced by the prime rate published in The Wall Street Journal.

All other capitalized terms used herein and not otherwise defined herein shall have the meanings assigned thereto in the Act. To the extent that a term specifically defined in this Section 1.1 conflicts with a definition provided in the Act, the specific definition set forth herein shall govern.

## ARTICLE II
## FORMATION

Section 2.1     Formation. The Company was formed on November 6, 2014, by the filing of the Articles of Organization with the Secretary of State of the State of New York pursuant to the Act and on behalf of the Members of the Company.

Section 2.2     Name. The name of the Company is CCSW LLC. The business of the Company shall be conducted under such name or such other trade or fictitious names as may be adopted in accordance with Section 2.3.

Section 2.3     Trade Name Affidavits. The Company shall file such trade name or fictitious name affidavits and other certificates as may be necessary or desirable in connection with the formation, existence and operation of the Company (including those filings required in any jurisdiction where the Company owns property).

Section 2.4     Foreign Qualification. The Company shall apply for authority to transact business in those jurisdictions where it is required to do so. The Company shall file such other certificates and instruments as may be necessary or desirable in connection with its formation,

11

existence and operation.

Section 2.5        Term. The term of the Company commenced on its date of formation and shall continue until dissolved, wound up and terminated in accordance with Article XVI and Article XVII of this Agreement.

Section 2.6        No State Law Partnership. The Members intend that the Company not be a partnership (including, without limitation, a limited partnership or a general partnership) or joint venture, and that no Member be an agent, partner or joint venturer of any other Member, for any purposes other than federal and state tax purposes, and this Agreement shall not be construed to suggest otherwise.

## ARTICLE III
## OFFICES

Section 3.1        Registered Office; Place of Business; Registered Agent. Except as otherwise determined by the Managers, the registered office in the State of New York is: 950 Third Avenue, New York, NY 10022, and the registered agent is James Haber. The Company shall maintain an office and principal place of business at 950 Third Avenue, New York, NY 10022, or at such other place as may from time to time be determined as its principal place of business by the Managers.

Section 3.2        Other Offices. The Company may also have offices at other places, either within or without the State of New York as the Managers may from time to time determine in accordance with the terms of this Agreement or as the business of the Company may require.

## ARTICLE IV
## BUSINESS AND POWERS

Section 4.1        Business. The business ("**Business**") of the Company shall be to engage, whether directly or through one or more Affiliates or subsidiaries, in the ownership and/or management and/or licensing and/or franchising of one or more restaurants utilizing the Concept (the "**Restaurants**") and Approved Projects. As used herein, the term "**Approved Projects**" means any project related to the food and beverage industry that utilizes one or more of the NFL Rights or the By Chloe Mark, and which has been pre-approved in writing by CC Entity. In connection with Approved Projects, the provisions of any sublicense relating to the use and protection of the NFL Rights shall be subject to the approval of CC Entity, such consent not to be unreasonably withheld, conditioned or delayed. In furtherance of the foregoing, Company shall submit to CC Entity in writing any project for which it wishes to seek the CC Entity's approval, and CC Entity shall endeavor to review and either approve or disapprove of such project within ten (10) business days. If the CC Entity fails to timely respond, Company may send a second approval request with the following language included: "FAILURE TO RESPOND WITHIN FIVE (5) BUSINESS DAYS SHALL BE TREATED AS YOUR APPROVAL OF THE PROJECT." Any such submission that has not been timely disapproved by within such five-business day period shall be deemed approved.

12

Section 4.2    <u>Powers</u>. The Company shall have all the powers permitted to a limited liability company under the Act and which are necessary, convenient or advisable in order for it to conduct its business. The Company shall maintain and preserve its existence and all rights and franchises material to its businesses and shall be, at all times, validly existing and in good standing in the State of New York.

Section 4.3    <u>Ownership of Concept and Intellectual Property Rights; NFL License</u>.

(a)    The Company shall be deemed the owner of the Company IP.

(b)    The Company IP shall not include (i) any intellectual property rights that were developed by or on behalf of ESquared Hospitality or any of its Affiliates prior to the Effective Date, or independently from CC, CC Entity or its Affiliates, all of which are proprietary to ESquared Hospitality or any of its Affiliates, and shall remain the property of ESquared Hospitality or its Affiliates ("**<u>ESquared Pre-Existing IP</u>**") and (ii) any intellectual property rights that were developed by or on behalf of CC, CC Entity or any of its Affiliates prior to the Effective Date, or independently from ESquared Hospitality or its Affiliates, all of which are proprietary to CC, CC Entity or its Affiliates, and  shall remain the property of CC, CC Entity or its Affiliates ("**<u>CC Entity Pre-Existing IP</u>**"). Notwithstanding the foregoing, Company IP may include derivatives of ESquared Pre-Existing IP or CC Entity Pre-Existing IP.

(c)    ESquared Hospitality hereby licenses to the Company the non-exclusive, irrevocable, royalty-free, worldwide right to use the  are described on <u>Exhibit B-1</u> attached hereto solely in connection with the operations of the Restaurants and Approved Projects. CC Entity hereby licenses to the Company the non-exclusive, irrevocable, royalty-free, worldwide right to use the CC Entity Pre-Existing IP described on <u>Exhibit B-2</u> attached hereto solely in connection with the operations of the Restaurants and Approved Projects.

(d)    Simultaneously with the execution of this Agreement, CC, CC Entity and the Company shall enter into the NFL License Agreement pursuant to which CC and CC Entity shall grant the Company the right to use CC's name, face, likeness, and other attributes of her persona for use in connection with the Business as set forth in the NFL License Agreement.

(e)    Unless otherwise agreed to by the unanimous consent of the Members, exploitation of the Concept shall be done only through the Company. "Exploitation of the Concept" includes owning, managing, licensing, consulting with and/or franchising Restaurants (as owner, manager, licensor, consultant or franchisor, respectively) and engaging in the Approved Projects.  Nothing in this paragraph prohibits the Company or its subsidiaries from licensing or sublicensing the Concept, the NFL Rights, the Company IP, ESquared Pre-Existing IP and CC Entity Pre-Existing IP to third parties on terms acceptable to the Managers in connection with Restaurants and Approved Projects provided that 100% of the economics of such transactions flow to the Company, except (i) as specifically set forth herein, (ii) as set forth in the NFL License Agreement, (iii) as set forth in an Approved Financing, (iv) as agreed by CC Entity in connection with an Approved Project or (v) if unanimously agreed to by the Members.

Section 4.4    <u>By Chloe Mark</u>. The parties acknowledge and agree that the By Chloe Mark incorporates CC's first name, and that nothing contained in this Agreement is intended to

13

bestow upon the Company any rights to CC's NFL Rights (as defined in the NFL License Agreement), except as permitted herein and the NFL License Agreement. In furtherance of the foregoing, and notwithstanding anything contained in this Agreement or in the NFL License Agreement the contrary, the parties agree as follows:

(a)     The Company shall own all right, title and interest in and to the By Chloe Mark, including the right to register the By Chloe Mark with the U.S. Patent & Trademark Office, subject to the terms and conditions of this Operating Agreement and the NFL License Agreement;

(b)     The Company's rights to the By Chloe Word mark is limited solely to the exact lettering of the By Chloe Word Mark and not to any similar or derivative mark;

(c)     Except as permitted under Section 19.7(a)(ii), CC and CC Entity shall not use or permit others to use the By Chloe Word Mark or a design mark confusingly similar to the design elements of the By Chloe Design Mark, except (i) in connection with the Business, and (ii) in connection with any future cookbooks published by or on behalf of CC or the CC Entity; provided that the look, feel and placement of any such use of the By Chloe Mark in connection with any such cookbook shall be subject to the Company's prior written approval, such approval not to be unreasonably withheld or delayed. Notwithstanding the forgoing, CC and CC Entity shall not use or permit others to use a name or mark that includes the By Chloe Mark for a restaurant without the approval of the Company. Company and ESquared Hospitality may take any action it deems reasonably necessary to protect the By Chloe Mark if the Company or ESquared Hospitality determine in good faith that CC or CC Entity has violated this Section 4.4(c).

(d)     The parties agree that CC, CC Entity and Permitted Transferees can use any "Chloe" designation other than the By Chloe Word Mark or By Chloe Design Mark in any way except (i) as restricted by Section 19.7 hereof; (ii) in connection with Restaurants and Approved Projects; and (iii) as set forth in Section 4.4(c) above.

(e)     In furtherance of the foregoing and except as permitted under Section 4.4(c), the Company and ESquared Hospitality on behalf of itself and its Permitted Transferees, hereby agrees that they will not oppose, petition to cancel, commence a legal action, or otherwise challenge, object to or interfere with CC or CC Entity's ownership, use (or authorized the use by others) or registration of any "Chloe" designation other than the By Chloe Mark;

(f)     If Company ceases all use of the By Chloe Mark for a period of one year (commencing on or after the date of the opening of the first Restaurant), then the Company shall assign the By Chloe Mark to CC Entity or CC, as directed by CC, and the Company hereby agrees to execute any and all documents and take any other reasonable action requested by CC to effectuate the assignment contemplated by this Section 4.4(e).

**ARTICLE V**
**INTERESTS IN THE COMPANY**

Section 5 1     <u>General Rights</u>.  Membership Interests shall not have a stated value or any

14

rights to Distributions unless the Managers, pursuant to the terms hereof, have declared such a Distribution out of funds legally available therefor.

Section 5.2    Membership Interests.  The interest of each Member in the profits and losses and in the right, if any, to vote and participate in the management of the Company shall be as set forth in this Agreement, including in the definition of Membership Interests as set forth in Article I hereto.

**ARTICLE VI**
**CAPITAL CONTRIBUTIONS; MEMBERS**

Section 6.1    Capital Contributions; Advances.    The Members have made the initial Capital Contributions to the Company in cash in the amounts as set forth on Exhibit A annexed hereto.

Section 6.2    Additional Capital Contributions/Loans.

(a)    Except as provided below in paragraph (b), no Member shall be required to make any Capital Contributions other than the initial Capital Contributions set forth on Exhibit A.

(b)    ESquared Hospitality has agreed to fund through Capital Contributions (a) the initial development of the Concept, (b) the testing and modification of the recipes, as appropriate, (c) the design of a model restaurant (but not the build-out thereof), (d) the Personal Services Agreement (until such time as it can be funded out of Company funds) and (e) miscellaneous costs in connection thereof approved by the Managers.  Although it may choose to, ESquared Hospitality has not agreed to finance the opening or operation of an actual Restaurant.  Such financing may be provided by third parties, by ESquared Hospitality or by an Affiliate of ESquared Hospitality or any combination thereof.  If ESquared Hospitality or an Affiliate thereof participates in  such financing, such financing shall be solely in accordance with an Approved Financing Arrangement.

(c) If the Managers reasonably determine that the Company is in need of additional funds, the Managers may, from time to time or at any time, cause the Company to borrow funds from banks or similar financial institutions, or from Members, with interest and on such terms and conditions as Managers deem acceptable in Managers' sole and absolute discretion, and to grant a mortgage or other lien on the Company's property as security for the loan.  The Managers need not offer the opportunity to all Members of the Company to participate in making loans to the Company.

Section 6.3    Withdrawal of Capital. Except as specifically provided in this Agreement, no Member shall be entitled to withdraw all, or any part of, such Member's Capital Contribution or Capital Account from the Company prior to the Company's Dissolution and Liquidation. When such withdrawal is permitted, no Member shall be entitled to demand a Distribution of property other than money.

15

Section 6.4        No Interest on Capital.  No Member shall be entitled to receive interest on such Member's Capital Account or any Capital Contribution, except as otherwise provided specifically herein.

Section 6.5        Admission of Members.

(a)        Members. The initial Members of the Company are listed on Exhibit A hereto, each of which has executed this Agreement as of the date hereof and is hereby admitted to the Company as a Member.  Each such Member holds a share of all Membership Interests (the "**Percentage Interest**") equal to the percentage set forth in Exhibit A.

(b)        Subsequent Members. The Managers may, from time to time, subject to any other approvals as may be required herein, admit one or more additional Persons as new Members.  The conditions to and procedures for admission of any such new Member shall be as determined by the Managers. Effective upon such admission, the Percentage Interests of the then current Members shall be diluted pro rata in proportion to their respective Percentage Interests.

(c)        Transferees. Upon the Transfer (other than any pledge or hypothecation) of any Membership Interest(s) to any Person who is not a Member, and the approval, if required, in accordance with Article XVIII hereof, such Person shall be admitted to the Company as a Member, provided such Person shall execute and deliver or cause to be executed and delivered such documentation (including, if requested, an opinion of counsel) as the Managers shall reasonably request, including but not limited to execution of a substitute signature page to this Agreement.

Section 6.6        Capital Return.  Any Member who has received the return of all or any part of such Member's Capital Contribution pursuant to any Distribution that has been wrongfully or erroneously made to such Person in violation of the Act, the Articles of Organization or this Agreement shall be required to return such Distribution to the Company if notice of an obligation to return such amount is given to such Member within three (3) years of the date of such return or Distribution.

Section 6.7        Outside Activities.  Each Member and any Person who is an Affiliate of a Member may engage or hold interests in other business ventures of every kind and description for the Member's or the Affiliate's own account, including, but not limited to, other restaurants, bars, hotels, or other similar businesses, within or outside of New York, except that the Service Member (and CC) shall be subject to the restrictions set forth in Sections 19.2 and 19.7.

## ARTICLE VII
## MANAGEMENT

Section 7.1        General Powers.

(a)        Except as otherwise provided in this Agreement or mandated by the Act, the Members (other than any Member acting in its capacity as a Manager, in the event a Member is appointed as a Manager) shall take no part whatsoever in the control, management direction or operation of the affairs of the Company and shall have no power to act for or bind the Company.

16

(b)     Except as expressly provided herein or under the Act, the Managers shall have sole, full and complete charge of all operations of the Company and the management of the Company's business as described in Section 4.1.

