## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 (Subchapter V) |
| BC HOSPITALITY GROUP INC., *et al.*, | Case No. 20-13103 (BLS) |
| Debtors.[1] | (Jointly Administered) |
| | **Ref. Docket No.  221. 232, 233, 234, 235** |
| | **Hearing Date:**<br>**February 25, 2021 at 11:30 am ET** |

### CHLOE'S REPLY BRIEF IN SUPPORT OF HER OBJECTION TO BCHG'S OWNERSHIP OF THE BY CHLOE TRADEMARK AND ITS PLAN TO SELL THE MARK

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: BC Hospitality Group Inc. (8766); BC Hospitality Group LLC (9360); BC International LLC (1356); BC Commissary NJ LLC (0230); E2 185 Bleecker LLC (6862); E2 60 West 22nd Street LLC (9567); E2 Lafayette LLC (7419); BC Williamsburg LLC (8277); BCRC LLC (7297); CW SSS LLC (9958); BC Union Square LLC (5172); BC 1385 Broadway LLC (2138); BC 630 Lexington LLC (3202); CCSW Fenway LLC (5517); E2 Seaport LLC (9720); BC Back Bay LLC (0550); BC Providence LLC (0737); BC Silver Lake LLC (2825); BC Century City LLC (0901); and BC West Hollywood LLC (3878). The Debtors' mailing address is 205 Hudson Street, Suite 1001, New York, New York 10013.

Chloe Coscarelli and Chef Chloe LLC submit this reply brief in response to Debtor BC Hospitality Group's answering brief about the ownership of the By Chloe trademark.

### PRELIMINARY STATEMENT

1.     The conditional language over the By Chloe trademark reflects the sensitive nature about the Company's use of Chloe's name. Chloe never agreed that the Company would own the By Chloe mark without condition or limitation. Chloe never agreed that the By Chloe mark—which exploits her name—was not a "name, face, and likeness" right. And BCHG has shown no plain language in either contract that says otherwise.

2.     To the contrary, the undisputed record is that the plain meaning of "subject to" is "conditional or dependent on." That is what the unrebutted dictionary definitions say. And that is what the New York Court of Appeals has construed to the term to mean in the past. See, e.g., *F.W. Berk & Co. v. Derecktor*, 92 N.E.2d 914, 301 N.Y. 110, 113 (1950) (construing "subject to" as "conditional upon" or "depending on"). BCHG offered no response to the contrary. Nor does BCHG make any showing that BCHG has—and continues—to breach the exact "terms and conditions" that any ownership interest depended on.

3.     BCHG's insistence that it can have its cake and eat it too—all the benefits of the contract, like ownership, without any of the bargained-for obligations, like honoring the terms and conditions—is the same strategy it adopted with the enforceability of arbitration awards. As shown in Section III below, this proceeding is house of cards that BCHG built on an illegitimate premise. In short, BCHG denies Chloe's membership interest in this proceeding by claiming that Judge Hochberg's arbitration award is "unenforceable" until confirmed. But that is in exact opposition to the position it took to try to repurchase her membership interest in the first place in 2017. The day after the first arbitration award was issued—well before it was confirmed by any court—counsel for ESquared Hospitality sent a letter

relying on the unconfirmed arbitration award to try to repurchase Chef Chloe's membership and remove her as manager. BCHG and its counsel cannot have it both ways: they cannot enforce an unconfirmed arbitration to try to repurchase her ownership rights and then deny the arbitration award rejecting that repurchase because it has not been confirmed. The entire basis for BCHG's petition in this Court lacks good faith as a result, and reflects their overall goal—since 2017—to disregard Chef Chloe's ownership in the company she founded.

## ARGUMENT

**I.      BCHG did not own the By Chloe mark before it petitioned for bankruptcy.**

**A.      BCHG failed to rebut the unambiguous language in the Operating Agreement.**

4.      Chloe established in her opening brief that any BCHG ownership in the By Chloe mark was "subject to"—meaning conditional or dependent on—the Company honoring the terms and conditions in both the Operating and NFL Agreement. Dkt. 221 at 11-13. Like an ostrich's head in the sand, BCHG ignored controlling canons of construction and undisputed definitions that prove this conclusion.

