# Exhibit A

**Post-Mediation Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| BC HOSPITALITY GROUP INC., *et al.*, | Case No. 20-13103 (BLS) |
| Debtors.[1] | (Jointly Administered) |

## ORDER (I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order authorizing the Debtors to conduct a marketing process for plan sponsors or purchasers of the Debtors' assets and to sell the Debtors' assets or equity through a chapter 11 plan or through a sale under section 363 of the Bankruptcy Code; and this Court having entered that certain *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadline and the*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: BC Hospitality Group Inc. (8766); BC Hospitality Group LLC (9360); BC International LLC (1356); BC Commissary NJ LLC (0230); E2 185 Bleecker LLC (6862); E2 60 West 22nd Street LLC (9567); E2 Lafayette LLC (7419); BC Williamsburg LLC (8277); BCRC LLC (7297); CW SSS LLC (9958); BC Union Square LLC (5172); BC 1385 Broadway LLC (2138); BC 630 Lexington LLC (3202); CCSW Fenway LLC (5517); E2 Seaport LLC (9720); BC Back Bay LLC (0550); BC Providence LLC (0737); BC Silver Lake LLC (2825); BC Century City LLC (0901); and BC West Hollywood LLC (3878). The Debtors' mailing address is 205 Hudson Street, Suite 1001, New York, New York 10013.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the APA (as defined herein), or to the extent not defined therein, the Bidding Procedures Order (as defined herein).

*Auction, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* [Docket No. 102] (the "Bidding Procedures Order"); and the Debtors having received no bids for a chapter 11 plan transaction; and upon consideration of the Debtors' proposed order (this "Sale Order") (a) authorizing and approving that certain Asset Purchase Agreement (the "APA," a copy of which is attached hereto as **Exhibit 2**), dated as of March 9, 2021, between BC Hospitality Group Inc., BC Hospitality Group LLC, BC International LLC, BC Commissary NJ LLC, E2 185 Bleecker LLC, E2 60 West 22nd Street LLC, E2 Lafayette LLC, BC Williamsburg LLC, BCRC LLC, CW SSS LLC, BC Union Square LLC, BC 1385 Broadway LLC, BC 630 Lexington LLC, CCSW Fenway LLC, E2 Seaport LLC, BC Back Bay LLC, BC Providence LLC, BC Silver Lake LLC, BC Century City LLC, and BC West Hollywood LLC (collectively, the "Sellers") and the buyer parties to the APA (collectively, with any designee thereof in accordance with the APA, the "Buyer"), (b) approving the sale of the Purchased Assets pursuant to the APA, (c) approving the assumption and assignment of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code, (d) authorizing the Debtors to consummate transactions related to the APA, and (e) granting other related relief; and the Debtors having determined that the highest or otherwise best offer for the Purchased Assets was made by Buyer pursuant to the APA; and upon consideration of the declaration of Michael Mortell [Docket No. 306] (the "Mortell Declaration") and the declarations of Patrick J. Bartels, Jr. [Docket Nos. 307 & 312]; and this Court having conducted hearings on March 11, 2021 and March 16, 2021 (together, the "Sale Hearing"), at which time all parties in interest were offered an opportunity to be heard with respect to the sale of the Purchased Assets to the Buyer pursuant to the APA (the "Sale"), to consider the approval of the Sale pursuant to the terms and conditions of the APA, and this Court having considered (i) the Motion and any objections thereto, (ii) the Sale and any objections thereto, (iii) the

arguments of counsel made, and evidence adduced, related thereto, and (iv) the full record in these chapter 11 cases, including the record related to the hearing to consider the Bidding Procedures Order and the Sale Hearing held before this Court; all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the APA and the Sale and other transactions contemplated by the APA; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT**:[3]

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.

B.      To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      This Court has jurisdiction over the Motion and over the property of the Debtors, including the Purchased Assets to be sold, transferred, and conveyed pursuant to the APA, pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases and the Motion in this District and Court is proper under 28 U.S.C. §§ 1408 and 1409.

D.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court finds that there is no just

---

[3]      All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to this Sale Order are hereby incorporated herein to the extent not inconsistent herewith.

reason for delay in the implementation of this Sale Order, and directs entry of judgment as set forth herein.

E.     The Purchased Assets constitute property of Sellers' bankruptcy estates and title thereto is vested in Sellers' bankruptcy estates within the meaning of section 541(a) of the Bankruptcy Code.

F.     The statutory bases for the relief provided for herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

G.     On December 14, 2020 (the "Petition Date"), each of the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code and elected to proceed under Subchapter V of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

H.     This Court previously entered the Bidding Procedures Order:  (i) establishing bidding and auction procedures; (ii) scheduling the Auction (if necessary) and the Sale Hearing to consider the sale of the Purchased Assets, to the extent set forth in the Bidding Procedures Order; (iii) establishing procedures for noticing and determining Cure Costs related to the Sellers' executory contracts and unexpired leases, which procedures were set forth in the Debtors' proposed chapter 11 plan [Docket No. 169], the *Notice of Potential Assumption of Executory Contracts and Unexpired Leases and Cure Claims* [Docket No. 226] and the *Amended Notice of Potential Assumption of Executory Contracts or Unexpired leases and Cure Claims* [Docket No. 230]; (iv) approving the form and manner of notice of all procedures, protections, schedules, and agreements; (v) specifically contemplating that the Debtors could seek approval of the Sale pursuant to section 363 of the Bankruptcy Code at any hearing scheduled to confirm the Debtors'

proposed chapter 11 plan (*see* Paragraph 17 of the Bidding Procedures Order); and (vi) granting certain related relief.

I.      As evidenced by the affidavits of service previously filed with the Court [Docket Nos. 104, 205, 211, 217, 240, 253, 271 & 311], and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Auction, the Sale, the assumption and assignment of the executory contracts and unexpired leases to be assumed and assigned to Buyer at Closing pursuant to this Sale Order and the APA (collectively, the "Assigned Contracts"), and the designation of the Buyer as the winning bidder has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9007, and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable:  (a) the Office of the United States Trustee for the District of Delaware; (b) the Subchapter V Trustee; (c) holders of the twenty (20) largest unsecured claims on a consolidated basis against the Debtors; (d) counsel to the Debtors' post-petition lenders; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the Office of the United States Attorney General for the District of Delaware; (h) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' assets during the past six months; (i) all entities known to have asserted any interest in or upon any of the Debtors' assets; (j) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (k) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Winning Bidder; and (l) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  The notices

described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale, and the Sale Hearing is, or shall be, required.

J.      The Debtors have articulated good and sufficient reasons for this Court to grant the relief provided for herein.

K.      The *Notice of Entry of Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadline and the Auction, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* [Docket No. 104] and the *Notice of (I) Hearing to Consider Confirmation of the Joint Chapter 11 Plan of BC Hospitality Group Inc. and Its Debtor Affiliates and (II) Related Voting and Objection Deadlines* [Docket No. 175] provided all interested parties with timely and proper notice of the Sale, the Sale Hearing, and the Auction, including the Debtors' ability to seek approval of the Sale pursuant to section 363 of the Bankruptcy Code at the Sale Hearing.

L.      The disclosures made by the Debtors in the Motion, the Sale Notice, and related documents filed with the Court concerning the APA, the Auction, the Sale, and the Sale Hearing were good, complete, and adequate.

M.      The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive, proposed and executed in good faith as a result of arms'-length negotiations, and were substantively and procedurally fair to all parties.

N.      As set forth in the Mortell Declaration, the Debtors conducted the sale process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order. The sale process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Purchased Assets.

O.     The terms contained in the APA constitute the highest and best offer for the Purchased Assets and will provide a greater recovery for the Sellers' estates for the Purchased Assets than would be provided by any other available alternative.  The Sellers' determination that the APA constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Sellers' business judgment.

P.     The APA and the Sale contemplated thereby represent a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these chapter 11 cases.  No other entity or group of entities has presented a higher or otherwise better offer to the Sellers to purchase the Purchased Assets for greater economic value to the Sellers' bankruptcy estates than Buyer.

Q.     Approval of the Motion and the APA and the consummation of the Sale contemplated thereby is in the best interests of the Debtors, their creditors and estates, and other parties in interest in these chapter 11 cases.

R.     The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale of the Purchased Assets because, among other reasons, (i) the APA constitutes the highest and best offer for the Purchased Assets, (ii) the APA and the closing thereon will present the best opportunity to realize the value of the Purchased Assets, and (iii) any other transaction would not have yielded as favorable an economic result.

S.     The Buyer is purchasing the Purchased Assets in good faith and is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code and therefore is entitled to the full protections of that provision, and otherwise has proceeded in good faith in all respects in connection with these chapter 11 cases in that:  (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (ii) the Buyer complied with the provisions in the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the

competitive bidding procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by Buyer and other agreements or arrangements entered into by Buyer in connection with the Sale have been disclosed; (v) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (vi) the negotiation and execution of the APA, including the Sale contemplated thereby, were at arms'-length and in good faith.

T.    The APA and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  The Debtors and the Buyer and the Buyer's agents, representatives and affiliates have not engaged in any conduct that would cause or permit the APA or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

U.    The consideration provided by Buyer pursuant to the APA:  (i) is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Fraudulent Transfer Act); (ii) is fair consideration under the Uniform Fraudulent Transfer Act; (iii) is reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory, or possession thereof, or the District of Columbia; and (iv) will provide a greater recovery for the Debtors' creditors than would be provided by any other reasonably practicable available alternative.

V.    By consummating the Sale, the Buyer is not a mere continuation of Sellers or any other Debtor or any Debtor's bankruptcy estate, and there is no continuity, no common identity, and no continuity of enterprise between the Buyer and any Debtor.  Buyer is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Sale does not amount to a consolidation, merger, or de facto merger of Buyer or any of the Debtors.  Neither

Buyer nor any of its agents, representatives or affiliates shall assume or in any way be responsible for any obligation or liability of any Debtor (or any affiliates thereof) and/or any Debtor's estate except as expressly provided in this Sale Order or the APA.

W.    The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization of the Debtors.  The Sale does not constitute a *sub rosa* plan.

X.    The Debtors, acting by and through their existing agents, representatives, and officers, have full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and the Debtors require no further consents or approvals to consummate the Sale contemplated by the APA, except as otherwise set forth in the APA.

Y.    The transfer of each of the Purchased Assets to the Buyer will be as of the Closing Date a legal, valid, and effective transfer of such assets, and vests or will vest the Buyer with all right, title, and interest of Seller to the Purchased Assets free and clear of all Interests or Claims (as defined below) accruing, arising or relating thereto any time prior to the Closing Date, unless otherwise assumed in, or permitted by, the APA.

Z.    The Sellers may sell the Purchased Assets free and clear of all Interests or Claims against Sellers, their bankruptcy estates, or any of the Purchased Assets (unless otherwise assumed in, or permitted by, the APA) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Interests or Claims against the Sellers, their bankruptcy estates, or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of such Interests or Claims who did object fall within one or more of the other subsections of section 363(f) and are

adequately protected by having their Interests or Claims, if any, in each instance against the Sellers, their bankruptcy estates, or any of the Purchased Assets, attach to the cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force, and effect that such creditor had prior to the Sale, subject to any claims and defenses that the Sellers may possess with respect thereto.

AA.    If the Sale were not free and clear of all Interests or Claims (except as otherwise assumed in, or permitted by, the APA), or if the Buyer would, or in the future could, be liable for any of the Interests or Claims (except as otherwise assumed in, or permitted by, the APA), the Buyer would not have entered into the APA and would not consummate the Sale, thus adversely affecting the Debtors and their bankruptcy estates and creditors.

BB.    Sellers have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Buyer pursuant to the terms of this Sale Order and the APA, in each case in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Sellers, their bankruptcy estates and creditors, and other parties in interest.  The Assigned Contracts being assigned to the Buyer under the APA are an integral part of the APA and the Sale and, accordingly, such assumptions and assignments are reasonable and enhance the value of the Debtors' bankruptcy estates.  Any non-Debtor counterparty to any Assigned Contract that has not actually filed with this Court an objection to such assumption as of the date hereof is deemed to have consented to such assumption and assignment.

CC.    The Sellers and the Buyer have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), 365(b)(1)(B), and 365(f) of the Bankruptcy Code, in connection with the sale and assumption and assignment of the

Assigned Contracts to the extent provided under this Sale Order and the APA and will:  (i) cure any default existing prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code; and (ii) provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and Buyer has provided adequate assurance of future performance with respect to the Assigned Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  The Assigned Contracts are assignable notwithstanding any provisions contained therein to the contrary.

DD.    The APA and Sale must be approved and the Closing must occur promptly to preserve the value of the Purchased Assets and the Debtors' bankruptcy estates.

EE.    Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the consideration provided by Buyer under the APA, the Sale constitutes a reasonable and sound exercise of Sellers' business judgment, is in the best interests of Sellers and the other Debtors, their bankruptcy estates, their creditors, and other parties in interest in these chapter 11 cases, and should be approved.

FF.    The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.

**<u>NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:</u>**

1.    The relief requested in the Motion is granted as set forth herein.

2.      Any and all objections and responses to the Motion that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.      Notice of the Motion, the Auction, the Sale Hearing, and the Sale was fair and equitable under the circumstances, and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

<u>**Approval of the Sale of the Purchased Assets**</u>

4.      The APA, including all other ancillary documents, and all of the terms and conditions thereof, and the Sale contemplated thereby, are hereby approved in all respects.

5.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, acting by and through their existing agents, representatives, and officers, are authorized and empowered to take any and all actions necessary or appropriate to:  (a) consummate and close the Sale pursuant to and in accordance with the terms and conditions of this Sale Order and the APA; (b) transfer and assign all right, title, and interest to all property, licenses, and rights to be conveyed in accordance with the terms and conditions of this Sale Order and the APA; and (c) execute and deliver, perform under, consummate, and implement this Sale Order and the APA and all additional instruments and documents that may be reasonably necessary or desirable to implement this Sale Order, the APA, and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by this Sale Order, the APA, and any such other ancillary documents.  The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other ancillary documents.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding

sentence and the other provisions of this Sale Order; provided, however, that the Court shall retain

exclusive jurisdiction over any and all disputes with respect thereto.

6.      This Sale Order shall be binding in all respects upon the Debtors, their bankruptcy

estates, all creditors, all holders of equity interests in the Debtors, all holders of any Interests or

Claims (whether known or unknown) against any Debtor, any holders of Interests or Claims

against or on all or any portion of the Purchased Assets, all counterparties to any executory contract

or unexpired lease of the Debtors, the Buyer and all agents, representatives, affiliates, and

permitted successors and assigns of the Buyer, and any trustees, examiners, or other fiduciary

under any section of the Bankruptcy Code, if any, subsequently appointed in any of the Debtors'

chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtors'

cases.  The terms and provisions of the APA and this Sale Order shall inure to the benefit of the

Debtors, their bankruptcy estates, and their creditors, the Buyer and all agents, representatives,

affiliates, and permitted successors and assigns of the Buyer, and any other affected third parties,

including all persons asserting any Interests or Claims in the Purchased Assets to be sold to the

Buyer pursuant to the APA, notwithstanding any subsequent appointment of any trustee(s), party,

entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which

trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.

## Sale and Transfer of Purchased Assets

7.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy

Code, upon the Closing Date and pursuant to and except as otherwise set forth in the APA, the

Purchased Assets shall be transferred to the Buyer free and clear of all encumbrances, claims,

interests, and liens, including the Excluded Liabilities (as defined in the APA), mortgages,

restrictions, hypothecations, charges, indentures, loan agreements, instruments, collective

bargaining agreements, leases, licenses, options, deeds of trust, security interests, other interests,

conditional sale or other title retention agreements, pledges, and other liens (including mechanics',

materialman's, and other consensual and non-consensual liens and statutory liens), judgments,

demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery,

claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego,

environmental, or tax, decrees of any court or foreign or domestic governmental entity, or charges

of any kind or nature, if any, including any restriction on the use, voting, transfer, receipt of income

or other exercise of any attributes of ownership, debts arising in any way in connection with any

agreements, acts, or failures to act, including any liabilities related to the Employee Retirement

Income Security Act of 1974, liabilities related to the Internal Revenue Code, or any other liability

relating to Debtors' current and former employees, including any withdrawal liabilities or

liabilities under any collective bargaining agreement or labor practice agreement, of the Debtors

or any of the Debtors' predecessors or affiliates, claims, whether known or unknown, choate or

inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded,

perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or

unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether

arising prior to or subsequent to the commencement of these chapter 11 cases, and whether

imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising

under doctrines of successor liability (other than Assumed Liabilities and Permitted

Encumbrances) (collectively, the "Interests or Claims"), with all such Interests or Claims to attach

to the cash proceeds of the Sale in the order of their priority, with the same validity, force, and

effect that they now have as against the Purchased Assets, subject to any claims and defenses the

Debtors and their bankruptcy estates may possess with respect thereto.

8.      On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to Buyer pursuant to the terms and allocations set forth in this Sale Order and the APA.  For the avoidance of doubt, the Excluded Assets set forth in the APA are not included in the Purchased Assets, and the Excluded Liabilities set forth in the APA are not Assumed Liabilities.

9.      Subject to the terms and conditions of this Sale Order, and based on the record made in connection with the Motion and the Sale Order, the transfer of Purchased Assets to Buyer pursuant to the APA and the consummation of the Sale and any related actions contemplated thereby do not require any consents other than as specifically provided for in this Sale Order and the APA, constitute a legal, valid, and effective transfer of the Purchased Assets, and shall vest the Buyer with right, title, and interest of Sellers in and to the Purchased Assets as set forth in this Sale Order and the APA, as applicable, free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise assumed in, or permitted by, the APA).

10.      The Buyer, to the extent provided by this Sale Order or the APA, shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of Sellers constituting Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to Buyer as of the Closing Date as provided by this Sale Order and the APA.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.  Each and every federal, state,

and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale.