(c)     The Managers shall be "managers" within the meaning of the Act. Except as otherwise set forth in this Agreement, the Managers shall have power and authority, on behalf of the Company, to take any and all lawful acts that the Managers consider necessary, advisable, or in the best interests of the Company in connection with the day to day operations and business of the Company, as well as any transaction outside the ordinary course of business, including, without limitation, to:

(i)     open, maintain and close bank accounts (including cash equivalent accounts), establish company credit cards, draw checks or other orders for the payment of moneys on behalf of the Company;

(ii)     expend the capital and revenues of the Company in furtherance of the Company's Business as described in Section 4.1 hereof and pay, in accordance with the provisions of this Agreement, all expenses, debts, and obligations of the Company to the extent that funds of the Company are available therefor;

(iii)     make investments in interest bearing securities, including United States government securities, securities of governmental agencies, commercial papers, money market funds, bankers' acceptances, certificates of deposit and other investment-grade securities (excluding cash equivalent accounts), pending disbursement of the Company's funds in furtherance of the Company's Business as described in Section 4.1 hereof or to provide a source from which to meet contingencies;

(iv)     maintain, at the expense of the Company, adequate records and accounts of all operations and expenditures of the Company and the Company property and furnish the Members with the reports referred to in Section 10.1 hereof;

(v)     purchase, at the expense of the Company, liability, casualty, fire and other insurance and bonds to protect the Company's property, business, Members and employees and to protect the Managers and their employees;

(vi)     establish reasonable reserves for repairs, replacements and contingencies, for future capital needs for any investment (including repayment of any indebtedness of the Company) and for any other proper Company purpose;

(vii)     employ, at the expense of the Company, consultants, accountants, attorneys and others, and terminate such employment;

(viii)     open banking and credit facilities with banks and other financial institutions for any Company purpose including, but not limited to, a credit facility to provide the Company with working capital, construction loans, permanent financing and to otherwise

17

borrow money, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness in connection therewith and to secure the same by a mortgage, deed of trust, pledge or other lien on any asset of the Company;

       (ix)    bring and defend actions and proceedings at law or equity before any court or governmental, administrative or other regulatory agency, body or commission or otherwise;

       (x)    delegate its responsibilities and obligations hereunder, where reasonably appropriate and for reasonable compensation;

       (xi)    perform commercially reasonable acts to protect individual assets of the Members or the principal of the Members where such Members or principals have executed personal guarantees on behalf of the Company's business;

       (xii)    negotiate and execute any and all documents in connection with any loan made to or by the Company or any subsidiary of the Company; and

       (xiii)    do all other things necessary or appropriate to accomplish the foregoing.

By executing this Agreement, each Member shall be deemed to have consented to the exercise by the Managers of any of the foregoing powers of the Managers contained herein in accordance with the terms of this Agreement. Except as otherwise provided in this Agreement or the Act, a Member shall have no voting rights with respect to the Company.

     (d)    Notwithstanding anything to the contrary herein, the Managers may not do any of the following:

       (i)    any act in contravention of the Act or this Agreement; or

       (ii)    any act that would make it impossible to carry on the ordinary business of the Company as described in Section 4.1 hereof, except as otherwise provided in this Agreement.

     Section 7.2    <u>Binding Authority</u>. Unless specifically authorized to do so by this Agreement, no Member (other than a Member acting in its capacity as a Manager) or other Person shall have any power or authority to bind the Company, unless such Member or other Person has been authorized by the Managers in writing to act on behalf of the Company. The signature of the Managers on behalf of the Company shall be deemed binding on third parties; provided, however, that the Managers shall remain liable to the other Members for acts which exceed the Managers' authority under this Agreement.

     Section 7.3    <u>Managers</u>.    The total number of Managers shall be two (2) unless otherwise fixed at a different number by the written consent of a Super Majority of the Members. ESquared Hospitality or its successors or assigns shall be entitled to designate one Manager. The

18

initial Manager designated by ESquared Hospitality is Samantha Wasser. The other initial Manager is CC. Each Manager shall serve until such Manager resigns or is removed in accordance with Section 7.5, or such Manager dies (with respect to a Manager that is a person) or is unable to serve. Each decision shall require the consent of a majority of the Managers; provided, however, that in the event of a deadlock between the Managers, such deadlock shall be decided by the Manager appointed by ESquared Hospitality or its successor or assign (the "**Deadlock Rule**") with respect to any decision other than a Major Decision.

    Section 7.4    <u>Actions Requiring Approval of the CC Entity</u>. Notwithstanding anything to the contrary contained in this Agreement, for so long as the CC Entity owns any of the outstanding Membership Interests, the following actions shall be considered "**Major Decisions**" which shall require the approval of CC Entity and/or its Permitted Transferee:

        (a)    issuing any additional Membership Interest in or admitting any new Member to the Company (except a Permitted Transferee);

        (b)    increasing the number of Managers;

        (c)    changing the Concept from "fast casual" vegan;

        (d)    conducting any business of the Company relating to food or beverages that is not vegan;

        (e)    changing the name of any Restaurant other that to a name that has been approved by CC Entity for other Restaurants;

        (f)    altering or waiving any provision of or otherwise amending any provision of this Agreement, other than amending the agreement as permitted in the proviso of Section 20.1; or

        (g)    entering into any financing arrangements with respect to any Restaurant, other than Approved Financing Arrangements.

    The Members and Managers hereby approve the NFL License Agreement, substantially in the form attached hereto as <u>Exhibit C</u>, and the Personal Services Agreement, substantially in the form attached hereto as <u>Exhibit D</u>.

    Section 7.5    <u>Resignation, Removal and Vacancies</u>.

    (a)    A Manager may resign at any time by giving ten (10) days' prior written notice of his, her or its resignation to the Members. Any such resignation shall take effect at the time specified therein, or, if the time when it shall become effective shall not be specified therein, when accepted by the other Manager(s). Except as aforesaid, the acceptance of such resignation shall not be necessary to make it effective.

    (b)    CC may be removed as Manager (i) for Cause, (ii) in connection with a Service

19

Member's termination for Cause, or (iii) if CC Entity (or its Permitted Transferee) is no longer a Member (including in connection with an exercise of Exercise of Purchase Right or Put Right).

(c)     In the event of the removal, resignation, Disability or death of a Manager, the vacancy (and future vacancies of such position) shall be filled by ESquared Hospitality (or its Permitted Transferees).

(d)     In the event that a Manager resigns or is removed, except as otherwise provided in this Agreement, such removal or resignation shall not affect his/her/its Membership Interests.

Section 7.6     Compensation; Expenses.     No Manager shall receive any stated salary for his/its services as a Manager. The Managers shall be reimbursed for all ordinary and necessary out-of-pocket costs and expenses incurred in performing the functions of a Manager.

Section 7.7     Fiduciary Duty.

(a)     The Managers shall perform their duties as managers in good faith and with the degree of care that an ordinarily prudent person in a like position would use under similar circumstances. In performing their duties, the Managers shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by: (i) one or more agents or employees of the Company, or (ii) legal counsel, public accountants or other persons as to matters that the Managers reasonably believe to be within such person's professional or expert competence, as to matters within his designated authority, which the Managers believe to merit confidence, so long as in so relying it shall be acting in good faith and with such degree of care that an ordinarily prudent person in a like position would use under similar circumstances. The provisions of this Agreement, to the extent they restrict the duties and liabilities of the Managers otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of the Managers.

(b)     To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by any Manager in defending any claim, demand, action, suit or proceeding relating to Section 7.7(a) shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of such Manager to repay such amount if it shall be determined by a court of competent jurisdiction having final or unappealed dispositive authority over such matter that such Manager is not entitled to be indemnified as authorized in Article XIV.

Section 7.8     Transactions with Affiliates.   Subject to Section 7.4(f), nothing in this Agreement shall preclude transactions between the Company and an Affiliate or any of their employees or agents acting in and for his/her or its own account, provided that all such transactions shall be on a fair market "arm's length" basis (including, without limitation, that the rate of compensation to be paid for any such services shall be comparable to the amount paid for similar services under similar circumstances to independent third parties). Approved Financing Arrangements shall be deemed to satisfy this requirement. The Managers shall have the power and authority, on behalf of the Company, to take any and all lawful acts that the Managers consider necessary, advisable, or in the best interests of the Company in connection with the transactions

20

with Affiliates.

Section 7.9      Delegated Authority.  Notwithstanding anything to the contrary set forth herein, the exclusive control, decision making authority and power of the Managers over the business and affairs of the Company shall be subject to the Managers' delegation of authority or responsibility as and when deemed appropriate by the Managers.

Section 7.10      Other Business Activities of Managers.  The Managers shall devote such of their business time as they deem, in their reasonable discretion, necessary to manage and operate the Company and to perform their obligations as set forth hereunder.  It is understood and agreed by the Members that the Managers will not be engaged full-time in the management of the Company, and that the Managers have, and may have, duties and responsibilities to other companies.  Each Manager may engage in or hold interests in other business ventures of every kind and description for their own account, except as otherwise limited pursuant to Section 6.8 or with respect to Managers who are Service Members (for such purposes, CC shall be considered a Service Member), Sections 19.2 and 19.7 and as set forth in the Personal Services Agreement.  The obligation to devote business time to the Company set forth in the Personal Services Agreement is separate than the obligations set forth above.

Section 7.11      Investment Opportunities.  Except as limited under Section 4.3(c) or Section 19.7 herein, no Member or Manager shall be obligated to present any investment opportunity to the Company, even if the opportunity is of a character consistent with the Company's other activities and interests, and, subject to the limitations under Sections 4.3(c), 19.2 and 19.7 herein, each Member and Manager shall have the right to take for its own account, or to recommend to others, any investment opportunity presented to such Member or Manager.

Section 7.12      Power of Attorney.

(a)      Each Member hereby appoints the Managers, acting collectively with power of substitution, as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, swear to and file: (i) any and all instruments, certificates, and other documents that may be deemed necessary or desirable to effect the Dissolution or Liquidation of the Company in accordance herewith;  and (ii) any business certificate, fictitious name certificate, amendment thereto, or other instrument or document of a similar nature necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable federal, state or local law.

(b)      The power of attorney hereby granted by each Member is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy or insolvency of such Member.

Section 7.13      Officers.  The Managers may appoint officers.  The officers of the Company may consist of a President, one or more Vice Presidents, a Secretary, a Treasurer and such other officers, if any, appointed by the Managers pursuant to a written resolution.

The powers and duties of each officer shall be as follows:

21

President.  The President shall have, subject to the supervision, direction and control of the Managers, the general powers and duties of supervision, direction and management of the affairs and business of the Company usually vested in the president of a corporation, including, without limitation, all powers necessary to direct and control the organizational and reporting relationships within the Company.

Other Officers.  Each other officer shall have such powers and perform such duties as may from time to time be assigned to him or her by the Managers or President.

## ARTICLE VIII

## CONFIDENTIALITY

Section 8.1        Confidentiality/Proprietary Rights/Return of Company Property.

(a)    The parties acknowledge that each Member and Manager (referred to in this Section 8.1 as a "**Restricted Person**") may have access to and participate in the development of or be acquainted with confidential or proprietary information and trade secrets related to this Agreement, the business of the Company and its Affiliates (the "**Companies**"), including but not limited to (i) business plans, operating plans, marketing plans, bid strategies, bid proposals, financial reports, operating data, budgets, wage and salary rates, pricing strategies and information, terms of agreements with suppliers or customers and others, customer lists, formulas, patents, devices, software programs, reports, tangible property and specifications owned by or used in the Companies' businesses, operating strengths and weaknesses of the Companies' members, managers, shareholders, officers, directors, employees, agents, suppliers and customers, (ii) information pertaining to future developments such as, but not limited to, research and development, future marketing, distribution, delivery or merchandising plans or ideas, and potential new distribution or business locations, (iii) other tangible and intangible property used in the business and operations of the Companies, but not made publicly available, (iv) Company Recipes, whether or not made publicly available and (v) the contents of this Agreement (the "**Confidential Information**").

(b)    No Restricted Person shall, directly or indirectly, disclose, use or make known for his or another's benefit any Confidential Information or use such Confidential Information in any way except in the best interests of the Companies in the performance of the Restricted Person's duties under this Agreement.  The Members acknowledge that CC Entity may discuss and do taste tests of recipes with friends, family, interns and employees ("**Testers**") in connection with testing and refining the same without violating this provision so long as such Testers are subject to nondisclosure agreements in form reasonably satisfactory to the Managers.

(c)    Return of Company Property.  Upon the termination, resignation or replacement of a Restricted Person, the Restricted Person shall deliver to the Company all copies of data, information and knowledge of the Company, including, without limitation, all Confidential Information, documents, correspondence, notebooks, reports, computer programs, names of full-time and part-time employees and consultants, and all other materials and copies thereof (including computer discs and other electronic media) relating in any way to the business of the

22

Company in any way obtained by the Restricted Person during the period of his position with, the Company.

(d)      Neither CC nor the CC Entity shall use or permit others to use any of the Company Recipes in connection with the operation of any restaurants, catering operations or packaged food sales unrelated to the Company even if such recipes are published in cookbooks or other materials.

(e)      The obligations of the Restricted Person under this Section 8.1 (including, without limitation, clause (d)) shall survive (i) the removal or resignation of such Restricted Person as Manager, (ii) the sale, exchange, transfer or forfeiture of such Restricted Person's Membership Interests or (iii) the expiration or termination of this Agreement.

## ARTICLE IX
## CONTRACTS, CHECKS, DRAFTS, BANK ACCOUNTS, PROXIES, ETC.

Section 9.1     Execution of Documents. Except as specifically set forth herein, the Managers shall have the power to execute and deliver deeds, leases, contracts, mortgages and other grants of security interests, bonds, debentures, notes and other evidences of indebtedness, checks, drafts and other orders for the payment of money and other documents approved or authorized as required herein for and in the name of the Company, and such power may be delegated (including power to re-delegate) by written instrument to officers, employees or agents of the Company.

Section 9.2     Deposits. All funds of the Company not otherwise employed shall be deposited from time to time to the credit of the Company or otherwise in accordance with Company policy as approved by the Managers.

Section 9.3     Proxies in Respect of Stock or Other Securities of Other Companies. The Managers shall have the authority (a) to appoint from time to time an agent or agents of the Company to exercise in the name and on behalf of the Company the powers and rights that the Company may have as the holder of stock or other securities in any other company, (b) to vote or consent in respect of such stock or securities, and (c) to execute or cause to be executed in the name and on behalf of the Company such written proxies, consents, powers of attorney or other instruments as they may deem necessary or appropriate in order that the Company may exercise such powers and rights. The president or any such designated officer may instruct any Person or Persons appointed as aforesaid as to the manner of exercising such power and rights.