5.      Chloe detailed New York law that requires courts to apply the plain and ordinary meaning from dictionaries to undefined terms in a contract. *Id.* at 11-12. BCHG did *not* dispute or respond to this law. Chloe also detailed the plain and ordinary definitions of "subject to" from many dictionaries. *Id.* at 12. BCHG did *not* dispute or respond to any of these definitions. Thus, the Court should adopt the unrebutted and undisputed definition of "subject to" as "conditional or dependent on."

6.      BCHG likewise did *not* dispute or respond to the unambiguous language that the By Chloe trademark is subject to—conditional or dependent on—the terms and conditions in ¶ 4.4(e). *Id.* at 15. Indeed, the unambiguous and undisputed language prevents BCHG from opposing Chloe's trademark rights in word marks like "Chef Chloe" and "Chloe's Delicious." And BCHG did *not* dispute or respond to its unequivocal breach of these terms and conditions.

2

7.      BCHG also did *not* dispute or respond to its undisputed breach of the terms and conditions that prevented BCHG from selling retail products with the By Chloe mark. And BCHG did *not* dispute or respond to its undisputed breach of the terms and conditions that required BCHG to accept Judge Hochberg's decision as "binding."

8.      Thus, the record for this Court is simple—indeed, undisputed—that the plain and ordinary meaning of "subject to" is "conditional or dependent on," and that BCHG breached the terms and conditions for which any ownership was so conditional or dependent on. For this reason alone, this Court should sustain Chloe's objection and deny BCHG's request to sell the By Chloe trademark.

**B.      BCHG failed to rebut the unambiguous language in the NFL Agreement.**

9.      Chloe also established in her opening brief that she never granted *any* rights in her name to BCHG outside the terms and conditions of the NFL Agreement. Dkt. 221 at 16-19. BCHG failed to rebut or dispute this conclusion based on any unambiguous language in either the Operating or NFL Agreement for two core reasons.

10.     First, the NFL Agreement unambiguously establishes that Chloe's "name" and any "variations of her name" is a "*name*, face, likeness" (NFL) right. BCHG did *not* dispute or rebut this unambiguous language. Nor could BCHG point to any unambiguous language that says otherwise. For instance, no provision in any agreement says: "the By Chloe Mark is not a NFL Right." That is how an unambiguous carve out would read.

11.     Second, BCHG continues to ignore elementary trademark law and the unambiguous application to the contracts here. Chloe explained that trademark law bars BCHG from obtaining any trademark that uses Chloe's name without her express authorization. *Id.* at 16-17. And Chloe detailed how ¶ 4.3(d) required Chloe to provide that express authorization to her "name" through the NFL Agreement.

12.    BCHG did *not* dispute or rebut this law or application. BCHG did *not* dispute that

trademark law requires Chloe's individual consent. BCHG did *not* dispute that Chloe is not a party to the

Operating Agreement. Indeed, the NFL Agreement is the only agreement Chloe—as an individual—is a

party to. And thus BCHG did *not* dispute that Chloe never expressly authorized use of her name except

in the NFL Agreement.

13.    Finally, Chloe proved that she terminated the NFL Agreement in 2018. Following that

termination, BCHG had to "discontinue all use of NFL Rights"—that includes use of Chloe's name. All

means all. No provision of this license to use Chloe's name (Section 1 of the NFL Agreement) survives

this termination. BCHG offered no response to this unambiguous record.

14.     The unambiguous language, and the unrebutted record, show that any rights BCHG ever

had in the By Chloe mark depended on—was subject to—the NFL Agreement. And because Chloe

terminated that agreement, so too was BCHG's ownership in the By Chloe mark. This conclusion is an

independent basis for the Court to sustain Chloe's objection and deny BCHG's request to sell the By

Chloe trademark.

**C.    None of BCHG's arguments has any merit.**

15.    Rather than engage with unambiguous language and record above, BCHG spent its prolix

brief with a scattershot of inapplicable arguments.

16.    **By Chloe is named after Chloe.** BCHG stretches—if not breaks—the bounds of credible

advocacy when it argued that "[t]he 'by CHLOE." trademark does not suggest a connection to

Coscarelli". Dkt. 233 at 29. The Paperwhite report—an elite branding firm hired by ESquared

Hospitality—proposed "by Chloe" because of Chloe's "existing notoriety in the food industry to further

establish her presence without needing to compete with smaller and potential future brands." Ex[1]. 6 at 5-

10. And BCHG's lawyers stated "Our client's restaurant is the creation of and is guided by Chloe

---

[1] Citations to Exs. 1 to 25 refer to exhibits filed with Chloe's Opening Brief (Dkt. 221).  Exs. 26-30 are filed herewith.