11.     For the avoidance of doubt, the Purchased Assets do not include the By Chloe Mark, and the By Chloe Mark and the other Excluded IP set forth in the APA shall not be transferred to the Buyer in connection with the Sale; *provided*, *however*, that the Buyer, the Sellers, and Chloe Coscarelli, as an individual and on behalf of Chef Chloe LLC ("Chef Chloe"), CC Hospitality Holdings LLC and CKC Sales LLC and their respective parents, subsidiaries, affiliates or any of their respective officers, directors, shareholders, employees, consultants, agents, attorneys, bankers, accountants, advisors, assigns, successors, predecessors or representatives (collectively "Chloe") have entered into a covenant not to sue agreement dated March [15], 2021 (the "Covenant Not to Sue Agreement"), the terms of which are approved and incorporated into this Sale Order by reference.  The Covenant Not to Sue Agreement is attached hereto as **Exhibit 1**.  For the avoidance of doubt, the Buyer will not attempt to register the By Chloe Mark or any of the Excluded IP, alone or as part of the Buyer's own service marks, trademarks, or tradenames, in the United States or with any other governmental entity anywhere in the world.  The Buyer will not represent that it has any ownership right in the By Chloe Mark or Excluded IP other than the rights provided in the Covenant Not to Sue Agreement or in this Sale Order.

12.     All entities that are presently, or on the Closing may be, in possession of some or all of the Purchased Assets to be sold, transferred, or conveyed (wherever located) to the Buyer pursuant to this Sale Order and the APA are hereby directed to surrender possession of the Purchased Assets to the Buyer on the Closing Date.

13.     Upon consummation of the Sale, if any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements

evidencing Interests or Claims against or in the Purchased Assets shall not have delivered to Sellers prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Interests or Claims that the person or entity has with respect to the Purchased Assets (unless otherwise assumed in, or permitted by, the APA), or otherwise, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests or Claims in the Purchased Assets of any kind or nature (except as otherwise assumed in, or permitted by, the APA); *provided* that, notwithstanding anything in this Sale Order or the APA to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Sellers nor Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.  For the avoidance of doubt, upon consummation of the Sale, the Buyer is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code.

14.    Except to the extent included in Assumed Liabilities or Permitted Encumbrances, or to enforce the APA, all entities, including all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts and unexpired leases, customers, employees and former employees, dealers and sale representatives, and trade or

other creditors holding Interests or Claims of any kind or nature whatsoever against or in the Debtors and their bankruptcy estates or the Purchased Assets arising under or out of, in connection with, or in any way relating to, the Purchased Assets or the transfer of the Purchased Assets to Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting any Interests or Claims of any kind or nature whatsoever against Buyer and its permitted successors, designees, and assigns, or property in connection with the Purchased Assets conveyed in accordance with the APA.

15.     As of and after the Closing:  (a) each of the Debtors' creditors is hereby authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests or Claims in the Purchased Assets (if any) as such Interests or Claims may have been recorded or may otherwise exist; and (b) any Purchased Asset that may be subject to a statutory or mechanic's lien shall be turned over and such liens shall attach to the proceeds of the Sale in the same priority they currently enjoy with respect to the Purchased Assets.

16.     To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing Date.

17.     Subject to the terms, conditions, and provisions of this Sale Order, all persons are hereby forever prohibited and barred from taking any action that would adversely affect or interfere (a) with the ability of the Debtors to sell and transfer the Purchased Assets to Buyer in accordance with the terms of the APA and this Sale Order, and (b) with the ability of the Buyer to acquire, take possession of, use and operate the Purchased Assets in accordance with the terms of the APA

and this Sale Order. Notwithstanding the foregoing, nothing in this Sale Order or the APA shall prohibit any party from seeking to enforce or collect any of the Assumed Liabilities against the Buyer.

18.    Effective upon the Closing, and to the maximum extent available under applicable law, the Debtors shall be deemed to have released Buyer and its current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, subsidiaries, successors, assigns and affiliates (the "Buyer Released Parties") from all actions, causes of action, damages, claims, and demands whatsoever, in law or in equity, known or unknown, contingent or liquidated, whether direct claims or for indemnification or contribution, that the Debtors ever had, now have, or may have against the Buyer Released Parties in connection with any event, conduct or circumstance occurring prior to the Closing; provided that, to the extent that a claim or cause of action by the Debtors, their estates, or any of their predecessors, successors or assigns is determined by order of this Court or any court of competent jurisdiction to have resulted from fraud, gross negligence or willful misconduct of the Buyer, such claim or cause of action shall not be released against Buyer.

19.    Effective upon the Closing, and to the maximum extent available under applicable law, neither the Buyer nor any of its members, partners, employees, affiliates, successors, assigns, advisors, or representatives shall have or incur any liability to, or be subject to any action by, the Debtors, their estates, or any of their predecessors, successors or assigns, including any trustee or examiner appointed in these cases or upon a conversion of these cases to chapter 7 of the Bankruptcy Code, other fiduciaries that are or may be appointed in these cases, or any persons or entities, arising from, based on, or related in any way to the negotiation, documentation, or due diligence in respect of, or the performance or consummation of the APA and any related

agreements entered into in connection therewith, the Debtors, their estates, and the conduct of their business prior to the Closing, and the entry into and consummation of the sale transaction, other than (with respect to the Buyer only) the Buyer's obligations under this Sale Order or the APA or any related agreements entered into in connection with the sale transaction; provided that, to the extent that a claim or cause of action by the Debtors, their estates, or any of their predecessors, successors or assigns is determined by order of this Court or any court of competent jurisdiction to have resulted from fraud, gross negligence or willful misconduct of the Buyer, such claim or cause of action shall not be released against Buyer.

20.     For the avoidance of doubt, Paragraphs 18 and 19 of this Sale Order do not exculpate or release the Buyer with respect to any direct or personal prepetition claims or defenses that a person may have independent of any claims or causes of action of the Debtors and the Debtors' estates (including derivative claims).  For the avoidance of doubt, except to the extent permitted under section 363 of the Bankruptcy Code, nothing in this Sale Order exculpates or releases any direct or independent claim (known or unknown) that Chloe, Chef Chloe, or any affiliated entity has or may have against the Buyer, including any of its past, present, or future members, partners, employees, affiliates, successors, assigns, advisors, or representatives and all such claims are preserved.

21.     The Buyer and its successors and assigns shall not be deemed, as a result of any action taken in connection with the transfer of the Purchased Assets, (a) to be a successor to the Debtors or their estates, (b) to have, *de facto* or otherwise, merged or consolidated with or into the Debtors or their estates, (c) to be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors, (d) to have a common identity with the Debtors, (e) to have acquired the trade or business of any of the Debtors for any purpose under applicable U.S. federal law (including

the Bankruptcy Code and the Internal Revenue Code of 1986, as amended), or (f) to be held out to the public as a continuation of the Debtors or the Debtors' trade or business, and the Buyer shall have no successor, transferee, or vicarious liability of any kind or character, including, but not limited to, under any theory of foreign, federal, state, or local antitrust, environmental, successor, tax, ERISA, assignee, or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, or regulation, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Business, the Purchased Assets, the Debtors or any obligations of the Debtors arising prior to the Closing Date.  The Buyer shall not be deemed to have expressly or implicitly assumed any of the Debtors' liabilities other than the Assumed Liabilities.  Except as otherwise provided herein or in the APA, the transfer of the Purchased Assets to the Buyer pursuant to the APA shall not result in the Buyer or the Purchased Assets having any liability or responsibility for, or being required to satisfy in any manner, whether in law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any claim against the Debtors or against any insider of the Debtors or liens (other than Permitted Encumbrances).

## Contracts to be Assumed and Assigned

22.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date, Sellers' assumption and assignment to the Buyer, and the Buyer's assumption, on the terms set forth in this Sale Order and the APA of the Assigned Contracts, is hereby approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

23.     Sellers are hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to assume and assign to the Buyer, effective upon the Closing Date, the

Assigned Contracts free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise assumed in, or permitted by, the APA) and execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to Buyer.  A schedule of the Assigned Contracts is set forth on **Exhibit 3** hereto.  For the avoidance of doubt, nothing herein affects the Buyer's right to re-designate prior to the Closing Date an Assigned Contract as an Excluded Asset, or an Excluded Asset as an Assigned Contract, in accordance with, and subject to the conditions set forth in, Section 2.8 of the APA.

24.    Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of each Assigned Contract.  The Debtors shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing, as further provided in this Sale Order and the APA.

25.    The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract that is assumed and assigned to the Buyer pursuant to the APA (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

26.    Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, at the Closing, the Buyer shall pay to the respective counterparty the Cure Costs relating to any Assigned Contract.

27.    The Debtors served all counterparties to the Debtors' executory contracts and unexpired leases with notice [Docket Nos. 226 and 230] ("Notice of Potential Assignment") of potential assignment to the Winning Bidder, the proposed Cure Costs, and the deadline to object to the Cure Costs and adequate assurance of future performance with respect to a potential buyer, which deadlines have passed.  Accordingly, unless an objection to the proposed assumption and

assignment of an Assigned Contract (including whether applicable law excuses a counterparty from accepting performance by, or rendering performance to, Buyer), the proposed Cure Costs or the adequate assurance of future performance with respect to Buyer was filed and served before the applicable deadline, each counterparty to an Assigned Contract is forever barred, estopped and permanently enjoined from asserting against the Debtors or Buyer, their respective affiliates, successors or assigns or the property of any of them, any objection to assignment or default if such objection or default was not raised or asserted prior to or at the appropriate objection deadline.

28.     RCPI Landmark Properties LLC ("RCPI"), lessor under that certain lease agreement for space located at One Rockefeller Center (the "Rockefeller Lease"), preserves for later adjudication before this Court its rights to argue about the assumption, assumption and assignment, assignment, or rejection under section 365 of the Bankruptcy Code and the terms and conditions thereof, including, without limitation, the Cure Costs, the cure of non-economic defaults that must be cured under section 365 of the Bankruptcy Code as a condition to assumption and assignment, and adequate assurance of future performance. Nothing in this Sale Order shall release and/or discharge any guarantee issued by a non-debtor party in connection with the Rockefeller Lease without the parties' consent.

29.     Except as otherwise agreed in writing between the Debtors and the non-Debtor parties to the Assigned Contracts or stated on the record of the Sale Hearing, the Cure Costs for the Assigned Contracts are hereby fixed at the amounts set forth on the Notice of Potential Assignment, and the non-Debtor parties to such Assigned Contracts are forever bound by such Cure Costs and, upon payment of such Cure Costs, are hereby enjoined from taking any action against the Debtors and their bankruptcy estates, Buyer and all agents, representatives, affiliates,

and permitted successors and assigns of Buyer, or the Purchased Assets with respect to any claim for cure under any Assigned Contract.

30.     Upon the Closing, the Debtors shall file a notice of sale Closing and serve the same on all counterparties to the Assigned Contracts.    Such notice shall serve as notice that such Assigned Contracts have actually been assumed and assigned.  The Buyer may designate any of the Assigned Contracts listed on **Exhibit 3** hereto as a rejected contract, and any rejected contract as an Assigned Contract, until the Closing occurs.

31.     The payment of the applicable Cure Costs (if any) shall effect a cure of all defaults existing as of the date that such executory contracts or unexpired leases are assumed and compensate for any actual pecuniary loss to such non-Debtor party resulting from such default.

32.     The Buyer shall have assumed the Assigned Contracts, and pursuant to section 365(f) of the Bankruptcy Code, the assignment by Sellers of such Assigned Contracts shall not be a default thereunder.  After the payment of the relevant Cure Costs by the Buyer, neither the Debtors and their bankruptcy estates nor Buyer shall have any further liabilities to the non-Debtor counterparties to the Assigned Contracts, other than the Buyer's obligations under the Assigned Contracts that accrue or become due and payable on or after the date that such Assigned Contracts are assumed.

33.     Any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under sections 363 and

365 of the Bankruptcy Code for the assumption by the Sellers and assignment to Buyer of the Assigned Contracts have been satisfied.

34.     Any party having the right to consent to the assumption or assignment of any Assigned Contract that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

35.     The Buyer shall be deemed to be substituted for the Sellers as a party to the applicable Assigned Contracts and the Debtors and their estates shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

36.     The Buyer has provided adequate assurance of future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

37.     There shall be no assignment fees, increases, rent-acceleration, or any other fees charged to the Buyer or the Debtors and their estates as a result of the assumption and assignment of the Assigned Contracts.

38.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors and their estates or the Buyer any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date that such Assigned Contracts are assumed or arising by reason of the Closing.

39.     Neither the Buyer nor any successor of the Buyer shall be responsible for or have any Interests or Claims or obligations arising out of any of the contracts, agreements, or

understandings that are not Assigned Contracts after the Closing Date (except as specifically provided by the APA).

## **Additional Provisions**

40.     The Sellers and the Buyer hereby waive, and shall be deemed to waive, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.

41.     Following the Closing, no holder of an Interest or Claim in or against the Debtors and their bankruptcy estates or the Purchased Assets shall interfere with Buyer's title to or use and enjoyment of the Purchased Assets based on or related to such Interest or Claim or any actions that the Debtors and their bankruptcy estates may take in these chapter 11 cases or any successor cases.

42.     The Debtors, including their respective officers, employees, and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the APA and this Sale Order.  The Debtors shall be, and they hereby are, authorized to take all such actions as may be necessary to effectuate the terms of this Sale Order and the relief granted pursuant to this Sale Order.

43.     The Sale is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts by the Buyer, if any, and the sale free and clear of all Interests or Claims (unless otherwise assumed in, or permitted by, the APA)), unless such authorization and consummation of such Sale are duly stayed pending such appeal.  The Buyer is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

44.     As a good-faith purchaser of the Purchased Assets, the Buyer has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets, and therefore the sale of the Purchased Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

45.     The Buyer shall use commercially reasonable efforts to comply with information requests from the Debtors' investors in connection with the requirements of the EB-5 Immigrant Investor Program.

46.     The failure specifically to include any particular provisions of the APA including any of the documents, agreements, or instruments executed in connection therewith in this Sale Order shall not diminish or impair the efficacy of such provision, document, agreement, or instrument, it being the intent of this Court that the APA and each document, agreement or instrument be authorized and approved in its entirety.

47.     Nothing contained in any other order in these chapter 11 cases (including any order entered after any conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Sale Order shall alter, conflict with, or derogate from, the provisions of the APA or this Sale Order.

48.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

49.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Sale Order shall govern.

50.     To the extent there are any inconsistencies between the terms of this Sale Order and the APA (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

51.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.

52.     The provisions of this Sale Order are nonseverable and mutually dependent.

53.     Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the local rules of this Court, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.

54.     This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

# **EXHIBIT 1**

## **Covenant Not to Sue Agreement**

### Covenant Not to Sue Agreement

This Covenant Not to Sue Agreement ("this Agreement") is made and entered into as of March [15], 2021, by and between Chloe Coscarelli, as an individual and on behalf of Chef Chloe LLC, CC Hospitality Holdings LLC and CKC Sales LLC and their respective parents, subsidiaries, affiliates or any of their respective officers, directors, shareholders, employees, consultants, agents, attorneys, bankers, accountants, advisors, assigns, successors, predecessors or representatives (collectively "Chloe"); the Sellers;[1] and the buyer parties set forth on the signature pages hereto (together with any newly formed entities to operate the Business post Closing, "Buyer", and together with Chloe and the Sellers, the "Parties").

### Background

A.  The Sellers and the Buyer have entered into an Asset Purchase Agreement, dated March 9, 2021 (Dkt. 303-1).

B.  The Sellers and the Buyer have submitted a proposed Sale Order to the Bankruptcy Court on March 9, 2021 (Dkt. 303-1) (the "Proposed Sale Order").

C.  Chloe filed objections to the Proposed Sale Order on March 10, 2021 (Dkt. 310) (the "Objection").

D.  To fully and finally resolve the Objection, the Parties enter into this Agreement under the terms below.

Therefore, in consideration of the good and valuable consideration set forth below, the Parties agree as follows:

1.  **Covenant Not to Sue for Temporary Use of the By Chloe Mark.** Except for any disputes over this Agreement, the Sellers (or any successor Chapter 7 trustee) and Chloe covenant not to sue and not to commence, assert, bring or file against the Buyer and their respective parents, subsidiaries, affiliates or any of their respective officers, directors, shareholders, employees, consultants, agents, attorneys, bankers, accountants, advisors, assigns, successors, predecessors or representatives, any legal, equitable, administrative, or arbitration proceeding, or exercise or attempt to exercise any other judicial or non-judicial remedies, based on the Buyer's exclusive use of the By Chloe Mark or other Excluded IP during the Interim Period (as defined in paragraph 2 below). Any Party may seek a hearing before the Bankruptcy Court on an expedited basis to resolve any dispute under this Agreement.

The Parties agree to replace paragraph 11 in the Proposed Sale Order with the following language:

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Proposed Sale Order (Dkt. 303-1) or the APA (Dkt. 303-1).

For the avoidance of doubt, the Purchased Assets do not include the By Chloe Mark, and the By Chloe Mark and the other Excluded IP set forth in the APA shall not be transferred to the Buyer in connection with the Sale; provided however, that the Buyer, the Sellers, and Chloe have entered into a covenant not to sue agreement dated March [15], 2021, the terms of which are approved and incorporated into this Order by reference (the "Covenant Not to Sue Agreement"). For the avoidance of doubt, the Buyer will not attempt to register the By Chloe Mark or any of the Excluded IP, alone or as part of Buyer's own service marks, trademarks, or tradenames, in the United States or with any other governmental entity anywhere in the world. Buyer will not represent that it has any ownership right in the By Chloe Mark or Excluded IP other than the rights provided in the Covenant Not to Sue Agreement or in this Sale Order.

The Parties agree that the Objection shall be deemed withdrawn with prejudice.

2. **Time period.** The Parties agree that the covenant not to sue in Paragraph 1 is expressly limited to a period of one hundred thirty five (135) days immediately after the Closing (the "Interim Period").