## ARTICLE X
## BOOKS AND RECORDS; RIGHTS OF INSPECTION; TAX MATTERS

Section 10.1     Books And Records. The Company shall keep accurate books and records relating to transactions with respect to the assets of the Company at the principal place of business of the Company (or such other place of business or office as the Managers may designate), which shall be available for the inspection by any Member (or audit by a Member at the Member's sole cost and expense) or such Member's representative, upon reasonable notice and at reasonable times on Business Days.

Section 10.2        Information.

(a)        Each Member has the right to inspect: (i) a current list of the full name and last known business, residence or mailing address of each Member, (ii) a copy of the Articles of Organization and of this Agreement (as well as any signed powers of attorney pursuant to which any such document was executed); (iii) a copy of the Company's federal, state and local income tax returns and reports, and annual financial statements of the Company, for all Fiscal Years that such Person is a Member; and (iv) copies of minutes (or written consents without a meeting), of every meeting (or action taken by consent) of the Members or the Managers.

(b)        Upon the request of a Member, the Company will furnish to each Member a balance sheet, an income statement, and an annual statement of source and application of funds of the Company prepared in accordance with US generally accepted accounting principles, and will make reasonable efforts to cause to be delivered to each Member as promptly as practicable on or before the later of 90 days after such request, or June 30 of each Fiscal Year.  Any Member shall have the right to inspect the books and records of the Company during ordinary business hours upon reasonable notice.

Section 10.3        Tax Returns.  The Company, at its expense, shall cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required state and local tax returns in each jurisdiction in which the Company owns property or does business.  Within ninety (90) days following the end of each Fiscal Year, the Company shall use reasonable efforts to provide each member with all necessary tax reporting information, a copy of the Company's informational federal income tax return for such Fiscal Year and such other information as is reasonably necessary to enable the Members to comply with their tax reporting requirements.  If the final federal income tax return is not completed within such ninety (90) day period, the Managers shall provide estimates of income, gain, loss, deductions and credit to the Members and shall endeavor to complete the Company's income tax returns for such Fiscal Year within reasonably timely extension periods.

Section 10.4        Tax Elections.  The Company shall make and revoke such tax elections as the Managers may from time to time determine.

Section 10.5        Tax Matters Partner.

(a)        ESquared Hospitality shall be the tax matters partner (the "Tax Matters Partner") under §6231(a)(7) of the Code.

(b)        The Tax Matters Partner shall be responsible for notifying all Members of ongoing proceedings, both administrative and judicial, and shall represent the Company throughout any such proceeding.  Each Member agrees, and each holder of Membership Interests who is not a Member shall be deemed by virtue of its ownership of Membership Interests to agree, that it shall furnish the Tax Matters Partner with such information as the Tax Matters Partner may reasonably request in order to allow the Tax Matters Partner to provide the Internal Revenue Service with sufficient information with respect to any such proceedings.

24

(c)     If an administrative proceeding with respect to a partnership item under the Code has begun, and the Tax Matters Partner so requests, each Member agrees, and each holder of Membership Interests who is not a Member shall be deemed by virtue of its ownership of Membership Interests to agree, that it shall notify the Tax Matters Partner of its treatment of any partnership item on its federal income tax return, if any, that is inconsistent with the treatment of that item on the partnership return for the Company. Any settlement agreement with the Internal Revenue Service shall be binding upon the holder of Membership Interests only as provided in the Code. The Tax Matters Partner shall not bind any other holder of Membership Interests to any extension of the statute of limitations or to a settlement agreement without such holder's written consent. Any holder of Membership Interests who enters into a settlement agreement with respect to any partnership item shall notify the other holders of Membership Interests of such settlement agreement and its terms within thirty (30) days from the date of settlement.

(d)     If the Tax Matters Partners does not file a petition for readjustment of partnership items in the Tax Court Federal District Court or Claims Court within the ninety (90) day period following a notice of a final partnership administrative adjustment, any notice partner and 5-percent group (as such terms are defined in the Code) may institute such action within the following sixty (60) days. The Tax Matters Partner shall timely notify the other Members in writing of its decision. Any notice partner and 5-percent group shall notify any other Member of its filing of any petition for readjustment.

Section 10.6     No Partnership. The classification of the Company as a partnership shall apply only for federal (and, as appropriate, state and local) income tax purposes. This characterization, solely for tax purposes, does not create or imply a general partnership among the Members for state law or any other purpose Instead, the Members acknowledge the status of the Company as a limited liability company formed under the Act.

Section 10.7     Title to Company Assets. Title to, and all right and interest in, the Company's assets shall be acquired in the name of and held by the Company, or, if acquired in any other name, be held for the benefit of the Company.

## ARTICLE XI
## CAPITAL ACCOUNTS

Section 11.1     Maintenance. Each Member agrees that a single capital account (each a "Capital Account") shall be established and maintained for each Member and shall be credited, charged and otherwise adjusted as provided in this Article XI and as required by the Regulations promulgated under §704(b) of the Code (the "§704(b) Regulations"). The Capital Account of each Member shall be:

(a)     credited with (i) each Capital Contribution made by such Member, (ii) such Member's allocable share of Net Profits and other items of income and gain of the Company (as set forth in Article XI hereof), including items of income and gain exempt from tax, and (iii) all other items properly charged to the Capital Account of such Member as required by the §704(b) Regulations; and

25

(b)        charged with (i) each Distribution made to such Member by the Company, (ii) such Member's allocable share of Net Losses and other items of loss and deduction of the Company (as set forth in Article XII hereof) and (iii) all other items properly charged to the Capital Account of such Member as required by the §704(b) Regulations.

Section 11.2        Adjustments. The Members intend to comply with the §704(b) Regulations in all respects, and to agree to adjust their Capital Accounts to the full extent that the §704(b) Regulations may apply (including, without limitation, applying the concepts of the minimum gain chargebacks and qualified income offsets).  To this end, each Member agrees to make any Capital Account adjustment that, in the opinion of tax counsel selected by the Managers, is necessary or appropriate to maintain equality between the aggregate Capital Accounts of the Members and the amount of capital of the Company reflected on its balance sheet (as computed for book purposes), as long as such adjustments are consistent with the underlying economic arrangement of the Members and are based on, wherever practicable, and consistent with federal tax accounting principles.

Section 11.3        Market Value Adjustments.  Each Member agrees that appropriate adjustments (if any) shall be made to the Capital Accounts of all Members upon any Transfer of Membership Interests, including those that apply upon the constructive liquidation of the Company under §708(b)(1) of the Code or the liquidation of a Member's Membership Interests, all in accordance with the §704(b) Regulations.

Section 11.4        Transfer.  Each Member agrees that, if all or any part of its Membership Interests are transferred in accordance with this Agreement, except to the extent otherwise provided in the §704(b) Regulations, upon admission of the transferee as a Member, the Capital Account of the transferor that is attributable to the transferred Membership Interests shall carry over to the transferee.

## ARTICLE XII
## ALLOCATION OF INCOME, GAIN, LOSS AND DEDUCTION

Section 12.1      Allocation of Net Profits and Net Losses. The Net Profits and the Net Losses for each Fiscal Year shall be allocated among the Members as follows:

Subject to Section 12.3, Net Profits and Net Losses for each Fiscal Year shall be (except as otherwise required by Section 704(b) of the Code or the §704(b) Regulations as determined by the Managers together in their sole discretion) be allocated to the Members in a manner such that the Capital Account of each Member, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member during such Fiscal Year pursuant to Section 13, if (A) the Company were dissolved and terminated; (B) its affairs were wound up and each asset of the Company were sold for cash equal to its Fair Market Value); (C) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability); and (D) the net assets of the Company were distributed in accordance with Section 13 (other than Section 13.4) to the Members immediately after giving effect to such allocation, minus (ii) such Member's share of Company Minimum Gain. The Managers may, together in their sole discretion, make such other assumptions (whether or not consistent with the foregoing assumptions) as the Managers deem necessary or appropriate to effectuate the intended economic arrangement of the Members, which is for the allocations pursuant to this Section 12.1 to track and follow the distributions actually made pursuant to Section 13.

Section 12.2      Allocation in the Event of Property Distribution.    Any non-cash asset distributed to one or more Members shall first be valued at its Fair Market Value to determine the gain or loss that would have resulted if such asset were sold for such value.  Such gain or loss shall then be allocated in accordance with Section 12.1.

Section 12.3      Special Rules.  Notwithstanding the general allocation rules set forth in Section 12.1 or the allocation rules set forth in Section 12.2, the following special allocation rules shall apply under the circumstances described.

(a)      Deficit Capital Account and Nonrecourse Debt Rules.

(i)      Limitation on Loss Allocations. The Net Losses allocated to any Member pursuant to Section 12.1 with respect to any Fiscal Year shall not exceed the maximum amount of Net Losses that can be so allocated without causing such Member to have a deficit in its Adjusted Capital Account at the end of such Fiscal Year.  All Net Losses in excess of the limitation set forth in the preceding sentence of this Section 12.3(a)(i) shall be allocated (1) first, to the maximum extent permitted by the Code and the Regulations, pro rata among the Members having positive balances in their Adjusted Capital Accounts (after giving effect to the allocations required by Section 12.1) in the ratio obtained by dividing (x) each such Member's Capital Account balance by (y) the sum of all such Members' Capital Account balances and (2) second, any remaining amount to the Members in accordance with their Percentage Interests.

27

(ii)    Qualified Income Offset. If in any Fiscal Year a Member unexpectedly receives an adjustment, allocation or distribution described in §§1.704-1 (b)(2)(ii)(d)(4), (5) or (6) of the Regulations, and such adjustment, allocation or distribution causes, or increases, a deficit in the Adjusted Capital Account for such Member, then, before any other allocations are made under this Agreement or otherwise, such Member shall be allocated items of income and gain (consisting of a pro rata portion of each item of income, including gross income and gain) in an amount and manner sufficient to eliminate such deficit in the Adjusted Capital Account as quickly as possible.

(iii)    Company Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be allocated items of income and gain for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in proportion to, and to the extent of, an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain during such Fiscal Year, subject to the exceptions set forth in §1.704-2(f)(2), (3) and (5) of the Regulations (hereinafter referred to as **"Company Minimum Gain Chargeback"**); provided that, if the Company has any discretion as to an exception set forth in §1.704-2(f)(5), the Tax Matters Partner (with the consent of the other Members) shall exercise such discretion on behalf of the Company. The Tax Matters Partner shall, if the application of this Section 12.3(a)(ii) would cause a distortion in the economic arrangement among the Members, ask the Commissioner of the Internal Revenue Service to waive the Company Minimum Gain Chargeback requirements pursuant to §1.704-2(f)(4) of the Regulations. To the extent that this Section is inconsistent with §1.704-2(f) or 1.704-2(k) of the Regulations or incomplete with respect to such Sections of the Regulations, the Company Minimum Gain Chargeback provided for herein shall be applied and interpreted in accordance with such Sections of the Regulations.

(iv)    Member Minimum Gain Chargeback. If there is a net decrease in Member Minimum Gain during any Fiscal Year, each Member shall be allocated items of income and gain for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Member Minimum Gain during such Fiscal Year, subject to the exceptions set forth in §§ 1.704-2(f)(2), (3), and (5) of the Regulations as referenced by §1.704-2(i)(4) of the Regulations (hereinafter referred to as **"Member Minimum Gain Chargeback"**).  The Tax Matters Partner shall, if the application of this Section 12.3(a)(iv) would cause a distortion in the economic arrangement among the Members, ask the Commissioner of the Internal Revenue Service to waive the Member Minimum Gain Chargeback requirement pursuant to §1.704-2(i)(4) of the Regulations. To the extent that this Section 12.3(a)(iv) is inconsistent with §1.704-2(i)(4) or 1.704-2(k) of the Regulations or incomplete with respect to such Sections of the Regulations, the Member Minimum Gain Chargeback provided for herein shall be applied and interpreted in accordance with such Sections of the Regulations.

(v)    Nonrecourse Deductions. Nonrecourse deductions shall be allocated among the Members in accordance with their respective Percentage Interests. Member Nonrecourse Deductions shall be allocated among the Members in accordance with the ratios in which the Members share the economic risk of loss for the Member Nonrecourse

28

Debt that gave rise to those deductions as determined under §1.752-2 of the Regulations This allocation is intended to comply with the requirements of §1.704-2(i) of the Regulations and shall be interpreted and applied consistent therewith.

(vi)    Limited Effect and Interpretation. The special rules set forth in Sections 12.3(a)(i), (ii), (iii), (iv) and (v) (the **"Regulatory Allocations"**) shall be applied only to the extent required by applicable Regulations for the resulting allocations provided for in this Section 12.3, taking into account such Regulatory Allocations, to be respected for federal income tax purposes. The Regulatory Allocations are intended to comply with the requirements of §1.704-1(b), 1.704-2 and 1.752-1 through 1.752-5 of the Regulations and shall be interpreted and applied consistently therewith.

(vii)    Curative Allocations. The Regulatory Allocations may not be consistent with the manner in which the Members intend to divide the Net Profits, Net Losses and similar items. Accordingly, Net Profits, Net Losses and other items shall be reallocated among the Members in a manner consistent with §§1.704-1(b) and 1.704-2 of the Regulations so as to negate as rapidly as possible any deviation from the manner in which Net Profits, Net Losses and other items are intended to be allocated among the Members pursuant to Sections 12.1 and 12.2 that is caused by the Regulatory Allocations.

(viii)    Change in Regulations. If the Regulations incorporating the Regulatory Allocations are hereafter changed or if new Regulations are hereafter adopted, and such changed or new Regulations, in the opinion of independent tax counsel for the Company, make it necessary to revise the Regulatory Allocations or provide further special allocation rules in order to avoid a significant risk that a material portion of any allocation set forth in this Article XII would not be respected for federal income tax purposes, the Members shall make such reasonable amendments to this Agreement as, in the opinion of such counsel, are necessary or desirable, taking into account the interests of the Members as a whole and all other relevant factors, to avoid or reduce significantly such risk to the extent possible without materially changing the amounts allocable and distributable to any Member pursuant to this Agreement.

(b)    Change in Member's Interests. If there is a change in any Member's share of the Net Profits, Net Losses or other items of the Company during any Fiscal Year, allocations among the Members shall be made in accordance with their interests in the Company from time to time during such Fiscal Year in accordance with §706 of the Code, using the closing-of-the-books method, except that Depreciation, amortization and similar items shall be deemed to accrue ratably on a daily basis over the entire Fiscal Year during which the corresponding asset is owned by the Company if such asset is placed in service prior to or during the Fiscal Year.

Section 12.4 Tax Allocations.