Coscarelli, a vegan chef, who almost immediately became well known as 'Chef Chloe' or just 'Chloe.'" Ex. 10 at 1. And Haber confirmed this most obvious conclusion as well:

> Q.  My question was at inception, and at the conception of the name By Chloe, was it your understanding that the Chloe was referring to Chloe Coscarelli?
>
> A.  I actually had a dog named Chloe, and I refer to it by that. I was only being facetious and joking. Of course it was Chloe Coscarelli.

Ex. 26 at 303:5-14. Indeed, that the trademark invokes Chloe's name is critical. As BCHG's own lawyers recognized in a trademark dispute with a competing brand (Chloe's Sofserve). While Chloe's Softserve predated the By Chloe mark, BCHG was able to argue that Chloe's preexisting fame gave the Company superior rights. Ex. 10 at 1.

17.    **"Subject to."** Not until page 29 of BCHG's brief does the core term in dispute even make an appearance. BCHG's meager argument is that this conditional phrase "only means that there are applicable terms and conditions." Dkt. 233 at 33. The only example BCHG provides is that BCHG could not use the mark outside fast-casual vegan restaurants without Chloe's consent. *Id.*

18.    This argument fails for two main reasons. First, as explained above, it violates New York's law that the plain and ordinary dictionary definition of "subject to" should apply. Second, BCHG's interpretation renders "subject to" as mere surplusage in violation of another canon of construction. Paragraph 4.1 of the Operating Agreement already restricts *the entire business*—not just use of the By Chloe mark—to fast-casual vegan restaurants only.

19.    BCHG's hypothetical about how the Company's use of the By Chloe mark could be subject to the NFL Agreement is even more bizarre. BCHG conjures up a strawman argument—"in theory"—that *if* Chloe approved retail products and *if* her likeness was included on the product, then "the use of the By Chloe Mark on that product *would be* subject to the terms and conditions in the NFL Agreement because the product also used an NFL Right—Coscarelli's likeness." *Id.* at 33-34 (emphasis added).

20.    The circular nature of this hypothetical is still spinning. If the Company were to use Chloe's likeness on a product, then that use by itself would be subject to the terms and conditions of the NFL Agreement alone. It would be irrelevant whether the mark was also used. Put differently, a product that used Chloe's likeness is subject to the terms and conditions of the NFL Agreement. A product that used the By Chloe mark is subject to the terms and conditions of the NFL Agreement. That a product may use the By Chloe mark *and* Chloe's likeness is not a special combination to trigger the terms and conditions of the NFL Agreement in ¶ 4.4(a).

21.    The plain language of 4.4(a) of course rejects BCHG's far-fetched theory as well. The Company's ownership of the mark in ¶ 4.4(a) *was* subject to—not "in theory"—the terms and conditions of the NFL Agreement. Nothing about this clear language only triggers the terms and conditions of the NFL Agreement under narrow hypothetical scenarios. And for good reason. The Company's ownership in the mark was subject to the NFL Agreement because the mark used Chloe's name, which is expressly defined as an NFL right.

22.    At base, BCHG has no credible explanation for why the By Chloe mark would be "subject to" the terms and conditions of the NFL Agreement if the By Chloe mark did not implicate the NFL Agreement. It does. The unambiguous language confirms it. And for good reason. Chloe maintained, for example, quality control rights for the restaurant that bears her name under the terms and conditions of the NFL Agreement. Ex. 9 § 6. BCHG has no explanation for why any ownership in the mark is not subject to *all* terms and conditions in the NFL Agreement.

23.    **Any ambiguity over "subject to".** BCHG's plea that the Court not construe the conditional language of "subject to" against it as the drafter fails on the law and facts. Dkt. 233 at 34-35. For the law, Judge Hochberg has already rejected BCHG's argument once before when she construed a provision in the Operating Agreement drafted by ESquared Hospitality against the ESquared Hospitality and thus the Company as well. Ex. 8 at 41 (citing *BT Commercial Corp. v Blum*, 175 A.D.2d 43, 44 (1st

6

Dept. 1991); *see also RLS Assocs., LLC v. United Bank of Kuwait PLC,* 380 F.3d 704, 712 (2d Cir.