3. **Restrictions.**

    a. The Buyer represents and warrants that it will use the By Chloe Mark only to operate existing fast-casual vegan restaurants under the By Chloe brand during the Interim Period. For the avoidance of doubt, the Buyer represents and warrants that it will not use the By Chloe Mark for use with retail products. Also for the avoidance of doubt, the Buyer represents and warrants that it will not expand the use of the By Chloe Mark from any use existing as of the date of this Agreement during the Interim Period.

    b. The Buyer represents and warrants that it will not use or reference Chloe's name, face, or likeness during the Interim Period in connection with the operation or promotion of the Business; provided that the use of the By Chloe Mark during the Interim Period under this Agreement shall not be deemed to violate the preceding sentence; provided further that notwithstanding the foregoing, Buyer shall not be prohibited from referencing Chloe's name in the following three limited scenarios: (i) in any legal proceeding, litigation, hearing, subpoena, arbitration or mediation pending by or before any government authority, (ii) as otherwise required by law; or (iii) in response to any press statements, social media or other public statements, or press inquiries relating to press statements, social media or other public statements, made during the Interim Period by Chloe about the Buyer, the Sellers, the Business (past, present and future), the Bankruptcy Case or any other legal disputes among or relating to the Parties.

4. **Reservation of Rights.** The Parties agree to include this additional language in paragraph 20 of the Proposed Sale Order: "For the avoidance of doubt, except to the extent permitted under section 363 of the Bankruptcy Code, nothing in this Order exculpates or releases any direct or independent claim (known or unknown) that Chloe, Chef Chloe, or

any affiliated entity has or may have against the Buyer, including any of its past, present, or future members, partners, employees, affiliates, successors, assigns, advisors, or representatives and all such claims are preserved."

The Parties, intending to be legally bound, have duly executed this Agreement as set forth below.

**Chloe Coscarelli**

*Chloe Coscarelli*
_____
Chloe Coscarelli, individually, and
on behalf of Chef Chloe LLC,
CC Hospitality Holdings LLC and CKC Sales LLC

**Sellers**

BC Hospitality  Group Inc.

By: _____
Name: Patrick J. Bartels, Jr. _____
Title:   Authorized  Person _____


BC Hospitality  Group LLC

By: _____
Name: Patrick J. Bartels, Jr. _____
Title:   Authorized  Person _____


BC International  LLC

By: _____
Name: Patrick J. Bartels, Jr. _____
Title:   Authorized  Person _____


BC Commissary  NJ LLC

By: _____
Name: Patrick J. Bartels, Jr. _____
Title:   Authorized  Person _____


E2 185 Bleecker  LLC

By: _____
Name: Patrick J. Bartels, Jr. _____
Title:   Authorized  Person _____

E2 60 West 22nd Street LLC

By: _____
Name: Patrick J. Bartels, Jr. _____
Title:   Authorized  Person_____


E2 Lafayette  LLC

By: _____
Name: Patrick J. Bartels, Jr. _____
Title:   Authorized  Person_____


BC Williamsburg  LLC

By: _____
Name: Patrick J. Bartels, Jr. _____
Title:   Authorized  Person_____


BCRC LLC

By: _____
Name: Patrick J. Bartels, Jr._____
Title:   Authorized  Person_____


CW SSS LLC

By: _____
Name: Patrick J. Bartels, Jr._____
Title:   Authorized  Person_____


BC Union  Square LLC

By: _____
Name: Patrick J. Bartels, Jr._____
Title:   Authorized  Person_____

BC 1385 Broadway LLC

By: _____

Name: Patrick J. Bartels, Jr.

Title:   Authorized Person


BC 630 Lexington LLC

By: _____

Name: Patrick J. Bartels, Jr.

Title:   Authorized Person


CCSW Fenway LLC

By: _____

Name: Patrick J. Bartels, Jr.

Title:   Authorized Person


E2 Seaport LLC

By: _____

Name: Patrick J. Bartels, Jr.

Title:   Authorized Person


BC Back Bay LLC

By: _____

Name: Patrick J. Bartels, Jr.

Title:   Authorized Person


BC Providence LLC

By: _____

Name: Patrick J. Bartels, Jr.

Title:   Authorized Person

BC Silver Lake LLC

By:
Name: Patrick J. Bartels, Jr.
Title:   Authorized Person


BC Century City LLC

By:
Name: Patrick J. Bartels, Jr.
Title:   Authorized Person


BC West Hollywood LLC

By:
Name: Patrick J. Bartels, Jr.
Title:   Authorized Person

**BUYER:**

**BAIN CAPITAL DOUBLE IMPACT FUND, LP**,

By:  Bain Capital Double Impact Partners, LP
Its:  General Partner

By:  Bain Double Impact Investors, LLC
Its:  General Partner



By: _____
      Name: Todd Cook
      Title:  Authorized Signatory


**BCIP DOUBLE IMPACT ASSOCIATES, L.P.**,

By:  Boylston Coinvestors, LLC
Its:  General Partner



By: _____
      Name: Todd Cook
      Title:  Authorized Signatory


**KITCHEN FUND, LP**.


By: _____
      Name: Gregory Golkin


**KF-CHLOE, LLC**


By: _____
      Name: Gregory Golkin

**KITCHEN FUND, LP**.,

By: _____
    Name: Gregory Golkin


**KF-CHLOE, LLC**,

By: _____
    Name: Gregory Golkin

**QOOT INTERNATIONAL UK LIMITED**

By: _____
      Name:  Simon Wright


**LION/BC LLC**

By: _____
      Name:  Simon Brown,
              Attorney for Cottesmore Partners LLP,
              Managing Member of Lion/BC LLC


**COLLAB+CONSUMER I, L.P.**

By: _____
      Name:  Craig Shapiro

**QOOT INTERNATIONAL UK LIMITED**


By: _____
      Name:  Simon  Wright



**LION/BC LLC**

By: _____
      Name:  Simon Brown,
                  Attorney for Cottesmore Partners LLP,
                  Managing Member of Lion/BC LLC



**COLLAB+CONSUMER I, L.P.**


By: _____
      Name:  Craig Shapiro

**QOOT INTERNATIONAL UK LIMITED**


By: _____
    Name:  Simon Wright


**LION/BC LLC**


By: _____
    Name:  Simon Brown,
            Attorney for Cottesmore Partners LLP,
            Managing Member of Lion/BC LLC


**COLLAB+CONSUMER I, L.P.**
By: Collab+Consumer GP, LLC
Its: General Partner


By: _____
    Name:  Craig Shapiro, Managing Director

## **EXHIBIT 2**

**Asset Purchase Agreement**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of March 9, 2021 (the "***Effective Date***"), is entered into by and between BC Hospitality Group Inc., a Delaware corporation ("***BC Hospitality***"), each of the entities listed on Schedule A attached hereto (together with BC Hospitality, each a "***Seller***" and collectively, the "***Sellers***"), and the parties set forth on the signature pages hereto (each, a "***Buyer Party***" and collectively, the "***Buyer***"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in Article I hereof.

WHEREAS, Sellers are engaged in the business of fast casual dining, operating a 100 percent vegan and plant-based restaurant chain under the name By Chloe (the "***Business***");

WHEREAS, Sellers commenced voluntary cases (collectively, the "***Bankruptcy Case***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") on December 14, 2020 (the "***Petition Date***");

WHEREAS, on January 7, 2021, the Bankruptcy Court entered an order [Docket No. 102] (as amended, the "***Bidding Procedures Order***") approving bid procedures for the sale of Sellers' assets or the issuance of new equity interests in the reorganized Sellers (the "***Bid Procedures***"), scheduling an auction for and hearing to approve the sale and approving the form and manner of notices related thereto;

WHEREAS, on February 19, 2021, the Sellers and Buyer entered into that certain Plan Funding Agreement (the "***Plan Funding Agreement***") pursuant to which the parties agreed that Buyer would acquire the new equity interests issued by the reorganized Sellers pursuant to the terms and conditions set forth therein;

WHEREAS, following the Bankruptcy Court's ruling on March 1, 2021 regarding the Sellers' ownership rights with respect to the By Chloe Mark, the condition precedent set forth in Section 7.2(e) of the Plan Funding Agreement was not fulfilled and therefore, Sellers and Buyer mutually consent and agree that the Plan Funding Agreement was terminated in accordance with the terms therein and the parties intend for this Agreement to amend and supersede the Plan Funding Agreement and the bid and transactions contemplated therein;

WHEREAS, Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from Sellers, certain specified assets and certain specified liabilities of the Business, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with §§ 105, 363 and 365 and other applicable provisions of the Bankruptcy Code;

WHEREAS, the Purchased Assets and Assumed Liabilities are assets and liabilities of Sellers that are to be purchased by Buyer pursuant to the Sale Order all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code;

WHEREAS, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order; and

WHEREAS, the restructuring committee, board of managers, board of directors or other applicable governing body of each Seller has determined that it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the contemplated transactions provided for herein pursuant to this Agreement, the Bidding Procedures Order, the Sale Order and has approved Sellers' entry into this Agreement, subject to higher and/or otherwise better offers as contemplated by the Bidding Procedures Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"*Accounts Receivable*" has the meaning set forth in Section 2.1(a).

"*Action*" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity, including all claims, cross claims, and causes of action of Sellers, including, all claims and causes of action arising under Sections 542 through 553 of the Bankruptcy Code existing at Closing.

"*Affiliate*" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Allocable Consideration*" has the meaning set forth in Section 2.6.

"*Allocation Notice of Objection*" has the meaning set forth in Section 2.6.

"*Allocation Schedule*" has the meaning set forth in Section 2.6.

"*Alternative Transaction*" means a transaction or series of related transactions pursuant to which Sellers accept a bid for all or a substantial and material portion of the Purchased Assets or any group of assets that includes all or a substantial and material portion of the Purchased Assets or outstanding securities of the reorganized Sellers, from a Person other than Buyer or any Affiliate of Buyer (or a group or joint venture that includes Buyer or any Affiliate of Buyer), as the highest and/or otherwise best offer, in accordance with the Bidding Procedures Order or otherwise, but shall exclude sales of goods or services of the Business conducted in the Ordinary Course of Business.

"*Ancillary Documents*" means the Bill of Sale, the Assignment and Assumption Agreement, the IP Assignment Agreement, and the other agreements, instruments and documents required to be delivered at the Closing.

"*Assigned Contracts*" has the meaning set forth in <u>Section 2.1(c)</u>.

"*Assigned Leases*" means the Leases that constitute Assigned Contracts as set forth in <u>Section 2.1(c)</u>.

"*Assignment and Assumption Agreement*" has the meaning set forth in <u>Section 3.2(a)(ii)</u>.

"*Assumed Liabilities*" has the meaning set forth in <u>Section 2.3</u>.

"*Auction*" means an auction conducted by Sellers in accordance with the Bid Procedures.

"*Backup Bid*" has the meaning set forth in the Bid Procedures.

"*Backup Bidder*" has the meaning set forth in the Bid Procedures.

"*Bankruptcy Case*" has the meaning set forth in the Recitals.

"*Bankruptcy Code*" has the meaning set forth in the Recitals.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

"*Bid Procedures*" has the meaning set forth in the Recitals.

"*Bidding Procedures Order*" has the meaning set forth in the Recitals.

"*Bill of Sale*" has the meaning set forth in <u>Section 3.2(a)(i)</u>.

"*Books and Records*" has the meaning set forth in <u>Section 2.1(i)</u>.

"*Business*" has the meaning set forth in the Recitals.

"*Business Confidential Information*" has the meaning set forth in <u>Section 6.5</u>.

"*Business Day*" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"*Buyer*" has the meaning set forth in the preamble.

"*Buyer Party*" has the meaning set forth in the preamble.

"*Buyer Closing Certificate*" has the meaning set forth in <u>Section 7.3(d)</u>.

"*By Chloe Mark*" has the meaning set forth in that certain Operating Agreement of CCSW LLC, dated as of November 7, 2014.

"*Cash Consideration*" has the meaning set forth in <u>Section 2.5(a)</u>.

"*Closing*" has the meaning set forth in <u>Section 3.1</u>.

"*Closing Date*" has the meaning set forth in <u>Section 3.1</u>.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Competing Bid***" has the meaning set forth in <u>Section 6.12(a)</u>.

"***Continuing Restaurant***" means any of Sellers' restaurant locations with respect to which the associated Leases are Assigned Leases.

"***Contracts***" means all contracts, Leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral, other than Employee Benefit Plans.

"***Cure Costs***" has the meaning set forth in <u>Section 2.8</u>.

"***Disclosure Schedules***" means the Disclosure Schedules delivered by Sellers concurrently with the execution and delivery of this Agreement by Sellers.

"***DIP Order***" means the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 103], entered by the Bankruptcy Court on January 7, 2021.

"***Dollars or $***" means the lawful currency of the United States.

"***Effective Date***" has the meaning set forth in the preamble.

"***Employee Benefit Plans***" means (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA); (ii) all employment, consulting, non-competition, employee nonsolicitation, employee loan or other compensation agreements; (iii) all collective bargaining agreements; and (iv) all bonus or other incentive compensation, equity or equity-based compensation, stock  purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, Section 125 cafeteria, dependent care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, whether written or unwritten, qualified or unqualified, funded or unfunded and all underlying insurance policies, trusts and other funding vehicles, in each case currently maintained by Sellers for current or former employees of Sellers.

"***Encumbrance***" means any charge, claim (as defined in Section 101(5) of the Bankruptcy Code), community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations and formal guidance issued thereunder.

"***Excluded Assets***" has the meaning set forth in <u>Section 2.2</u>.

"***Excluded Contracts***" has the meaning set forth in <u>Section 2.2(a)</u>.

"*Excluded IP*" means those assets included on <u>Schedule 2.2(p)</u>.

"*Excluded IP License*" has the meaning set forth in <u>Section 3.3</u>.

"*Excluded Liabilities*" has the meaning set forth in <u>Section 2.4</u>.

"*Excluded Restaurants*" has the meaning set forth in <u>Section 2.9.</u>

"*Excluded Restaurant Stub Rent*" means the rent due for the period between the Petition Date and December 31, 2020, with respect to those Leases that were designated as Assigned Leases on the date of this Agreement but prior to Closing were designated as Excluded Assets pursuant to <u>Section 2.8</u>.

"*FIRPTA Certificate*" has the meaning set forth in <u>Section 7.2(e)</u>.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"*Governmental Order*" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"*Intellectual Property*" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("*Patents*"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("*Trademarks*"); (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("*Copyrights*"); (d) internet domain names and social media account or user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not Copyrights; (e) mask works, and all registrations, applications for registration, and renewals thereof; (f) industrial designs, and all Patents, registrations, applications for registration, and renewals thereof; (g) trade secrets, know-how, inventions (whether or not patentable), recipes, menus, discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques and all rights therein ("*Trade Secrets*"); (h) computer programs, operating systems, applications, firmware and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof ("*Software*"); and (i) all other intellectual or industrial property and proprietary rights.

"*Intellectual Property Agreements*" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions

and other Contracts, whether written or oral, relating to any Intellectual Property that is used or held for use in the conduct of the Business as currently conducted to which a Seller is a party, beneficiary or otherwise bound; provided, however, the forgoing shall exclude any "off-the-shelf" Software license contracts.

"***Intellectual Property Assets***" means, except for the Excluded IP, all Intellectual Property that is owned by a Seller or licensed to a Seller and used or held for use in the conduct of the Business as currently conducted, together with all (i) royalties, fees, income, payments, and other proceeds hereafter due or payable to a Seller with respect to such Intellectual Property; and (ii) claims and causes of action with respect to such Intellectual Property, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation, or other violation thereof; provided, however, the foregoing shall exclude any "off-the-shelf" Software.

"***Inventory***" has the meaning set forth in Section 2.1(b).

"***IP Assignment Agreement***" has the meaning set forth in Section 3.2(a)(iii).

"***Law***" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"***Leased Property***" means the property subject to the Assigned Leases.

"***Leases***" means all real property leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto.

"***Liabilities***" means any and all debts, Losses, liabilities, claims (including "claims" as defined in the Bankruptcy Code) obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"***Licensed Intellectual Property***" means all Intellectual Property in which a Seller holds any rights or interests granted by other Persons; provided, however, the foregoing shall exclude any "off-the-shelf" Software.

"***Losses***" means losses, damages, liabilities, deficiencies, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees.

"***Material Adverse Effect***" means a material adverse change in any of (a) the condition (financial or otherwise) or business, performance, operations of the Business taken as a whole; (b) the ability of the Sellers to perform their obligations under the Sale Documents; or (c) the validity or enforceability of the Sale Documents or the rights and remedies of the Buyer under any of the Sale Documents; provided, however, that a Material Adverse Effect will not be deemed to include (i) changes as a result of the commencement of the Bankruptcy Case and the financial condition of the Sellers in the aggregate or (ii) events or conditions arising from changes in general business or economic conditions.

"***Material Contract***" means Contracts to which a Seller is a party that by their terms require annual payments by a Seller to the counterparty of more than $100,000.

"***Offeree***" has the meaning set forth in Section 6.14(a).

"*Order*" means any judgment, order, writ, decree, injunction or other determination whatsoever of any Governmental Authority or any other entity or body whose finding, ruling or holding is legally binding or is enforceable as a matter of right (in any case, whether preliminary or final).

"*Ordinary Course*" means the ordinary course of business consistent with past custom and practice, subject to any Orders of the Bankruptcy Court and Sellers' status as, and operation of the Business as, debtors-in-possession.

"*Other Acceptable Order*" shall have the meaning set forth in <u>Section 6.12(b)</u>.

"*Outside Date*" has the meaning set forth in <u>Section 3.1</u>.

"*Permit*" means any permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"*Permitted Encumbrances*" means (a) Encumbrances for utilities and current Taxes not yet due and payable or that are due but may not be paid as a result of the commencement of the Bankruptcy Case or are being contested in good faith by appropriate procedures; (b) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Business or the use or occupancy of any Leased Property as it relates to the operation of the Business; (c) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law); (d) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the Ordinary Course; (e) non-exclusive licenses of Intellectual Property; and (f) licenses, covenants not to sue and similar rights granted with respect to intellectual property; it being understood that the Sale Order shall extinguish liens to the maximum extent permissible under applicable Law (including, for the avoidance of doubt, all Encumbrances set forth in clauses (a) and (d) hereof).