(a)    In General. Except as set forth in Section 12.3, allocations for tax purposes of items of income, gain, loss and deduction, and credits and basis therefor, shall be made in the same manner as allocations for book purposes as set forth in Sections 12.1 and 12.2. Allocations pursuant to this Section 12 4 are solely for purposes of federal, state and local income taxes and

29

shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, other items or Distributions pursuant to any provision of this Agreement.

(b)     Special Rules.

(i)     Elimination of Book/Tax Disparities. Any item of income, gain, loss, and deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company and which is required to be allocated for income tax purposes under Section 704(c) of the Code so as to take into account the variation between the tax basis of such property and its agreed upon Fair Market Value at the time of its contribution shall be allocated to the Members solely for income tax purposes in any manner permitted by Section 704(c) selected by the Tax Matters Member. Similarly, if any property of the Company is reflected in the Capital Accounts of the Members and on the books of the Company at a Book Value that differs from the adjusted tax basis of such property, the Company's allocations of tax items shall be appropriately made pursuant to the Treasury Regulations using Section 704(c) principles so as to take account of the variation between the adjusted tax basis of the applicable property and its Book Value.

(ii)     Allocation of Items Among Members. Except as otherwise provided in Section 12.3(a) and this Section 12.4(b), each item of income, gain, loss and deduction and all other items governed by § 702(a) of the Code shall be allocated among the Members in proportion to the allocation of Net Profits and Net Losses set forth in Sections 12.1 and 12.2, provided that any gain recognized from any disposition of a Company asset that is treated as ordinary income because it is attributable to the recapture of any depreciation or amortization shall be allocated among the Members in the same ratio as the prior allocations of Net Profits, Net Losses or other items that included such depreciation or amortization, but not in excess of the gain otherwise allocable to each Member.

(iii)     Tax Credits. All tax credits shall be allocated among the Members in accordance with their Percentage Interests.

(c)     Conformity of Reporting. The Members are aware of the income tax consequences of the allocations made by this Section 12.4 and hereby agree to be bound by the provisions of this Section 12.4 in reporting their shares of the Company's profits, gains, income, losses, deductions, credits and other items for income tax purposes.

## ARTICLE XIII
## DISTRIBUTIONS

Section 13.1     Distributions. Except as otherwise provided in this Agreement, Distributions of Available Cash, other than Tax Distributions in accordance with Section 13.4, shall be made to the Members in cash on a quarterly basis (within thirty (30) days of the end of each Fiscal Quarter), in the following order and priority:

(a)     First, to repay Unreturned Capital Contributions to the Members proportionately

30

er

made to a Member shall be treated as an advance distribution to such Member pursuant to Section 13.1 and shall reduce the amount of distributions otherwise distributable to such Member pursuant to Section 13.1.

Section 13.5    <u>Limitation Upon Distributions</u>.  No Distribution shall be declared and paid to the extent that, at the time of the Distribution, after giving effect to the Distribution, all liabilities of the Company (other than liabilities to Members on account of their interest in the Company and liabilities for which recourse of creditors is limited to specified property of the Company) exceed the Fair Market Value of the assets of the Company (except that the Fair Market Value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the Company only to the extent that the Fair Market Value of such property exceeds such liability).

## ARTICLE XIV
## INDEMNIFICATION

Section 14.1    <u>Indemnification</u>.    The Company shall indemnify and hold harmless each Member and each general or limited partner of any Member or such Member's Affiliates, shareholders, members or other holder of any equity interest in such Member or its Affiliate, or any officer or director of any of the foregoing and each and every Manager and any representative, manager and officer of the Managers (collectively, the "**Indemnified Party**"), in accordance with this Article XIV and to the fullest extent allowed by the law, from and against any and all losses, claims, damages, liabilities, expenses (including legal and other professional fees and disbursements), judgments, fines, settlements, demands, costs, causes of action and other amounts (each an "**Indemnification Obligation**") arising from any and all claims, demands, actions, suits or proceedings (civil, criminal, administrative or investigative), actual or threatened, in which such Indemnified Party may be involved, as a party or otherwise, by reason of such Indemnified Party's service to, or on behalf of, or management of the affairs of, the Company, or rendering of advice or consultation with respect thereto, or which relate to the Company, its properties, business or affairs, or any matter incidental to this Agreement, including the formation hereof, the making of the initial Capital Contributions and any matter for which such Indemnified Party is exculpated, whether or not the Indemnified Party continues to be a Member, Manager, representative or officer at the time any such Indemnification Obligation is paid or incurred, provided that that the conduct of the Indemnified Party has not been established by a judgment or other final adjudication adverse to such Indemnified Party (a) to constitute bad faith or be the result of active and deliberate dishonesty and be material to the cause of action so adjudicated, or (b) to result in financial profit or other advantage to the Indemnified Party to which the Indemnified Party was not legally entitled.  Any indemnity under this Section shall be paid solely out of and to the extent of Company Assets and shall not be a personal obligation of any Member and in no event shall any Member be required, or permitted without the consent of all of the Members, to contribute additional capital to enable the Company to satisfy any obligation under this Section. The Company shall also indemnify and hold harmless any Indemnified Party from and against any Indemnification Obligation suffered or sustained by such Indemnified Party by reason of any action or inaction of any employee, broker or other agent of such Indemnified Party, provided, that such employee, broker or agent was selected, engaged or retained by such Indemnified Party with reasonable care.  The termination of a proceeding by judgment, order, settlement, conviction or

32

upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that such Indemnification Obligation resulted from actions that (a) constituted bad faith or be the result of active and deliberate dishonesty and be material to the cause of action so adjudicated, or (b) resulted in financial profit or other advantage to the Indemnified Party to which the Indemnified Party was not legally entitled. Expenses (including legal and other professional fees and disbursements) incurred in any proceeding shall be paid by the Company, as incurred, in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of such Indemnified Party to repay such amount if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified by the Company as authorized hereunder.

Section 14.2   Indemnification Not Exclusive. The indemnification provided by this Article XIV shall not be deemed to be exclusive of any other rights to which each Indemnified Party may be entitled under any agreement, or as a matter of law, or otherwise, both as to action in such Indemnified Party's official capacity and to action in another capacity, and shall continue as to such Indemnified Party who has ceased to have an official capacity for acts or omissions during such official capacity or otherwise when acting at the request of the Managers, or any Person granted authority thereby, and shall inure to the benefit of the heirs, successors and administrators of such Indemnified Party.

Section 14.3   Insurance on Behalf of Indemnified Party. The Managers shall have the power, but not the obligation, to purchase and maintain insurance on behalf of each Indemnified Party, at the expense of the Company, against any liability which may be asserted against or incurred by it or him in any such capacity, whether or not the Company would have the power to indemnify the Indemnified Parties against such liability under the provisions of this Agreement.

Section 14.4   Indemnification Limited by Law.  Notwithstanding any of the foregoing to the contrary, the provisions of this Article XIV shall not be construed so as to provide for the indemnification of an Indemnified Party for any liability to the extent (but only to the extent) that such indemnification would be in violation of applicable law or to the extent that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Article XIV to the fullest extent permitted by law.

**ARTICLE XV**
**ACCOUNTING PROVISIONS**

Section 15.1   Fiscal Year. For income tax and financial accounting purposes, the Fiscal Year of the Company shall end on December 31 of each year (unless otherwise required by the Code).

Section 15.2   Accounting Matters.  All decisions as to accounting matters, except as otherwise expressly provided herein, shall be made by the Managers. The Managers may rely upon the advice of the Company's accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes or financial accounting purposes (as applicable).

**ARTICLE XVI**

33

## DISSOLUTION

Section 16.1     Dissolution.  Dissolution of the Company shall occur upon the happening of any of the following events:  (i) the consent of the Managers, (ii) the sale of all or substantially all of the Company's assets; provided, however, that if, in connection with such sale or other disposition, the Company receives a promissory note or notes evidencing all or a part of the purchase price of a property, the Company shall not be dissolved until such promissory note(s) are satisfied, sold or otherwise disposed of, but distributions from such sale or other disposition shall nevertheless be made pursuant to Section 17.2 below, and not Section 13.1, (iii) the conversion of the Company into a corporation or other Person; or (iv) an entry of judicial dissolution pursuant to Section 702 the Act or as otherwise provided under Section 701 of the Act.  The Company shall not be dissolved by the death, resignation, withdrawal, bankruptcy or dissolution of a Member.

## ARTICLE XVII
## LIQUIDATION

Section 17.1     Liquidation. Upon Dissolution of the Company, the Company shall immediately proceed to wind up its affairs and liquidate. The Liquidation of the Company shall be accomplished in a businesslike manner by such Person or Persons designated by the Managers, which Person(s) shall be entitled to reasonable compensation therefor. Subject to Section 17.3, a reasonable time shall be allowed for the orderly Liquidation of the Company and the discharge of liabilities to creditors so as to enable the Company to minimize any losses attendant upon Liquidation.  Any Net Profits or Net Losses on disposition of any Company assets in Liquidation shall be allocated among the Members and credited or charged to Capital Accounts in accordance with Section 12.1 and 12.2.  Until the filing of the articles of dissolution under Section 17.6 and without affecting the liability of Members and without imposing liability on the liquidating trustee, the Person or Persons conducting the liquidation may settle and close the Company's business, prosecute and defend suits, dispose of its property, discharge or make provision for its liabilities and make Distributions in accordance with the priorities set forth in Section 17.2.

Section 17.2     Priority of Payment. The assets of the Company shall be distributed in Liquidation in the following order:

(a)     To creditors, including Members who are creditors, by the payment or provision for payment of the debts and liabilities of the Company and the expenses of Liquidation;

(b)     To the setting up of any reserves that are reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; and

(c)     To Members in the same order and manner as distributions under Section 13.1.

Section 17.3     Negative Capital Accounts.  If, after the allocation of all Profit or Loss from the winding up of the Company and the distribution of assets pursuant to Section 17.2 hereof and upon final liquidation of the Company, the Capital Account of any Member is negative, the Member shall not be obligated to restore the negative balance in its Capital Account.

34

Section 17.4    Timing. Final Distributions in Liquidation shall be made by the end of the Company's Fiscal Year in which such actual Liquidation occurs (or, if later, within ninety (90) days after such event) in the manner required to comply with the §704(b) Regulations. Payments of Distributions in Liquidation may be made to a liquidating trust established by the Company for the benefit of those entitled to payments under Section 17.2 in any manner consistent with this Agreement and the §704(b) Regulations.

Section 17.5    Liquidating Reports. A report shall be submitted with each liquidating Distribution to the Members, showing the collections, disbursements and Distributions during the period which is subsequent to any previous report. A final report, showing cumulative collections, disbursements and Distributions, shall be submitted upon completion of the Liquidation process.

Section 17.6    Articles of Dissolution. Within ninety (90) days following the Dissolution of the Company and the commencement of winding up of its business, or at any other time there are no Members, the Company shall file Articles of Dissolution (to cancel the Articles of Organization) with the Secretary of State of the State of New York pursuant to the Act. At such time, the Company shall also file an application for withdrawal of its Certificate of Authority in any jurisdiction where it is then qualified to do business.

## ARTICLE XVIII
## TRANSFER RESTRICTIONS

Section 18.1    Transfer Restrictions. Except as otherwise provided in this Article XVIII, no Member shall, directly or indirectly, sell, assign, pledge, mortgage, encumber, hypothecate, grant a security interest in or otherwise dispose of or transfer (or suffer any of the foregoing to occur), whether voluntarily or involuntarily or by operation of law or otherwise, or grant or create any participation in such Member's right to receive distributions or returns of capital, all or a portion of its Membership Interest in the Company (in the case of CC Entity, this provision restricts the transfer of any ownership interests therein from CC) (each, a "**Transfer**") without the prior written consent of the Managers. If such written consent is not first obtained, the proposed transferee or assignee of the Membership Interest (or portion thereof) so transferred or assigned shall have no right to be, and shall not be, admitted as a Member and shall have no right to participate in, and shall not participate in, the management of the business and affairs of the Company, and such Transfer shall be null and void. No Member may encumber any or all of his Membership Interest in the Company in connection with any debt, guarantee or personal undertaking, except with the unanimous consent of the Managers or if approved under the terms of Approved Financing Arrangements.

Section 18.2    Permitted Transfers. Notwithstanding anything to the contrary in Section 18.1, (i) a Member that is an entity may transfer or assign its Membership Interest (or any portion thereof) to its Affiliates, and (ii) a member that is an individual may transfer or assign his Membership Interest to a sibling or lineal descendent, or a trust the beneficiary or beneficiaries of which is or are the Member and/or one or more Immediate Family members of such Member or a Family Trust of such Member for estate planning purposes, or at death by operation of law or through a testamentary transfer, in each case without the consent required in Section 18.1, provided that such transferee first agrees, in writing, to be bound by all the provisions of this

Agreement (a "**Permitted Transfer**"), and, provided further, that any such assignment by CC Entity (or its transferee) shall not relieve CC or CC Entity of their obligations hereunder. The transferring or assigning Member shall promptly notify the Managers, in writing, of any such Permitted Transfer to a permitted transferee (a "**Permitted Transferee**"), and such Member and Permitted Transferee shall execute and deliver or cause to executed and delivered such documentation (including but not limited to a joinder agreement or substitute signature page to this Agreement that binds such Permitted Transferee to the obligations of a Member hereunder) as the Managers shall reasonably request, and the Managers shall update Exhibit A attached hereto to reflect any changes to the Members. Permitted Transfers are not subject to the First Refusal Right, Drag Along Right or Tag Along Right. Notwithstanding the foregoing, while CC Entity is the Service Member, any transfer of its interest shall require the approval of the Managers, such approval not to be unreasonably withheld. **For the avoidance of doubt, any Membership Interests transferred by CC Entity (or any future transfers of such interests by any transferee) shall be subject to the Membership Interest Recapture provisions set forth below.**

Section 18.3     Right of First Refusal.