2004). New York law applies this canon of construction, as it has been applied to these identical parties

with this identical contract.

24.     This same analysis applies here too. The undisputed fact is that 4.4(a) was drafted

entirely by ESquared Hospitality. *Cf.* Ex. R ¶ 4.4(a) with Ex. 7 ¶ 4.4(a).  Both versions include verbatim

language drafted by ESquared Hospitality. No dispute exists that ESquared Hospitality—not Chloe—

introduced the conditional nature of "subject to" to ¶ 4.4(a) because ESquared Hospitality drafted all of

it.

25.     BCHG's case law is not to the contrary. *In Catlin Specialty Insurance v. QA3 Financial

Corp.*, the court denied a jury instruction on this canon of construction because there was "ample

extrinsic evidence from which the jury could divine the parties' intent" and—in the context of an

insurance contract with two corporate parties—both parties had equal bargaining power. 36 F. Supp. 3d

336, 341-42 (S.D.N.Y. 2014). Here, there is no jury and the parties lacked equal bargaining power.

Chloe was a 26-year old chef negotiating with a multi-millionaire restaurateur who had orchestrated

preexisting illegal tax schemes that the IRS is still pursuing tens of millions of dollars from.

26.     **Company IP.** BCHG's attempt to shortcut the analysis by relying on a general reference

to Company IP warrants little attention. Dkt. 233 at 21. New York law "follows the common (and

commonsensical) rule that a specific provision . . . governs the circumstance to which it is directed, even

in the face of a more general provision[.]" *Capital Ventures Int'l v. Republic of Argentina,* 652 F.3d 266,

271 (2d Cir. 2011). Paragraph 4.4—titled By Chloe Mark—is the specific provision about the By Chloe

mark. Thus, the Company's conditional interest in the By Chloe mark in ¶ 4.4(a)—not a more generic

reference to Company IP in ¶ 4.3(a)—controls.

27.     **Section 1 of NFL Agreement.** BCHG mischaracterizes Section 1 of the NFL Agreement

when it contends that the parties "intentionally carved the By Chloe Mark out of Section 1(b) in the NFL

Agreement to make clear that it is not an NFL Right." Dkt. 233 ¶59. Not so. The Preamble defines "NFL Rights" and contains no such carve out. Section 1(b) merely restricts Chloe's use of the By Chloe mark. The sentence at the end—"All rights in and to the By Chloe Mark are reserved by the Company as stated in the Operating Agreement"—does not say that the By Chloe mark is not a NFL right. Again, the parties never agreed—unambiguously or otherwise—that "the By Chloe mark is not a NFL right." That is how parties would intentionally carve out the mark. It would not be hard. Even so, BCHG ignores that no part of Section 1 survived Chloe's termination of the NFL Agreement. Dkt. 221 at ¶ 20 (citing NFL Agreement § 9). Thus, even if BCHG could rewrite the provision to change the definition of NFL rights to exclude use of Chloe's name, its argument still fails because the NFL Agreement is terminated and so is this provision as a result.

28.     **Forfeiture.** BCHG's argument about forfeiture is wrong. To start, this dispute is not about forfeiture. This dispute is over the fundamental bargain that the parties made when they started the Company. The Company could only hold rights in the By Chloe mark if it complied with the terms and conditions that Chef Chloe and Chloe bargained for. The Company never had an unconditional right to forfeit.

29.     Even then, BCHG's irrelevant case law shows just how far it must stretch to argue its position. Its lead case, *LG Capital Funding LLC v. MineralRite Corp.*, addressed a default from failing to answer a complaint in litigation. 2017 WL 9250297 (E.D.N.Y. Dec. 1, 2017). And the quote it relies on relates to a case from 1886, and a dispute about a right to cut down tree bark for a tannery. *Lyon v. Hersey*, 8 N.E. 518, 103 N.Y. 254 (1886). The other party argued that the right to cut down trees terminated when the tannery burned down. The ultimate holding found that the contract did not condition the right to cut down the bark on using the bark in the tannery. *Id.* at 520 (explaining "there is neither condition nor limitation" in the contract). Indeed, the court explained more generally that forfeitures arise with "no particular form of words" as long as they expressly "create a limitation or

condition." *Id.* Here, the Operating Agreement expressly conditions the By Chloe mark—through the conditional phrase "subject to"—on the terms and conditions of the Operating and NFL Agreements.