"*Person*" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"*Petition Date*" has the meaning set forth in the Recitals.

"*Pre-Closing Tax Period*" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"*Privileged Communications*" means any records, information, ledgers, files, invoices, documents, work papers, work product, drafts, presentations, analysis, correspondence, summaries, or similar items that, in whole or part, constitutes privileged communications between a Seller and such Seller's counsel or other professional advisors, or any records, information, documents, correspondence that if disclosed would violate any privacy or confidentiality Laws.

"*Purchase Price*" has the meaning set forth in <u>Section 2.5</u>.

"*Purchased Assets*" has the meaning set forth in <u>Section 2.1</u>.

 "***Representative***" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"***Sale Documents***" means this Agreement and the Ancillary Documents.

"***Sale Hearing***" means the hearing before the Bankruptcy Court to approve the transactions contemplated herein.

"***Sale Order***" has the meaning set forth in <u>Section 6.12(b)</u>.

"***Seller(s)***" has the meaning set forth in the preamble.

"***Seller Closing Certificate***" has the meaning set forth in <u>Section 7.2(d)</u>.

"***Seller Representative***" has the meaning set forth in <u>Section 9.2(a)</u>.

"***Sellers' Knowledge***" or any other similar knowledge qualification, means the actual knowledge of the Officers of the Seller Representative.

"***Solicitation Procedures***" means the *Order (I) Establishing Solicitation and Tabulation Procedures; (II) Approving the Form of Ballot and Solicitation Materials; (III) Establishing the Voting Record Date; (IV) Fixing the Date, Time and Place for the Confirmation Hearing and the Deadline for Filing Objections Thereto; and (V) Granting Related Relief* [Docket No. 174], entered by the Bankruptcy Court on January 22, 2021.

"***Tangible Personal Property***" has the meaning set forth in <u>Section 2.1(e)</u>.

"***Tax***" or "***Taxes***" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"***Tax Return***" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"***Transferred Employees***" has the meaning set forth in <u>Section 6.14(a)</u>.

"***Winning Bid***" has the meaning set forth in the Bid Procedures.

"***Winning Bidder***" has the meaning set forth in the Bid Procedures.

**ARTICLE II**

**PURCHASE AND SALE**

2.1     **Purchase and Sale of Assets**.     Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and subject to the terms and conditions set forth herein and the Sale Order, at the Closing, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers, free and clear of any Encumbrances other than Permitted Encumbrances and Excluded Liabilities, all of Sellers' right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), which are used or held for use in connection with, the Business (collectively, the "***Purchased Assets***"), including, without limitation, the following:

(a)     all accounts or notes receivable held by Sellers related to Continuing Restaurants as of the Closing Date, including credit card receivables as of the Closing Date, and any security, claim, remedy or other right related to any of the foregoing ("***Accounts Receivable***");

(b)     all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories, whether in the physical possession of a Seller or another party, located at the Continuing Restaurants ("***Inventory***");

(c)     all Contracts set forth on Schedule 2.1(c) (the "***Assigned Contracts***"), which shall include the Assigned Leases;

(d)     all Intellectual Property Assets, which, for the avoidance of doubt, shall exclude (i) the Excluded IP; and (ii) those Intellectual Property Assets that are Licensed Intellectual Property and for which the underlying Intellectual Property Agreement is not an Assigned Contract;

(e)     all furniture, fixtures (excluding real property fixtures), equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones, assets leased to third parties pursuant to any Assigned Contracts, and other tangible personal property related to the Continuing Restaurants (the "***Tangible Personal Property***");

(f)     all rights to any Actions of any nature available to or being pursued by a Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(g)     all claims, refunds, credits, allowances, rebates, rights of recovery, rights of set-off, rights of recoupment, deposits, security deposits, advances, prepayments, prepaid charges and expenses and related sums and fees that relate to the Purchased Assets as of the Closing Date;

(h)     all of Sellers' rights under warranties, representations, guarantees, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(i)     originals, or where not available, copies, of all books and records, including, but not limited to, books of account and ledgers machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files,

records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets and the Intellectual Property Agreements, except books and records related to corporate governance or tax matters (e.g., minute books, capitalization records and tax records), and books and records that constitute Privileged Communications ("***Books and Records***");

(j)        all goodwill and the going concern value of the Business;

(k)        all cash, cash equivalents, bank deposits and similar cash items of Sellers, excluding the Purchase Price, amounts paid by Buyer at Closing, proceeds of the DIP Financing or any amounts earmarked for Ordinary Course Claims and professional fees pursuant to the Approved Budget (as defined in the DIP Order);

(l)        all open purchase orders related to the Continuing Restaurants;

(m)        all of the Sellers' telephone numbers, fax numbers, email addresses, websites, and URLs related to the Continuing Restaurants;

(n)        all Permits, and all pending applications therefor, related to the Continuing Restaurants to the extent such Permits and pending applications therefor are transferrable;

(o)        all Employee Benefit Plans relating to the Transferred Employees and all assets of or relating to such Employee Benefit Plans; provided that Sellers shall make reasonable best efforts to cause the transfer of each such Employee Benefit Plan to Buyer as of the Closing without any additional cost to Buyer (either in respect of such transfer or the cost of maintaining such Employee Benefit Plan from and after the Closing);

(p)        all insurance and tax deposits or refunds owing to a Seller;

(q)        the refunds for all utility, tax, rent and insurance deposits or premiums paid by a Seller after the Petition Date;

(r)        the Excluded IP License; and

(s)        all other assets that are related to or used in connection with the Purchased Assets, the Continuing Restaurants or the Business, but excluding all of the Excluded Assets.

2.2        **Excluded Assets**. Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "***Excluded Assets***"):

(a)        all Contracts other than the Assigned Contracts (the "***Excluded Contracts***");

(b)        the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Sellers;

(c)        the assets, properties and rights specifically set forth on <u>Schedule 2.2(c)</u>;

(d)        deposits held by Seller in connection with any Excluded Contracts;

(e)     all utility, tax and other deposits or refunds owing to a Seller with respect to Excluded Contracts (including Leases that are not Assigned Leases) and Excluded Restaurants;

(f)     all insurance, policies and insurance agreements, including directors and officers insurance policies;

(g)     the rights which accrue or will accrue to Sellers under this Agreement and the Sale Documents;

(h)     books and records (i) that relate to corporate governance or tax matters of the Business, or (ii) that constitute Privileged Communications;

(i)     any assets expressly excluded from Purchased Assets pursuant to Section 2.1;

(j)     all equity interests held by any Seller including any such interests of any Seller in another Seller;

(k)     all liabilities related to employee-related obligations accruing prior to the Closing other than those assumed in accordance with Section 2.1(o) and Section 2.3(e);

(l)     all of Sellers' right, title and interest in and to all of the assets primarily related to the Excluded Restaurants;

(m)     Inventory located at an Excluded Restaurant;

(n)     all open purchase orders related to the Excluded Restaurants;

(o)     all accounts or notes receivable held by Sellers related to Excluded Restaurants; and

(p)     the Excluded IP, subject to the Excluded IP License.

Buyer shall have the right, exercisable in Buyer's sole discretion at any time prior to the Sale Hearing, to designate any of the Purchased Assets as Excluded Assets; provided, however, that designating Purchased Assets as Excluded Assets shall not affect the Purchase Price.

2.3     **Assumed Liabilities**. Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Sellers (collectively, the "***Assumed Liabilities***"), and no other Liabilities:

(a)     the Cure Costs with respect to the Assigned Contracts;

(b)     all Liabilities in respect of the Assigned Contracts but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date and do not arise from any failure to perform, improper performance, warranty or other breach, default or violation by a Seller on or prior to the Closing;

(c)     all Liabilities arising from the conduct of the Business or the use or operation of the Purchased Assets by Buyer from and after the Closing;

11

(d)      Taxes that (i) arise out of the consummation of the transactions contemplated hereby or (ii) that are otherwise the responsibility of Buyer pursuant to <u>Section 6.9</u> and <u>Section 6.10</u>;

(e)      all Employee Benefit Plans set forth in <u>Section 2.1(o)</u> and all assets of or relating to such Employee Benefit Plans; and

(f)      Excluded Restaurant Stub Rent.

2.4      **Excluded Liabilities**. Notwithstanding the provisions of <u>Section 2.3</u> or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Sellers or any of their Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "***Excluded Liabilities***"). Notwithstanding anything to the contrary set forth in this Agreement, nothing in this Agreement shall require or obligate the Sellers to pay, satisfy or otherwise discharge a liability that is not assumed by Buyer or is an Excluded Asset.

2.5      **Purchase Price**.

(a)      The aggregate consideration for the sale and transfer of the Purchased Assets shall be (the "***Purchase Price***"):  (i) the assumption by the Buyer of the Assumed Liabilities; (ii) payment of $333,000 in cash (the "***Cash Consideration***"); and (iii) the amount set forth in <u>Seciton 2.5(b)</u>, if applicable.  At the Closing, Buyer shall pay the Purchase Price (except for the amount set forth in <u>Seciton 2.5(b)</u>, if applicable).

(b)      In the event that Closing does not occur on or prior to March 19, 2021, Buyer agrees to fund additional cash to Seller in the amount of $30,000, which shall be paid to an account designated by Seller, shall be nonrefundable and shall be paid no later than noon Eastern Time on March 22, 2021.

2.6      **Allocation of Purchase Price**. Sellers and Buyer agree that the Purchase Price and the Assumed Liabilities as well as any other items constituting the amount realized for Tax purposes (the "***Allocable Consideration***") will be allocated among the Purchased Assets in a manner consistent with, and to the extent necessary to comply with, Section 1060 of the Code and any Treasury Regulations promulgated thereunder. Buyer will, no later than ninety (90) days following the Closing Date, prepare and deliver to Seller Representative a schedule setting forth the allocation of the Allocable Consideration in accordance with the preceding sentence (the "***Allocation Schedule***").  Sellers will have forty-five (45) days following delivery of the Buyer's proposed Allocation Schedule to submit any objections thereto setting forth in reasonable detail the basis of their objections (the "***Allocation Notice of Objection***").  If Sellers fail to deliver an Allocation Notice of Objection in accordance with this <u>Section 2.6</u>, the Buyer's proposed Allocation Schedule will be conclusive and binding on all parties.  If Sellers submit an Allocation Notice of Objection,  Buyer and Seller Representative will endeavor for a period of not less than thirty (30) days to resolve any disputes related to the Allocation Schedule.  Neither Buyer nor any Seller will take any position that is contrary to or inconsistent with the Allocation Schedule for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns).  In the event that the Allocation Schedule is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation Schedule. Notwithstanding any provision of this <u>Section 2.6</u> to the contrary, if Buyer and Seller Representative are not able to agree to the Allocation Schedule, each party shall be allowed to

use that party's own formulation with respect to the allocation of the Purchase Price and the Assumed Liabilities.

2.7    **Third Party Consents**. To the extent that a Seller's rights under any Contract or Permit constituting a Purchased Asset, or any other Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained and such consent right is not otherwise overridden by operation of the Bankruptcy Code, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, provided, however, that, subject to the satisfaction or waiver of the conditions contained in Article VII, the Closing shall occur notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof, and each Seller and Buyer, each at its own expense, shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent(s) as promptly as possible.

2.8    **Assigned Contracts; Cure Costs**. The Assigned Contracts are to be designated by Buyer and to be assumed and assigned on the Closing Date in accordance with the Bidding Procedures Order, the Sale Order and the Solicitation Procedures Order.  Notwithstanding anything in this Agreement to the contrary, Buyer may, in its sole and absolute discretion, amend or revise Schedule 2.1(c) setting forth the Assigned Contracts, in order to add any Contract to, or eliminate any Contract from, such Schedule at any time during the period commencing on the date of this Agreement and ending on the date that is one (1) Business Day prior to the Closing. Automatically upon the addition of any Contract to Schedule 2.1(c), such Contract shall be an Assigned Contract for all purposes of this Agreement. Automatically upon the removal of any Contract from Schedule 2.1(c), such Contract shall be an Excluded Asset for all purposes of this Agreement, and no liabilities arising thereunder shall be assumed or borne by the Buyer unless such liability is otherwise specifically assumed pursuant to Section 2.3. With respect to each of the Assigned Contracts assigned to Buyer on the Closing Date, Buyer shall pay on the Closing Date all amounts necessary to cure any monetary default (as distinct from curing all defaults or failures to comply with provisions thereunder that may not be cured by the mere payment of money) that are required to be paid pursuant to section 365 of the Bankruptcy Code, the Bidding Procedures, the Sale Order and the Solicitation Procedures Order in order to assume and assign the Assigned Contracts to Buyer (collectively, the "***Cure Costs***").

2.9    **Excluded Locations**.

Any of Sellers' restaurant locations with respect to which the associated Leases have not been designated by Buyer as Assigned Contracts in accordance with Section 2.1(c) shall be deemed to have been classified as "***Excluded Restaurants***."

## ARTICLE III

## CLOSING; POST-CLOSING MATTERS

3.1    **Closing**. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "***Closing***") shall take place remotely via the exchange of documents and signatures on such date as may be agreed to by the Sellers and the Buyer, but in no event later than March 23, 2021 (the "***Outside Date***"), or in such other manner as will be mutually acceptable between Buyer and Sellers.  The date on which the Closing is to occur is herein referred to as the "***Closing Date***".

3.2    **Closing Deliverables**.

(a)        At the Closing, Sellers shall deliver to Buyer the following:

(i)        one or more bill of sales, in a form to be agreed to among the parties prior to Closing (the "***Bill of Sale***"), and duly executed by the applicable Sellers, transferring the Tangible Personal Property included in the Purchased Assets to Buyer;

(ii)        one or more assignment and assumption agreements, in a form to be agreed to among the parties prior to Closing (the "***Assignment and Assumption Agreement***"), and duly executed by the applicable Sellers, effecting the assignment to and assumption by Buyer of the Assigned Contracts;

(iii)        one or more intellectual property assignment agreements, in a form to be agreed to among the parties prior to Closing (the "***IP Assignment Agreement***"), and duly executed by the applicable Sellers, effecting the assignment to and assumption by Buyer of the Intellectual Property Assets;

(iv)        the Seller Closing Certificate;

(v)        the FIRPTA Certificate;

(vi)        possession of all the Purchased Assets; provided that Purchased Assets shall be deemed delivered to the extent located on Leased Property;

(vii)        a copy of the Sale Order entered by the Bankruptcy Court; and

(viii)        such other duly executed customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)        At the Closing, Buyer shall deliver to Seller Representative the following:

(i)        the Cash Consideration by wire transfer of immediately available funds to an account designated in writing by Sellers to Buyer;

(ii)        the Assignment and Assumption Agreement, duly executed by the Buyer;

(iii)        the Buyer Closing Certificate; and

(iv)        the certificate of the Secretary of Buyer required by Section 7.3(d).

3.3        **Limited Purpose License of Excluded IP.**  Effective as of the Closing, Sellers hereby grant to Buyer a non-exclusive, transferable, sublicensable, perpetual, worldwide, irrevocable right and license to use the Excluded IP for a period of six (6) months after the Closing (the "***Interim Period***") for the purpose of manufacturing, using, selling, offering for sale, importing, exporting, creating, reproducing, distributing, marketing, promoting or otherwise exploiting the Purchased Assets in any form in connection with the Business (the "***Excluded IP License***").  Buyer agrees that Buyer's use of the Excluded IP shall be expressly limited to and consistent with Sellers' past usage of the Excluded IP.  For the avoidance of doubt, Buyer acknowledges and agrees that Sellers own the Excluded IP and

Buyer will not challenge in any court of law or in any other manner the validity of the Excluded IP or Sellers' exclusive ownership of the Excluded IP. Buyer will not attempt to register the Excluded IP, alone or as part of Buyer's own service marks, trademarks, or tradenames, in the United States or with any other governmental entity anywhere in the world. In connection with Buyer's use of the Excluded IP, Buyer will not in any manner represent that it has any ownership right in the Excluded IP. Buyer shall cause each sub-licensee, if any, to agree to and comply with the provisions of this Section 3.3 to the same extent such provisions apply to Buyer.

The Sale Order shall provide that during the Interim Period, the Sellers (or any successor chapter 7 trustee), Chloe Coscarelli, Chef Chloe, LLC and their affiliates shall not be permitted to oppose, petition to cancel, commence a legal action or otherwise challenge, object to or interfere with the Buyer's use of the Excluded IP; provided that if the Sellers (or any successor chapter 7 trustee), Chloe Coscarelli, Chef Chloe, LLC and their affiliates determine in good faith that such use violates the terms hereof and the Sale Order, such parties may seek a hearing before the Bankruptcy Court on an expedited basis to resolve such dispute. Following the expiration of the Interim Period, Buyer's rights to the Excluded IP shall terminate.

3.4    **Transition Services.** Prior to the Closing Date, Sellers and Buyer, to the extent they deem necessary or desirable, shall negotiate in good faith and enter into a transition services agreement pursuant to which the Parties shall use commercially reasonable efforts to assist the other Parties in accomplishing a smooth transition of the Business from Sellers to Buyer. The Parties shall use commercially reasonable efforts to obtain any consents, waivers or approvals from third parties that are necessary for the provision and receipt of services under the transition services agreement.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF SELLERS**

As a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated herein, subject to the entry of the Sale Order, each Seller represents and warrants to Buyer that the statements contained in this Article IV, except as set forth in the correspondingly numbered Section of the Disclosure Schedules, as to such Seller, are true and correct as of the date hereof.

4.1    **Organization and Qualification of Sellers**. Each Seller is a corporation or limited liability company duly organized or formed, as applicable, validly existing and in good standing under the Laws of the state of such Seller's organization or formation, as applicable, and has full entity power and authority to own, operate or lease the properties and assets now owned, operated or leased by such Seller and to carry on the Business as currently conducted.