(a)     If a Member ("**Third-Party Transferor**") or any principal, member or partner of such Third Party Transferor whose sole asset is Membership Interests desires to, directly or indirectly, Transfer all or part of his or its Membership Interest (the "**Offered Interest**") in the Company or interest in such Third-Party Transferor (or constituent entity of such Third-Party Transferor) to an unrelated third party ("**Third-Party Transferee**"), and such transfer has been approved in accordance with Section 18.1, and such Third-Party Transferor has not exercised its Drag Along Right, if any, such Third-Party Transferor shall provide the other Members written notice ("**Offer Notice**") offering to Transfer to the other Members the Offered Interests ("**First Refusal Right**") on all of the same terms and conditions which the Third-Party Transferor is willing to Transfer the Offered Interest to the Third-Party Transferee, all of which shall be set forth in reasonable detail in the Offer Notice (including the price per Membership Interest). The other Members shall have the exclusive right for a period of thirty (30) days after the Offer Notice is received ("**Offer Period**"), by means of written notice to the Third-Party Transferor ("**Response Notice**") to agree to purchase all or a portion of the Offered Interests that are being offered to the other Members. If one (1) Member exercises the First Refusal Right by accepting the offer, the Third-Party Transferor shall Transfer to such Member the entire Offered Interest being offered to the other Members on the same terms and conditions which it is willing to transfer the Offered Interest to the Third-Party Transferee. If more than one (1) Member exercises the First Refusal Right by accepting the offer, the Third-Party Transferor shall Transfer to each such Member the Offered Interest being offered to the Members pro rata in proportion to its respective Percentage Interest prior to such Transfer on the same terms and conditions which it is willing to transfer the Offered Interest to the Third-Party Transferee. Failure to give the Member Response Notice within the thirty (30) day period shall be deemed a rejection of the Offered Interest.

(b)     In the event that the other Members do not collectively elect to purchase all of the Offered Interests, then the Third-Party Transferor shall be free to Transfer the Offered Interests that the other Members did not elect to purchase to the Third-Party Transferee for a period of 90 days from the expiration of the Offer Period on terms and conditions no more favorable to

36

Third-Party Transferee than set forth in the Offer Notice.  If the Offered Interests shall not have been sold in a bona fide transaction pursuant to this Section 18.3, then all of such Offered Interests then owned by such Third-Party Transferor shall again be subject to all of the restrictions and provisions of this Agreement.

(c)     Any transfer or assignment of a Membership Interest (or any portion thereof) to any Member permitted or required pursuant to the terms of this Agreement is hereby authorized and shall not require the consent of the Managers.

18.4     <u>Drag-Along Rights</u>.

(a)     If ESquared Hospitality  (or its successor) finds a third party buyer for all the outstanding Membership Interests or assets of the Company (whether such sale is by way of purchase of assets or Membership Interests, merger, recapitalization or other form of transaction, and whether related to the sale solely of the Business or an ESquared Hospitality Liquidity Event) (the "**Dragging Member**"), the Dragging Member may elect to require all, but not less than all, of the other Members to sell all, but not less than all, of the Membership Interests then owned by the Members to the third party purchaser for proportionally the same consideration (based on relative Percentage Interest) and on the same terms and conditions as the Dragging Member will receive provided, that with respect to a sale of Membership Interests, the Dragging Member's and the other Members' share of the purchase price paid by the bona fide third party buyer shall be equal to the amount of Distributions which the Dragging Member and other Members would be entitled to receive if the Company were to sell all or substantially all of its assets for such purchase price and were to distribute the proceeds from such sale to the Members pursuant to Section 13.1 ("**Drag Along Right**").  To exercise such rights, the Dragging Member shall send written notice (the "**Drag-Along Notice**") to each of the other Members, setting forth the consideration per Membership Interest to be paid by the third party purchaser and the other terms and conditions of such transaction.  The Dragging Member may execute any documents as shall be required by the Company for the purpose of transferring the Membership Interests of all the Members on the books and records of the Company, as required by this Section 18.3(a), and the Dragging Member is deemed appointed the attorney-in-fact of such other Members for the purpose of effectuating the requirements of this Section 18.3(a); provided, however, that the other Members shall not be required to make any representations or warranties with respect to selling such Membership Interests but will be required to provide the indemnification on a several basis with respect to such representations made by the Dragging Member with respect to such sale of Membership Interests.

(b)     Promptly, but in no event later than two (2) Business Days after the consummation of the sale of Membership Interests of the Members pursuant to Section 18.3(a), the Dragging Member shall remit to each of the other Members the applicable sales price for the Membership Interests of such other Members sold pursuant hereto.  All expenses incurred by the Members in connection with the sale of their Membership Interests or the assets of the Company in accordance with this Section 18.3 shall be expenses of the Company (and paid out of sales proceeds before distribution).

Section 18.5     <u>Tag Along Rights</u>.

(a)     If a Member (the "**Selling Member**") finds a third party buyer for all or any portion of its Membership Interest, and the sale is approved by the Managers as required pursuant to Section 18.1 and no Drag Along Right has been exercised, the Selling Member(s) shall provide to all other Members a notice, which notice shall fully disclose all material terms of the proposed transaction, including, but not limited to, the name of the proposed purchaser, the purchase price and terms of sale and any information as to the ability of the proposed purchaser to perform such offer that the Selling Member(s) then possesses (the "**Selling Member Notice**"), and any other Member may elect to participate in the contemplated transfer to the purchaser by delivering written notice to the Selling Members within thirty (30) days after receipt of the Selling Member Notice by said Members (the "**Tag Along Period**"). If any such Members elect to participate in the contemplated transfer (a "**Participating Holder**"), the Selling Member(s) and each Participating Holder shall be entitled to participate in the contemplated transfer pro rata in accordance with each such Member's Percentage Interest. The purchase by the purchaser of Membership Interests of Participating Holders and the Selling Member(s) shall be upon the terms set forth in the Selling Member Notice.

(b)     Promptly, but in no event later than two (2) Business Days, after the consummation of the sale of Membership Interests of the Members pursuant to Section 18.4(a) the Selling Member(s) shall remit to each of the other Members the applicable sales price for the Membership Interests of such other Members sold pursuant hereto. All expenses incurred by the Members in connection with the sale of their Membership Interests in accordance with this Section 18.4 shall be expenses of the Company (and paid out of sales proceeds before distribution).

Section 18.6     Appraisal in Connection ESquared Hospitality Liquidity Event. Notwithstanding anything to the contrary herein, with respect to any sale of substantially all of the Company's assets, sale of all the Company's Membership Interests, or a merger or recapitalization, if such sale occurs in connection with an ESquared Hospitality Liquidity Event, and such sale is not approved by a Super Majority of the Members, the value of the Company in such sale shall be determined by an independent appraisal conducted by an independent appraiser selected by the Managers, the cost of which appraisal shall be borne by the Company.

Section 18.7     Time of the Essence. Time shall be of the essence for all time periods specified in this Article XVIII.

**ARTICLE XIX**
**SERVICE MEMBER**

Section 19.1    Service Member. CC Entity shall be the service member ("**Service Member**") of the Company (its "**Position**") and in connection therewith shall perform the duties set forth in Section 19.2.  Unless otherwise agreed to by the Managers, transfers of Membership Interests by CC Entity (or subsequent transfers of such interests or portions thereof by transferees) does not release CC Entity of its obligations as a Service Member.

Section 19.2    Service Member's Duties.

(a)    Duties.

i.    The services required to be performed by CC Entity hereunder shall be performed solely by CC ("**CC**").  CC shall, together with ESquared Hospitality, develop the Concept, including the Company Recipes, and test and update the same from time to time as reasonably required by the Managers.  Upon the opening of the first Restaurant, if any, CC shall devote all reasonably necessary time and efforts and attention to the business of the Company (other than absences due to vacation, illness, disability or approved leave of absence), as may be more specifically reasonably enumerated from time to time by the Managers. Without limitation to the terms of the Personal Services Agreement, included in CC Entity's responsibilities shall be CC's personal appearances at the Restaurants, social media posts, public appearances, media appearances, and other promotional services as reasonably determined by the Managers ("**CC Promotional Activities**").

ii.    CC shall be consulted on the decor, menu, publicity, locations, operations and day-to-day management of the Restaurants including but not limited to, the hiring or termination of personnel, unless such consultation is not practical in the specific circumstances; provided, however, that, except for Major Decisions, the final decision for such matters rests with ESquared Hospitality (or its Permitted Transferee).

iii.    Except as set forth in Section 19.7, nothing herein shall be deemed to prohibit CC Entity or CC from engaging in other business activities ("**CC Permitted Activities**") (a) related to the food and beverage industry (other than restaurant related activities), including but not limited to participating in or contributing to cooking shows, demonstrations, appearances, blogs, cookbooks, packaged foods and beverages – provided that neither CC Entity nor CC shall use any Company IP (including Company Recipes, except as specified below for cookbooks) in whole or in part, in connection with any of the foregoing without the prior written consent of ESquared Hospitality (or its Permitted Transferee) in its sole discretion - and (b) unrelated to the food and beverage industry so long as such other activities do not interfere with the performance of obligations of CC Entity and CC hereunder or otherwise violate the provisions of this Agreement. Notwithstanding the foregoing, CC Entity (and CC) may use the Company Recipes in new publications or editions of cookbooks without prior consent while CC Entity is the Service Member (for the avoidance of doubt, the foregoing shall not be construed as to prohibit the use of or inclusion of Company Recipes in such cookbooks that were published while the CC Entity is the Service Member after the CC Entity ceases to be the Service Member, if at all).  For the avoidance

39

of doubt, neither CC nor CC Entity is obligated to share any revenue with the Company or its other Members from CC Permitted Activities.

(b)    Service Member Expenses.  The Company authorizes the Service Member to incur reasonable and necessary out-of-pocket business expenses in the course of performing his/her/its duties and rendering services hereunder in accordance with the Company's policies with respect thereto, and the Company shall reimburse the Service Member for all such expenses, provided (i) such expenses and the purpose for which they were incurred are in accordance with the Company's policies, and (ii) the Service Member timely submits to the Company expense reports and substantiation of the expenses in accordance with the Company's policies.

Section 19.3    Separation from Service.

(a)    Removal from Position.  A Service Member may be removed from his/her/its Position only for Cause or upon the occurrence of a Termination Event.  A Service Member may resign from his/her/its Position for Good Reason or for reasons other than Good Reason.  The date in which such termination occurs shall be known as the "**Effective Termination Date**".

(b)    Effect of Termination Event or Removal of Service Member. Upon the Effective Termination Date, the following shall apply with respect to the terminated Service Member (herein referred to as a "**Terminated Service Member**"):

(i)    the Terminated Service Member shall be treated as resigning as Manager and from his/her/its Position with the Company and its affiliates and if directed by ESquared Hospitality (or its Permitted Transferee) shall cause any and all of his/her/its designees or representatives to resign from any and all positions held with the Company and its affiliates on the Effective Termination Date;

(ii)    the Terminated Service Member shall return all property to the Company as provided in Section 8.1(c);

(iii)    subject to the recapture provisions of Section 19.5, the Terminated Service Member (or his/her/its transferee(s)) shall remain a Member, if applicable, but shall cease to be a Service Member for purposes of this Agreement; and

(iv)    the Terminated Service Member shall no longer be eligible for further reimbursement of business expenses, other than reimbursement based upon timely submission of any claims for reimbursement of business expenses incurred prior to the Effective Termination Date; except in connection with duties performed at the request of the Managers after such date (such as CC Promotional Activities).

(c)    **Surviving Rights**.  Except as specifically set forth in this Agreement or in the NFL License Agreement, the Company's right to continue using (and granting others the right to use) the CC Entity Pre-Existing IP and the NFL Rights in the operation of the Restaurants (including New Restaurants) and Approved Projects (including new Approved Projects approved as set forth in the NFL License Agreement) shall survive any termination of CC Entity as the Service Member

and any Membership Interest Recapture or exercise of the Put Right or any other Transfer (collectively, the "**Surviving Rights**"). In addition, in the event that the Terminated Service Member is terminated for Cause, or if the Terminated Service Member resigns for reasons other than Good Reason, then CC Entity (and CC) shall continue to provide the CC Promotional Activities as reasonably requested by the Company including as reasonably required under third party agreements where such CC Promotional Activities have been reasonably approved by CC Entity or CC. If the Terminated Service Member was terminated by the Company without Cause or if the Terminated Service Member resigns for Good Reason, then the CC Entity's obligations to provide the CC Promotional Activities shall automatically terminate effective on the date of such termination; provided, that if third party agreement (i) contains requirements that CC visit the Restaurant a certain number of days per year (not to exceed 2) and (ii) CC or CC Entity is receiving a Post Repurchase Royalty (as defined in the NFL License Agreement) on account of such Restaurant and (iii) CC Entity or CC approved such agreement, the Company and CC Entity (and CC) agree to work in good faith to find reasonably acceptable times for such visitation requirement to be satisfied so that the agreement is not breached based on the failure thereof.

Section 19.4    Acknowledgments and Waivers.

(a)    The Service Member is aware that its ownership of Membership Interests is subject to redemption under Section 19.5 ("**Membership Interest Recapture**") and is also aware that the Company would not execute and deliver this Agreement and/or the Membership Interests if the Membership Interests were not subject to Membership Interest Recapture by the Company under such circumstances. The Service Member acknowledges that on the date the Membership Interests were issued to such Service Member it is impossible to determine what the Fair Market Value of the Membership Interests will be on the date that they may be subject to Membership Interest Recapture. The Service Member also acknowledges that the damages that may accrue to the Company as a result of the termination of the Service Member for Cause, or by the death or disability of the Service Member, the parties have determined that it is in the best interests of the Service Member and the Company, given those uncertainties, to endeavor to fix such damages at this time by providing for the Membership Interest Recapture upon the circumstances set forth in Section 19.5. Nevertheless, the Service Member hereby accepts the foregoing remedy of Membership Interest Recapture as fair and reasonable and irrevocably and unconditionally waives any claim that such remedy is unreasonable, or constitutes a penalty or forfeiture. The Service Member further acknowledges and agrees that each such remedy is not subject to modification in any respect by any court or other tribunal or by any judge or arbitrator.

(b)    To induce the Company to issue Membership Interests, the Service Member warrants and represents to the Company that (i) such Membership Interests are acquired for investment purposes and not with a view to redistribution, (ii) that it has had an opportunity to consult with its attorney, accountant or other professional adviser and to ask questions with respect to this transaction, and (iii) it has consulted with its counsel, and its other advisors concerning the possible adverse economic consequences to it of Membership Interest Recapture. The Service Member confirms that after evaluating such advice, unconditionally and without reservation, it approves the transaction described in this Agreement and confirms that the remedies of Membership Interest Recapture are fair and reasonable in the context of this Agreement and in view of the foregoing uncertainties.

41

Section 19.5    <u>Option to Purchase Interest of a Terminated Service Member</u>.