30.    The rest of BCHG's cases do not compare to this case for this same reason. The remaining citations in BCHG's other footnotes all omit any explicit conditional language like the "subject to" term that the parties adopted here. And courts have long embraced this particular conditional phrase. *See, e.g.*, *F.W. Berk & Co. v. Derecktor,* 92 N.E.2d 914, 301 N.Y. 110, 113 (1950) (construing "subject to" as "conditional upon" or "depending on"); *Swan Magnetics, Inc. v. Superior Court*, 56 Cal. App. 4th 1504, 1510, 66 Cal. Rptr. 2d 541 (Cal. Ct. App. 1997), as modified (Sept. 12, 1997) (construing "subject to" to mean "conditioned upon, limited by, or subordinate to").

31.    Finally, BCHG's contention that the Operating Agreement provides for no forfeiture remedy mischaracterizes the broad remedy provision. Paragraph 20.6 ensures that "all legal remedies" and "all equitable remedies" will be available "for any breach or threatened breach of any provision of this Agreement." Ex. 7 ¶ 20.6. All means all.

32.    **Rescission.** BCHG's arguments about rescission fail for many of the same reasons as its argument about forfeiture. To start, Chloe disagrees that this dispute is over rescission. Transfer of intellectual property rights by operation of law is commonplace. For instance, when an inventor "hereby assigns"—present assignment, as used on ¶ 4.3(c)—her inventions to an employer, legal title automatically passes to the employer upon invention and patent application. *See, e.g.*, *FilmTec Corp. v. Allied-Signal, Inc.,* 939 F.2d 1568, 1572-73 (Fed. Cir. 1991). Here too, Chloe need not rescind an agreement for the plain language of the conditional ownership in ¶ 4.4(a) to be effective.

33.    Even so, BCHG provides no support for its sweeping proposition that "rescission of the entire Operating Agreement" is the only conceivable remedy. Dkt. 233 ¶85. Indeed, BCHG provided no support for that statement, despite its 133 footnotes elsewhere. Nor is BCHG's contention correct. New York law, for instance, recognizes partial rescissions of contracts. *See, e.g., Arlington Park Racetrack*

9

*Ltd. v. SRM Computers Inc.,* 674 F. Supp. 986, 996 (E.D.N.Y. 1987). Whatever the remedy or name, the law allows Chloe to enforce the fundamental bargain she made. And BCHG is not allowed to own a trademark with her name while it breaches the terms and conditions of contracts that its ownership is conditional upon.

34.     BCHG also erred when it argued that Chloe has no taken no action over the ownership of the By Chloe mark. *See* Dkt. 233 at ¶ 86. Chloe terminated the NFL Agreement in 2018. Ex. 19. She sued BCHG for infringing her trademarks and violating her rights of publicity—both premised on BCHG's lack of ownership in any rights to the By Chloe mark. And Chloe pled in the Southern District of New York that "BCHG has breached the terms and conditions of the Operating Agreement and NFL License Agreement, and therefore lacks ownership and standing to assert the By Chloe Mark." Ex. 27 at ¶235. Chloe has unequivocally explained that BCHG owns no rights in the trademark for years now.

35.     Finally, BCHG is in no position to invoke equity. Dkt. 233 at 336. BCHG has conspired to "milk" Chloe's name. Ex. 16. BCHG has attacked Chloe in the vilest ways possible. Exs. 11-13. It unlawfully seized her membership interests and still refuses to accept Judge Hochberg's "binding" decision over it. BCHG intentionally misused the By Chloe mark to oppose Chloe's permissible trademark applications as part of a scheme to prevent her from working—as a chef and an author. Exs. 17-18. BCHG lacks standing in equity.

36.     **Parol Evidence.** BCHG's protracted discussion of the drafting history leading to the Operating and NFL Agreement does not support its position here. If anything, the drafting history reflects the sensitive nature over use of Chloe's name and brand. And nothing in it—or the final agreements—states (1) that BCHG will have complete and total ownership of the By Chloe mark, or (2) that the use of Chloe's name in the By Chloe mark is not a NFL right. Chloe does not expect that any party to the agreements will testify that their intent was to the contrary either.