4.2    **Authority of Sellers**. The execution and delivery of this Agreement by each Seller, the sale of the Purchased Assets, and the performance of the obligations of such Seller contemplated hereby have been duly and validly authorized by all necessary action. Each Seller has the right, power, authority, and legal capacity to enter into and perform this Agreement and the transaction contemplated hereby, and this Agreement constitutes the valid and binding agreement of such Seller, enforceable against such Seller in accordance with its terms, subject to the approval of the Bankruptcy Court.

4.3    **No Conflicts; Consents**. The execution, delivery and performance by each Seller of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the

transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, bylaws or other organizational documents of such Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to such Seller, the Business or the Purchased Assets owned by such Seller; or (c) except as set forth in <u>Schedule 4.3</u> of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that would constitute a default under, or result in the acceleration of any Material Contract of such Seller; except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a Material Adverse Effect. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to each Seller in connection with the execution and delivery of this Agreement or any of the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby by such Seller.

4.4    **Title to Purchased Assets**.  Each Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets owned by such Seller.  All such Purchased Assets are free and clear of Encumbrances except for Permitted Encumbrances.

4.5    **Legal Proceedings; Governmental Orders**.

(a)    Except as set forth in <u>Schedule 4.5(a)</u> of the Disclosure Schedules, there are no Actions pending or, to Sellers' Knowledge, threatened against or by any Seller (a) relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities; or (b) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement, which, in each case, if determined adversely to such Seller would result in a Material Adverse Effect.

(b)    There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Business which would have a Material Adverse Effect.

4.6    **Compliance With Laws**.  Each Seller has at all times been in material compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets by such Seller.

4.7    **Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Sellers.

4.8    **Permits**. <u>Schedule 4.8</u> contains a list of all material Permits that Sellers hold as of the date hereof in connection with the operations of the Business. As of the date hereof, there is no litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Permits, except where a failure of this representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect. To Sellers' Knowledge, all required filings with respect to the Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect.

4.9     **Contracts**.  Sellers have made available, or within five (5) days of the date hereof shall make available, to Buyer true and complete copies of all Material Contracts, as amended, supplemented or otherwise modified through the date hereof.

4.10    **Real Property.**

(a)     Schedule 4.10(a) sets forth a complete list of all of the Leased Property and a true and complete list of all Leases for such Leased Property.  Sellers have made available, or within five (5) days of the date hereof shall make available, to Buyer true and complete copies of such Leases, as amended, supplemented or otherwise modified through the date hereof.

(b)     Sellers do not own any real property.

4.11    **No Other Representations and Warranties**.  Except for the representations and warranties contained in this Article IV (including the related portions of the Disclosure Schedules), no Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of such Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated herein, subject to the entry of the Sale Order, Buyer represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the date hereof.

5.1     **Organization of Buyer**.  Each Buyer Party referenced on the signatures pages hereto is duly organized, validly existing, in good standing and qualified to do business in the jurisdiction of its organization.

5.2     **Authority of Buyer**.  Each Buyer Party has full corporate power and authority to enter into this Agreement and the Ancillary Documents to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by each Buyer Party of this Agreement and any Ancillary Document, the performance by Buyer of its respective obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of each Buyer Party.  This Agreement has been duly executed and delivered by each Buyer Party, and (assuming due authorization, execution and delivery by Sellers) this Agreement constitutes a legal, valid and binding obligation of each Buyer Party enforceable against each Buyer Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally.  When each Ancillary Document of each Buyer Party is or will be a party has been duly executed and delivered by such Buyer Party (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of such Buyer Party enforceable against it in accordance with

its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally.

5.3    **No Conflicts; Consents**.  The execution, delivery, and performance by a Buyer Party of this Agreement and the Ancillary Documents to which Buyer is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the articles of incorporation or other organizational documents of such Buyer Party; (b) violate or conflict with any provision of any Law or Governmental Order applicable to such Buyer Party; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

5.4    **Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Buyer.

5.5    **Sufficiency of Funds**. Buyer has sufficient cash on hand and has other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

5.6    **Legal Proceedings**.  There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement; and no event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

5.7    **"As Is" Transaction**. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV ABOVE, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR OTHER CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS WHICH ARE  THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED

ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." FURTHERMORE BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSIGNED CONTRACTS FORMING PART OF THE PURCHASED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH CONTRACTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

## ARTICLE VI

## COVENANTS

6.1    **Conduct of Business Prior to the Closing**. From the date hereof until the Closing, except as consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Sellers shall use commercially reasonable efforts to maintain and preserve intact the Business and the Purchased Assets in the Ordinary Course.  Among other things, no Seller shall assume, reject or assign any Contract of Lease that may become an Assigned Contract other than with Buyer's consent or through the procedures contemplated by this Agreement.

6.2    **Access to Information**.

(a)    From and after the date of this Agreement until the Closing Date, Sellers shall, upon reasonable advance notice, afford Buyer's officers, independent public accountants, counsel, consultants and other representatives, reasonable access during normal business hours to the Purchased Assets and all records pertaining to the Purchased Assets; provided, however, notwithstanding the foregoing (x) Buyer shall not be entitled to access any materials containing Privileged Communications, (y) prior to Closing, upon advance notice to Seller Representative, Buyer shall be permitted to contact any suppliers to, or customers or landlords of, the Business, and (z) prior to Closing, without the prior written consent of Seller Representative, which consent shall not be unreasonably conditioned, withheld or delayed, Buyer shall have no right to perform invasive or subsurface investigations of the Leased Property.  Buyer shall, and shall cause its Representatives to, maintain confidentiality with respect to any access or information provided pursuant to this Section 6.2(a).  Reasonable access to Records shall include (i) the right of Sellers' professionals to copy, at Sellers' expense, such documents and records as Sellers may request in furtherance of the purposes described above and (ii) Buyer's copying and delivering to a Seller such documents or records as such Seller may request, but only to the extent a Seller furnishes Buyer with reasonably detailed written descriptions of the materials to be so copied and such Seller reimburses Buyer for the reasonable costs and expenses thereof.

(b)    Buyer may not communicate with those counterparties to Assigned Contracts, without the prior written consent of Seller Representative, which consent shall not be unreasonably conditioned, withheld or delayed.

6.3    **Notice of Certain Events**.

(a)    From the date hereof until the Closing, Seller Representative shall promptly notify Buyer in writing of:

(i)    any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had a Material Adverse Effect, (B) has resulted in any representation or warranty made by a Seller hereunder not being true and correct or (C) has resulted in the failure of any of the conditions set forth in Section 7.2 to be satisfied;

(ii)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iii)    any Actions commenced or, to Sellers' Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.5 or that relates to the consummation of the transactions contemplated by this Agreement.

(b)    Buyer's receipt of information pursuant to this Section 6.3 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by a Seller in this Agreement (including Section 8.1(b)) and shall not be deemed to amend or supplement the Disclosure Schedules.

6.4    **Employees and Employee Benefits**. Except as provided in Sections 2.1(o) and 2.3(e), Sellers shall be solely responsible, and Buyer shall have no obligation whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of any Seller, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with a Seller at any time on or prior to the Closing Date.

6.5    **Confidentiality**. Buyer covenants and agrees to keep confidential (other than as may be permitted or required under this Agreement) information provided to, or reviewed or accessed by, Buyer or its Representatives pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the provisions of this Section 6.5 shall nonetheless continue in full force and effect.  From and after the Closing, Sellers shall, and shall cause their Affiliates to, hold, and shall use its commercially reasonable efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business (the "***Business Confidential Information***"), except to the extent that Sellers can show that such information (a) is generally available to and known by the public through no fault of a Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by a Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If a Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, such Seller or such Seller's Representative shall promptly notify Buyer in writing and shall disclose only that portion of such information which such Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* such Seller shall use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

6.6     **Books and Records**. In order to facilitate the resolution of any claims made against or incurred by a Seller prior to the Closing or the continuing administration of the Bankruptcy Case for a period of three years after the Closing, Buyer shall retain the Books and Records that are Purchased Assets relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of such Seller; and upon reasonable notice, afford such Seller Representatives reasonable access (including the right to make, at such Seller's expense, photocopies), during normal business hours, to such Books and Records.

6.7     **Closing Conditions**.  From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VII hereof.

6.8     **Receivables**. From and after the Closing, if a Seller or any of its Affiliates receives or collects any funds relating to any Accounts Receivable or any other Purchased Asset, such Seller or its Affiliate shall remit such funds to Buyer within a reasonable period of time after its receipt thereof. From and after the Closing, if Buyer or its Affiliate receives or collects any funds relating to any Excluded Asset, Buyer or its Affiliate shall remit any such funds to Seller Representative within a reasonable period of time after its receipt thereof.

6.9     **Transfer Taxes**. Any sales, purchases, transfer, stamp, documentary stamp, use, or similar taxes, if any, that may be payable by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated herein shall be borne and timely paid by Buyer.

6.10     **Prorations**.  Rent, Taxes (other than Taxes imposed or assessed on income), utilities, and prepaid expenses related to the Purchased Assets shall be prorated between Sellers and Buyer as of the Closing Date; provided that, for the avoidance of doubt, all property Taxes shall be pro-rated based on the period to which the tax applies without regard to the date of assessment.  All obligations due in respect of periods prior to and including the Closing Date, unless included as an Assumed Liability, shall be the obligations of Sellers, and all obligations due in respect of periods after the Closing Date shall be the obligations of and shall be paid in full or otherwise satisfied by Buyer; provided that amounts that Buyer is obligated to pay under this Section 6.10 shall be treated as a credit to Sellers at Closing (and paid by Buyer to Sellers in cash at Closing) to the extent that the amount either (i) was already paid by or on behalf of a Seller prior to the Closing or (ii) is a Tax for which the Sale Order provides for such obligation to attach to the Purchase Price, in which case such Tax obligation shall be retained by Sellers.  For purposes of this Section 6.10, rent shall be prorated on the basis of a thirty (30) day month.

6.11     **Further Assurances.**  Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

6.12     **Bankruptcy Court Matters**.

(a)     This Agreement is the "Stalking Horse APA" referenced in the Bidding Procedures Order. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher and/or otherwise better competing bids that are otherwise consistent with the Bid Procedures (each a "*Competing Bid*"). From the Effective Date and until the designation of a Winning Bidder, Sellers are permitted to cause Seller Representatives and Affiliates to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by, any Person (in addition to Buyer and Buyer's affiliates, agents and representatives) in connection with any sale or other disposition of the Sellers' assets or equity interests. In addition, Sellers may respond to any inquiries or offers to purchase all or any part of the Purchased Assets or equity interests in Sellers and perform any and all other acts related thereto that are required under the Bankruptcy Code, the Bidding Procedures Order, or other applicable Law, including supplying information relating to the Business and the assets of Sellers or any of its Affiliates to prospective purchasers. Sellers acknowledge and agree that Buyer is a Qualified Bidder (for purposes of, and as such term is defined in, the Bid Procedures), and to the extent that any additional Qualified Bids (as such term is defined in the Bid Procedures) are timely submitted, Buyer shall be entitled to participate at the Auction. If no Qualified Bids (other than the bid of Buyer) are timely received, the Auction shall be cancelled and Sellers shall take all actions, in accordance with the Bid Procedures and subject to the terms hereof, necessary to consummate the transactions contemplated by this Agreement.

(b)     At the Sale Hearing or such other hearing agreed to by Sellers and Buyer, if Buyer is designated as the Winning Bidder, Sellers shall seek an order of the Bankruptcy Court, which order may be an order (the "*Sale Order*"), in form and substance reasonably acceptable to Buyer, that among things: (i) approves the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement, and authorizes Sellers to proceed with the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and the Sale Order, (ii) includes a specific finding that Buyer is a good faith purchaser of the Purchased Assets within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to the protections of Section 363(m) of the Bankruptcy Code, (iii) states that the sale of the Purchased Assets to Buyer shall be free and clear of all Encumbrances (except as expressly provided in this Agreement), (iv) contains Seller release and exculpation provisions with respect to Buyer; and (v) approves Sellers' assumption and assignment to Buyer of the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code subject to Buyer's satisfaction of the Cure Costs and Buyer's ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts. Buyer shall provide a copy of such financial information as may be required by the Bankruptcy Court to demonstrate Buyer's ability to assume, or to take an assignment of, the Assigned Contracts. Both Buyer's and Sellers' obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order or such other order in form and substance acceptable to Buyer (the "*Other Acceptable Order*").

(c)     Sellers and Buyer agree that, in the event that Buyer is not the Winning Bidder at the Auction, and the Alternative Transaction with the Winning Bidder does not close, if and only if Buyer is the Backup Bidder, Buyer shall promptly consummate the transactions set forth in this Agreement upon the terms and conditions as set forth herein, including the Purchase Price as the same may be modified by Buyer at the Auction. The parties hereto acknowledge that time is of the essence in achieving Closing and shall undertake all commercially reasonable efforts to reach Closing in a timely manner.

(d)     If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for rehearing or

reargument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that nothing herein shall preclude the parties hereto from consummating the transactions contemplated herein if the Sale Order or the Other Acceptable Order shall have been entered and has not been stayed in which event Buyer shall be able to assert the benefits of Section 363(m) of the Bankruptcy Code.

6.13    **Bulk Sales Laws**.  The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

6.14    **Employee Matters**.

(a)    Sellers shall provide Buyer with a list of all current Employees of each Seller. At least three (3) Business Days prior to the Closing Date, Buyer will provide Sellers with a schedule setting forth a list of the names of employees who Buyer shall offer to employ (each an "*Offeree*"). Prior to the Closing, Buyer shall offer (or cause a designee of Buyer to offer) to employ the Offerees (i) to operate the Continuing Restaurants, with employment commencing as of the Closing Date or (ii) to be employed in the Buyer's head office with employment commencing on the Closing Date. Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "*Transferred Employee*." Each Seller shall, effective as of the day prior to the Closing Date, discharge all current employees who are Transferred Employees.  Except to the extent Sellers fail to comply in any material respects with <u>Section 6.14(b)(i)</u> and <u>Section 6.14(b)(iii)</u>, Buyer hereby agrees that the written offer to an Offeree shall include a level of base salary, wages and benefits that are substantially comparable in the aggregate to the base salary, wages and benefits provided to such Offeree by Sellers as of the Closing Date.

(b)    Following the date of this Agreement:

(i)    Sellers shall allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the current employees who are members of executive management and other employees reasonably requested during normal business hours;

(ii)    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under <u>Section 6.14(a)</u> to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

(iii)    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Offeree;

(iv)    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all employees of Sellers. Seller shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all employees of Sellers as of such date; and

(v)     Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Closing Date with respect to all Transferred Employees. Buyer shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees. In addition, Buyer shall (or shall cause its designee to) process all employee and Tax reporting covering the periods prior to the Closing in connection with the Transferred Employees that will be required to be prepared and delivered after the Closing; provided, that the foregoing shall not be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment of any specific person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

6.15    **Publicity**.  Except as required by the Bankruptcy Court in connection with the Bankruptcy Case, on the Closing Date in forms mutually agreeable to Sellers and Buyer, Buyer and Sellers will not issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party, which approval may not be unreasonably withheld, except that such consent shall not be required in connection with ordinary or required pleadings made by any Seller in the Bankruptcy Court or if disclosure is otherwise required by applicable Law or by the Bankruptcy Court; provided, however, that Buyer or Sellers, as applicable, will use its or their commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text of any such required disclosure; provided, further, that nothing in this Section 6.15 shall restrict Buyer and its Affiliates' disclosure of information regarding the transactions contemplated hereby, including information related to Buyer's determination to enter into this Agreement, to investors or prospective investors of Buyer or its Affiliates.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1    **Conditions to Obligations of All Parties**.  The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

(a)     [Reserved]

(b)     The Bankruptcy Court shall have entered the Sale Order or the Other Acceptable Order in the Bankruptcy Case, authorizing the transactions set forth in this Agreement and approving this Agreement, in form and substance reasonably acceptable to Sellers and Buyer, and as of the Closing Date the Sale Order or the Other Acceptable Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed, and shall have become a final order.

(c)     [Reserved]

(d)     No injunction, stay, or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays, or prohibits the consummation of the transactions set forth in this Agreement.

7.2     **Conditions to Obligations of Buyer**. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Sellers contained in Section 4.1, Section 4.2, and Section 4.7, the representations and warranties of Sellers contained in Article IV of this Agreement delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Sellers contained in Section 4.1, Section 4.2, and Section 4.7 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Sellers shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by Sellers prior to or on the Closing Date; *provided, that*, with respect to agreements, covenants and conditions that are qualified by materiality, Sellers shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)     Sellers shall have delivered to Buyer duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.2(a).

(d)     Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller Representative, that each of the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied (the "***Seller Closing Certificate***").

(e)     To the extent applicable, Buyer shall have received a certificate pursuant to Treasury Regulations Section 1.1445-2(b) (the "***FIRPTA Certificate***") that each Seller is not a foreign person within the meaning of Section 1445 of the Code duly executed by such Seller.

(f)     The Bankruptcy Court shall approve the terms of the Excluded IP License set forth in Section 3.3 and the Sale Order shall so find and hold.

(g)     From the Effective Date until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect.

7.3    **Conditions to Obligations of Sellers**. The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Sellers' waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the representations and warranties of Buyer contained in Section 5.1, Section 5.2 and Section 5.4, the representations and warranties of Buyer contained in this Agreement delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained in Section 5.1, Section 5.2 and Section 5.4 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by Buyer prior to or on the Closing Date; *provided, that*, with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)    Buyer shall have delivered to Seller Representative duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.2(b).

(d)    Seller Representative shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied (the "***Buyer Closing Certificate***").

(e)    Seller Representative shall have received a certificate of the Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of the Sale Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

7.4    **Frustration of Closing Conditions.**  With respect to the conditions to Buyer's and Sellers' respective obligations to consummate the transactions contemplated by this Agreement as provided hereunder and each such party's right to terminate this Agreement as provided herein, neither Buyer nor any Seller may rely on the failure of any condition set forth in this Article VII to be satisfied if such failure was caused by such party's material breach, or failure to act in good faith or to use its commercially reasonable efforts to cause the condition to be satisfied to the extent required.