(a)      For so long as ESquared (or its Permitted Transferee) owns more than twenty five percent (25%) of the issued and outstanding Membership Interests or controls the vote of the Company (including but not limited to the Deadlock Rule), then upon a termination of the Service Member (i) by the Company for Cause before March 7, 2023, (ii) upon resignation of the Service Member other than for Good Reason before March 7, 2023 or (iii) in connection with a Termination Event, the Terminated Service Member (as defined in Section 19.3(b)) is deemed to have offered to sell all of its Membership Interest to the Company (which shall include those Membership Interests transferred by the Terminated Service Member to a Permitted Transferee (or subsequent transfers thereof) pursuant to Section 18.2, if any).  The Company shall then have an option, but not an obligation, to purchase all and not less than all of the Membership Interests of the Terminated Service Member within the time and according to the procedure in Section 19.6 hereof (the "**Repurchase Right**").

(b)      If the Company elects to repurchase the Membership Interests of a Terminated Service Member upon a termination by the Company for Cause or upon a termination by the Service Member for any reason other than Good Reason, the purchase price that the Company will pay for the Terminated Service Member's Membership Interests shall be calculated as follows:

> a.  If the termination occurs prior to March 7, 2019, the purchase price shall be equal to the positive value of such Member's Capital Account;

> b.  If the termination occurs on or after March 7, 2019 but before March 7, 2020, the purchase price shall be an amount equal to the greater of (1) the positive value of such Member's Capital Account, and (2) 20% of the Fair Market Value of the Membership Interests being repurchased, calculated in accordance with paragraph (d) below;

> c.  If the termination occurs on or after March 7, 2020 but before March 7, 2021, the purchase price shall be an amount equal to the greater of (1) the positive value of such Member's Capital Account, and (2) 40% of the Fair Market Value of the Membership Interests being repurchased, calculated in accordance with paragraph (d) below;

> d.  If the termination occurs on or after March 7, 2021 but before March 7, 2022, the purchase price shall be an amount equal to the greater of (1) the positive value of such Member's Capital Account, and (2) 60% of the Fair Market Value of the Membership Interests being repurchased, calculated in accordance with paragraph (d) below; and

> e.  If the termination occurs on or after March 7, 2022 but before March 7, 2023, the purchase price shall be an amount equal to the greater of (1) the positive value of such Member's Capital Account, and (2) 80% of the Fair Market Value of the Membership Interests being repurchased, calculated in accordance with paragraph (d) below; and

42

  f. If the termination occurs on or after March 7, 2023, the purchase price shall equal 100% of the Fair Market Value of the Membership Interests being repurchased, calculated in accordance with paragraph (d) below.

If the Company elects to repurchase the Membership Interests of a Terminated Service Member in connection with a Termination Event, the purchase price that the Company will pay for the Terminated Service Member's Membership Interests shall be equal to the Fair Market Value of the Membership Interests being repurchased, calculated in accordance with paragraph (d) below.

  (c) If the Terminated Service Member was terminated (i) by the Company without Cause or (ii) by the Terminated Service Member for Good Reason, then (A) Company shall not have a Repurchase Right; and (B) the Service Member shall have the right (but not the obligation) to put to the Company all (and not less than all) of such Service Member's Membership Interests (the "**Put Right**") by providing notice to the Company of the exercise of such Put Right within thirty (30) days after such termination, and the Company shall purchase all and not less than all of such Membership Interests for a purchase price equal to the greater of (1) the positive value of such Member's Capital Account, and (2) the Fair Market Value of the Membership Interests, calculated in accordance with paragraph (d) below and documented and paid in accordance with paragraphs (d) and (e) of Section 19.6 below.

  (d) The Fair Market Value of a Terminated Service Member's Membership Interest shall be (i) the entire Fair Market Value for the Company as determined by an independent appraiser, multiplied by (ii) the Percentage Interest of such Terminated Service Member. The independent appraiser shall be selected by the mutual agreement of the Company and the Terminated Service Member. If the Company and Terminated Service Member cannot agree as to an appraiser, then the Company shall select one independent appraiser, the Terminated Service Member shall select one appraiser, and a third independent appraiser shall be selected by the first two appraisers chosen. In the event that more than one appraiser is chosen, the Fair Market Value of the Company shall be equal to the average of the two closest determinations made by the appraisers. Each appraiser chosen shall make a determination of the Fair Market Value of the Company within twenty (20) Business Days of the matter being submitted to it. If there is one appraiser, the Company shall pay the fees and expenses of the appraiser. If there is more than one appraiser, the Company and the Terminated Service Member shall pay the fees and expenses of the appraiser he or it selects, and the Company and the Terminated Service Member shall split the fees and expenses of the third appraiser. The cost of the appraisal(s) shall not be taken into account by the appraiser(s) in determining the Fair Market Value of the Company.

  (e) The provisions of this Section 19.5, including but not limited to the Repurchase Right set forth herein, shall automatically terminate and be of no further force or effect upon the occurrence of any of the following: (i) ESquared Hospitality or its Permitted Transferee ceases to own more than 25% of the issued and outstanding Percentage Interests of the Company or ceases to control the voting of the Company (including but not limited to the Deadlock Rule), (ii) there occurs an ESquared Hospitality Liquidity Event; or (iii) if the Company has not terminated the Service Member for Cause and the Service Member has not resigned for any reason other than Good Reason prior to March 7, 2023; provided that the Repurchase Right in connection with a Termination Event shall continue on and after March 7, 2023 (i.e., such right will terminate upon

43

the occurrence of clauses (i) or (ii) above, but will not be terminated and will remain in full force and effect regardless of whether clause (iii) is satisfied).

Section 19.6    Procedures for Membership Interest Recapture.

(a)    The time period for exercising the right to recapture Membership interests described in Section 19.5 is triggered by providing notice to the Service Member the notification of the event set forth in Section 19.5 hereof in circumstances where the Company has such option to purchase the Membership Interests that are the subject of such notice or notification (called the "**Available Interest**").

(b)    The Company shall have an option to purchase the Available Interest within ninety (90) days after the Effective Termination Date.

(c)    If the Company exercises its option to purchase the Available Interest, the Company shall deliver or mail to the Terminated Service Member, no later than five business days after the expiration of the period to exercise their option to purchase the Available Interest, a notice of intent to purchase that includes the following information:

- a description and the total amount of Membership Interest to be purchased by the Company;

- the terms of the purchase according to this Article XIX;

- a copy of this Agreement; and

- if the interest to be purchased is represented by certificates, such as share certificates, a request for the surrender of the share certificates to the Company.

(d)    The sale shall be considered final when the Company makes payments to the Terminated Service Member or, if payment is made over time, when all paperwork necessary to the sale has been executed by the Company and the Terminated Service Member.

(e)    The purchase price shall be paid in cash in thirty six (36) equal monthly installments, the first of which shall be paid by the date that is five (5) days after the closing, together with interest on the unpaid principal balance, at a rate equal to the Applicable Federal Rate (for monthly compounding periods) in effect on the date of the triggering event.  Interest shall accrue from the closing date and shall be paid together with each monthly installment of principal.  Subject to compliance with Section 409A of the Code, to the extent applicable, the Company at any time may prepay the amount owing, in whole or in part, without premium or penalty, which such prepayment shall be applied first to accrued but unpaid interest and then to principal installments in their inverse order of maturity.

Section 19.7    Restrictive Covenant/Non-Solicitation.

(a)    Each Restricted Person hereby covenants and agrees that for so long as such Restricted Person or any Permitted Transferee thereof is a Member (in the case of CC, for so long as she is Manager and/or CC Entity or a Permitted Transferee thereof is a Member) (such period,

44

the "**Restricted Period**"), such Restricted Person shall not, directly or indirectly, engage in any of the following activities (except to the extent otherwise permitted in this Agreement):

      (i)     own, manage, operate, join, control, or participate in the ownership, management, operation or control of, or be connected with as a director, officer, executive, administrative employee, partner, lender, consultant, contractor or otherwise, or promote, endorse or sponsor, any business or division or line of business or organization located worldwide which (a) is a vegan restaurant or (b) provides a product or service which is, in whole or in part, substantially the same as a product or service offered by Company in connection with an Approved Project, other than as may be explicitly set forth herein. Nothing herein shall prohibit any Restricted Person from being a passive owner of an aggregate of not more than five (5%) percent of the outstanding stock of any class of securities of a corporation that owns or operates a casual vegan restaurant and which is publicly traded so long as such Restricted Person has no active participation in the business of such corporation or other entity; or

      (ii)    provide any right, license or permission to use any Company IP, ESquared Pre-Existing IP, CC Entity Pre-Existing IP, or the NFL Rights, in whole or in part, in connection with any of the foregoing prohibited activities, or otherwise engage in any practice the purpose of which is to evade the provisions of this restrictive covenant.

Notwithstanding the foregoing, (a) with respect to ESquared Hospitality and its Permitted Transferees, the restrictions set forth in clauses (i) and (ii) above shall only relate to "fast casual" vegan restaurants and (b) with respect to CC, CC Entity and its Permitted Transferees, the restrictions in clauses (i) and (ii) above shall not apply to a restaurant in which (X) ESquared Hospitality and/or its Permitted Transferees has been given a right of first offer for such restaurant and declined (and such Restricted Person engages in such restaurant under the terms of such right of first offer) in which case CC, CC Entity and its Permitted Transferees may use the "By Chloe" name (but not the By Chloe Mark) for such a restaurant pursuant to the terms of Section 4.4) and (Y) such restaurant does not use any of the Company IP.

      (b)    Each Restricted Person covenants and agrees that during the Restricted Period and the one (1) year period thereafter, it shall not, directly or indirectly, engage in any of the following activities:

      (i)     hire, offer to hire, or solicit for employment on their own behalf or on behalf of any third party, any Member, employee or independent contractor of the Company or any Company Affiliate (other than an Affiliate of such Restricted Person), without the prior consent of the Company;

      (ii)    or for or on behalf of himself/herself/itself or any third party,

      (A)    persuade or seek to persuade any customer or supplier of the Company to cease to do business with respect to any Restaurant or to reduce the amount of business with respect to any Restaurant which any customer or supplier has customarily done or contemplates doing with the Company whether or not the

45

relationship between the Company and such customer or supplier was originally established in whole or in part through the efforts of any Restricted Person; or

(B)     interfere in any adverse manner in the relationship of the Company or any Affiliate with any of its customers or suppliers whether or not the relationship between the Company or Affiliate and such suppliers was originally established in whole or in part through the efforts of any Restricted Person. For this purpose, "customer" and "supplier" shall include any person that is then a customer or supplier of the Company or is a former customer or supplier, as the case may be, or potential customer or supplier as the case may be, of the Company which the Company has solicited prior to or during the term of this Agreement, but shall not include a customer or supplier which is also a Restricted Person; or

(C)     engage in any practice the purpose of which is to evade the provisions of this non-solicitation.

(c)     Each Restricted Person agrees to abide by any radius restriction contained in a Restaurant lease or other operative document with a third party for the duration of such agreements.

(d)     The Restricted Persons intend that the covenants set forth in this Section 19.7 shall be construed as separate covenants one for each country and jurisdictional subdivision to which the covenant applies. In the event a court of competent jurisdiction determines that the provisions of this covenant not to compete are excessively broad as to duration, geographic scope or activity, it is expressly agreed that this restrictive covenant shall be construed so that the remaining provisions shall not be affected, but shall remain in full force and effect, and any such over broad provisions shall be deemed, without further action on the part of any person, to be modified, amended and/or limited, but only to the extent necessary to render the same valid and enforceable in such jurisdiction.

(e)     Because a breach of the provisions of this Section 19.7 could not be adequately compensated for by money damages, the Company shall be entitled, in addition to any other right or remedy available to it, to an injunction restraining such breach or a threatened breach and to specific performance of any such provision of this Agreement, and in either case no bond or other security shall be required in connection therewith, and each Restricted Person hereby consents to such injunction and to the ordering of specific performance. Each Restricted Person also hereby waives and agrees not to urge in any court proceeding any claim or defense that the Company has an adequate remedy at law. Additionally, the Company shall have the right and remedy to require the breaching Restricted Person to account for and pay over to the Company all compensation, profits, monies, accruals, increments or other benefits (collectively, "**Benefits**") derived or received by him or her as the result of any transactions constituting a breach of any such provisions, and he or she hereby agrees to account for and pay over any such Benefits to the Company. Each of the rights and remedies enumerated above shall be independent of the others and shall be severally enforceable, and all of such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity. Each Restricted Person is entitled to enforce remedies against another Restricted Person for breaches

46

under this Agreement, including this Section 19.7 and Section 8.1.

Section 19.8   Duties of ESquared Hospitality; Back Office Fee.  ESquared Hospitality shall, with CC Entity, develop the Concept and the Restaurant operating policies and procedures. If and when the Company is ready to open its first Restaurant (or any subsequent restaurant) ESquared Hospitality shall search for an appropriate site, seek capital for the project and manage the build-out and opening process (until such time as the Company has the resources to handle such tasks internally).   ESquared Hospitality shall also provide back office and administrative functions, including human resources, accounting and tax reporting (although to the extent third parties are used for accounting and tax, they shall be paid out of the Company) and ESquared Hospitality shall receive a fee equal to two percent (2%) of gross sales from each Restaurant ("**Back Office Fee**") for providing such services; provided, however, that the Managers will from time to time evaluate whether to perform such functions in-house (and to the extent it does perform such functions in-house, the Back Office Fee shall no longer be payable to ESquared Hospitality). ESquared Hospitality shall devote such time as is reasonably necessary to fulfill its responsibilities, but there shall be no minimum time requirement for ESquared Hospitality. ESquared Hospitality shall not be considered a "Service Member" and its Membership Interests are not subject to recapture.

## ARTICLE XX
## GENERAL PROVISIONS

Section 20.1   Amendment.  Except as specifically set forth herein, the terms and provisions of this Agreement may be modified or amended at any time and from time to time with the written consent of ESquared Hospitality and CC Entity (or their Permitted Transferees); provided, however, that the Managers may amend this Agreement without the vote or written consent of the Members to (a) reflect changes validly made in the membership of the Company and the Capital Contributions of the Members and the Percentage Interests of the Members; (b) make a change that is necessary or, in the opinion of the Managers, advisable to qualify the Company as a limited liability company under the laws of any state or foreign jurisdiction, or to ensure that the Company shall not be treated as an association taxable as a corporation for federal, state or local income tax purposes; (c) make a change that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provisions in this Agreement, or to make a change to any other provision with respect to matters or questions arising under this Agreement that shall not be inconsistent with the provisions of this Agreement, in each case so long as such change does not increase the financial obligations of the Members and does not otherwise adversely affect the Members in any material respect; or (d) satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state, local or foreign governmental entity, so long as such change is made in a manner that minimizes any adverse effect on the Members.