37.    Chloe also objects to testimony from BCHG and ESquared Hospitality's attorney Brad Muro. Extrinsic evidence is a tool to determine the intent of *the parties*. *See, e.g., Ralli v. Tavern on the Green,* 566 F. Supp. 329, 331 (S.D.N.Y.1983). Muro is not a party to any agreement. He was an advocate for Haber and ESquared Hospitality. In fact, BCHG continues to employ and pay Muro even in this bankruptcy proceeding. *See, e.g.,* Dkt. 199-1; Dkt. 224-2. Nothing about his advocacy, and his professional duty of loyalty to Haber, ESquared Hospitality, and now BCHG, will help the Court understand what *the parties* intended when they signed the Operating and NFL Agreements.

38.    BCHG also made the strategic choice not to waive privilege over communications Muro had with Haber and ESquared Hospitality before the contracts were finalized. Exs. 28-29. Parties may not use privilege as a sword and a shield. *See, e.g.*, *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,* 2012 WL 2568972, at *6 (S.D.N.Y. July 3, 2012). Thus, BCHG cannot use Muro as a surrogate to testify about the parties' intent while withholding his candid and privileged communications to those same parties on the same subject. Any testimony about intent must come from Haber, the lead representative for ESquared Hospitality who negotiated and signed the contracts. But Haber has no testimony to offer—he has no recollection of ever reading the Operating Agreement or NFL Agreement before he signed them. Ex. 26 at 268-69.

## II.    **BCHG's concessions confirm that it cannot now sell the By Chloe mark in this proceeding under any circumstances.**

39.    BCHG has made two recent concessions that prevent it from selling the By Chloe mark in this proceeding. First, BCHG concedes that the terms and conditions limit the scope of the Company's use of the mark. Dkt. 233 ¶ 80. Second, BCHG filed updated disclosures with the Court that confirm it will not try to assume—because it cannot—the NFL Agreement, or the Operating Agreement for that matter. *See* Dkt. 230-1 (omitting Operating and NFL Agreements). These concessions are fatal to its desire to sell the By Chloe mark without regard to those contracts.

40.      The most basic principle in property law is that one can only sell what it owns. Even if BCHG had never breached its obligations to Chloe, the Company's ownership of the mark was never unconditional or unlimited. To the contrary, any ownership was "subject to" many terms and conditions of two contracts. BCHG cannot now sell the trademark untethered to the terms and conditions of the Operating and NFL Agreements—agreements that would not follow any sale of the mark.

41.      *In re Trump Entertainment Resorts Inc.* is also supports this conclusion. 526 B.R. 116 (Bankr. D. Del. 2015). This Court explained the important policy concerns over transferring trademark rights through bankruptcy. *Id.* at 123. "In other words, federal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor." *Id.* at 124. The Court applied this default rule because the debtor was not allowed to sublicense or assign rights without the Trump party's consent. *Id.*

42.      The same reasoning applies here. The Company's rights in the By Chloe mark are inextricably bound to the terms and conditions of the Operating and NFL Agreements. And rightfully so. For instance, Chloe maintained quality control rights under the terms and conditions of the NFL Agreement. Ex. 9 § 6. This provision allowed her to monitor the quality of restaurants that bear her name—the same considerations recognized in the *Trump* decision. More generally, nothing in either agreement suggests that BCHG may sell the By Chloe mark unencumbered by the terms and conditions of the Operating and NFL Agreement. BCHG has pointed to no such provision because none exists. Put differently, nothing about ESquared Hospitality's drag-along rights in ¶ 18.4 allows it to sell the assets of the company—including the mark—without also continuing the terms and conditions of the NFL and Operating Agreement. Chloe never consented otherwise.

**III.    BCHG's continuing refusal to honor Judge Hochberg's binding arbitration award lacks good faith.**

43.    BCHG strayed from the merits in front of the Court when it tried to justify its refusal to accept Judge Hochberg's "binding" arbitration award. This argument, in fact, reflects just how indefensible its treatment of Chloe has been. It also undercuts the legitimacy of these proceedings.

44.    BCHG's *only* basis to avoid Judge Hochberg's award is its contention that arbitration awards are unenforceable until confirmed by a court. Dkt. 233 ¶ 88. Indeed, that was advice BCHG's counsel provided BCHG's Corporate Secretary to support its first-day filing. Dkt. 3 ¶ 41. Unfortunately for BCHG and its counsel, the entirety of this dispute falls apart if that premise is true and confirms their bad-faith efforts to cheat Chloe out of her ownership all along.