## ARTICLE VIII

## TERMINATION

8.1    **Termination**. This Agreement may be terminated at any time prior to the Closing:

(a)        by the mutual written consent of Seller Representative and Buyer;

(b)        by Buyer by written notice to Seller Representative if:

(i)        Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by a Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in <u>Article VII</u> and such breach, inaccuracy or failure has not been cured within three (3) Business Days of Seller Representative's receipt of written notice of such breach from Buyer;

(ii)        any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.2</u> shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Outside Date**,** unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)        if the Bankruptcy Case is dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or upon the appointment of a trustee or other Person responsible for operation or administration of Sellers or their business or assets, or a responsible officer for any Seller, or an examiner with enlarged powers relating to the operation or administration of the applicable Seller or its business or assets;

(iv)        upon the occurrence of an event of default under the DIP Order, including failure to satisfy the milestones in connection therewith; or

(v)        if following entry by the Bankruptcy Court of the Sale Order or the Other Acceptable Order, the Sale Order or the Other Acceptable Order is amended, modified or supplemented without Buyer's prior written consent or is voided, reversed or vacated.

(c)        by Seller Representative by written notice to Buyer if:

(i)        No Seller is then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in <u>Article VII</u> and such breach, inaccuracy or failure has not been cured by Buyer within three (3) Business Days of Buyer's receipt of written notice of such breach from Seller Representative; or

(ii)        any of the conditions set forth in <u>Section 7.1</u> or <u>Section 7.3</u> shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)        by Buyer or Seller Representative in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

(e)     automatically, if Sellers enter into a definitive agreement with respect to an Alternative Transaction and the Bankruptcy Court enters an Order approving an Alternative Transaction; provided, however, that if the Auction is held and Buyer is designated as the Backup Bidder than this Agreement shall not terminate pursuant to this Section 8.1(e) until the closing of the Alternative Transaction.

(f)     the Bankruptcy Court enters an Order that otherwise precludes the consummation of the transactions set forth herein on the terms and conditions set forth in this Agreement, subject to any limitations set forth in the Bidding Procedures Order.

8.2     **Effect of Termination**. In the event of the termination of this Agreement in accordance with this Article VIII, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)     as set forth in this Article VIII and Section 6.5 hereof; and

(b)     that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

# ARTICLE IX

## MISCELLANEOUS

9.1     **Expenses**. Except as otherwise expressly provided herein or in the DIP order, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

9.2     **Seller Representative**.

(a)     Each Seller irrevocably appoints BC Hospitality as the representative, agent and proxy for such Seller (the "*Seller Representative*") for all purposes under this Agreement and Sale Documents, including the full power and authority to act on such Seller's behalf to: (i) consummate the transactions contemplated by the Sale Documents, (ii) negotiate disputes arising under, or relating to the Sale Documents, (iii) receive and disburse to such Seller any funds received on behalf of Sellers under the Sale Documents, (iv) withhold any amounts received on behalf of Sellers pursuant to the Sale Documents or otherwise to satisfy any and all obligations or liabilities incurred by Sellers of the Seller Representative in the performance of its duties hereunder or thereunder, (v) execute and deliver any amendment or waiver to this Agreement or the Sale Documents (in each case, without the prior approval of Sellers), and (vi) take all other actions to be taken by or on behalf of Sellers in connection with the Sale Documents. Sellers further agree that such agency and proxy are coupled with an interest, are therefore irrevocable without the consent of the Seller Representative and shall survive the bankruptcy, dissolution or liquidation of any Seller. All decisions and actions by the Seller Representative shall be binding upon all of the Sellers, and no Seller shall have the right to object, dissent, protest or otherwise contest the same. The Seller Representative shall have no duties or obligations hereunder, including any fiduciary duties, except those set forth herein, and such duties and obligations shall be determined solely by the express provisions of this Agreement.

(b)        Each Seller severally, for itself only and not jointly, agrees to indemnify and hold harmless the Seller Representative and its Representatives against all expenses (including reasonable attorneys' fees), judgments, fines and amounts incurred by such Persons in connection with any action, suit or proceeding to which the Seller Representative or such other Person is made a party by reason of the fact that it is or was acting as, or at the direction of, the Seller Representative pursuant to the terms of this Agreement.

(c)        Neither the Seller Representative nor any of its Representatives shall incur any liability to any Seller by virtue of the failure or refusal of such Persons for any reason to consummate the transactions contemplated hereby or relating to the performance of their duties hereunder, except for actions or omissions constituting intentional and knowing fraud.  The Seller Representative and its Representatives shall have no liability in respect of any action, claim or proceeding brought against such Persons by any Seller, regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise, if such Persons took or omitted taking any action in good faith.

(d)        In the event that the Seller Representative becomes unable or unwilling to continue in its capacity as the Seller Representative, or if the Seller Representative resigns as the Seller Representative, a majority-in-number of the Sellers may, by written consent, appoint a new representative as the Seller Representative.  Notice and a copy of the written consent appointing such new representative and bearing the signatures of a majority-in-number of the Sellers must be delivered to Buyer and each Seller.  Such appointment will be effective upon the later of the date indicated in the consent or the date such consent is received by Buyer.

(e)        Buyer shall be entitled to rely upon any action or decision of, or instruction by, or any document or other paper delivered by, the Seller Representative on behalf of the Sellers (without any obligation to inquire into the authority of the Seller Representative or the genuineness or correctness of such document or other paper or any signature of the Seller Representative), and Buyer shall not be liable to any Seller for any action taken or omitted to be taken by Buyer in such reliance or with respect to actions, decisions and determinations of the Seller Representative.

9.3    **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.3):

If to Seller Representative: BC Hospitality Group Inc.
205 Hudson Street, Suite 1001
New York, NY 10013
Attention: Patrick J. Bartels, Jr., Director
Email: patrick@redanadvisors.com

with a copy (that shall not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Attention:  M. Blake Cleary, Esq.
Email: mbcleary@ycst.com

If to Buyer:

Bain Capital Double Impact Fund, LP and BCIP Double
Impact Associates, L.P.
200 Clarendon Street
Boston, MA 02116
Attention:  Todd Cook
              David Hutchins
Email:  TCook@BainCapital.com
          DHutchins@BainCapital.com

Kitchen Fund, LP and KF-Chloe, LLC
500 Park Avenue, 4th Floor
New York, New York 10022
Attention:  Gregory Golkin
Email:  greg@kitchenfund.com

Qoot International UK Limited
11 Dover Street, First Floor
Mayfair, London W1S 4LH
Attention:  Simon Wright
Email:  simon.wright@qootco.com

Lion/BC LLC
21 Grosvenor Place
London SW1X 7HF
Attention:  Simon Brown,
Attorney for Cottesmore Partners LLP,
Managing Member of Lion/BC LLC

Collab+Consumer I, L.P.
347 Bowery, 2nd Floor
New York, New York 10003
Attention:  Craig Shapiro

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Paul V. Shalhoub, Esq.
              Andrew S. Mordkoff, Esq.

Email: pshalhoub@willkie.com
amordkoff@willkie.com

9.4    **Interpretation**. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules, Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules, Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules, Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

9.5    **Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9.6    **Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

9.7    **Entire Agreement**. This Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits, the Schedules and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control, except as otherwise provided in the Sale Order.

9.8    **Successors and Assigns; Joint and Several Liability**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign its rights or obligations hereunder without the prior written consent of the other parties, which consent shall not be unreasonably withheld or delayed; *provided, however*, that prior to the Closing Date, Buyer may, without the prior written consent of Sellers, assign all or any portion of its rights under this Agreement to one or more of its direct or indirect parent entities or wholly-owned subsidiaries.  No assignment shall relieve the assigning party of any of its obligations hereunder. Notwithstanding anything to the contrary set forth herein, if and when included within the term "Buyer," as used in this Agreement, there is more than one Person, each Person shall be jointly and severally liable for the obligations of Buyer set forth herein, and all notices and

agreements given or made by, with or to any one such Person shall be deemed to have been given or made by, with or to all such Persons included in the term "Buyer."

9.9     **No Third-party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.10     **Amendment and Modification; Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.11     **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

(b)     BUYER AND SELLERS AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (I) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT; OR (II) THE PURCHASED ASSETS AND ASSUMED LIABILITIES ASSUMED PURSUANT TO OR ARISING OUT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT, AND BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.12     **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**BC HOSPITALITY GROUP INC.,** a Delaware corporation
**BC HOSPITALITY GROUP LLC**, a New York limited liability company
**BC INTERNATIONAL LLC**, a Delaware limited liability company
**BC COMMISSARY NJ LLC**, a New York limited liability company
**E2 185 BLEECKER LLC**, a New York limited liability company
**E2 60 WEST 22ND STREET LLC**, a New York limited liability company
**E2 LAFAYETTE LLC**, a New York limited liability company
**BC WILLIAMSBURG LLC**, a New York limited liability company
**BCRC LLC**, a New York limited liability company
**CW SSS LLC**, a New York limited liability company
**BC UNION SQUARE LLC**, a New York limited liability company
**BC 1385 BROADWAY LLC**, a New York limited liability company
**BC 630 LEXINGTON LLC**, a New York limited liability company
**CCSW FENWAY LLC**, a Massachusetts limited liability company
**E2 SEAPORT LLC**, a New York limited liability company
**BC BACK BAY LLC**, a Massachusetts limited liability company
**BC PROVIDENCE LLC**, a Rhode Island limited liability company
**BC SILVER LAKE LLC**, a Delaware limited liability company
**BC CENTURY CITY LLC**, a California limited liability company
**BC WEST HOLLYWOOD LLC**, a California limited liability company

By: _____
Name: Patrick Bartels
Title:  Authorized Person

*[Signature page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER:**

**BAIN CAPITAL DOUBLE IMPACT FUND, LP**,

By:  Bain Capital Double Impact Partners, LP
Its:  General Partner

By:  Bain Double Impact Investors, LLC
Its:  General Partner

By: _____
      Name: Todd Cook
      Title:  Authorized Signatory

**BCIP DOUBLE IMPACT ASSOCIATES, L.P.**,

By:  Boylston Coinvestors, LLC
Its:  General Partner

By: _____
      Name: Todd Cook
      Title:  Authorized Signatory

**KITCHEN FUND, LP**.

By: _____
      Name: Gregory Golkin

**KF-CHLOE, LLC**

By: _____
      Name: Gregory Golkin

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER:**

**BAIN CAPITAL DOUBLE IMPACT FUND, LP**,


By: _____
    Name: Bryan Curran


**BCIP DOUBLE IMPACT ASSOCIATES, L.P.**,


By: _____
    Name: Bryan Curran


**KITCHEN FUND, LP**.,

By: _____
    Name: Gregory Golkin


**KF-CHLOE, LLC**,

By: _____
    Name: Gregory Golkin

**QOOT INTERNATIONAL UK LIMITED**


By: _____
     Name:  Simon Wright



**LION/BC LLC**


By: _____
     Name:  Simon Brown,
            Attorney for Cottesmore Partners LLP,
            Managing Member of Lion/BC LLC



**COLLAB+CONSUMER I, L.P.**


By: _____
     Name:  Craig Shapiro

**QOOT INTERNATIONAL UK LIMITED**


By: _____
     Name:  Simon  Wright



**LION/BC LLC**

By: _____
     Name:  Simon Brown,
             Attorney for Cottesmore Partners LLP,
             Managing Member of Lion/BC LLC



**COLLAB+CONSUMER I, L.P.**


By: _____
     Name:  Craig Shapiro

**QOOT INTERNATIONAL UK LIMITED**


By: _____
    Name:  Simon Wright



**LION/BC LLC**


By: _____
    Name:  Simon Brown,
            Attorney for Cottesmore Partners LLP,
            Managing Member of Lion/BC LLC



**COLLAB+CONSUMER I, L.P.**
By: Collab+Consumer GP, LLC
Its: General Partner


By: _____
    Name:  Craig Shapiro, Managing Director

**SCHEDULE A**

1.  BC Hospitality Group LLC
2.  BC International LLC
3.  BC Commissary NJ LLC
4.  E2 185 Bleecker LLC
5.  E2 60 West 22nd Street LLC
6.  E2 Lafayette LLC
7.  BC Williamsburg LLC
8.  BCRC LLC
9.  CW SSS LLC
10. BC Union Square LLC
11. BC 1385 Broadway LLC
12. BC 630 Lexington LLC
13. CCSW Fenway LLC
14. E2 Seaport LLC
15. BC Back Bay LLC
16. BC Providence LLC
17. BC Silver Lake LLC
18. BC Century City LLC
19. BC West Hollywood LLC

## SCHEDULE 2.1(c) – ASSIGNED CONTRACTS

| | DEBTOR PARTY | COUNTERPARTY | TITLE OF CONTRACT | CONTRACT DATE |
|---|---|---|---|---|
| 1 | BC Hospitality Group Inc. | Trinity Hudson Holdings LLC | Lease Agreement: Lease of Office Space | 5/7/2019 |
| 2 | BC Commissary NJ LLC | Eden Wood Realty, LLC | Lease Agreement: NJ Commissary | 1/29/2016 |
| 3 | E2 185 Bleecker LLC | Matthew Adam Properties, Inc. | Lease Agreement: 185 Bleecker Store | 8/3/2020 |
| 4 | E2 60 West 22nd Street LLC | WGW Associates LLC | Lease Agreement: 60 West 22nd Street Store | 4/1/2020 |
| 5 | E2 Lafayette LLC | Ira Weissman and Iwona Weisman Trustees under Ira Weissman First 2006 Revocable Trust | Lease Agreement: 240 Lafayette Street | 11/30/2020 |
| 6 | BC Williamsburg LLC | Redbridge Bedford, LLC | Lease Agreement: 173 North 3rd Street | 2/23/2016 |
| 7 | BCRC LLC | RCPI Landmark Properties LLC | Lease Agreement: One Rockefeller Center | 6/20/2016 |
| 8 | CW SSS LLC | South Street Seaport LP | Lease Agreement: CW SSS Store | 1/1/2020 |
| 9 | BC Union Square LLC | Union Square-Broadway Associates LLC | Lease Agreement: BC Union Square Store | 12/28/2018 |
| 10 | BC 1385 Broadway LLC | B. Bros. Broadway Realty, LLC | Lease Agreement: BC 1385 Broadway Store | 11/1/2020 |
| 11 | BC 630 Lexington LLC | BP 399 Park Avenue LLC | Lease Agreement: BC 630 Lexington Store | 11/17/2020 |
| 12 | BC Back Bay LLC | BRE Boylston Owner LLC | Lease Agreement: BC Back Bay Store | 10/23/2020 |
| 13 | BC Providence LLC | Carol Baker | Lease Agreement: BC Providence LLC | 1/1/2017 |
| 14 | BC Silver Lake LLC | Mrs. Gooch's Natural Food Markets, Inc. | Lease Agreement: BC Silver Lake LLC | 3/1/2016 |

| | DEBTOR PARTY | COUNTERPARTY | TITLE OF CONTRACT | CONTRACT DATE |
|---|---|---|---|---|
| 16 | BC West Hollywood LLC | West Hollywood Development Co., LLC | Lease Agreement: BC West Hollywood LLC | 8/1/2019 |
| 17 | BC Hospitality Group LLC | Brandibble Co. | Service Agreement | 1/20/2016 |
| 18 | BC Commissary NJ LLC | Active Staffing Services | Temporary Worker Agreement | 7/22/2019 |
| 19 | E2 Lafayette LLC | Square Inc., dba Caviar | Delivery Service Agreement | 8/18/2017 |
| 20 | BC Silver Lake LLC | Square Inc., dba Caviar | Delivery Service Agreement | 12/9/2016 |
| 22 | BC Hospitality Group Inc. | Sysco Metro, LLC and affiliates | Master Distribution Agreement | 1/6/2020 |
| 23 | BC Commissary NJ LLC | Isuzu Finance of America Inc. | Vehicle Lease Agreement | 11/26/2018 |
| 24 | BC Williamsburg LLC | DoorDash | Delivery Service Agreement | 2/20/2020 |
| 25 | BC Hospitality Group Inc. | ezCater | Master Service Agreement | 10/1/2020 |
| 26 | BCRC LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 10/26/2018 |
| 27 | BC Williamsburg LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 28 | E2 Lafayette LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 29 | E2 185 Bleecker LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 30 | E2 60 West 22nd Street LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 31 | CW SSS LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 10/26/2018 |
| 32 | BC Silver Lake LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 33 | BC Back Bay LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 34 | CCSW Fenway LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 35 | E2 Seaport LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 36 | BC Silver Lake LLC | Postmates Inc. | Delivery Service Agreement | 7/26/2016 |
| 37 | BC Hospitality Group Inc. | Ritual Technologies (U.S.) Inc. | Ritual Merchant Agreement | 5/16/2019 |
| 38 | E2 60 West 22nd Street LLC | ShareBite, Inc. | Delivery Service Agreement | 10/1/2019 |
| 39 | BC 1385 Broadway LLC | ShareBite, Inc. | Delivery Service Agreement | 10/1/2019 |
| 40 | CW SSS LLC | ShareBite, Inc. | Delivery Service Agreement | 10/1/2019 |
| 41 | BCRC LLC | ShareBite, Inc. | Delivery Service Agreement | 10/1/2019 |
| 42 | BC Providence LLC | UberEATS (New England) | UberEATS Platform Order Form (Delivery Service Agreement) | 7/18/2018 |
| 43 | E2 60 West 22nd Street LLC | UberEATS (NYC) | UberEATS Platform Order Form (Delivery Service Agreement) | 6/15/2018 |
| 44 | BC Hospitality Group Inc. | W.B. Mason Co., Inc. | Corporate Purchasing Agreement | 7/1/2019 |

| | DEBTOR PARTY | COUNTERPARTY | TITLE OF CONTRACT | CONTRACT DATE |
|---|---|---|---|---|
| 45 | BC Hospitality Group Inc. | OAE Software, LLC | Toast Order Form | 1/1/2020 |
| 46 | BC Hospitality Group Inc. | Baltz & Company, Inc. | Contract for Public Relations Representation | 12/9/2020 |
| 47 | BC Hospitality Group Inc. | Compeat, Inc. | Compeat Services Agreement | 7/10/2018 |
| 48 | BC Hospitality Group Inc. | Harri US, LLC | Talent Technology Subscription Agreement | 9/1/2020 |
| 49 | BC Hospitality Group Inc. | Restaurant HR Group, Inc. | Letter of Agreement, HR, Benefits & Payroll | 2/1/2019 |
| 50 | BC Hospitality Group Inc. | MSG Arena, LLC | Food Provision Agreement | 10/23/2019 |
| 51 | BC International LLC | Qoot International DMCC | Master License Agreement (International) | 1/9/2017 |
| 52 | BC Hospitality Group Inc. | Bite Inc. | SAAS Master Service Agreement | 6/20/2019 |
| 53 | BC Hospitality Group Inc. | Thanx Inc. | Merchant Agreement & Co-Branded Application | 3/29/2019 |
| 54 | BC Hospitality Group LLC | Wisetail LMS | Pricing Worksheet | 12/31/2018 |
| 55 | BC Hospitality Group LLC | Salido Inc. | Salido Merchant Agreement | 12/5/2017 |
| 56 | BC Hospitality Group Inc. | Yext Inc. | Yext Master Subscription Agreement | 11/19/2020 |
| 57 | BC Hospitality Group Inc. | Zero-In Media Inc. | Zero-In Service Level Agreement | 5/14/2019 |