Section 20.2   Waiver of Dissolution Rights.  The Members agree that irreparable damage would occur if any Member should bring an action for judicial Dissolution of the Company. Accordingly, each Member accepts the provisions under this Agreement as such Member's sole

entitlement on Dissolution of the Company and waives and renounces such Member's right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Company. Each Member further waives and renounces any alternative rights that might otherwise be provided by law upon the withdrawal or resignation of such Member and accepts the provisions under this Agreement as such Member's sole entitlement upon the happening of such event.

Section 20.3    Waiver of Partition Right. Each Member waives and renounces any right that it may have prior to Dissolution and Liquidation to institute or maintain any action for partition with respect to any property of the Company.

Section 20.4    Waivers Generally. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Members, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect any Member's obligations pursuant to this Agreement or any rights and remedies of a Member pursuant to this Agreement. No delay in the exercise of any right shall operate as a waiver of such right. No single or partial exercise of any right shall preclude its further exercise. A waiver of any right on any one occasion shall not be construed as a bar to, or waiver of, any such right on any other occasion.

Section 20.5    Equitable Relief. If any Member proposes a Transfer in violation of the terms of this Agreement, the Company or any Member may apply to any court of competent jurisdiction for an injunctive order prohibiting such proposed Transfer except upon compliance with the terms of this Agreement, and the Company or any Member may institute and maintain any action or proceeding against the Person proposing to make such Transfer to compel the specific performance of this Agreement. Any attempted Transfer in violation of this Agreement is null and void, and of no force and effect. The Person against whom such action or proceeding is brought waives the claim or defense that an adequate remedy at law exists, and such Person shall not urge in any such action or proceeding the claim or defense that such remedy at law exists.

Section 20.6    Remedies for Breach. The rights and remedies of the Members set forth in this Agreement are neither mutually exclusive nor exclusive of any right or remedy provided by law, in equity or otherwise. The Members agree that all legal remedies (such as monetary damages) as well as all equitable remedies (such as specific performance) shall be available for any breach or threatened breach of any provision of this Agreement.

Section 20.7    Costs. If the Company or any holder of Membership Interests retains counsel for the purpose of enforcing or preventing the breach or any threatened breach of any provision of this Agreement or for any other remedy relating to it, then the prevailing party shall be entitled to be reimbursed by the non-prevailing party for all costs and expenses so incurred (including reasonable attorneys' fees, costs of bonds, and fees and expenses for expert witnesses).

Section 20.8    Counterparts. This Agreement may be signed in multiple counterparts, including facsimile counterparts. Each counterpart shall be considered an original, but all of them in the aggregate shall constitute one instrument.

Section 20.9    Notice. Notices to the Company shall be sent to the principal executive

office of the Company specified. All notices, demands, consents, approvals, requests and other communications required or permitted hereby shall be in writing and shall be deemed to have been duly and sufficiently given only if (a) personally delivered with proof of delivery thereof (any notice or communication so delivered being deemed to have been received at the time so delivered); (b) sent by Federal Express (or other similar overnight courier) (any notice or communication so delivered being deemed to have been received only when delivered); (c) sent by registered or certified mail, return receipt requested (any notice or communication so delivered being deemed to have been received at the time so delivered) ; or (d) sent by email (any notice or communication delivered via email being deemed to have been received if a copy is also delivered by one of the other means of delivery and shall be deemed to have been received (i) on the Business Day so sent, if so sent prior to 4:00 p.m. (based upon the recipient's time) of the Business Day so sent, and (ii) on the Business Day following the day so sent, if so sent on a non-Business Day or on or after 4:00 p.m. (based upon the recipient's time) of the Business Day so sent (unless actually received by the addressee on the day so sent)), in any such case addressed to the Members' respective addresses set forth on Exhibit A. Failure to accept delivery shall constitute receipt. Any Member may require future notices to be sent to a different address by giving at least ten (10) days' notice to the Company and other Members in accordance with this Section.

Section 20.10      Date of Performance.  Whenever this Agreement provides for any action to be taken on a day which is not a Business Day, such action shall be taken on the next following Business Day.

Section 20.11      Limited Liability.

(a)      The liability of each Member, the Managers, committee member, officer or agent of the Company shall be limited as set forth in this Agreement, the Act and other applicable laws. No Member, Managers, committee member, officer or agent of the Company is liable for any debts, obligations or liabilities of the Company or each other, whether arising in tort, contract or otherwise, solely by reason of being a Member, Manager, committee member, officer or agent of the Company, or acting (or omitting to act) in such capacities or participating (as an employee, consultant, contractor or otherwise) in the conduct of the business of the Company, except that a Member shall remain personally liable for the payment of such holder's Capital Contribution and as otherwise set forth in this Agreement, the Act and other applicable law.

(b)      Notwithstanding the foregoing or anything else to the contrary in this Agreement, the Managers shall perform their duties in accordance with the provisions of Section 7.7(a).  The Managers who so perform such duties shall not have any liability by reason of being or having been a Manager.  The Managers shall not be liable to the Company or any holder of Membership Interests for any loss or damage sustained by the Company or any holder of Membership Interests, unless a judgment or other final adjudication adverse to such Managers establishes that such Managers' acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that such Managers personally gained, in fact, a financial profit or other advantage to which such Managers were not legally entitled or that, with respect to a Distribution the subject of Section 13.5, such Managers' acts were not performed in accordance with the duties of such Managers set forth in Section 7.7(a).  WITHOUT LIMITING THE GENERALITY OF THE PRECEDING SENTENCE, THE MANAGERS DO NOT IN ANY WAY GUARANTY

49

THE RETURN OF ANY CAPITAL CONTRIBUTION TO A HOLDER OF MEMBERSHIP INTERESTS OR A PROFIT FOR THE HOLDERS OF MEMBERSHIP INTERESTS FROM THE OPERATIONS OF THE COMPANY.

Section 20.12    Partial Invalidity.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  However, if for any reason any one or more of the provisions of this Agreement are held to be invalid, illegal or unenforceable in any respect, such action shall not affect any other provision of this Agreement.  In such event this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained in it.

Section 20.13    Entire Agreement.  This Agreement contains the entire agreement among the Members with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made by the Members with respect thereto, whether or not relied or acted upon.

Section 20.14    Binding Effect.  Except as otherwise provided herein, this Agreement is binding upon, and inures to the benefit of, the Members and their transferees, successors and assigns.

Sections 20.15    Further Assurances.  Each Member agrees, without further consideration, to sign and deliver such other documents of further assurance as may reasonably be necessary to effectuate the provisions of this Agreement.

Section 20.16    Headings.  Article and Section titles have been inserted for convenience of reference only.  They are not intended to affect the meaning or interpretation of this Agreement.

Section 20.17    Terms.  Terms used with initial capital letters shall have the meanings specified, applicable to both singular and plural forms, for all purposes of this Agreement.  All pronouns (and any variation) shall be deemed to refer to the masculine, feminine or neuter, as the identity of the Person may require.  The singular or plural includes the other, as the context requires or permits.  The word include (and any variation) is used in an illustrative sense rather than in a limiting sense.  The word day means a calendar day, unless otherwise specified.

Section 20.18    Governing Law; Consent to Jurisdiction.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to New York choice of law provisions).  Any conflict or apparent conflict between this Agreement and the Act shall be resolved in favor of this Agreement except as otherwise required by the Act.

Section 20.19    Arbitration.

(a)    The parties shall in good faith attempt amicably to resolve any claim, dispute, deadlock and other matters in question arising hereunder.  All claims, disputes, deadlocks and other matters in question between the parties arising out of, or relating to, this Agreement or the breach hereof which have not been resolved through good faith negotiation between the parties

50

(each, a "**Dispute**") shall be decided by arbitration in accordance with this Section 20.19 unless otherwise mutually agreed to by the parties. The agreement by the parties to arbitrate pursuant to this Section 20.19 shall be enforceable under prevailing law.

(b)     Any Dispute subject to arbitration shall be promptly submitted to arbitration as herein provided. The arbitration may be initiated by either party by giving notice to the others in accordance with Section 20.19(c), below.    The parties hereby agree that such arbitration proceeding shall be prosecuted without delay and that such proceeding shall be concluded and decision rendered thereon within sixty (60) days after the commencement thereof, it being recognized and agreed that any delay will materially and adversely affect the financial and other interests of the Company.  Any arbitration under this Agreement shall take place in New York, New York under the authority of, and in accordance with, the expedited rules of the American Arbitration Association.  The decision of the arbitrator shall be binding upon the parties.  The administrative costs and expenses of the arbitration proceedings, and the fees and expenses of any arbitrator, including without limitation, any advances or deposits required by the American Arbitration Association or any arbitrator, shall be divided equally between the parties, subject to any re-allocation thereof contained in any arbitration award.  All other legal fees, costs and expenses incurred in connection with any dispute under this Agreement shall be paid as determined/apportioned by the arbitrator.

(c)     Written notice of demand (the "**Demand Notice**") to arbitrate by either party shall be given to the other party and simultaneously filed with the American Arbitration Association.  The Demand Notice shall be given within a reasonable time after the Dispute in question has arisen and in no event shall such Demand Notice be given after the date when institution of legal or equitable proceedings based on such Dispute shall be barred by the applicable statute of limitations.

(d)     All claims related to or dependent upon each other and in existence at the time any matter is brought to arbitration shall be presented to and heard by the arbitrators even though the parties are not the same, unless a specific contract prohibits such consolidation.

(e)     Notwithstanding the foregoing, in the event the Dispute involves a claim for which immediate injunctive relief is being sought, a party shall have the right to bring an action for such relief in a court of competent jurisdiction prior to commencing as arbitration action.

Section 20.20     Representations and Warranties.  Each Member represents, warrants and covenants to each other Member and to the Company as of the date hereof that with respect to such Member and all holders of equity interests in such Member:

(a)     this Agreement has been duly executed and delivered by such Member and constitutes the valid and legally binding agreement of such Member enforceable in accordance with its terms against such Member except as enforceability hereof may be limited by bankruptcy, insolvency, moratorium and other similar laws relating to creditors' rights generally and by general equitable principles;

(b)     the execution and delivery of this Agreement by such Member does not, and the

51

performance of its duties and obligations hereunder shall not, result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or give rise to a right to terminate, cancel or accelerate under, or the creation of a lien, pledge or other encumbrance pursuant to, any indenture, mortgage, deed of trust, credit agreement, note or other evidence of indebtedness, or any material lease or other agreement, or any material license, permit, franchise or certificate, to which such Member is a party or by which it is bound or to which its properties are subject, or require any authorization or approval under or pursuant to any of the foregoing, which has not been obtained, or violate any statute, regulation, law, order, writ, injunction, judgment or decree to which such Member or its property is subject;

(c)     such Member is not in default (nor has any event occurred which with notice, lapse of time, or both, would constitute a default) in the performance of any material obligation, agreement or condition contained in any indenture, mortgage, deed of trust, credit agreement, note or other evidence of indebtedness or any lease or other agreement, or any license, permit, franchise or certificate, to which it is a party or by which it is bound or to which the properties of it are subject, nor is it in violation of any statute, regulation, law, order, writ, injunction, judgment or decree to which it or its property is subject, which default or violation would adversely affect such Member's ability to carry out its obligations under this Agreement.

(d)     there is no litigation or other proceeding pending or, to the knowledge of such Member, threatened against such Member or any of its Affiliates or their property which, if adversely determined, would materially adversely affect such Member's ability to carry out its obligations under this Agreement;

(e)     no consent, approval or authorization of, or filing, registration or qualification with, any court or governmental authority on the part of such Member is required for the execution and delivery of this Agreement by such Member and the performance of its obligations and duties hereunder, which has not been obtained; and

(f)     with respect to CC Entity, CC Entity represents that it is wholly owned by CC.

Section 20.21    Separate Counsel.  Each Member acknowledges that such member has retained separate counsel with whom to discuss the terms and provisions of the Agreement and their effect on such Member before execution of this Agreement.

[Signature Page Follows]

52

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement as of the date first above written.

**ESQUARED HOSPITALITY LLC**

By:
Name: James Haber
Title: Manager

**CHEF CHLOE, LLC**

By:
Name: Chloe Coscarelli
Title:

**MANAGERS**

Samantha Wasser

Chloe Coscarelli

Acknowledged and Agreed as
to the Rights and Obligations
Set Forth Herein

Chloe Coscarelli

53

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement as of the date first above written.

**ESQUARED HOSPITALITY LLC**

By:_____
Name: James Haber
Title: Manager

**CHEF CHLOE, LLC**

By: _____
Name: Chloe Coscarelli
Title:

**MANAGERS**

_____
Samantha Wasser

_____
Chloe Coscarelli

Acknowledged and Agreed as
to the Rights and Obligations
Set Forth Herein

_____
Chloe Coscarelli

53

## EXHIBIT A

### Capital Contributions and Percentage Interests

| Name and Address of Member | Capital Contribution | Percentage Interest |
|---|---|---|
| | $42,451.51 | 50% |
| ESquared Hospitality LLC 950 Third Avenue, Suite 2200 New York, NY 10022 Attention: James Haber Tel: 212-688-2700 Fax: 212-688-7908 Email: jhaber@esquaredhospitality.com | | |
| Chef Chloe, LLC 4712 Admiralty Way Marina Del Rey, CA 90292 Fax: 310-458-6102 Email: chloe@chefchloe.com | $0 | 50% |

With a copy (which shall not constitute notice) to:

Morrison Cohen LLP
909 Third Avenue
New York, NY 10022
Attention: Joshua Saviano, Esq.
Fax: (917) 522-3174

## EXHIBIT B-1

## ESQUARED LICENSED PRE-EXISTING IP

None

**EXHIBIT B-2**

**CHEF CHLOE LICENSED PRE-EXISTING IP**

None

**EXHIBIT C**

**NFL LICENSE AGREEMENT**

**[See Attached.]**

# EXHIBIT D

## PERSONAL SERVICES AGREEMENT

### [See Attached.]

**EXHIBIT E**

**UNMODIFIED CC EXISTING RECIPES**

<u>As of November 7, 2014</u>

None

**EXHIBIT B**

## NAME, FACE AND LIKENESS AGREEMENT

This Name, Face and Likeness Agreement (this "**Agreement**") is made and entered into as of November 7, 2014 by and among **Chloe Coscarelli** ("**Licensor**"), and **CCSW LLC**, a New York limited liability company ("**Licensee**").