45.    Start with the parties' first arbitration in 2017. Far from the decisive victory that BCHG now touts, the arbitrator rejected BCHG's outlandish claim that Chloe owed over $7 million in damages. In fact, the arbitrator awarded zero damages. The arbitrator also refused even to decide Chloe's counterclaims, including significant breaches of fiduciary duty, because Chloe could not afford to pay the arbitrator's fee—as an individual, she simply could not afford the opportunity for justice. If anything, the arbitrator's decision was a tepid compromise result given the allegations between warring business partners.

46.    The relevance here is that BCHG and ESquared Hospitality (wrongfully) believed that this arbitration decision allowed it to repurchase Chef Chloe's membership interest for zero dollars and remove Chloe as a manager.[2] Ex. 30. So the day after the arbitrator issued her award—long before any court ever confirmed the award—ESquared Hospitality's lawyer sent a letter that purported to repurchase Chef Chloe's interest "[p]ursuant to the Final Award." *Id.* To be sure, it tried to enforce the award *without court confirmation*. It never purported to repurchase Chef Chloe's interest after the award

---

[2] As Judge Hochberg detailed, ESquared Hospitality never had the option to repurchase Chef Chloe's membership interests because an ESquared Hospitality Liquidity Event occurred years before the arbitration, which extinguished any potential repurchase right from arising in the future.

was confirmed either. And thus the entire premise for BCHG's actions in this proceeding unravel as a result.

47.    If, as BCHG and its counsel represent to this Court now, arbitration awards are unenforceable until confirmed by a court, then the attempt to repurchase Chef Chloe's membership interest and remove her as manager the day after the first arbitration award issued was ineffective from the start, and thus Chef Chloe remains a member and Chloe remains a manager. Put differently, the arbitration award could not be enforceable without a court order when it benefitted ESquared Hospitality and BCHG in 2017, but not now when it is to their detriment.

48.    More simply, Chef Chloe is a 50% member of BCHG—rightfully called CCSW LLC— no matter what. If Judge Hochberg's decision cannot be enforced until confirmed, then so too the first arbitration could not have been either. Under that scenario, ESquared Hospitality's letter was ineffective from the start. And if ESquared Hospitality could enforce the first arbitration award before court confirmation, then so too must the Company accept Judge Hochberg's binding arbitration award now. BCHG cannot have it both ways. And its attempt to do so here shows the entire premise for this proceeding lacks good faith.

49.     Nor is this an irrelevant question as BCHG's counsel suggested to the Court at the most recent hearing. To start, every debtor must petition for bankruptcy in good faith. *See, e.g., In re SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir. 1999). That BCHG has adopted inconsistent positions—a heads-I-win, tails-you-lose approach—to exclude its founding 50% member shows its lack of good faith. Even more generally, corporate formality and governance matter. BCHG cannot shortcut the necessary requirements just because it believes an independent committee would make the same decisions regardless.

50.    Chloe will formally object to confirmation of the plan by the deadline next week, including the objection that the plan has not been proposed in good faith. But BCHG and its counsel

have duties for this proceeding as well, and Chloe believes they cannot honor those duties based on the record above.

## **CONCLUSION**

BCHG has misappropriated Chloe's name for over five years now. It now wants to sell the trademark with her name. It has no right to do so. Chloe asks this Court to sustain her objection to prevent this injustice from occurring.

Respectfully submitted,

Dated: February 19, 2021
Wilmington, Delaware

  */s/ Mette H. Kurth*
Mette H. Kurth (DE Bar No. 6496)
CULHANE MEADOWS, PLLC
4023 Kennett Pike #165
Wilmington, Delaware 19807
Telephone: (302) 660-8331
Email: mkurth@cm.law

  */s/ Patrick M. Arenz*
Ronald J. Schutz (admitted pro hac vice)
Patrick M. Arenz (admitted pro hac vice)
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8591
Email: rschutz@robinskaplan.com
Email: parenz@robinskaplan.com

Counsel for Chloe and Chef Chloe LLC

## CERTIFICATE OF SERVICE

I, Mette H. Kurth, hereby certify that on the 19th day of February, 2021, a true and correct copy of *Chloes Reply Brief in Support of Her Objection to BCHGs Ownership of the By Chloe Trademark and Its Plan to Sell the Mark* was electronically filed via the Court's CM/ECF system and thereby served on those parties having consented to electronic service.

Dated:  February 19, 2021              */s/ Mette H. Kurth*_____
                                       Mette H. Kurth