## SCHEDULE 2.2(p) – EXCLUDED INTELLECTUAL PROPERTY ASSETS

I. Trademarks:

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| Australia | BY CHLOE. (AND DESIGN) | by CHLOE. | Registered | 1883600 | Oct-30-2017 | 1883600 | Oct-30-2017 | 29, 30 | Class 29 Food, namely, pre-packaged salads, salads, hummus, veggie burger patties, french fries, cheese substitutes, soups, tofu-based egg-substitute combined with vegetables and/or cheese substitute, seed-based snack bars, nut-based snack bars, snack bars. Class 30 Food, namely pastries, cupcakes, cookies, muffins, dessert bars, non-dairy frozen confections, non-dairy ice cream, non-dairy ice cream confections, ice coffee, veggie burger sandwiches, non-dairy ice cream lollipops, condiments, ketchup, pesto sauce, salad | CCSW LLC (NY LLC) | Oct-30-2027 Renewal Deadline Apr-30-2028 Renewal Grace Period |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | dressing, salsa, non-dairy aioli, substitute cheese sauce, pesto sauce, non-dairy sauces, coffee, iced coffee, tea, vegan cake icing, protein cookies, desert puddings, babkas, pies, cookie dough, cinnamon rolls, doughnuts, cakes, fruit breads, dessert bars in the nature of cakes, brownies, baked goods in the nature of cakes, non-frozen desserts, cake-mixes, dough, cereal based energy bars, cereal bars, rice and pasta salad. | | |
| Australia | BY CHLOE. (AND DESIGN) | by CHLOE. | Registered | 1826766 | Feb-19-2017 | 1826766 | Feb-19-2017 | 43 | Class 43 Restaurant and catering services. | CCSW LLC (NY LLC) | Feb-19-2027 Renewal Deadline Aug-19-2027 Renewal Grace Period |
| Canada | BY CHLOE | | Registered | 1846383 | Jul-07-2017 | TMA1061904 | Nov-05-2019 | | Class GOODS: (Int. Classes 29, 30, 32) | BC Hospitality Group LLC | Nov-05-2029 Renewal |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
|  |  |  |  |  |  |  |  |  | (1) Food, namely pre-packaged salads, salads, hummus, veggie burger patties, French fries. (2) Food, namely pastries, cupcakes, cookies, muffins, dessert bars, non-dairy frozen confections, non-dairy ice cream, non-dairy ice cream lollipops, iced coffee, veggie burger sandwiches; condiments, namely, hummus, ketchup, pesto sauce, salad dressing, salsa; coffee; tea. (3) Beverages, namely non-alcoholic beverages flavored with tea, fruit juices, smoothies. SERVICES: (Int. Classes 35, 39, 43) (1) Franchise services for restaurants, namely, providing advice in the running of establishments as | (NY LLC) | Deadline May-05-2030 Renewal Grace Period |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | franchises, offering technical assistance in the establishment and operation of restaurants; delivery of food by restaurants; catering services; business management advisory services relating to franchising. (2) Restaurant and catering services. | | |
| Canada | BY CHLOE | | Pending | 1893933 | Apr-16-2018 | | | 29, 30, 31, 32 | Class 29 Food, namely, cheese substitutes, soups, tofu-based egg-substitute combined with vegetables and cheese substitute; seed-based snack bars; nut-based snack bars; snack bars namely dried fruit-based snack bars. Class 30 Food, namely, vegan cake icing, protein cookies, dessert puddings, babkas, pies, cookie dough, cinnamon rolls, | BC Hospitality Group LLC (NY LLC) | |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | doughnuts, cakes, fruit breads; brownies; baked goods in the nature of cakes, namely, dessert cakes, snack cakes; non-frozen desserts, namely, cake mixes, dough; cereal based energy bars; cereal bars; condiments, namely, non-dairy aioli, substitute cheese sauce, non-dairy sauces namely vegan mayonnaise, soya sauce, ketchup sauce, salad sauces and barbecue sauce.<br><br>Class 31 Dog food; edible dog treats.<br><br>Class 32 Beverages, namely, vegetable juices, bottled water, sparkling water, beer. | | |
| Canada | BY CHLOE. (AND DESIGN) | by CHLOE. | Registered | 1846380 | Jul-07-2017 | TMA1061900 | Nov-05-2019 | | Class GOODS: (Int. Classes 29, 30, 32) (1) Food, namely pre-packaged salads, salads, hummus, veggie | BC Hospitality Group LLC (NY LLC) | Nov-05-2029 Renewal Deadline May-05-2030 Renew |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | burger patties, French fries. (2) Food, namely pastries, cupcakes, cookies, muffins, dessert bars, non-dairy frozen confections, non-dairy ice cream, non-dairy ice cream lollipops, iced coffee, veggie burger sandwiches; condiments, namely, hummus, ketchup, pesto sauce, salad dressing, salsa; coffee; tea. (3) Beverages, namely non-alcoholic beverages flavored with tea, fruit juices, smoothies.<br><br>SERVICES: (Int. Classes 35, 39, 43) (1) Franchise services for restaurants, namely, providing advice in the running of establishments as franchises, offering technical assistance in the establishment and | | al Grace Period |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | operation of restaurants; delivery of food by restaurants; catering services; business management advisory services relating to franchising. (2) Restaurant and catering services. | | |
| Canada | BY CHLOE. (AND DESIGN) | by CHLOE. | Registered | 1846371 | Jul-07-2017 | TMA1017200 | Mar-13-2019 | 43 | Class 43 Restaurant and catering services. | BC Hospitality Group LLC (NY LLC) | Mar-13-2034 Renewal Deadline Sep-13-2034 Renewal Grace Period |
| European Community | BY CHLOE | | Registered | 017888172 | Apr-16-2018 | 017888172 | Nov-02-2018 | 29, 30, 31, 32, 35 | Class 29 Food, namely pre-packaged prepared salads and prepared salads, hummus, cheese substitutes, soups, tofu-based egg-substitute combined with vegetables and/or cheese substitute, veggie burger patties, French fries; seed-based snack bars; nut-based snack bars; snack | BC Hospitality Group LLC (NY LLC) | Apr-16-2028 Renewal Deadline Oct-16-2028 Renewal Grace Period |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | bars, namely fruit-based snack bars, organic nut-and seed-based snack bars.<br><br>Class 30 Food, namely salad dressings, salsas, vegan cake icing, pastries, cupcakes, cookies, protein cookies, dessert puddings, muffins, babkas, pies, cookie dough, cinnamon rolls, doughnuts, cakes, fruit breads, dessert bars in the nature of cakes; brownies; baked goods in the nature of cakes, including, dessert cakes, snack cakes, crumble bars and fruit bars; iced coffee; veggie burger sandwiches; beverages, namely tea, coffee; non-frozen desserts, including, cake mixes, dough; cereal based energy bars; cereal bars; condiments, | | |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | including, ketchup, non-dairy aioli, substitute cheese sauce, pesto sauce, non-dairy sauces.<br><br>Class 31 Dog food; edible dog treats.<br><br>Class 32 Beverages, namely non-alcoholic beverages, including, non-alcoholic beverages flavored with tea; beverages, namely fruit juices, vegetable juices, bottled water, sparkling water, smoothies, beer.<br><br>Class 35 Franchise services, namely, offering business management assistance in the establishment and operation of restaurants, food delivery services, catering and hospitality businesses being cafes. | | |
| European | BY CHLOE. (AND |  | Registered | 0154171 57 | May-09- | 015417157 | Sep-01- | 43 | Class 43 | BC Hospitality | May-09-2026 |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Community | DESIGN) | | | | 2016 | | 2016 | | Restaurant and catering services. | Group LLC (NY LLC) | Renewal Deadline Nov-09-2026 Renewal Grace Period |
| Japan | BY CHLOE. (AND DESIGN) | by CHLOE. | Registered | 2017-028314 | Mar-06-2017 | 5991874 | Oct-27-2017 | 43 | Class 43 Restaurant and catering services. | CCSW LLC (NY LLC) | Oct-27-2027 Renewal Deadline Apr-27-2028 Renewal Grace Period |
| Kuwait | BY CHLOE. (AND DESIGN) | by CHLOE. | Registered | 180036 | May-04-2016 | 154230 | Apr-08-2018 | 43 | Class 43 Services for providing food and drink; temporary accommodation, Restaurant and catering services. | CCSW LLC (NY LLC) | May-04-2026 Renewal Deadline Nov-04-2026 Renewal Grace Period |
| Saudi Arabia | BY CHLOE. (AND DESIGN) | by CHLOE. | Registered | 1437019224 | Jun-01-2016 | 1437019224 | Oct-18-2016 | 43 | Class 43 Services for providing food and drink; temporary accomodation; Restaurant; Catering (Food and drink—). | BC Hospitality Group LLC (NY LLC) | Feb-09-2026 Renewal Deadline Aug-05-2026 Renewal Grace Period |
| United Arab Emirates | BY CHLOE. (AND | by CHLOE. | Registered | 254839 | Jun-07- | 254839 | Jan-14- | 43 | Class 43 | BC Hospitality | Jun-07-2026 Renew |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | DESIGN) | | | | 2016 | | 2018 | | Restaurant and catering services. | Group LLC (NY LLC) | al Deadline Sep-07-2026 Renewal Grace Period |
| United Kingdom | BY CHLOE | | Registered | 01788881 72 | Apr-16-2018 | UK0091788 8172 | Nov-02-2018 | 29, 30, 31, 32, 35 | Class 29 Food, namely pre-packaged prepared salads and prepared salads, hummus, cheese substitutes, soups, tofu-based egg-substitute combined with vegetables and/or cheese substitute, veggie burger patties, French fries; seed-based snack bars; nut-based snack bars; snack bars, namely fruit-based snack bars, organic nut-and seed-based snack bars.  Class 30 Food, namely salad dressings, salsas, vegan cake icing, pastries, cupcakes, cookies, protein cookies, dessert | BC Hospitality Group LLC (NY LLC) | Apr-16-2028 Renewal Deadline Oct-16-2028 Renewal Grace Period |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | puddings, muffins, babkas, pies, cookie dough, cinnamon rolls, doughnuts, cakes, fruit breads, dessert bars in the nature of cakes; brownies; baked goods in the nature of cakes, including, dessert cakes, snack cakes, crumble bars and fruit bars; iced coffee; veggie burger sandwiches; beverages, namely tea, coffee; non-frozen desserts, including, cake mixes, dough; cereal based energy bars; cereal bars; condiments, including, ketchup, non-dairy aioli, substitute cheese sauce, pesto sauce, non-dairy sauces.<br><br>Class 31 Dog food; edible dog treats.<br><br>Class 32 Beverages, namely non-alcoholic beverages, including, non- | | |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | alcoholic beverages flavored with tea; beverages, namely fruit juices, vegetable juices, bottled water, sparkling water, smoothies, beer. Class 35 Franchise services, namely, offering business management assistance in the establishment and operation of restaurants, food delivery services, catering and hospitality businesses being cafes. | | |
| United Kingdom | BY CHLOE | | Registered | 3304787 | Apr-18-2018 | 3304787 | Aug-17-2018 | 29, 30, 31, 32, 35 | Class 29 Meat substitutes; fish and seafood substitutes; dairy substitutes; egg substitutes; oils and fats; processed fruits, fungi and vegetables (including nuts and pulses); soups and stocks, vegetable extracts; food, including, pre- | BC Hospitality Group LLC (NY LLC) | Apr-18-2028 Renewal Deadline Oct-18-2028 Renewal Grace Period |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
|  |  |  |  |  |  |  |  |  | packaged salads except macaroni, rice and pasta salad, salads not being macaroni, rice and pasta salad, hummus, cheese substitutes, soups, tofu-based egg-substitute combined with vegetables and/or cheese substitute, veggie burger patties, French fries; seed-based snack bars; nut-based snack bars; snack bars.<br><br>Class 30 Convenience food and savoury snacks; baked goods, confectionery, chocolate and desserts; sugars, natural sweeteners, sweet coatings and fillings; ice creams substitutes, frozen yoghurt alternatives and sorbets; processed grains, starches and goods made thereof, baking |  |  |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
|  |  |  |  |  |  |  |  |  | preparations and yeasts substitutes; food, including, salad dressings, salsas, vegan cake icing, pastries, cupcakes, cookies, protein cookies, dessert puddings, muffins, babkas, pies, cookie dough, cinnamon rolls, doughnuts, cakes, fruit breads, dessert bars in the nature of cakes; brownies; baked goods in the nature of cakes, including, dessert cakes, snack cakes, crumble bars and fruit bars; iced coffee; veggie burger sandwiches; beverages, including, tea, coffee; non-frozen desserts, including, cake mixes, dough; cereal based energy bars; cereal bars; condiments, including, ketchup, non-dairy aioli, substitute cheese sauce, pesto |  |  |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | sauce, non-dairy sauces.<br><br>Class 31 Dog food; edible dog treats.<br><br>Class 32 Non-alcoholic beverages; non-alcoholic beverages, including, non-alcoholic beverages flavored with tea; beverages, including, fruit juices, vegetable juices, bottled water, sparkling water, smoothies, beer.<br><br>Class 35 Franchise services; franchise services, including, offering business management assistance in the establishment and operation of restaurants, food delivery services, catering and hospitality businesses being cafes. | | |
| United Kingdom | BY CHLOE. (AND DESIGN) |  | Registered | 0154171 57 | May-09-2016 | UK0091541 7157 | Sep-01-2016 | 43 | Class 43 Restaurant and catering services. | BC Hospitality Group LLC | May-09-2026 Renewal |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | | (NY LLC) | Deadline Nov-09-2026 Renewal Grace Period |
| United Kingdom | BY CHLOE. (AND DESIGN) | by CHLOE. | Registered | 3163621 | May-10-2016 | 3163621 | Aug-12-2016 | 43 | Class 43 Catering services; restaurant services; services for the provision of food and drink. | BC Hospitality Group LLC (NY LLC) | May-10-2026 Renewal Deadline Nov-10-2026 Renewal Grace Period |
| United States of America | BY CHLOE | | Suspended | 87/827301 | Mar-09-2018 | | | 29, 30 | Class 29 Seed-based snack bars; nut-based snack bars; snack bars. Class 30 Non-frozen desserts, including, cake mixes, dough; cereal based energy bars; cereal bars. | BC Hospitality Group LLC (NY LLC) | |
| United States of America | BY CHLOE | | Opposed | 87/536460 | Jul-20-2017 | | | 29, 30, 32, 43 | Class 29 Food, namely, pre-packaged salads except macaroni, rice and pasta salad, salads not being macaroni, rice and pasta salad, hummus, cheese substitutes, | BC Hospitality Group LLC (NY LLC) | |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | soups, tofu-based egg-substitute combined with vegetables and/or cheese substitute, veggie burger patties, French fries.<br><br>Class 30 Food, namely, salad dressings, salsas, vegan cake icing, pastries, cupcakes, cookies, protein cookies, dessert puddings, muffins, babkas, pies, cookie dough, cinnamon rolls, doughnuts, cakes, fruit breads, dessert bars in the nature of cakes; brownies; baked goods in the nature of cakes, namely, dessert cakes, snack cakes, crumble bars and fruit bars; iced coffee; veggie burger sandwiches; beverages, namely, tea, coffee.<br><br>Class 32 | | |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | Beverages, namely, non-alcoholic beverages, namely, non-alcoholic beverages flavored with tea; beverages, namely, fruit juices, vegetable juices, bottles water, sparkling water, smoothies, beer.<br><br>Class 43 Restaurant and catering services. | | |
| United States of America | BY CHLOE | | Opposed | 87/53656 0 | Jul-20-2017 | | | 30, 35 | Class 30 Condiments, namely, ketchup, non-dairy aioli, substitute cheese sauce, pesto sauce, non-dairy sauces.<br><br>Class 35 Franchise services, namely, offering business management assistance in the establishment and operation of restaurants, food delivery services, catering and hospitality businesses being cafes. | BC Hospitality Group LLC (NY LLC) | |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---|---|---|---|---|---|---|---|---|---|---|---|
| United States of America | BY CHLOE | | Opposed | 87/828046 | Mar-09-2018 | | | 31 | Class 31 Dog food; edible dog treats. | BC Hospitality Group LLC (NY LLC) | |
| United States of America | BY CHLOE. (AND DESIGN) |  | Opposed | 87/545183 | Jul-27-2017 | | | 29, 30, 32 | Class 29 Food, namely, pre-packaged salads except macaroni, rice and pasta salad, salads not being macaroni, rice and pasta salad, hummus, cheese substitutes, soups, tofu-based egg-substitute combined with vegetables and/or cheese substitute, veggie burger patties, French fries.  Class 30 Food, namely, salad dressings, salsas, vegan cake icing, pastries, cupcakes, cookies, protein cookies, dessert puddings, muffins, babkas, pies, cookie dough, cinnamon rolls, doughnuts, | BC Hospitality Group LLC (NY LLC) | |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | cakes, fruit breads, dessert bars in the nature of cakes; brownies; baked goods in the nature of cakes, namely, dessert cakes, snack cakes, crumble bars and fruit bars; iced coffee; veggie burger sandwiches; beverages, namely, tea, coffee. Class 32 Beverages, namely, non-alcoholic beverages, namely, non-alcoholic beverages flavored with tea; beverages, namely, fruit juices, vegetable juices, bottles water, sparkling water, smoothies, beer. | | |
| United States of America | BY CHLOE. (AND DESIGN) |  | Registered | 86/474876 | Dec-09-2014 | 4833607 | Oct-13-2015 | 43 | Class 43 Restaurant and catering services. | BC Hospitality Group LLC (NY LLC) | Oct-13-2021 Section 15 Deadline Oct-13-2021 Section 8 Deadline Apr-13-2022 |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | | | Sections 8 & 15 Grace Period Oct-13-2025 Section 8 & 9 Renewal Deadline Apr-13-2026 Section 8 & 9 Renewal Grace Period |
| United States of America | MUNCHIES BY CHLOE (AND DESIGN) |  | Suspended | 88/045363 | Jul-19-2018 | | | 29, 30, 31, 32 | Class 29 Food, including, pre-packaged salads except macaroni, rice and pasta salad, salads not being macaroni, rice and pasta salad, hummus, cheese substitutes, soups, tofu-based egg-substitute combined with vegetables and/or cheese substitute, veggie burger patties, French fries; seed-based snack bars; nut-based snack bars; snack bars; almond milk; | BC Hospitality Group LLC (NY LLC) | |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | almond milk-based beverages.<br><br>Class 30 Food, including, salad dressings, salsas, puddings, vegan cake icing, pastries, cupcakes, cookies, protein cookies, dessert puddings, muffins, babkas, pies, cookie dough, cinnamon rolls, doughnuts, cakes, fruit breads, dessert bars in the nature of cakes; brownies; baked goods in the nature of cakes, including, dessert cakes, snack cakes, crumble bars and fruit bars; iced coffee; beverages, including, tea, coffee, espresso; non-frozen desserts, including, cake mixes, dough; cereal based energy bars; cereal bars; condiments, including, ketchup, non-dairy aioli, substitute cheese | | |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---------|------|-------|--------|----------|-----------|----------|-----------|----------------|----------------|-------|----------------|
| | | | | | | | | | sauce, pesto sauce, non-dairy sauces; veggie burger sandwiches. Class 31 Dog food; edible dog treats. Class 32 Beverages, including, non-alcoholic beverages, including, non-alcoholic beverages flavored with tea; fruit juices, vegetable juices, bottled water, sparkling water, smoothies, beer. | | |
| United States of America | SWEETS BY CHLOE. (AND DESIGN) | | Published | 87/954174 | Jun-08-2018 | | | 16 | Class 16 Stationery; greeting cards. | BC Hospitality Group LLC (NY LLC) | |
| United States of America | SWEETS BY CHLOE. (AND DESIGN) | | Suspended | 87/932889 | May-23-2018 | | | 29, 30, 32, 43 | Class 29 Almond milk; almond milk-based beverages. Class 30 Food, including, puddings, vegan cake icing, pastries, cupcakes, cookies, protein cookies, dessert | BC Hospitality Group LLC (NY LLC) | |