**WHEREAS**, Licensor is a Manager and, indirectly, a Member of Licensee, pursuant to that certain operating agreement, dated of November 7, 2014, of Licensee (as amended and/or restated from time to time, the "**Operating Agreement**");

**WHEREAS**, Licensee is engaged in the ownership and/or management and/or licensing and/or franchising of one or more Restaurants and Approved Projects; and

**WHEREAS**, Licensor owns or controls all right, title and interest in and to (i) Chloe's full and formal name, nickname or variations of her name ("**Name**"), and (ii) versions of her image, signature, voice, likeness and other elements or attributes of her persona, identity, or personality ("**Rights of Publicity**" and collectively with the Name, the "**NFL Rights**"); and

**WHEREAS**, Licensee desires to utilize, and Licensor would like to license to Licensee the right to use, the NFL Rights in connection with the operation and publicity of the Restaurants and/or Approved Projects.

**NOW, THEREFORE**, in consideration of the recitals above and the mutual promises set forth below, the parties hereto agree as follows:

1. **License.**

   a.    Licensor hereby grants to Licensee the right to use (including the right to authorize others to use) the Name and pre-approved Rights of Publicity throughout the world (the "**Territory**") by any means, methods and technologies now known or hereafter to become known, (i) on an exclusive basis solely in connection with the operation, marketing and promotion of the Restaurants, and (ii) on an exclusive basis solely in connection with the manufacturing, distribution, advertising and promotion of products and services bearing the Company IP and associated with the Approved Projects.

   b.    Notwithstanding anything contained in this Agreement or the Operating Agreement to the contrary except in connection with the By Chloe Mark, and for the avoidance of doubt, (i) any rights not specifically granted to Licensee hereunder or under the Operating Agreement shall remain the sole and absolute right and ownership of Licensor, and (ii) Licensor shall retain the right to use the NFL Rights in any way whatsoever except in connection with the By Chloe Mark, including but not limited to in connection with cooking shows, demonstrations, appearances, blogs, and cookbooks and packaged foods and beverages, except as set forth pursuant to the terms of the Operating Agreement (the rights in (i) and (ii), collectively, the "**Retained Rights**").   All rights in and to the By Chloe Mark are reserved by the Company as stated in the Operating Agreement.

   c.    Each sublicense by the Licensee of the NFL Rights (including agreements with third parties) shall contain protections with respect to the NFL Rights consistent with the terms

hereof and shall acknowledge that any applicable sublicensee does not obtain any ownership rights in, or goodwill to, the NFL Rights.

2.  **Term of License.** The term of this Agreement will be perpetual commencing as of the date hereof (the "**Term**"), unless otherwise terminated pursuant to Paragraph 7 below.

3.  **Use of NFL Rights.** Licensee will not use the NFL Rights or take other action in connection with the NFL Rights or any services associated with the NFL Rights that: (i) contravenes any applicable law or regulation; (ii) impairs the value, goodwill, validity or enforceability of the NFL Rights; (iii) impairs the quality of goods or services with which the NFL Rights are used by Licensor; or (iv) disparages or holds up to criticism or ridicule Chloe Coscarelli or her interests in the NFL Rights.

4.  **Representations and Warranties**

    a.    Licensor hereby represents , warrants and covenants to Licensee that she has the full right and power to grant to Licensee the rights set forth herein, to enter into this Agreement and to carry out her obligations under this Agreement, that the execution and delivery of this Agreement, and the satisfaction of her obligations herein, does not and shall not conflict with any other agreement to which she is a party, and that she has not previously granted and will not grant any rights in the NFL Rights to any third party that limit her ability to grant the rights granted to Licensee under this Agreement.

    b.    Licensee hereby represents, warrants and covenants to Licensor that (i) the execution and delivery of this Agreement by Licensee, and the satisfaction of its obligations herein shall not conflict with any other agreement to which Licensee is a party; and (ii) it has the full and exclusive right and authority to enter into this Agreement and to satisfy its obligations hereunder.

5.  **Intentionally Omitted**.

6.  **Quality Control.** Licensee covenants that the quality of all Restaurants and any and all products and services offered pursuant to an Approved Projects by Licensee or any of its sublicensees using the NFL Rights ("**Products and Services**") will meet or exceed the quality of similar products and services offered by Licensor as of the date hereof.  In particular, the quality of all Restaurants shall be at least comparable with other "fast casual" restaurants in New York City.   Licensor and her authorized representatives will have the right to test and inspect the Products and Services at any reasonable time with reasonable prior notice. No modified or derivative version of the NFL Rights may be used at any time for any purpose without the express written consent of Licensor in each instance; provided that once such modified or derivative version is approved, Licensee may continue to use in a substantially similar manner without seeking further approval.  If Licensor reasonably determines that any aspect of the Products and Services, or Licensee's use of the NFL Rights in connection with the advertising or sale of the Products and Services, does not comply with Licensor's quality standards, then Licensor will notify Licensee in writing specifying such deficiencies and providing reasonable requirements that, when satisfied, would be deemed to cure such deficiency (such requirements, the "**Cure Actions**"), and Licensor and Licensee shall work to correct such deficiencies in a reasonable time frame.  The parties shall work in good faith to resolve any dispute for a period of sixty (60) days; provided, however, that if the parties cannot resolve such dispute in good faith within such 60 day period, then either party may institute an arbitration action as provided in Section 20.19 of the Operating Agreement in order to

resolve the dispute.

**7. Royalty.**    Except as otherwise provided in Section 10, Licensee shall not have any obligation to pay any royalty payments or other monies, fees, commissions or charges of any type or nature to Licensor in connection with the license granted hereunder.   Licensor expressly acknowledges and agrees that the membership interest in Licensee and the rights granted Licensee in the Operating Agreement constitute full and adequate consideration for the grant of the license hereunder.

**8. Termination.**

 a. Licensor may terminate this Agreement upon written notice effective immediately, if:

 i. Licensee commences any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or Licensee will make a general assignment for the benefit of its creditors; or there will be commenced against Licensee any case, proceeding or other action of a nature referred to above which results in the entry of an order for relief of any such adjudication or appointment or remains undismissed, undischarged or unbonded for a period of thirty (30) days; or there will be commenced against Licensee any case, proceeding or other action seeking issuance of a warrant of attachment, execution, restraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which will not have been vacated, discharged, stayed or bonded pending appeal with thirty (30) days from the entry thereof; or Licensee will take any action in furtherance of, or acquiescence in, any of the acts set forth in this Section; or Licensee will generally not, or will be unable to, or will admit in writing its inability to, pay its debts as they become due;

 ii. Licensee attempts to assign, sublicense or transfer to any person any right, interest or obligation under this Agreement, except as permitted herein, unless such action is cured within thirty (30) days notice thereof;

 iii. Licensee suffers an event of dissolution, in accordance with the Operating Agreement;

 iv. the first Restaurant fails to open on or before March 7, 2016 (the "First Opening Date");

 v. after the First Opening Date, there are no operating Restaurants for any twelve (12) consecutive months; or

 vi. Licensee opposes, petitions to cancel, commences a legal action, or otherwise challenges, objects to or interferes with Licensor's ownership, use (or authorized the use by others) or registration of any of the NFL Rights, except that Licensee may take any action permitted

3

under the Operating Agreement;

        b.     Licensee may terminate this Agreement at any time upon sixty (60) days' prior written notice to Licensor.

    **9. Effect of Termination**. Termination of this Agreement by Licensor will be without prejudice to any other remedy otherwise available to the parties to this Agreement. Upon termination of this Agreement for any reason, Licensee will within two (2) months of the date of such termination, discontinue all use of the NFL Rights, subject to a six-month sell-off period for the Licensee with respect to its then-current inventory of any products that are Approved Projects. Sections 9, 10, 11, 12, 17,18 and 19 shall survive termination of this Agreement.

    **10. Use Limitation Following Exercise of Repurchase Option or Put Right Under the Operating Agreement**.

        a.     In the event the Repurchase Right or Put Right is exercised, to the extent Licensee continues to use and permit others to use the NFL Rights as set forth herein in Restaurants and other Approved Projects, Licensee shall pay to (or cause to be paid to) Licensor as a royalty 1% of the gross sales from such operations (the "**Post Repurchase Royalty**"). The Post Repurchase Royalty shall be paid within thirty (30) days after the final day of each calendar month, in arrears for the immediately preceding calendar month, along with a report showing in reasonable detail the calculation for such month's Post Repurchase Royalty.   In the event that a third party Restaurant pays amounts less frequently than monthly, such payments (and reporting) shall be due within fifteen (15) days of receipt thereof by Licensee.   Licensee agrees to use commercially reasonable efforts to collect such payments.

        b.     In the event Licensee continues to use the NFL Rights pursuant to Section 10(a) above, then Licensee will maintain books and records that accurately reflect the basis and calculation for payments required under this Section 10, and maintain for a period of two (2) years following the end of the applicable calendar year, all books and records, including computerized data, necessary for Licensor and/or its representatives to audit the calculation of payments made or required to have been made under this agreement. Licensor may, at anytime during the Term and for a period of two (2) years thereafter, on Licensee's premises during normal business hours upon reasonable prior written notice, audit the records and/or other Licensee accounting documents directly relating to the Post Repurchase Royalty, such audit shall be performed at the cost and expense of Licensor. In the event that the audit reveals an underpayment by Licensee, Licensee agrees to immediately pay Licensor the amount of such underpayment, and if such underpayment exceeds five percent (5%) of the applicable amount, then Licensee will additionally pay Licensor her reasonable auditor's costs and fees; provided that no such fee shall be payable if the auditor is to receive any success fees or similar in connection with such audit.

        c.     In the event that the Service Member is terminated without Cause or resigns for Good Reason under the Operating Agreement, Licensee may continue to use and permit others to use the NFL Rights as set forth herein (including entering into renewals of existing agreements), but shall not be permitted to use or grant others the right use the NFL Rights for any new restaurants or projects (i.e., a restaurant or project that did not have an agreement signed at the time of such termination) without the consent of Licensor.

4

**11. Equitable Relief and Monetary Damages.** Licensee acknowledges that a breach of this Agreement by Licensee would cause immediate and irreparable harm to Licensor for which money damages could not adequately compensate Licensor. Therefore, Licensor will have the right to enforce this Agreement, not only for damages, but also by action for specific performance, injunctive or other equitable relief, without proof of actual damages and without the posting of bond or other security.

**12. Notices.**  All notices, requests, demands and other communications hereunder will be in writing and will be personally delivered, sent by overnight carrier (such as Express Mail, Federal Express, etc.) or sent by facsimile transmission with confirming copy sent by overnight carrier and a delivery receipt obtained and addressed to the intended recipient as follows (and will be deemed given upon receipt of evidence of delivery or failure of the recipient to accept delivery):

> If to Licensee:
>
> CCSW LLC
> c/o ESquared Hospitality LLC
> 950 Third Avenue, Suite 2300
> New York, New York 10022
> Tel: 212-688-2700
> Fax: 212-688-7908
> Email: jhaber@esquaredhospitality.com
>
> If to Licensor:
>
> Chloe Coscarelli
> 4712 Admiralty Way
> Marina Del Rey, CA 90292
> Fax: 310-458-6102
> Email: chloe@chefchloe.com

or to such other address as may be furnished to the other in writing.

**13. Assignments.** This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, including, with respect to any individual, such individual's estate, beneficiaries, trustees, or legal guardian.  This Agreement is assignable by Licensee to any (i) Third Party (as defined below) successor of Licensee or (ii) third party successor in which Licensor or CC Entity is a member that acquires all or substantially all of the assets or businesses of Licensee, whether by sale, merger, recapitalization or other business combination, without Licensor's consent, provided that any successor or assignee shall provide Licensor with a written agreement that it shall be bound by all the terms of this Agreement.  Except as specified in this Section 13, this Agreement is not assignable. Any assignment made in contravention of this Section 13 shall be null and of no effect.  For purposes of this Section 13, the term "Third Party" means any party or entity that does not include, directly or indirectly, Licensee or any of its affiliates as equity holders or debt holders.

14. **No Waiver**. No failure by either party to take action on account of any default by the other, whether in a single instance or repeatedly, will constitute a waiver of any such default or the performance required of such party. No express waiver of a default by any party will be construed as a waiver of any other default or future performance required hereunder.

15. **Headings.** The headings contained in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

16. **Invalidity.** If any provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement will nevertheless remain in full force and effect.

17. **Entire Agreement.** This Agreement (including the instruments between the parties referred to herein and in the Operating Agreement) and the Personal Services Agreement constitute the complete, final and exclusive statement of the entire agreement among the parties and supersedes all other prior agreements and understandings, both written and oral, with respect to the subject matter hereof. This Agreement may not be amended or supplemented in any manner except by a written agreement executed by an authorized representative of the party sought to be bound. All references to paragraphs, sections, subsections, clauses and schedules will be deemed to refer to such part of this Agreement, unless the context requires otherwise.

18. **Governing Law**. This Agreement and the legal relations between the parties hereto will be governed by and construed in accordance with the internal laws of the State of New York and without regard to conflicts of laws principles.

19. **Jurisdiction**. The state and federal courts of the State of New York located in the County of New York will have exclusive jurisdiction and venue to hear and decide all controversies that may arise under or concerning this Agreement.

20. **Counterparts.** This Agreement may be executed in any number of counterparts, including facsimile or pdf counterparts, each of which will be deemed to be an original but all of which together will constitute but one agreement.

21. **Definitions**. All capitalized terms used and not defined herein shall have the respective meanings given such terms in the Operating Agreement.

[Signature page follows.]

**IN WITNESS WHEREOF,** the authorized representatives of the parties hereto have duly executed this Agreement as of the first date above.

**"LICENSEE"**

**CCSW LLC**

BY: _____

Name: Samantha Wasser

Title: Manager

**"LICENSOR"**

**CHLOE COSCARELLI**

_____

Chloe Coscarelli

**IN WITNESS WHEREOF**, the authorized representatives of the parties hereto have duly executed this Agreement as of the first date above.

"LICENSEE"

**CCSW LLC**

BY: _____
Name: Samantha Wasser
Title: Manager

"LICENSOR"

**CHLOE COSCARELLI**

Chloe Coscarelli