| Country | Mark | Image | Status | App. No. | App. Date | Reg. No. | Reg. Date | Int. Class(es) | Goods/Services | Owner | Next Deadlines |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | puddings, muffins, babkas, pies, cookie dough, cinnamon rolls, doughnuts, cakes, fruit breads, dessert bars in the nature of cakes; brownies; baked goods in the nature of cakes, including, dessert cakes, snack cakes, crumble bars and fruit bars; iced coffee; beverages, including, tea, coffee, espresso.<br><br>Class 32 Beverages, including, non-alcoholic beverages, including, non-alcoholic beverages flavored with tea; beverages, including, fruit juices.<br><br>Class 43 Restaurant and catering services. | | |
| United States of America | WOOF BY CHLOE. (AND DESIGN) |  | Opposed | 87/864135 | Apr-05-2018 | | | 31 | Class 31 Dog food; edible dog treats. | BC Hospitality Group LLC (NY LLC) | |

II. Domain Names

1.   beyondmothersday.com
2.   blogbychloe.com
3.   burgersbychloe.com
4.   bychloe.ca
5.   bychloe.co
6.   bychloe.us
7.   bychloeaustin.com
8.   bychloeboston.com
9.   bychloeca.com
10.  bychloechi.com
11.  bychloedc.com
12.  bychloenyc.com
13.  bychloesa.com
14.  bychloeuae.com
15.  bychloeuk.com
16.  chillbychloe.com
17.  eatbychloe.ca
18.  eatbychloe.co.uk
19.  eatbychloeau.com
20.  eatbychloeca.com
21.  eatbychloede.com
22.  eatbychloehk.com
23.  eatbychloein.com
24.  eatbychloejp.com
25.  eatbychloeuae.com
26.  eatbychloeuk.com
27.  feelzbychloe.com
28.  foodbychloe.com
29.  icecreambychloe.com
30.  sweetsbychloe.com
31.  blogbychefchloe.com
32.  bychefchloe.com
33.  bychefchloeblog.com
34.  chefchloecoscarelli.com
35.  chloecoscarellinyc.com
36.  sweetsbychefchloe.com

## SCHEDULE 2.2(c) – EXCLUDED ASSETS

None.

## SCHEDULE 4.3 – CONSENTS

None.

## SCHEDULE 4.5(a) – LEGAL PROCEEDINGS

A lawsuit was filed in the District Court in the Southern District of New York ("***SDNY District Court***") against BC Hospitality Group LLC (the "***Company***") and ESquared Hospitality LLC, a member of the Company as of the date of the complaint, by Chloe Coscarelli, Chef Chloe LLC, CC Hospitality Holdings LLC, and CKC Sales LLC ("***Plaintiffs***") asserting twenty-one (21) claims including, among others, breach of contract, unjust enrichment, and federal trademark and cyber piracy violations.  Plaintiffs sought a preliminary injunction preventing the Company from launching or participating in retail food sales under the "by Chloe." name, alleging that such sales breached the Company's operating agreement and Name, Face and Likeness Agreement (the "***NFL Agreement***") entered into among the parties on November 7, 2014.

The SDNY District Court denied Plaintiffs' request for a preliminary injunction on the basis that the Plaintiffs failed to demonstrate a likelihood of success on the merits that the NFL Agreement had been breached.  In reaching this conclusion, the SDNY District Court decided that the Company owns the "by Chloe." trademark "outright." *Coscarelli v. ESquared Hosp. LLC*, 364 F.Supp.3d 207, 224.

On January 10, 2020, the Company filed a summary judgment motion seeking to dismiss all remaining claims.  The Plaintiffs cross-moved for summary judgment on February 7, 2020.  As of the effective date of the Agreement, the SDNY District Court has not scheduled a hearing or issued a ruling on the summary judgment motions.

**SCHEDULE 4.8 – PERMITS**

| Debtor | Food Permit Number | Food Permit Exp |
|---|---|---|
| E2 185 Bleecker LLC | 50032704 | 2/28/2021 |
| E2 60 West 22nd Street LLC | 50050905 | 5/31/2021 |
| E2 Lafayette LLC | 50049471 | 4/30/2021 |
| BCRC LLC | 50070960 | 10/31/2021 |
| CW SSS LLC | 50080676 | 7/31/2021 |
| BC Williamsburg LLC | 50061001 | 3/31/2021 |
| BC Silver Lake LLC | PR0180989 | 6/30/2020 |
| BC Back Bay | 354679 | 12/31/2021 |
| BC Commissary NJ | 0015253 | 4/30/2020 |
| BC Providence LLC | FSV32548 | 4/30/2021 |
| BC 1385 Broadway LLC | 50095138 | 7/31/2021 |
| BC 630 Lexington LLC | 50098645 | 9/30/2021 |
| BC Union Square LLC | 50098661 | 9/30/2021 |

## SCHEDULE 4.10(a) – LEASED PROPERTY

| Debtor Party | Counterparty | Location | Date of Lease Agreement |
|---|---|---|---|
| E2 185 Bleecker LLC | Matthew Adam Properties, Inc. | 185 Bleecker Street<br>New York, New York | 8/3/2020 |
| E2 60 W 22nd Street LLC | WGW Associates LLC | 60 W. 22nd Street<br>New York, New York | 8/13/2015 |
| E2 Lafayette LLC | Ira Weissman and Iwona Weisman Trustees | 240 Lafayette Street<br>New York, New York | 11/30/2015 |
| BC Commissary NJ LLC | Eden Wood Realty, LLC | 150 Pacific Avenue<br>Jersey City, NJ | 1/29/2016 |
| BC Williamsburg LLC | Redbridge Bedford, LLC | 173 North 3rd Street, Brooklyn, New York | 2/23/2016 |
| BCRC LLC | RCPI Landmark Properties LLC. | One Rockefeller Plaza,<br>Rockefeller Center<br>New York, New York | 6/20/2016 |
| CW SSS LLC | South Street Seaport LP. | South Street Seaport Schermerhorn Building 181, Front St.<br>New York, New York | 1/1/2020 |
| BC 1385 Broadway LLC | B. Bros Broadway Realty, LLC | Stores 5 and 6<br>1385 Broadway<br>New York, New York | 10/29/2018 |
| BC Union Square LLC | Union Square-Broadway Associates LLC | 29 Union Square West 16th Street (between Broadway and 5th) | 12/18/2018 |
| BC 630 Lexington LLC | BP 399 Park Avenue LLC | 399 Park Avenue<br>New York, New York | 11/17/2020 |
| BC Hospitality Group Inc. | Trinity Hudson Holdings LLC | 205 Hudson Street, New York, New York 10013 | 5/7/2019 |
| BC Silver Lake LLC | Mrs. Gooch's Natural Food Markets, Inc. | 2520 Glendale Blvd Silver Lake | 3/1/2016 |

| BC West Hollywood LLC | West Hollywood Development Co., LLC | 8550 Santa Monica Blvd West Hollywood | 8/1/2019 |
|---|---|---|---|
| BC Century City LLC | Century City Mall, LLC | 10250 Santa Monica Blvd Los Angeles, California | 10/18/2019 |
| BC Providence LLC | Carol Baker | 223 Thayer St Providence, RI | 9/28/2016 |
| BC Back Bay LLC | BRE Boylston Owner LLC | 399 Boylston Street Boston, Massachusetts | 10/23/2020 |

# **EXHIBIT 3**

## **Assigned Contracts**

# ASSIGNED CONTRACTS

| # | DEBTOR PARTY | COUNTERPARTY | TITLE OF CONTRACT | CONTRACT DATE |
|---|---|---|---|---|
| 1 | BC Hospitality Group Inc. | Trinity Hudson Holdings LLC | Lease Agreement: Lease of Office Space | 5/7/2019 |
| 2 | BC Commissary NJ LLC | Eden Wood Realty, LLC | Lease Agreement: NJ Commissary | 1/29/2016 |
| 3 | E2 185 Bleecker LLC | Matthew Adam Properties, Inc. | Lease Agreement: 185 Bleecker Store | 8/3/2020 |
| 4 | E2 60 West 22nd Street LLC | WGW Associates LLC | Lease Agreement: 60 West 22nd Street Store | 4/1/2020 |
| 5 | E2 Lafayette LLC | Ira Weissman and Iwona Weisman Trustees under Ira Weissman First 2006 Revocable Trust | Lease Agreement: 240 Lafayette Street | 11/30/2020 |
| 6 | BC Williamsburg LLC | Redbridge Bedford, LLC | Lease Agreement: 173 North 3rd Street | 2/23/2016 |
| 7 | BCRC LLC | RCPI Landmark Properties LLC | Lease Agreement: One Rockefeller Center | 6/20/2016 |
| 8 | CW SSS LLC | South Street Seaport LP | Lease Agreement: CW SSS Store | 1/1/2020 |
| 9 | BC Union Square LLC | Union Square-Broadway Associates LLC | Lease Agreement: BC Union Square Store | 12/28/2018 |
| 10 | BC 1385 Broadway LLC | B. Bros. Broadway Realty, LLC | Lease Agreement: BC 1385 Broadway Store | 11/1/2020 |
| 11 | BC 630 Lexington LLC | BP 399 Park Avenue LLC | Lease Agreement: BC 630 Lexington Store | 11/17/2020 |
| 12 | BC Back Bay LLC | BRE Boylston Owner LLC | Lease Agreement: BC Back Bay Store | 10/23/2020 |
| 13 | BC Providence LLC | Carol Baker | Lease Agreement: BC Providence LLC | 1/1/2017 |
| 14 | BC Silver Lake LLC | Mrs. Gooch's Natural Food Markets, Inc. | Lease Agreement: BC Silver Lake LLC | 3/1/2016 |
| 15 | BC West Hollywood LLC | West Hollywood Development Co., LLC | Lease Agreement: BC West Hollywood LLC | 8/1/2019 |

| | DEBTOR PARTY | COUNTERPARTY | TITLE OF CONTRACT | CONTRACT DATE |
|---|---|---|---|---|
| 16 | BC Hospitality Group LLC | Brandibble Co. | Service Agreement | 1/20/2016 |
| 17 | BC Commissary NJ LLC | Active Staffing Services | Temporary Worker Agreement | 7/22/2019 |
| 18 | E2 Lafayette LLC | Square Inc., dba Caviar | Delivery Service Agreement | 8/18/2017 |
| 19 | BC Silver Lake LLC | Square Inc., dba Caviar | Delivery Service Agreement | 12/9/2016 |
| 20 | BC Hospitality Group Inc. | Sysco Metro, LLC and affiliates | Master Distribution Agreement | 1/6/2020 |
| 21 | BC Williamsburg LLC | DoorDash | Delivery Service Agreement | 2/20/2020 |
| 22 | BC Hospitality Group Inc. | ezCater | Master Service Agreement | 10/1/2020 |
| 23 | BCRC LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 10/26/2018 |
| 24 | BC Williamsburg LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 25 | E2 Lafayette LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 26 | E2 185 Bleecker LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 27 | E2 60 West 22nd Street LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 28 | CW SSS LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 10/26/2018 |
| 29 | BC Silver Lake LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 30 | BC Back Bay LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 31 | CCSW Fenway LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 32 | E2 Seaport LLC | Grubhub Holdings Inc. | Delivery Service Agreement | 11/1/2018 |
| 33 | BC Silver Lake LLC | Postmates Inc. | Delivery Service Agreement | 7/26/2016 |
| 34 | BC Hospitality Group Inc. | Ritual Technologies (U.S.) Inc. | Ritual Merchant Agreement | 5/16/2019 |
| 35 | E2 60 West 22nd Street LLC | ShareBite, Inc. | Delivery Service Agreement | 10/1/2019 |
| 36 | BC 1385 Broadway LLC | ShareBite, Inc. | Delivery Service Agreement | 10/1/2019 |
| 37 | CW SSS LLC | ShareBite, Inc. | Delivery Service Agreement | 10/1/2019 |
| 38 | BCRC LLC | ShareBite, Inc. | Delivery Service Agreement | 10/1/2019 |
| 39 | BC Providence LLC | UberEATS (New England) | UberEATS Platform Order Form (Delivery Service Agreement) | 7/18/2018 |
| 40 | E2 60 West 22nd Street LLC | UberEATS (NYC) | UberEATS Platform Order Form (Delivery Service Agreement) | 6/15/2018 |
| 41 | BC Hospitality Group Inc. | W.B. Mason Co., Inc. | Corporate Purchasing Agreement | 7/1/2019 |
| 42 | BC Hospitality Group Inc. | OAE Software, LLC | Toast Order Form | 1/1/2020 |
| 43 | BC Hospitality Group Inc. | Baltz & Company, Inc. | Contract for Public Relations Representation | 12/9/2020 |
| 44 | BC Hospitality Group Inc. | Compeat, Inc. | Compeat Services Agreement | 7/10/2018 |

| | DEBTOR PARTY | COUNTERPARTY | TITLE OF CONTRACT | CONTRACT DATE |
|---|---|---|---|---|
| 45 | BC Hospitality Group Inc. | Harri US, LLC | Talent Technology Subscription Agreement | 9/1/2020 |
| 46 | BC Hospitality Group Inc. | Restaurant HR Group, Inc. | Letter of Agreement, HR, Benefits & Payroll | 2/1/2019 |
| 47 | BC Hospitality Group Inc. | MSG Arena, LLC | Food Provision Agreement | 10/23/2019 |
| 48 | BC International LLC | Qoot International DMCC | Master License Agreement (International) | 1/9/2017 |
| 49 | BC Hospitality Group Inc. | Bite Inc. | SAAS Master Service Agreement | 6/20/2019 |
| 50 | BC Hospitality Group Inc. | Thanx Inc. | Merchant Agreement & Co-Branded Application | 3/29/2019 |
| 51 | BC Hospitality Group LLC | Wisetail LMS | Pricing Worksheet | 12/31/2018 |
| 52 | BC Hospitality Group LLC | Salido Inc. | Salido Merchant Agreement | 12/5/2017 |
| 53 | BC Hospitality Group Inc. | Yext Inc. | Yext Master Subscription Agreement | 11/19/2020 |
| 54 | BC Hospitality Group Inc. | Zero-In Media Inc. | Zero-In Service Level Agreement | 5/14/2019 |